ACCEPTED
01-09-00328-CV
FIRST COURT OF APPEALS
HOUSTON, TEXAS
7/6/2015 5:08:20 PM
CHRISTOPHER PRINE
CLERK

*ORAL ARGUMENT REQUESTED*

No. 1-09-00328-CV

FILED IN
1st COURT OF APPEALS
HOUSTON, TEXAS
7/6/2015 5:08:20 PM
CHRISTOPHER A. PRINE
Clerk

In the

# First Court of Appeals

## Houston, Texas

---

Samson Lone Star, Limited Partnership n/k/a Samson Exploration LLC

*Appellant—Cross Appellee,*

v.

Charles G. Hooks III, Individually and as Independent Executor of the Estate of Charles G. Hooks, Jr., as Trustee of the Scott Ira McKeever Trust and the David Wayne McKeever Trust, and on behalf of Chas. G. Hooks & Son, a General Partnership; McKeever Partnership, Ltd.; Charles G. Hooks III and Sue Ann Hooks, as Co-Trustees Under the Will of Charles G. Hooks, Sr.

*Appellees—Cross-Appellants.*

*Appeal from Cause B173008-B, 60th District Court*
*Jefferson County, Texas*

_____

**SAMSON'S SUPPLEMENTAL APPELLANT'S BRIEF**

---

M.C. Carrington
  State Bar No. 03880800
MEHAFFY WEBER P.C.
P.O. Box 16
Beaumont, Texas  77704
Telephone:  (409) 835-5011
Facsimile: (409) 835-5177

Dick Watt
  State Bar No. 20977700
WATT BECKWORTH THOMPSON
HENNEMAN & SULLIVAN LLP
1800 Pennzoil Place, South Tower
711 Louisiana Street
Houston, Texas  77002
Telephone:  (713) 650-8100
Facsimile:  (713) 650-8141

Michael V. Powell
  mpowell@lockelord.com
  State Bar No. 16204400
Cynthia Keely Timms
  ctimms@lockelord.com
  State Bar No. 11161450
LOCKE LORD LLP
2200 Ross Avenue, Suite 2200
Dallas, Texas  75201
Telephone:  (214) 740-8000
Facsimile:   (214) 740-8800

**July 6, 2015**

# NAMES OF ALL PARTIES

The following is a complete list of the names and addresses of all parties to the trial court's final judgment and their counsel:

## APPELLANT/CROSS-APPELLEE

1. Appellant is Samson Lone Star Limited Partnership n/k/a Samson Exploration LLC ("Samson").

2. Samson is represented by the following counsel of record:

   a. Michael V. Powell and Cynthia Keely Timms, Locke Lord LLP, 2200 Ross Avenue, Suite 2200, Dallas, Texas 75201 (appeal).

   b. M.C. Carrington (trial and appeal), Matt Marchak (trial only), and Patricia Chamblin (trial and appeal), Mehaffy Weber, P.C., P.O. Box 16, Beaumont, Texas 77704.

   c. Dick Watt (trial and appeal), T. Neal Nobles (trial), and Katherine W. Strange (trial), Watt Beckworth Thompson & Henneman, L.L.P., 1800 Pennzoil Place, South Tower, 711 Louisiana Street, Houston, Texas 77002.

## APPELLEES/CROSS-APPELLANTS

1. Appellees are Charles G. Hooks III, Individually and as Independent Executor of the Estate of Charles G. Hooks, Jr., as Trustee of the Scott Ira McKeever Trust and the David Wayne McKeever Trust, and on behalf of Chas. G. Hooks & Son, a General Partnership; McKeever Partnership, Ltd; Charles G. Hooks III and Sue Ann Hooks, as Co-Trustees under the Will of Charles G. Hooks, Sr. (the "Plaintiffs").

2. Appellees are represented by the following counsel of record:

   a. David Gunn (appeal), Beck Redden L.L.P., OneHouston Center, 1221 McKinney St., Suite 4500, Houston, Texas 77010-2010

   b. Paul F. Simpson (trial and appeal), McGinnis, Lochridge, & Kilgore, L.L.P., 711 Louisiana Street, Suite 1600, Houston, Texas 77002.

i

c. Pat Lochridge (trial and appeal), Don H. McGee (trial), J. Derrick Price (trial), and Scott S. Cooley (trial), McGinnis, Lochridge, & Kilgore, L.L.P., 600 Congress Ave., Suite 2100, Austin, Texas 78701.

d. Jon B. Burmeister (trial), Moore Landrey, L.L.P., 905 Orleans Street, Beaumont, Texas 77701.

e. Gerald Flatten (trial), Rienstra, Dowell & Flatten, 595 Orleans, Suite 1007, Beaumont, Texas 77701.

f. Shannon H. Ratliff (Tex. S. Ct.) and Marla Broaddus (Tex. S. Ct.), Ratliff Law Firm, PLLC, 600 Congress Avenue, Suite 3100, Austin, Texas 78701.

g. Dale Wainwright (Tex. S. Ct.), Bracewell & Giuliani, LLP, 111 Congress Ave., Suite 2300, Austin, Texas 78701.

# TABLE OF CONTENTS

NAMES OF ALL PARTIES ...................................................................................i

TABLE OF CONTENTS...................................................................................iii

INDEX OF AUTHORITIES.............................................................................. vii

STATEMENT OF THE CASE........................................................................... xii

STATEMENT REGARDING ORAL ARGUMENT ...........................................xiv

ISSUES PRESENTED......................................................................................xv

    A.   Issues Involving Plaintiffs' Fraud Claim.................................................xv

        1.  Fraud....................................................................................xv

        2.  Statute of Limitations for Fraud........................................... xvii

        3.  Fraud Damages.................................................................... xvii

    B.   Issues Involving Plaintiffs' Most Favored Nations Claim ..........................xix

CASE HISTORY ..............................................................................................1

    A.  Fraud .................................................................................................2

    B.  Breach of Lease Claims .......................................................................3

        1.  Most Favored Nations .............................................................3

        2.  Incremental Formation Production............................................5

        3.  Unpooling .............................................................................6

    C.  Post-Judgment Interest .......................................................................7

    D.  Attorneys' Fees..................................................................................7

    E.  Hooks' Cross-Appeal..........................................................................8

    F.  Samson's Appeal Issues on Remand......................................................9

STATEMENT OF FACTS ................................................................................10

A.    Hooks Was a Very Experienced Oil and Gas Attorney ..................................10

B.    Samson Drilled the Black Stone Minerals No. 1 Gas Well...........................11

C.    The Jefferson County Lease Contained Offset Obligations..........................11

D.    Samson Contacted Plaintiffs, Offering to Include 50 Acres of Plaintiffs' Jefferson County Lease in the Unit..............................................13

E.    Hooks Requested a Plat, and Samson Sent Him One, to Show the Location of Plaintiffs' Land within the Unit................................................14

F.    Hooks Testified He Relied on the "1400´± Scaled" Depiction to Determine the Distance of the BSM1 Well from Plaintiffs' Jefferson County Lease ...............................................................................................17

G.    Plaintiffs Agreed to Include their 50 acres in the BSM1 Unit. .....................19

H.    Other Operations Near and on the BSM1 Unit .............................................20

I.    This Lawsuit ..................................................................................................21

SUMMARY OF THE ARGUMENT .........................................................................24

ARGUMENT ............................................................................................................29

A.    Standard of Review.......................................................................................29

B.    There is Legally and Factually Insufficient Evidence of Common Law Fraud...................................................................................................30

    1.    There is legally and factually insufficient evidence of a misrepresentation on which Hooks claims to have relied.......................31

    2.    There is legally and factually insufficient evidence of reliance..............35

    3.    There is legally and factually insufficient evidence Samson intended to defraud Plaintiffs.................................................................36

    4.    There is legally and factually insufficient evidence of a duty to disclose or any failure to disclose .......................................................40

        a.    There is legally and factually insufficient evidence of a *duty* to disclose...............................................................................40

iv

    b.    There is legally and factually insufficient evidence of a
          *failure* to disclose ..................................................................................42

C.    There is Legally and Factually Insufficient Evidence of Statutory
      Fraud................................................................................................................45

      1.    Statutory fraud does not apply to this case because there is no real
            estate transaction of the type required by that statute .............................45

      2.    There is legally and factually insufficient evidence of the elements
            of statutory fraud ...................................................................................46

D.    There is Factually Insufficient Evidence to Support the Jury's Finding
      that Plaintiffs Could Not Have Discovered the Alleged Fraud Claim
      until April 2007 .................................................................................................47

E.    There is Legally and Factually Insufficient Evidence to Support the
      Fraud Damages Finding .....................................................................................51

      1.    Plaintiffs did not prove fraud damages and, instead, proved only
            the same damages they would have presented for the breach of oil
            and gas lease claim they previously lost on summary judgment ............52

      2.    Plaintiffs never pleaded for consequential damages; they only
            pleaded for out-of-pocket damages.........................................................54

      3.    Plaintiffs were not entitled to consequential damages as a part of
            an out-of-pocket measure of recovery ...................................................54

      4.    Furthermore, Plaintiffs could not seek compensatory damages
            unless they set aside the pooling agreement, which is something
            they never sought to do .........................................................................55

      5.    Plaintiffs were not entitled to their compensatory royalty damages
            based on production from the DuJay1 well .............................................56

      6.    The fraud damages improperly include "late charges" of 18%
            compounded monthly..............................................................................57

      7.    The damages have to be reversed because they include
            incremental formation production damages, which the Supreme
            Court held were improper .......................................................................59

8.  If this Court reverses and remands for a new trial on fraud damages, then fraud liability will have to be retried as well ...................60

F.  The Court Must Also Remand the Favored Nations Damages for a Recalculation and Should Determine Issues Regarding the Application of Prejudgment Interest to Newly Awarded Favored Nations Damages........................................................................................61

PRAYER FOR RELIEF ...........................................................................................63

CERTIFICATE OF COMPLIANCE.........................................................................66

CERTIFICATE OF SERVICE .................................................................................67

## **APPENDIX**

Tab

Final Judgment (1Supp2d CR:4-11) .............................................................. Tab A

Charge of the Court (19CR:3262-76) .............................................................. Tab B

Damages Stipulation (Court Ex. A)................................................................. Tab C

*Samson v. Hooks* Ct. App. Opinion (389 S.W.3d 409) .................................... Tab D

*Hooks v. Samson* Tex. S. Ct. Opinion (457 S.W.3d 52).................................... Tab E

# INDEX OF AUTHORITIES

**Page(s)**

**CASES**

*Arbor Windsor Court, Ltd. v. Weekley Homes, LP*,
No. 14-13-00480-CV, 2015 WL 1245548 (Tex. App.—Houston [14th Dist.] Mar. 17, 2015, no pet.)................................................................39

*Baylor Univ. v. Sonnichsen*,
221 S.W.3d 632 (Tex. 2007) ...........................................................52, 55

*Blue Bell, Inc. v. Peat, Marwick, Mitchell & Co.*,
715 S.W.2d 408 (Tex. App.—Dallas 1986, writ ref'd n.r.e.)............................39

*Bradford v. Vento*,
48 S.W.3d 749 (Tex. 2001).................................................32, 40, 46

*Burbage v. Burbage*,
447 S.W.3d 249 (Tex. 2014) ...............................................29, 54

*Burleson State Bank v. Plunkett*,
27 S.W.3d 605 (Tex. App.—Waco 2000, pet. denied)........................................45

*Case Corp. v. Hi-Class Bus. Sys. of Am., Inc.*,
184 S.W.3d 760 (Tex. App.—Dallas 2005, pet. denied)..................................54

*City of Keller v. Wilson*,
168 S.W.3d 802 (Tex. 2005) ...............................................29, 52

*Coastal Oil & Gas Trust v. Garza Energy Trust*,
268 S.W.3d 1 (Tex. 2008)..................................................................52

*Ehrhardt v. Elec. & Instrumentation Unlimited*,
220 F. Supp. 2d 649 (E.D. Tex. 2002).............................................................40

*Ernst & Young, L.L.P. v. Pac. Mut. Life Ins. Co.*,
51 S.W.3d 573 (Tex. 2001)..................................................35, 39

*Fazio v. Cypress/GR Houston I, L.P.*,
403 S.W.3d 390 (Tex. App.—Houston [1st Dist.] 2013, pet. denied) ...............57

*Ford Motor Co. v. Ridgway*,
135 S.W.3d 598 (Tex. 2004) .......................................................................29

*Formosa Plastics Corp. v. Presidio Eng'rs & Contractors, Inc.*,
960 S.W.2d 41 (Tex. 1998)......................................................................53, 55

*Fortune Prod. Co. v. Conoco, Inc.*,
52 S.W.3d 671 (Tex. 2000).......................................................................52, 55

*Goldman v. Olmstead*,
414 S.W.3d 346 (Tex. App.—Dallas 2013, pet. denied)...................................56

*Grant Thornton LLP v. Prospect High Income Fund*,
314 S.W.3d 913 (Tex. 2010) .......................................................................36

*Greater Houston Transp. Co. v. Phillips*,
801 S.W.2d 523 (Tex. 1990) .......................................................................44

*Haase v. Glazner,*
62 S.W.3d 795 (Tex.2001)..........................................................................31

*Harkins v. North Shore Energy, L.L.C.*,
No. 13-12-00504-CV, 2014 WL 1789572 (Tex. App.—Corpus Christi
May 1, 2014, pet. pending)..........................................................................33

*Hartford Fire Ins. Co. v. C. Springs 300, Ltd.*,
287 S.W.3d 771 (Tex. App.—Houston [1st Dist.] 2009, pet. denied) ...............35

*HECI Exploration Co. v. Neel*,
982 S.W.2d 881 (Tex. 1998) ....................................................................41, 43

*Hooks v. Samson Lone Star, Ltd. P'ship*,
457 S.W.3d 52 (Tex. 2015)....................................................................passim

*IHS Cedars Treatment Ctr. v. Mason*,
143 S.W.3d 794 (Tex. 2004) .......................................................................57

*Ikon Office Solutions v. Eifert*,
125 S.W.3d 113 (Tex. App.—Houston [14th Dist.] 2003, pet. den.).................32

*Ins. Co. of N. Am. v. Morris,*
981 S.W.2d 667 (Tex. 1998) .......................................................................40

*Jelinek v. Casas*,
    328 S.W.3d 526 (Tex. 2010) .................................................................50

*Johnson & Higgins of Texas, Inc. v. Kenneco Energy, Inc.*,
    962 S.W.2d 507 (Tex. 1998) ............................................................62, 63

*Kerr-McGee Corp. v. Helton*,
    133 S.W.3d 245 (Tex. 2004) .................................................................52

*Lee & Lee Int'l, Inc. v. Lee*,
    261 F. Supp. 2d 665 (N.D. Tex. 2003) ................................................21, 47, 57

*Lewis v. Bank of Am. NA*,
    343 F.3d 540 (5th Cir. 2003) .............................................................36, 46

*Life Ins. Co. v. Murray Inv. Co.*,
    646 F.2d 224 (5th Cir. 1981) .................................................................45

*Maritime Overseas Corp. v. Ellis*,
    971 S.W.2d 402 (Tex. 1998) ..............................................................29, 30

*In re Media Arts Group, Inc.*,
    116 S.W.3d 900 (Tex. App.—Houston [14th Dist.] 2003, orig. proc.).............32

*Miller v. Raytheon Aircraft Co.*,
    229 S.W.3d 358 (Tex. App.—Houston [1st Dist.] 2007, no pet.)....................31

*Montgomery Cnty. Hosp. Dist. v. Brown*,
    965 S.W.2d 501 (Tex. 1998) ..............................................................36, 46

*Nat'l Prop. Holdings, L.P. v. Westergren*,
    453 S.W.3d 419 (Tex. 2015) .................................................................35

*Nolan v. Bettis*,
    577 S.W.2d 551 (Tex. Civ. App.—1979, writ ref'd n.r.e.) ..............................45

*Olympia Marble & Granite v. Mayes*,
    17 S.W.3d 437 (Tex. App.—Houston [1st Dist.] 2000, no pet.).......................58

*Ortiz v. Jones*,
    917 S.W.2d 770 (Tex.1996)...................................................................30

*Pegasus Energy Grp., Inc. v. Cheyenne Petroleum Co.,*
  3 S.W.3d 112 (Tex. App.—Corpus Christi 1999, no pet.) ...........................62, 63

*Petras v. Criswell*,
  248 S.W.3d 471 (Tex. App.—Dallas 2008, no pet.) ..........................................46

*Porter v. Irvine*,
  658 S.W.2d 711 (Tex. App.—Houston [1st Dist.] 1983, no writ) ....................45

*Rancho La Valencia, Inc. v. Aquaplex, Inc.*,
  383 S.W.3d 150 (Tex. 2012) ....................................................................60, 61

*Ratcliff v. Trenholm*,
  596 S.W.2d 645 (Tex. Civ. App.—Tyler 1980, writ ref'd n.r.e.).......................45

*Samson Lone Star. Ltd. P'ship v. Hooks*,
  389 S.W.3d 409 (Tex. App.—Houston [1st Dist.] 2012), *rev'd in part, aff'd*
  *in part and remanded*, 457 S.W.3d 52 (Tex. 2015).......................................passim

*Sawyer v. E.I. Du Pont de Nemours and Co.*,
  430 S.W.3d 396 (Tex. 2014) ....................................................................36, 46

*Schlumberger Tech. Corp. v. Swanson*,
  959 S.W.2d 171 (Tex. 1997) ...........................................................................46

*Scott v. Sebree*,
  986 S.W.2d 364 (Tex. App.—Austin 1999, pet. denied) ..................................53

*Serv. Corp. Int'l v. Guerra*,
  348 S.W.3d 221 (Tex. 2011) ...........................................................................50

*Simulis, L.L.C. v. Gen. Elec. Capital Corp.*,
  439 S.W.3d 571 (Tex. App.—Houston [14th Dist.] 2014, pet. denied)............32

*Slagle v. Clark*,
  237 S.W.2d 430 (Tex. Civ. App.—Amarillo 1951, no writ).......................33, 46

*Spethmann v. Anderson*,
  171 S.W.3d 680 (Tex. App.—Dallas 2005, no pet.) ..........................................46

*Statewide Bank and SN Servicing Corp. v. Keith,*
  301 S.W.3d 776 (Tex. App.—Beaumont 2009, pet. abated)..............................54

x

*Tracy v. Annie's Attic, Inc.*,
   840 S.W.2d 527 (Tex. App.—Tyler 1992, writ denied).....................................57

*United Teacher Assocs. Ins. Co. v. Union Labor Life Ins. Co.*,
   414 F.3d 558 (5th Cir. 2005) .........................................................................40

*In re Webber,*
   350 B.R. 344 (Bankr. S.D. Tex. 2006) .............................................................46

*Williams v. Khalaf*,
   802 S.W.2d 651 (Tex. 1990) ..........................................................................47

*Willis v. Marshall*,
   401 S.W.3d 689 (Tex. App.—El Paso 2013, no pet.) .......................................39

CONSTITUTION, STATUTES, AND RULES

16 Tex. Admin. Code §3.11 (2015) .......................................................................44

Tex. Bus. & Com. Code §27.01(a) ...................................................................45, 47

Tex. Gov't Code § 73.003(b) ...............................................................................xv

Tex. R. App. P. 44.1 ............................................................................................60

Tex. R. App. P. 44.1(b) ........................................................................................60

Tex. R. App. P. 61.2 ............................................................................................60

Tex. R. Civ. P. 56 ...............................................................................................54

TREATISES AND LAW REVIEWS

4 A. LEOPOLD, TEXAS PRACTICE SERIES, LAND TITLES AND TITLE
   EXAMINATION, §15.15 (3d Ed. 2015) ..............................................................32

26A C.J.S. Deeds § 274 (2015).............................................................................33

OWEN L. ANDERSON ET AL., HEMINGWAY OIL AND GAS LAW AND
   TAXATION, §7.13 AT 386 (4th ed. 2004) ...........................................................11

RESTATEMENT (SECOND) OF TORTS, §551 (1977) ............................................40, 41

TO THE HONORABLE COURT OF APPEALS:

This supplemental brief refers collectively to the Appellees/Cross-Appellants as "Plaintiffs" and to Mr. Charles G. Hooks, III as "Hooks."

## STATEMENT OF THE CASE

| | |
|---|---|
| *Nature of the Case*: | On November 16, 2006, Plaintiffs joined a pre-existing lawsuit brought by several lessors. Plaintiffs asserted several breach of oil and gas lease claims as well as fraud in connection with oil and gas leases located in Jefferson and Hardin Counties. Later, that case was severed into three actions, this *Hooks* action being one of them. Several of the breach claims were decided on motions for summary judgment and the remaining claims were tried to a jury in November 2008. |
| *Trial Court*: | The Hon. Gary Sanderson in the 60th District Court in Jefferson County. |
| *Trial Court Disposition*: | The original judgment in this case was against Samson for $21,749,376, plus attorneys' and expert witness fees, costs, (all totaling $22,251,297). $20,081,638 of the judgment rested on jury findings of fraud. Of that amount, nearly $13 million was an 18% contractual "late charge"; and around $3.5 million pertained to a well as to which Hooks admitted he had not been defrauded. The judgment also awarded damages for several alleged breaches of Plaintiffs' oil and gas leases, adding $1,615,481 to the judgment. Those alleged breaches included a favored nations claim, a claim for additional payments based on incremental formation production, and a claim Samson had wrongfully "unpooled" a unit. The judgment also awarded $52,257 to Plaintiffs for their ad valorem tax payments. |

| | |
|---|---|
| *Court of Appeals*: | This Court's panel was composed of Justice Keyes (authoring judge), joined by Justice Massengale and with Justice Sharp, concurring and dissenting. The panel decided this case in a published decision after it was transferred to this Court on a docket equalization order. The opinion appears at *Samson Lone Star. Ltd. P'ship v. Hooks*, 389 S.W.3d 409, 440 (Tex. App.—Houston [1st Dist.] 2012), *rev'd in part, aff'd in part and remanded*, 457 S.W.3d 52 (Tex. 2015). |
| *Court of Appeals' Disposition*: | This Court reversed the judgment against Samson, except for the $52,257 Samson agreed to pay Plaintiffs for ad valorem tax payments. |
| *Supreme Court Disposition*: | The Supreme Court granted Plaintiffs' petition for review and affirmed in part, reversed in part, and remanded to this Court for consideration of arguments previously undecided by this Court. *Hooks v. Samson Lone Star, Ltd. P'ship*, 457 S.W.3d 52, 70 (Tex. 2015). The Supreme Court affirmed this Court's judgment reversing the trial court's summary judgments on the incremental formation production and "unpooling" issues. *Id.* at 65, 66. That Court reversed this Court's reversal of the summary judgment on the favored nations issue. *Id.* at 63. The Supreme Court also reversed this Court's rendition of judgment against Plaintiffs as to Plaintiffs' fraud claim based solely on limitations barring that claim as a matter of law. The Supreme Court remanded the fraud limitations issue to this Court for further consideration of the factual sufficiency of the jury's limitations finding. The Supreme Court also remanded for this Court to consider the legal and factual sufficiency of the fraud liability and damages issues. *Id.* at 61. |

## STATEMENT REGARDING ORAL ARGUMENT

This case was previously briefed to this Court in 2009 and 2010 and orally argued in 2011. One of the judges of the original panel no longer serves on the Court. When this case was argued in 2011, a member of this Court stated this case was possibly the most complicated case then-pending before the First Court of Appeals.

The previous oral argument focused on issues no longer before the Court, such as whether Plaintiffs' fraud claims were barred by limitations as a matter of law. The Supreme Court's decisions against Samson were narrowly focused. As a result, virtually all of Samson's appellate points regarding the jury's findings of fraud and fraud damages remain for determination by this Court. The remand also involves other issues including the most favored nations damages and interest charges. Oral argument would assist the Court in addressing issues that remain before the Court, as informed by the Supreme Court's opinion. Those issues remain complicated, and oral argument will assist the Court in addressing them. Furthermore, this case has always been factually complex, and remains so following this Court's and the Supreme Court's prior opinion.

This case was transferred to this Court through docket equalization. Samson consents to this Court conducting oral argument in Houston. Tex. Gov't Code § 73.003(b) (allowing parties to request transferee appellate court to conduct oral argument in the court's regular location).

## ISSUES PRESENTED

### A. Issues Involving Plaintiffs' Fraud Claim

1. *Fraud*

Plaintiffs sued Samson for fraud allegedly arising from Samson's written offer to pool 50 acres out of one of Plaintiffs' leases into a gas unit. The unit well was not drilled on Plaintiffs' tract; it was drilled on a different tract. Plaintiffs, acting through Mr. Charles G. Hooks III ("Hooks"), accepted Samson's offer to pool in 2001. PX156, 157.

Before Hooks accepted the offer, he requested a plat showing where Plaintiffs' acreage would lie within the unit. Samson sent Hooks a scaled plat depicting the lands and leases to be included in the unit.

That plat included several indications of where the bottom hole of the well was located, including one Hooks interpreted to mean the bottom hole was 1400 feet from Plaintiffs' lease. The plat actually said "1400´± Scaled." Nearly eight years later, Hooks testified he relied on the "1400´± Scaled" indication (while ignoring other indications) when he consented to the pooling. Hooks claimed if he had known the well's bottom-hole was located closer than 1320 feet to Plaintiffs' lease line, he would not have agreed to the unit (the BSM1 unit), but would have demanded that Samson comply with offset obligations set out in Plaintiffs' oil and gas lease.

*There is no legally or factually sufficient evidence of fraud as to each of the following:*

a) *fraud - misrepresentation* – *Hooks testified he relied on a measurement that was <u>indefinite</u> on its face and on a <u>scaled</u> plat to determine whether a well's bottom hole was within 1320 feet of Plaintiffs' lease line.*

b) *fraud - reliance* - *Hooks read "1400′ ± Scaled" to mean exactly 1400 feet.*

c) *fraud - intent to deceive* - *There is no evidence Hooks told Samson why he wanted the plat or that he wanted a plat to answer his unstated question about the proximity between a well's bottom hole and Plaintiffs' lease line.*

d) *fraud - duty to disclose* – *There was no fiduciary or confidential relationship between Samson and the Plaintiffs, no continued reliance by Plaintiffs on the plat, no knowledge by Samson that Plaintiffs might be relying on the plat in this way, and Plaintiffs could have found the precise location of the bottom hole by consulting public records.*

e) *statutory fraud* - *There was no "sale" of land but only a consent by Plaintiffs to pooling, and the evidence underlying the jury's finding of statutory fraud has the same misrepresentation, reliance, and intent insufficiencies as the evidence underlying the common law fraud finding. Since statutory fraud fails, the judgment's award of expert witness fees and deposition costs should be reversed.*

## 2. *Statute of Limitations for Fraud*

Hooks and his wife executed the pooling agreement that is the subject of Plaintiffs' fraud claim in May 2001. Plaintiffs did not file any lawsuit against Samson until November 2006 and did not amend to assert fraud claims until May 2007. There were multiple publicly-filed records from which Plaintiffs could have discovered their alleged fraud claim at least by February 2003, and some of those records were in the official land records of both Jefferson and Hardin Counties. At trial, the jury found that, had Plaintiffs exercised reasonable diligence, they could not have discovered their fraud claim until April 2007. Hooks' testimony on that subject was nothing more than the simple statement that he <u>did not</u> learn of the claim until during discovery in the lawsuit during the Spring of 2007.

*There is factually insufficient evidence that:*

a) *Plaintiffs could not have discovered the alleged fraud in the exercise of reasonable diligence prior to four years before they filed suit for fraud.*

b) *Plaintiffs could not have discovered the alleged fraud by exercising reasonable diligence prior to April 2007.*

## 3. *Fraud Damages*

Plaintiffs originally pleaded this action as one for breach of an oil and gas lease. They pleaded that Samson did not pay compensatory royalty on production from Samson's wells on adjacent leases and units, which they claimed were

xvii

bottomed within 1320 feet of their Jefferson County lease line. Plaintiffs also pleaded fraud in the alternative. The trial court rendered summary judgment against Plaintiffs on their breach of lease compensatory royalty claim. Plaintiffs then tried their alleged fraud claim to the jury, but Plaintiffs introduced no evidence of fraud damages and did not seek to set aside their written consent to the pooled unit. Plaintiffs' damages evidence was (i) based on exactly the same calculation as their breach of lease claim for compensatory royalties, (ii) calculated as if their fraud claim were a breach of lease claim, and (iii) as if their consent to join the unit did not exist. The damages also included (i) contractual late fees (prejudgment interest) compounded monthly at 18% (ii) damages attributable to another well as to which Hooks admitted there was no fraud; and (iii) incremental formation production damages later found by this Court and the Supreme Court to have been improper.

*There is legally and factually insufficient evidence of damages when*

a. *Plaintiffs' evidence was not of fraud damages, but was of only breach of lease damages.*

b. *Plaintiffs' damages questions sought measures of special damages for which they had not pleaded and to which they were not entitled as a measure of out-of-pocket fraud damages.*

c. *Plaintiffs did not seek or obtain an order setting aside their written consent to the pooled unit, but presented evidence of damages as if their land was never a part of the pooled unit while continuing to accept payments based on their continued inclusion in the unit.*

d. *The fraud damages awarded by the jury include compensatory damages for another well as to which Plaintiffs admit there was no fraud.*

e. *The damages include a prejudgment interest rate of 18%, rather than 5%, and interest was compounded monthly when it should be simple.*

f. *The damages included incremental formation production damages even though Plaintiffs' formation production claim has been reversed by this Court and the Supreme Court and rendered against Plaintiffs on appeal.*

g. *As of the time of trial (and continuing through today), Plaintiffs continued to accept payments from Samson as if Plaintiffs were still a part of the unit. The fraud damages must be recalculated to take these payments into account.*

**B.    Issues Involving Plaintiffs' Most Favored Nations Claim**

The Supreme Court reversed this Court's judgment with respect to Plaintiffs' most favored nations ("favored nations") claim, holding Plaintiffs were due an increased royalty rate of 28.28896% (rather than the lease rate of 25%) for production attributable to Plaintiffs' three leases to Samson. The favored nations

damages awarded Plaintiffs in the judgment were based on a stipulation between the parties. Court Ex A. The stipulation set out favored nations damages sums with and without incremental formation production included. Both this Court and the Supreme Court reversed Plaintiffs' judgment for incremental formation production damages. As awarded in the original judgment, the favored nations damages include the substantial amounts attributable to the incremental formation production claims. Furthermore, the damages only go through May 2008.

The fraud damages for the wells included in the BSM1 unit incorporated favored nations amounts for those wells in the fraud damages. Should this Court again reverse the fraud portion of the original judgment, Plaintiffs will seek an increased royalty percentage for production attributable to production from the wells in that unit.

*This Court must remand the favored nations damages for recalculation:*

a. *The original judgment's favored nations damages include incremental formation production damages, although Plaintiffs' incremental formation production claim has now been reversed by this Court and the Supreme Court.*

b. *Assuming reversal of any of the jury's fraud liability, limitations, or damages findings, Plaintiffs' favored nations increased royalty interest in production from the BSM1 unit will need to be calculated and awarded.*

c. *Any prejudgment interest awarded on the favored nations damages must be simple interest, not compounded monthly as Plaintiffs originally sought on all their damages.*

# CASE HISTORY

This case returns to this Court following this Court's reversal of the judgment below (except for an agreed-upon amount for ad valorem taxes) and the Supreme Court's partial reversal, partial affirmance, and remand of this Court's judgment.

The original judgment in this case was against Samson for $21,749,376.15, plus attorneys' and expert witness fees, costs, and post-judgment interest at the rate of 18%. *Samson Lone Star, Ltd. P'ship v. Hooks*, 389 S.W.3d 409, 440 (Tex. App.—Houston [1st Dist.] 2012), *rev'd in part, aff'd in part and remanded*, 457 S.W.3d 52 (Tex. 2015). The judgment arose from an oil and gas case involving allegations of fraud and breach of lease. $20,081,638 of the judgment's total award rested solely on jury findings of fraud. Of the fraud damages, $12,995,832 consisted of an 18% contractual "late charge"; $3,547,241 pertained to the one well (the BSM1 well) about which Plaintiffs complained at trial; and $3,538,565 pertained to another well as to which Hooks admitted he was not defrauded. In addition, Plaintiffs' evidence of alleged fraud damages were based on the assumption Plaintiffs would win all their breach of lease claims, including their claim for payments based on incremental formation production ("formation production"). As a result, the fraud damages have certain contractual lease claims included within those damages, even though those claims have been reversed.

1

The breach of lease claims—in addition to their inclusion in the fraud damages—separately added another $1,667,738 to the judgment. Those breach allegations included $848,854 for increased payments under a favored nations provision, $766,626 for additional payments under a claim that Samson had wrongfully "unpooled" a unit, and $52,257 for damages related to ad valorem taxes.

The claims, this Court's actions, and the Supreme Court's actions are summarized below:

## A.    Fraud

Plaintiffs asserted that had Hooks known the true bottom-hole location of the well drilled on the adjacent tract, he would not have agreed to include his Jefferson County lease within a unit (the Black Stone Minerals No.1 "BSM1" unit) and, instead, would have demanded compensatory royalties—one of the contractual remedies provided by Plaintiffs' lease. This Court reversed the fraud portion of the judgment because it found, as a matter of law, Plaintiffs' fraud claims were barred by limitations. This Court concluded Plaintiffs could have discovered the adjacent well's location from a directional survey filed in public Railroad Commission records. 389 S.W.3d at 428-30.

With regard to fraud, the Supreme Court held and ordered:

- Noting the allegedly-fraudulent plat that was the basis for Plaintiffs' fraud claim was also filed in Railroad Commission records attached to a P-12 pooling authorization form, the Supreme Court held: "when the defendant's fraudulent misrepresentations extend to the Railroad Commission record itself, earlier inconsistent filings cannot be used to establish, as a matter of law, that reasonable diligence was not exercised." 457 S.W.3d at 61. The Court continued: "Under these circumstances, reasonable diligence remains a fact question." *Id.*

- Based on its limitations ruling, the Supreme Court remanded for this Court's consideration "the factual and legal sufficiency of the evidence with regard to common-law fraud, statutory fraud, and damages for fraud, as well as the factual sufficiency of the evidence regarding when Hooks, by the exercise of reasonable diligence, would have discovered the fraud." *Id.*

**B.    Breach of Lease Claims**

Three breach of lease claims decided against Samson were a part of Samson's previous appeal to this Court. The claims and the Supreme Court's actions on those claims are:

1.    *Most Favored Nations*

Plaintiffs' leases to Samson contain a "most favored nations" clause requiring Samson to pay Plaintiffs the same royalty percentage Samson pays a

3

third party should Samson enter into a lease (within a 3-mile radius of Plaintiffs' premises) with a royalty exceeding 25%. 389 S.W.3d at 434. Samson entered into a pooling agreement with the State in which Samson paid the State an increased allocation of unit production as consideration for the State's approval of a unit. The Supreme Court noted the increased allocation of production was equal to a royalty increase from 25% to 28.28896%. 457 S.W.3d at 62. This Court reversed the favored nations judgment because Samson did not enter into a new "lease" with the State, but entered into a settlement agreement called a "pooling agreement." 389 S.W.3d at 435. The Supreme Court reversed, holding the payment to the State meant "Samson increased the State's 25% royalty on production from its tract to 28.28896%" and "the royalty imposed by the Pooling Agreement is 'payable under' the lease…." 457 S.W.3d 52 at 63. The Supreme Court concluded "the court of appeals erred in holding that Samson did not breach the most-favored nations clause." *Id.*

The judgment lists "Damages for breach of Most Favored Nations Clause" of $848,854.01. 1Supp2dCR:6. That amount is attributable to two wells: the Joyce DuJay No.1 and the Joyce DuJay "A" No.1 wells. But that amount is composed of (i) $431.450.71 of damages for both wells plus prejudgment interest (contractual "late charges" calculated at 18 percent compounded monthly) *resulting from the favored nations increased royalty* decimal of 3.28896%; *plus* (ii) $417,403.30 of

4

base damages and interest ("late charges") for both wells attributable to *formation production damages*. Court Ex A.

2.      *Incremental Formation Production.*

Plaintiffs claimed Samson was required to pay royalty based on all liquid condensate, and—on top of that—was required to pay royalty based on that same condensate production again as if the condensate were produced as a gas. 389 S.W.3d at 435-37; 457 S.W.3d at 63-65. Plaintiffs' claims were based on a lease term stating, "all such [royalty] calculations shall be based on formation production as reported on Texas Railroad Commission forms P-1 and P-2." 457 S.W.3d at 63. This Court held the formation production clause "does not operate to double the amount of royalties owed on the liquid condensate produced from the well." 389 S.W.3d at 437. This Court reversed the summary judgment in Plaintiffs' favor and rendered judgment in Samson's favor on that issue. *Id.* at 437, 440-41. The Supreme Court affirmed on this issue, agreeing with this Court's "decision with regard to the formation-production claims." 457 S.W.3d at 65.

Because of the disposition of this issue, any final judgment entered in this case cannot include amounts for formation production. But both the alleged fraud damages and the favored nations damages include formation production damages. For fraud, the jury awarded and the judgment granted damages of $20,081,638, which precisely matched the damages Plaintiffs' expert set out in his fraud

damages exhibit, PX608. 1Supp2dCR:6; 19CR:3268. That exhibit is titled, "Summary of Lost Compensatory Royalty *with Incremental Formation Production….*" PX608 (emphasis added). Thus, the damages awarded for fraud include formation production damages (as does favored nations damages), which cannot be a part of any judgment.

3.     *Unpooling*

Plaintiffs' third breach of lease claim was that Samson allegedly wrongfully "unpooled" a pooled unit by amending it. As the Supreme Court noted, "[b]ecause the owner of 87.5% of the mineral interest in the tract where the well in this unit was located refused to pool, Samson decided to 'amend' the unit designation." 457 S.W.3d at 65. Samson notified Hooks of the amendment and Plaintiffs accepted the payments made to them from the amended unit. *Id.* This Court held that under the circumstances of this case, "Hooks accepted and ratified the amendment and redesignation of the units." 389 S.W.3d at 434. The Supreme Court affirmed this Court's unpooling judgment, holding: "[b]ecause of the undisputed contents of the notice letter, Hooks' acceptance of royalties for the new unit, and Hooks' refusal to challenge the new unit, we decide the question of ratification as a matter of law." 457 S.W.3d at 66. Because of the disposition of this issue, there is nothing left for this Court to consider with regard to "unpooling," and any final judgment entered in this case cannot include "unpooling" damages.

6

## C.    Post-Judgment Interest

The trial court's judgment imposed post-judgment interest at the rate of 18% compounded annually. Because the only remaining portion of the judgment after the appeal to this Court was for ad valorem taxes—the subject of a trial stipulation between the parties—this Court held the proper post-judgment interest rate was 5%, rather than 18%. 389 S.W.3d at 439. The Supreme Court held the "leases only impose 'the maximum [interest] rate allowed by law' *for past-due royalties*." 457 S.W.3d at 69 (emphasis added). Accordingly, to the extent Hooks ultimately "recovers for past due royalties, he is entitled to an 18% interest rate" but "[f]or other recoveries, the statutory rate of 5% applies…."  457 S.W.3d at 70.

## D.    Attorneys' Fees

The trial court's judgment awarded attorneys' fees in accordance with a stipulation between the parties. Following the reversal of all claims on appeal (leaving only the agreed-upon ad valorem tax amounts to be paid by Samson), this Court also reversed the attorneys' fees award. 389 S.W.3d at 438. The Supreme Court, however, held Plaintiffs were entitled to recover on their favored nations claims, thus entitling them to the stipulated amounts of attorneys' fees. 457 S.W.3d at 69. The fees were $300,000 through trial and another $70,000 through all appeals. 18CR:3166.

## E.      Hooks' Cross-Appeal

Plaintiffs filed a cross-appeal challenging a summary judgment denying their claims that Samson had supposedly breached offset obligations concerning Plaintiffs' two leases in Hardin County, north of the lease at issue on the fraud claim. This Court affirmed that summary judgment based on Samson's limitations defense. The Supreme Court reversed this Court's affirmance because it disagreed the claims were entirely barred by limitations. 457 S.W.3d at 68-69. That portion of the case has also been remanded for this Court's consideration of "the merits of Hooks' claim for breach of the offset provisions and the proper construction of" the clause at issue. *Id.* at 69.

In their cross-appeal, Plaintiffs asserted their offset obligation that applied when a well was drilled on lands "not more than … 1320′ *from the leased premises*" applied even when a well was drilled much farther than 1320 feet from Plaintiffs' leased premises. Plaintiffs' theory is based on a common provision in Texas oil and gas leases stating operations on pooled units

> …shall be considered as operations for drilling on or production of
> gas from the Leased Premises, whether or not the well or wells be
> located on the Leased Premises, and the entire acreage constituting
> such unit or units shall be treated for all purposes, except the payment
> of royalties on production from the pooled unit, as if the same were
> included in this Lease. [PX26¶V(E), PX27¶V(E).]

Plaintiffs assert this provision means all their lease terms (and the terms of any other lease with such a provision) are spread to the entire unit so that if a well

8

is drilled within 1320 feet of any *unit line* (as opposed to a *lease line* as the lease says), Samson owes offset obligations to Plaintiffs even though the well is not within 1320 feet of their lease. Moreover, Samson did in fact offset the wells at issue in Plaintiffs' cross-appeal and Plaintiffs failed to provide notice to Samson of Samson's alleged default.

Because these offset obligation claims are the subject of Hooks' cross-appeal, Samson will address these claims in its response to Hooks' supplemental brief on this subject.

**F. Samson's Appeal Issues on Remand**

As a result of the Supreme Court's decision, the issues raised by Samson in its appeal that were remanded for this Court's consideration are:

1. Legal and factual sufficiency of the evidence supporting common law fraud;

2. Legal and factual sufficiency of the evidence supporting statutory fraud;

3. Legal and factual sufficiency of the fraud damages, along with a remand for a reduction and recalculation of the fraud damages, including attendant prejudgment and post-judgment interest issues;

4. Factual sufficiency of the jury's finding on limitations;

5. Remand for recalculation of favored nations damages owed to Plaintiffs, with consideration of interest issues including whether Plaintiffs are entitled

9

to 18% prejudgment interest compounded monthly, as they requested during the first trial.

## STATEMENT OF FACTS

**A.     Hooks Was a Very Experienced Oil and Gas Attorney**

Hooks was an attorney with extensive experience in oil and gas matters. 13RR:9. For 33 years, in addition to practicing law, Hooks managed his family's considerable investments in oil, gas and mineral estates. 13RR:9-10. Plaintiffs owned properties in Louisiana and 36 Texas counties. 13RR:11. Hooks has negotiated at least 100 oil and gas leases. 13RR:10-11.

Samson holds three separate oil and gas leases from Plaintiffs:

(1)   640 acres in Jefferson County (PX25) (called the "Jefferson County lease"). Fifty acres from the southwest corner of this lease is the land at issue in Plaintiffs' fraud claims.
(2)  95 acres in Hardin County (PX26).
(3)  10 acres in Hardin County (PX27).

The primary issue at trial was Plaintiffs' fraud claim. Plaintiffs were co-tenants in the mineral estate on the Jefferson County lease. 12RR:46-47, 13RR:26-27. Plaintiffs own 42.75% of the minerals in that tract; another extended family whom Samson called "the Broussards," owned the remaining 57.25% of the

10

minerals. PX25; 12RR:46-47, 13RR:26-27. Plaintiffs' Jefferson County lease did not grant authority to pool. PX25¶V(E).[1]

## B. Samson Drilled the Black Stone Minerals No. 1 Gas Well

In April 2000, Samson began drilling the Black Stone Minerals No. 1 Gas ("BSM1") well in the Walker Pettitt Survey in Hardin County. That survey lies immediately west of the Pine Island Bayou, which is the Hardin/Jefferson County line. The bayou forms the western boundary of Plaintiffs' Jefferson County lease and the 50 acres included in the BSM1 unit. PX25; PX569. The BSM1 well was completed in August 2000; first gas sales occurred October 2000. PX569, 627. The well was drilled as a directional well in accordance with Railroad Commission rules. The bottom of the hole was drilled to a location southeast of the surface location. 11RR:122-24; 8 H. WILLIAMS & C. MEYERS, OIL AND GAS LAW 264 (2008) (directional drilling is "[t]he drilling of a well that departs materially from the vertical," frequently because of surface conditions). As reported in public records, the BSM1 well was originally planned with a bottom hole 1080 feet (i.e., within 1320 feet) from Plaintiffs' lease line. PX616; 12RR:48-49.

## C. The Jefferson County Lease Contained Offset Obligations

Plaintiffs' Jefferson County lease provided if the leased lands were not pooled, and a gas well was drilled within 1320 feet of the leased premises, Samson

---

[1] "Pooling is the combining of tracts or interests, or parts of tracts or interests, for facilitating more orderly development and production of oil, gas and associated products." OWEN L. ANDERSON ET AL., HEMINGWAY OIL AND GAS LAW AND TAXATION, §7.13 AT 386 (4th ed. 2004).

had to do one of: (1) drill a well on the lease; (2) pay Plaintiffs compensatory royalty equal to their share of production from the adjacent producing well as if that well had been drilled on their lease; or (3) release the Lease and have no further obligations. PX25¶VI(A).[2] Separately, in addition to the offset obligations, Samson could at any time release "any portion or portions" of the lease "and be relieved of all obligations as to the acreage surrendered…." PX25¶IV(B). Samson did not owe any offset obligations if the well drilled within 1320 feet was on land pooled with Plaintiffs' lease.

Samson decided to create a 704-acre unit for the BSM1 well. Samson's plan was to include 50 acres out of the Broussards' lease and Plaintiffs' Jefferson County lease in that unit. That would require Samson to pay royalty to Plaintiffs based on their proportionate interest in the unit, but it would otherwise extinguish Samson's offset obligations. Otherwise, Samson simply could have released

---

[2] The Jefferson County lease provides at ¶VI(A):
"A. …[I]n the event *a well producing from a unit not comprised of acreage from the leased premises* … which has been classified as "gas" … is completed on adjacent or nearby lands not more than … [1,320'] from the leased premises … Lessee covenants and agrees to, within ninety (90) days from the date production is first sold …, *either* (1) commence with due diligence operations for the actual *drilling of an offset well* on the leased premises…, (2) pay Lessors as *compensatory royalty* … a sum equal to the royalties which would be payable under this Lease on the production from said adjacent or nearby producing well had same been producing on the leased premises, or (3) in lieu of drilling such offset well or paying such compensatory royalty, *release* by recordable instrument the offset acreage…. Notwithstanding anything herein to the contrary, *Lessee shall have no obligations under this Article … in the event a producing well … is already offset by a well on the leased premises or on acreage pooled therewith* producing from the same producing horizon …" [Emphasis added.]
The provision above measures the distance between the lease and where the nearby well is "completed." The well at issue was completed very near its bottom-hole location.

12

Plaintiffs' lease pursuant to lease paragraphs VI(A) or IV(B), the latter of which permitted Samson to release the lease at any time. PX25¶¶IV(B), VI(A). Samson took steps to obtain pooling authority from Plaintiffs and other mineral owners whose consent Samson needed to form the unit. *E.g.*,  PX62, 63, 65.[3]

**D.      Samson Contacted Plaintiffs, Offering to Include 50 Acres of Plaintiffs' Jefferson County Lease in the Unit**

On February 15, 2001, Mr. Lanoue—a landman then working for Samson—wrote Hooks requesting Plaintiffs' consent to pool 50 acres of Plaintiffs' Jefferson County Lease with adjacent land containing the BSM1 well (the "BSM1 unit"). PX65, 160.[4] The Broussard family already had consented to the unit as to their interest in the same acreage. PX63, 65; 12RR:122-23. Hooks wanted additional information and telephoned Lanoue on February 20, 2001. 12RR:124, 177; PX160. Hooks and Lanoue discussed a range of topics concerning the well and the unit. PX160. Among Hooks' notes of the conversation was the statement the BSM1 well was about 1500 feet west of Pine Island Bayou—the western boundary of Plaintiffs' Jefferson County lease—a boundary that can move as the river moves. PX160. Hooks' notes do not indicate whether the two were discussing the well's surface or bottom-hole location, or a generalized number between the two.

---

[3] It is typical for the planned unit to change as the well is designed and drilled.  15RR:54-56. Thus, there were different plats showing different participants in the possible unit configurations. 15RR:56.

[4] As it appears in the record, PX65 is not identical to what Samson sent to Hooks, but is an annotated version of the letter. 12RR:175. The original letter more closely resembled PX63, which did not have a plat attached. 12RR:176.

**E.     Hooks Requested a Plat, and Samson Sent Him One, to Show the Location of Plaintiffs' Land within the Unit**

During the February 2001 phone call, Hooks requested a plat showing the unit; Lanoue sent him one the next day. 12RR:180-81; PX64. Hooks testified he wanted the plat to see (1) how his property fit within the unit, and (2) whether the well was within 1320 feet of his lease. 12RR:180. But Hooks admitted he may not have told Lanoue he was interested in the offset obligation. 13RR:25. He also admitted he may not have said he needed to know whether the well was within 1320 feet of his lease. 13RR:25. Consistent with Hooks' explanation of the first reason he wanted the plat, Lanoue testified he sent Hooks the plat so Hooks could understand where his land lay within the unit. 12RR:124.

The plat Lanoue sent is attached to PX65. 12RR:181. It is similar to plats sent to other lessors, including the State of Texas (*see, e.g.*, PX62). It was prepared in August 2000, around the time the well was completed and months before Lanoue contacted Hooks. The plat regularly was used through October 2001. 12RR:33, 49-50. The plat shows the well deviated toward Plaintiffs' lease. Lanoue testified he estimated the well's bottom hole location on the plat, using only a ruler to do so. 12RR:110-111. The plat repeatedly says it is "scaled," meaning someone used a ruler, not a survey, to make the plat. 16RR:62-63; 13RR:70-71 (Hooks, agreeing to definition of "scaled"). It also uses the symbol: "±" in key places. As a result, the plat does not purport to be exact or survey-accurate:

14



Following is a segment of the plat, with color coding added to highlight

certain features:

15



The plat has a line (red) depicting something is "1400′±" *from the western boundary* of Plaintiffs' Jefferson County lease. PX65. (The 50 acres included in the unit from Plaintiffs' lease is in yellow.) An arrow (green) points to a bottom hole location not on that line, but to an east-west location slightly north of the line and approximately 3/4 of the way along that line. Three-fourths of 1400 is 1050.

The plat provides the following information in the lower left corner:

> The Surface Location is:
> 830′ FSL x 1600′ FEL Survey
> 2410′± Scaled FWL x 3834′ FNL Unit
>
> The Bottom Hole Location is:
> 290′ FSL x 740′ FEL Survey
> 500′ Scaled FNL x 1400′± Scaled FEL Unit

PX65.

So the plat also states the bottom hole of the well is "1400′± Scaled" *from the eastern line of the unit* (purple line, shown above). PX65 ("FEL" means "from east line of unit"). The eastern line of the unit is on Plaintiffs' lease. PX65.

16

Running a line 1400´± westward from the unit's eastern line would place the well on or nearly on Plaintiffs' Lease. PX65; 12RR:62-63.

These signals are contradictory. If the estimation of "1400´±" were to the well's bottom hole location, the BSM1 well could be farther than 1320 feet from Plaintiffs' lease. "1400´± Scaled" from the *east line of the unit* indicates the BSM1 well could have been closer than 1320 feet to Plaintiffs' lease. The arrow pointing to a bottom-hole location 3/4 of the way along the "1400´± Scaled" line showed the BSM1 well was about 1050 feet from Plaintiffs' lease. That is very close to the original estimated bottom-hole location of 1080 feet from Plaintiffs' Lease.

**F.    Hooks Testified He Relied on the "1400´± Scaled" Depiction to Determine the Distance of the BSM1 Well from Plaintiffs' Jefferson County Lease**

To determine the BSM1 well's distance from his Lease, Hooks testified he focused on the line estimating "1400´± Scaled":

Q. And what did you do to verify that the—what he told you was true about the well being located 1500 feet away from Pine Bayou—Pine Bayou?

A. [Hooks] Well, I looked at the—what was indicated on the plat; and it shows me that it was approximately—the bottom hole location was approximately 1400 feet west of Pine Island Bayou.

Q. Now, that's a little bit different than the 1500 feet that he told you over the telephone, right?

A. A little bit. I assumed that he was talking in generalities in that case and that once he got the plat it was more specific on the plat.

Q. Well, did that spark any concern that he might be lying to you if he told you 1500 on the telephone and then gave you a plat that was 1400?

17

A. No. I—the plat speaks for itself.

***

Q. Now, I want to—well, first of all, after you got this plat and checked it out and confirmed what Mr. Lanoue had told you over the telephone, what did you then do? Did you agree to—to accept the pooling?

A. Well, once I had satisfied myself that everything was in order, was appropriate, then I decided I would send back the letter that he had requested me to sign agreeing to this but with some changes on it.

12RR:181-183. On cross-examination, Hooks continued to stress his reliance on the "1400′± Scaled" distance:

Q. But, yet, you didn't call him [Lanoue], did you, and ask him for some clarification?

A. Well, I didn't think I needed any clarification. It seemed clear to me that it was—it was 1400 feet away from the bayou.

***

Q. All right, Mr. Hooks. So, anyway, you concluded that wherever in there the bottom hole was that it was in a satisfactory location, right?

A. Yes. I—I concluded that it was fourteen—approximately 1400 feet west of Pine Island Bayou. [13RR:33, 35.]

Hooks emphasized he relied on the plat's estimate of "1400′± Scaled" to the exclusion of everything else, including Lanoue's statement over the telephone. 13RR:36. He testified, "when I saw a surveyor's plat that shows 1400 feet, I assume that's more accurate than what his—his verbal estimation was." 13RR:36; *see also* 13RR:68 ("I assumed that he was just estimating and—verbally, but the

18

plat would be more accurate"). Hooks made no further inquiries regarding the location of the well's bottom hole. 13RR:39.

## G.     Plaintiffs Agreed to Include their 50 acres in the BSM1 Unit.

On May 25, 2001, Hooks and his wife signed a letter consenting to pool 50 acres from the Jefferson County lease into the BSM1 unit. PX65. They specified their acceptance was "conditioned upon the subsequent execution by Lessors and Lessee of a formal lease amendment document to be prepared by [Hooks] and submitted to [Samson]." PX65. Plaintiffs never prepared such a document. 12RR:187-88. At trial, Hooks testified repeatedly he always intended to be a part of the unit and considered Plaintiffs' 50 acres to be part of the unit. 13RR:14-17. Hooks also agreed to the division order setting out Plaintiffs' percentage distribution of the unit's proceeds. PX156, 157.

After Plaintiffs consented to the unit, Samson sent them royalty checks for their unit interest in production for the three wells eventually drilled on the BSM1 unit. PX552. *Plaintiffs cashed those checks continuing through trial and now for more than six years after the trial.* 12RR:203-04; 13RR:44-45. Plaintiffs never sought any judicial decree setting aside their consent to the pooled unit.

19

## H.    Other Operations Near and on the BSM1 Unit

Samson drilled other wells in the vicinity of Plaintiffs' lease after Plaintiffs consented to join the BSM1 unit. One of those wells was the Joyce DuJay No. 1 well ("DuJay1 well"), north of the Jefferson County lease. PX565. That well was completed in January 2002 and included in a unit called the DuJay1 unit. PX21, 552, 565. Plaintiffs' two Hardin County leases were included in the DuJay1 unit. PX21, 552. The bottom-hole location of the DuJay1 well was also within 1320 feet of Plaintiffs' Jefferson County lease. PX640. Samson owed no offset obligations as to the DuJay1 well because—although the well was drilled within 1320 feet of the Jefferson County lease—it was already offset by the BSM1 well[5]  Hooks testified *he had not been defrauded with regard to the DuJay1 well*:

> Q.    All right.  Now, nobody tricked you into – or nobody did anything to deceive you or defraud you with respect to the DuJay 1 well, did they?
>
> A.    [Hooks] Not that I'm aware of.
>
> Q.    Well, you never talked to Mr. Lanoue about it. Nobody ever sent you anything that you say is fraudulent.  With respect to the DuJay 1 nobody did anything—or from Samson,  anyway, nobody did anything to trick you or hoodwink you or defraud you or something with respect to the DuJay 1, right?
>
> A.    Not that I'm aware of, no.

---

[5] The Jefferson County lease states, "Lessee shall have no [offset] obligations under this Article VI in the event a producing well on nearby or adjacent land *is already offset by a well* on the leased premises or *on acreage pooled therewith* producing from the same producing horizon from which production has been secured…."  PX25 ¶VI (A). Both the BSM1 well and the DuJay1 well produced from the same formation and offset one another.

20

13RR:53. Nevertheless, alleged "damages" for the DuJay1 were included in the jury's award of "fraud damages." PX608; 19CR:3268.

Other wells followed the DuJay1. *See* PX552; 13RR:136. Plaintiffs did not claim any of these additional wells was within 1320 feet of the Jefferson County lease.

No well was ever drilled on *any* of Plaintiffs' three leases to Samson. The royalties Samson paid to Plaintiffs always were based on the inclusion of Plaintiffs' leases in a pooled unit, with unit wells drilled on someone else's property. Through May 2008, Plaintiffs received over $510,000 in royalty from the BSM1 unit (the subject of Plaintiffs' fraud claim), and over $2.14 million in royalty from Samson for wells drilled on units pooled with one or more of Plaintiffs' three leases. 16RR:21-22; DX3; PX552. Now, seven years later, those payments—all received and deposited by Plaintiffs—are much higher than in 2008. Despite these facts, Plaintiffs claim to have been damaged in excess of $22 million.[6]

## I.    This Lawsuit

In August 2004, an action was filed against Samson styled *Joyce DuJay Lee v. Samson*. 1CR:2. The *Lee* plaintiffs complained about pooling issues unrelated to the BSM1 well. In December 2004, a second action, *Thomas Klorer et al. v.*

---

[6] In recent trial court filings, Plaintiffs now assert their claims exceed $52 million.

21

*Samson*, was filed in which other landowners also complained about the same unrelated pooling issue. 1Supp1stCR:2. Those two actions were consolidated in August 2005. 2CR:295.

On his birthday in the fall of 2006, Hooks attended a seminar for oil and gas lawyers. 12RR:165-66; 13RR:50. There, he met Plaintiffs' attorney Paul Simpson, who told Hooks he was handling the consolidated actions against Samson. 12RR:165-67. Following that encounter, Plaintiffs joined the pending case on November 16, 2006. 3CR:440. At that time, however, Plaintiffs did not plead fraud claims. 3CR:440-465. They added fraud allegations May 7, 2007. 4CR:467, 490-94. In the May 7, 2007 petition, Plaintiffs alleged in the alternative—relying on differing facts—(1) they had never been part of the BSM1 unit and Samson breached its lease by not paying compensatory royalties; or (2) if they were a part of the unit, Samson defrauded them into joining the unit. 4CR:487-94. Plaintiffs had not notified Samson about their fraud or lease breach allegations prior to filing those claims. Accordingly, Samson drilled wells in the vicinity of the BSM1 unit in reliance on Plaintiffs' participation in that unit.

In September 2007, the trial court severed the action into three cases, one of which became this *Hooks* action, which was tried and is now this appeal. 4CR:626. The trial court granted summary judgment dismissing Plaintiffs' breach of lease claim with regard to the drilling of the BSM1 well because it was barred by

limitations. That left Plaintiffs with only their fraud claim. 18CR:3162. Plaintiffs did not appeal from the granting of the breach of lease summary judgment. The fraud claim was tried to the jury, along with the formation production claim. The judgment entered following the jury trial, in combination with previous summary judgment rulings, awarded the following amounts [1Supp2dCR:6; Court Ex. A]:

| | Damages Amount | 18% "Late Fee" Compounded Monthly | Total Judgment Damages |
|---|---|---|---|
| A. Fraud- | | | |
| 1. Blackstone Minerals No. 1 Well | $3,547,241 | | |
| 2. Joyce DuJay No. 1 Well | $3,538,565 | | |
| 3. Total Fraud | $7,085,806 | $12,995,832 | $20,081,638 |
| | | | |
| B. Breach of Lease- | | | |
| 1. Most Favored Nations | $416,325 | $432,529 | $848,854 |
| 2. Unpooling-Black Stone Minerals "A" No. 1 Well | $288,653 | $477,974 | $766,627 |
| 3. Ad Valorem Taxes | $52,257 | $0 | $52,257 |
| 4. Total Breach of Lease | $757,235 | $910,503 | $1,667,738 |
| | | | |
| C. Total Listed Damages | $7,843,041 | $13,906,335 | $21,749,376 |
| | | | |
| D. Plaintiffs' Attorneys' and Experts' Fees Plus Costs | $501,921 | $0 | $501,921 |
| | | | |
| E. Total Trial Court Damages | $8,344,962 | $13,906,335 | $22,251,297 |

## SUMMARY OF THE ARGUMENT

There is legally and factually insufficient evidence to support either the jury's common law or statutory fraud findings. There is factually insufficient evidence to support the jury's finding Hooks, in the exercise of reasonable diligence, could not have discovered his fraud claim until April 2007. Further, there is legally and factually insufficient evidence to support fraud damages and prejudgment interest on those damages.

Common Law Fraud Liability. There is legally and factually insufficient evidence to support Plaintiffs' common law fraud claim for the following reasons:

- The plat was marked "scaled," meaning it was inexact and the distance upon which Plaintiff testified he relied said "1400´± Scaled". A distance of "1400´± Scaled" is too indefinite to form the basis of a misrepresentation when someone is attempting to determine whether a well is 1320 feet from a lease line. Plaintiffs' witnesses admitted there had to be at least some give on the 1400 number, with Plaintiffs' expert admitting it could be a 100 foot tolerance.

- Hooks ignored the "±" part of the plat when he supposedly relied on the "1400´± Scaled" distance call. He could not justifiably have relied on such an indefinite measurement when he was looking for a precise answer to his supposed question—a question he never even posed to Samson.

24

- Hooks admitted he may not have told Samson why he cared about the location of the BSM1 well. Samson's landman, Lanoue, thought Hooks wanted the plat only to see where Plaintiffs' lease was located within the unit, which the plat plainly showed. There was no evidence Samson had any intent in supplying the plat to defraud Plaintiffs into consenting to the unit.

- Plaintiffs failed to prove a duty to disclose existed. First, as a matter of law, no duty to disclose existed. Second, there is legally and factually insufficient evidence of the breach of a duty to disclose. Samson did not know Plaintiffs were relying on the plat in the way Hooks testified. Further, Plaintiffs were not "continuing" to rely on the plat after the date they consented to the unit. Finally, in contrast to the requirement Plaintiffs must lack an equal opportunity to discover "the truth," Plaintiffs had access to multiple public records from which they could have learned the bottom hole's precise distance from their lease line.

Statutory Fraud Liability. Statutory fraud does not even apply to these facts because there was no "sale" of real estate. Moreover, for the same reasons as above, there is legally and factually insufficient evidence of statutory fraud. That claim requires the same misrepresentation, intent, and reliance elements as common law fraud. There is no, or insufficient, evidence of any of those elements.

25

Statute of Limitations for Fraud. The misrepresentation allegedly occurred in February 2001 and Plaintiffs supposedly acted on it in May 2001, when they signed the pooling consent. But Plaintiffs did not file their fraud claim until May 2007. Limitations for fraud is four years. There is factually insufficient evidence to support the jury's finding that Plaintiffs, by exercising reasonable diligence, could not have discovered their fraud claim until April 2007. Hooks' testimony on the issue was nothing more than a statement of when he actually learned about the claim. He did not provide any evidence why, in the exercise of reasonable diligence (as an experienced oil and gas attorney and mineral owner), he could not have discovered his claim earlier. Accordingly, there is factually insufficient evidence to support the jury's answer to when Plaintiffs could have discovered the alleged fraud by exercising reasonable diligence.

Improper Fraud Damages. There was legally and factually insufficient evidence supporting Plaintiffs' damages evidence for the following reasons:

- There was no evidence of a fraud measure of damages. Instead, Plaintiffs presented only breach of lease damages as alleged fraud damages.

- Although Plaintiffs attempted to categorize their damages as "consequential" damages, they never pleaded for consequential damages.

- In this alleged fraud in the inducement case, Plaintiffs had a choice of (1) setting aside the agreement they claim they were induced to sign (the

26

pooling consent) or (2) standing on that agreement and seeking fraud damages. Plaintiffs never attempted to set aside the agreement to pool but nevertheless sought damages as if that consent to pooling did not exist. Throughout this case, they accepted royalty payments from that unit and continue to do so to this day.

- Approximately half of Plaintiffs' claimed fraud damages were attributable to another well—the DuJay1 well—as to which Hooks admitted he was not defrauded. Moreover, to the extent Plaintiffs were seeking compensatory royalty damages for the DuJay1 well, there was no evidence (and insufficient evidence) those damages were foreseeable at the time the alleged fraud supposedly occurred.

- Almost ⅔ of the fraud damages ($12,995,832) represents an improper contractual "late charge" of 18% compounded monthly. The 18% interest rate "only" applies to "past due royalties" not to fraud damages. *Hooks*, 457 S.W.3d at 69-70. Fraud damages are an "other recovery" to which "the statutory rate of 5% applies." *Id.* at 70. Here, the 18% contractual late charge was incorporated into the fraud damages calculations and is part of the jury's damages award, so there is no proper evidence of fraud damages. PX608; 1Supp2dCR:6.

27

- The fraud damages also incorporated damages for formation production. The Supreme Court held Plaintiffs are not entitled to formation production damages. Accordingly, the fraud damages must be reversed.

- Plaintiffs have continued to accept royalties from the unit. Accordingly, those payments have to be taken into account if any damages are awarded to Plaintiffs.

Recalculation of Favored Nations Damages. The parties entered into a stipulation of the favored nations damages, both with and without formation production damages. The favored nations damages awarded in the original judgment are incorrect now because they, like the fraud damages, include formation production damages. Thus, the favored nations damages need to be recalculated. Moreover, because the damages currently only go through May 2008, Plaintiffs certainly will request those damages be made current. As a consequence, this Court should remand the favored nations damages to be recalculated by the trial court. In connection with that remand, Plaintiffs asserted the late payment provision provides for *monthly* compounding of interest at 18%. The Supreme Court agreed to the 18% interest rate for past-due royalties. But Plaintiffs are entitled to prejudgment interest measured by the standard "simple" interest measure. Other courts, interpreting contract language similar to the language at issue in this case, have held the language allows for 18% *simple* interest.

## ARGUMENT

### A.      Standard of Review

Samson's appeal presents both legal and factual insufficiency of the evidence challenges to the jury's findings on fraud and fraud damages. Further, this appeal presents factual insufficiency challenges to the jury's limitations finding on fraud. Finally, this appeal presents legal questions surrounding damages remand, interest calculation questions, and damages recalculations.

This Court should sustain a legal sufficiency challenge on issues on which Plaintiffs bear the burden of proof if "the evidence demonstrates a complete absence of a vital fact, or if the evidence offered is no more than a scintilla." *Burbage v. Burbage*, 447 S.W.3d 249, 259 (Tex. 2014). "We regard evidence that creates a mere surmise or suspicion of a vital fact as, in legal effect, no evidence." *Id.*; *accord Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 601 (Tex. 2004). The evidence must be considered in the light most favorable to the judgment but credit must be given to evidence a reasonable juror could not disregard. *City of Keller v. Wilson*, 168 S.W.3d 802, 807 (Tex. 2005).

When considering a factual sufficiency challenge, the court "must consider and weigh all of the evidence, not just that evidence which supports the verdict." *Maritime Overseas Corp. v. Ellis*, 971 S.W.2d 402, 407 (Tex. 1998). The appellate court is authorized to set aside the verdict in the circumstance that it is so contrary

to the overwhelming weight of the evidence that the verdict is clearly wrong and unjust. *Id.*; *see also Ortiz v. Jones*, 917 S.W.2d 770, 772 (Tex.1996).

The Supreme Court did not decide the legal or factual sufficiency of Plaintiffs' fraud claims. This Court reversed and rendered judgment on the fraud claim based on limitations. The Supreme Court held that ruling was incorrect and remanded for this Court's consideration of the other arguments "concerning Hooks' fraudulent inducement claims" including "the factual and legal sufficiency of the evidence with regard to common-law fraud, statutory fraud, and damages for fraud…." 457 S.W.3d at 61. Furthermore, the limitations issue has been remanded for reconsideration on factual sufficiency grounds.

Nothing in the Supreme Court's opinion addresses the fraud liability and damages challenges now remanded to this Court. Nor is there any decision on limitations factual sufficiency.

**B.    There is Legally and Factually Insufficient Evidence of Common Law Fraud**

To recover damages for fraud, Plaintiffs must prove:

(1) a material representation that was false when made; (2) when the representation was made, the speaker knew it was false or made it recklessly as a positive assertion without any knowledge of its truth; (3) the speaker made the representation with the intent that the other party should act upon it; (4) the party actually and justifiably relied on the representation; and (5) thereby suffered injury.

30

*Miller v. Raytheon Aircraft Co.*, 229 S.W.3d 358, 380-81 (Tex. App.—Houston [1st Dist.] 2007, no pet.). "Fraudulent inducement is a subspecies of fraud; 'with a fraudulent inducement claim, the elements of fraud must be established as they relate to an agreement between the parties.'" 457 S.W.3d at 57 (quoting *Haase v. Glazner,* 62 S.W.3d 795, 798–99 (Tex.2001)).

1.  *There is legally and factually insufficient evidence of a misrepresentation on which Hooks claims to have relied*

Hooks' reliance was limited. He made it very clear he only relied on the plat, and then on only one representation on the plat: the line saying "1400´± Scaled." He repeatedly disclaimed any reliance on Lanoue's statements in their telephone call. 12RR:181-183; 13RR:33-36, 68. He testified the "plat speaks for itself," he did not need "any clarification" and the plat was "more accurate" than Lanoue's "verbal estimation." 12RR:181-183; 13RR:33-36.

Hooks did not point to anything else on which he relied. He did not claim he had relied upon the X,Y coordinates on the plat. He testified he disregarded the contradictory statement in the legend that the well was bottomed "1400´± Scaled" from the east line of the unit. 13RR:38-39. Hooks did not rely on anything other than the plat and he relied only on the one statement on the plat.

The problem is the plat does not say "1400´ absolute." That is plainly how Hooks read it; but that it not what it says. The plat does not say it is an accurate survey. In fact, it says the opposite. Hooks admitted at trial "scaled" means there

31

may be inaccuracies in the plat. 13RR:71 (admitting there could be "some room for error" in a plat that says it is "scaled"); 16RR:62-63 (scaled map is subject to error). And the plat does not say "1400´". It says "1400´± Scaled". And the measurement was to a waterway whose boundaries can move.

Both the statement the plat is "scaled"—meaning it says on its face it is inaccurate—and the statement "1400´±" mean the plat did not represent the line measured anything precisely 1400 feet from Plaintiffs' lease.

The symbol "±" indicates a tolerance from 1400 feet. Plaintiffs' expert surveyor explained Lanoue's original verbal estimate that the well was approximately 1500 feet from Plaintiffs' lease could be explained by the plat's indication of "1400´±". 12RR:53, 67-68; *see also* 13RR:36, 68 (Hooks similarly excusing Lanoue's 1500 foot description). In other words, "1400´± Scaled" could mean a variance of 100 feet one way or the other. 12RR:53, 67-68. If "1400´±" could include 1500 feet, then it could equally encompass 1300 feet. 1300 feet would place the well closer than 1320 feet to Plaintiffs' lease.

Indefinite statements cannot form the basis of a misrepresentation. *Bradford v. Vento*, 48 S.W.3d 749, 759 (Tex. 2001).[7] The purpose of using terms like "more or less" or "plus or minus" is to relieve exactness. 4 A. LEOPOLD, TEXAS PRACTICE

---

[7] Accord, *Simulis, L.L.C. v. Gen. Elec. Capital Corp.*, 439 S.W.3d 571, 577, 579 (Tex. App.— Houston [14th Dist.] 2014, pet. denied); *Ikon Office Solutions v. Eifert*, 125 S.W.3d 113, 128 n. 11 (Tex. App.—Houston [14th Dist.] 2003, pet. den.); *In re Media Arts Group, Inc.,* 116 S.W.3d 900, 910 (Tex. App.—Houston [14th Dist.] 2003, orig. proc.).

SERIES, LAND TITLES AND TITLE EXAMINATION, §15.15 (3d Ed. 2015). Adding "±" to a number signals indefiniteness, as Plaintiffs' expert confirmed. Plaintiffs' surveyor could not put a number on what "±" might mean. 12RR:54. However, she allowed that "1400′±" could permit differences of 100 feet. 12RR:53, 67-68. Hooks testified he thought "±" meant a few feet one direction or another. 13RR:36.

Courts addressing acreage or distance calls using terms like "plus or minus" or "more or less" allow for variances at least up to 10%. *See Slagle v. Clark*, 237 S.W.2d 430, 433-34 (Tex. Civ. App.—Amarillo 1951, no writ); *Harkins v. North Shore Energy, L.L.C.*, No. 13-12-00504-CV, 2014 WL 1789572, at *8 (Tex. App.—Corpus Christi May 1, 2014, pet. pending) ("more or less" allowed a difference greater than 5%). For example, the *Slagle* court observed one jurisdiction had fixed the discrepancy at 10%. *Slagle* noted the discrepancy before it was less than 10% and held there was no fraud. *Id*. at 434; *see also* 26A C.J.S. Deeds § 274 (2015) ("more or less" relieves a "stated distance or quantity of the attribute of exactness").

Here, if the 10% rule is applied, "1400′±" would include everything from 1260 to 1540 feet. Even greater latitude is warranted when the term "Scaled" is used. There is less than a 6% difference between 1400 and 1320. So, even if someone read the plat as did Hooks, ignoring the arrow showing the well's bottom-hole location to be about 1050 feet from Plaintiffs' lease line, there was no

33

misrepresentation. "1400′± Scaled" warns it is inaccurate and the "±" causes "1400′" to be too close to the 1320 foot line. There was no actionable misrepresentation here as a matter of law. Alternatively, there is factually insufficient evidence to support the jury's finding.

Furthermore, Hooks specifically admitted at trial there was no fraud as to a substantial portion of what the jury awarded as fraud damages. Plaintiffs' expert presented fraud damages that included compensatory royalties supposedly owed on two wells—the BSM1 well (located in the BSM1 unit where the fraud supposedly occurred) and *another* well—the DuJay1 well. PX608; 19CR:3268 (jury awarding amount to which Plaintiffs' expert testified). Half what the jury awarded for fraud was for the DuJay1 well. PX608 ($3,538,565.24 of the total $7,085,806.02 fraud damages is for DuJay1 well; an additional $12,995,832.05 is "late charges" for both wells). But the DuJay1 well was not drilled until significantly after Plaintiffs consented to the BSM1 unit, and was in a different unit from the BSM1 well. Hooks admitted he was not defrauded as to the DuJay1 well. Hooks was asked: "*[N]obody did anything to deceive you or defraud you with respect to the DuJay 1 well, did they*?" He answered: "*Not that I'm aware of*." 13RR:53.

So, Hooks admitted there was no fraud with regard to the well comprising half the jury's award for fraud damages.

2.    *There is legally and factually insufficient evidence of reliance*

For the same reasons the uncertainty of "1400′± Scaled" means there was no legally or factually sufficient evidence of misrepresentation, there was similarly no and insufficient evidence of reliance. Hooks' testimony demonstrates he treated "1400′±" as if it was simply "1400′."   13RR:36. He did not "rely" on what was represented to him. He concluded the distance from the well to his property was 1400 feet, exactly, and he relied upon *his own conclusion*. He did not rely on Samson's plat, which said the "1400′" was "±" and the entire plat was "Scaled."

There must be legally and factually sufficient evidence that a plaintiff "actually" and justifiably relied on the alleged misrepresentation. *Ernst & Young, L.L.P. v. Pac. Mut. Life Ins. Co.*, 51 S.W.3d 573, 577 (Tex. 2001); *accord*, *Nat'l Prop. Holdings, L.P. v. Westergren*, 453 S.W.3d 419, 423 (Tex. 2015); *Hartford Fire Ins. Co. v. C. Springs 300, Ltd.*, 287 S.W.3d 771, 781 (Tex. App.—Houston [1st Dist.] 2009, pet. denied). The evidence here is lacking. Hooks "relied" on something other than the plat description. He relied on his own mental filling-in of the number "1400′" without taking into account the "± Scaled." Hooks assumed an answer to his unexpressed question concerning the well's location from Samson's indefinite statement "1400′± Scaled," contained on a plat sent to Hooks for another purpose, and did not tell Samson he had leaped to that conclusion or otherwise seek confirmation.

35

Cases hold a plaintiff has not relied as a matter of law when the statements he supposedly relied upon are indefinite. *Grant Thornton LLP v. Prospect High Income Fund*, 314 S.W.3d 913, 923 (Tex. 2010) (quoting *Lewis v. Bank of Am. NA*, 343 F.3d 540, 546-47 (5th Cir. 2003); *Sawyer v. E.I. Du Pont de Nemours and Co.*, 430 S.W.3d 396, 401 (Tex. 2014); *Montgomery Cnty. Hosp. Dist. v. Brown*, 965 S.W.2d 501, 503 (Tex. 1998).

There was legally and factually insufficient evidence of reliance.

3. *There is legally and factually insufficient evidence Samson intended to defraud Plaintiffs*

There is no and insufficient evidence Samson intended for Plaintiffs to rely on the "1400′± Scaled" or any other measurement on the plat to determine the distance between their lease and the bottom-hole location of the BSM1 well. Hooks was asked at trial whether he mentioned his concerns about Samson's offset obligations during the conversation with Lanoue that resulted in Lanoue's sending the plat. 13RR:25. Hooks admitted he may not have mentioned them:

Q. Did you mention to Mr. Lanoue anything about offset obligations in that phone call?

A. [Hooks] *I don't know if we specifically talked about offset obligations.* We talked about the location of the well; and I believe that was clear, that that was a potential issue.

Q. *Well, you did not tell Mr. Lanoue that you were concerned about whether the well was going to be within 1,320 feet. You never said that specifically, did you?*

A. *I may not have….* [13RR:25 (emphasis added).]

36

Lanoue testified he sent this plat because he understood Hooks wanted to visualize the location of Plaintiffs' Lease within the unit:

> Q. And, then, did you then send Mr. Hooks some additional information about the Black Stone Minerals well and unit?
>
> A. [Lanoue] He had called and was not sure—was not sure where their land was laying. He wanted to know where their tract was going to be located within the unit and requested a plat. So, I sent him one. I faxed him one. [12RR:124.]

Lanoue also testified the lease's offset provision was not a topic of conversation when he sent the plat to Hooks. 12RR:92-93. Lanoue explained, "*The plat I'd sent to the Hooks wasn't intended to be a plat showing where the—how far away the well was located. It was purely an informational plat to show where their tract was to be located within the unit.*" 12RR:93 (emphasis added). The plat sent to Hooks was not one created at Hooks' request. Lanoue drew it six months before he ever talked to Hooks. 12RR:49-50. Moreover, Lanoue used it and similar plats from August 2000 through October 2001. 12RR:49-50.

Samson derived no advantage—monetary or otherwise—from Plaintiffs' 50 acres being in the unit. Plaintiffs' 57.25% cotenant in the lease—the Broussards—already had agreed to the pooling. 15RR:63. If Plaintiffs refused to join the unit, Samson could have released their 50 acres from their lease. PX25 ¶IV(B). The Jefferson County lease expressly gave Samson the authority "at any time" to

release any portion of the lease "and be relieved of all obligations as to the acreage surrendered." PX25¶IV(B).

Had Samson been aware of Mr. Hooks' allegations earlier, it obviously would have released Plaintiffs' lease, and Plaintiffs would have received none of the $510,000 Samson paid them for their participation in the BSM1 unit through May 2008, plus additional payments thereafter. 15RR:63. Samson's geophysicist, Mr. Beale, testified without contradiction that if Hooks had refused to consent to the unit, Samson would have released Plaintiffs' Jefferson County lease. 15RR:62. Most of the Jefferson County lease was separated from productive acreage by a geological fault. 15RR:65-66. Hooks agreed that, had Samson released his lease and kept the Broussard lease in the unit, Samson would have made more money than it did by including Plaintiffs' interest in the unit:

> Q. And if you did not join the unit and your property was released, your interest in the property was released, the portion that would have gone to you would have just stayed with Samson, wouldn't it?
>
> A. I believe that's correct.
>
> Q. And that's perfectly legal, isn't it?
>
> A. Yes.
>
> Q. They would not have been doing anything improper, illegal, or wrong by doing that, would they?
>
> A. I suppose not.
>
> Q. So, they had zero incentive, didn't they, Mr. Hooks, to feel compelled to do whatever it took to get you into the unit?
>
> A. I don't know what their incentive is.

Q. Given that they had more money in their pocket without you going into the unit, would you agree with me that certainly is a counterincentive?

A. I—if that were the case, it would appear to be.

13RR:44. Hooks could not identify any reason why Samson would want to defraud him into consenting to the unit. 13RR:44; *see also* 15RR:63. In other words, Samson would have benefitted by releasing Plaintiffs' lease and excluding Plaintiffs from the unit, rather than by including them.[8]

Proof of intent requires something more than a foreseeable possibility someone *might* rely on something. "The mere fact that it *should be* known that another will rely upon a misrepresentation does not, of itself, establish that the misrepresentation was made with the intent to induce reliance." *Blue Bell, Inc. v. Peat, Marwick, Mitchell & Co.*, 715 S.W.2d 408, 415 (Tex. App.—Dallas 1986, writ ref'd n.r.e.); *see Ernst & Young*, 51 S.W.3d at 579-80 (citing *Blue Bell*). Rather, "[t]he 'intent' element of a fraud action imports a significantly greater degree of purposeful conduct than does the 'foreseeability' element of a negligence action." *Blue Bell*, 715 S.W.2d at 415; *Willis v. Marshall*, 401 S.W.3d 689, 702 (Tex. App.—El Paso 2013, no pet.) (quoting *Blue Bell* in a fraudulent inducement

---

[8] There is a breach notification provision in the Jefferson County lease, but Plaintiffs never complied with it. *See Arbor Windsor Court, Ltd. v. Weekley Homes, LP*, No. 14-13-00480-CV, 2015 WL 1245548, at *1 (Tex. App.—Houston [14th Dist.] Mar. 17, 2015, no pet.) (breach notification provision is condition precedent). Because Samson was not informed of any potential breaches, it did not release any portion of the Hooks lease, which it was free to do at any time. Had Samson released Plaintiffs' lease in whole or in part, Plaintiffs would have received no money from the BSM1 unit and Samson would have avoided Plaintiffs' fraud claim with all the attendant costs.

case); *see also Ehrhardt v. Elec. & Instrumentation Unlimited*, 220 F. Supp. 2d 649, 660 (E.D. Tex. 2002). There is legally and factually insufficient evidence of an intent to defraud.

4.    *There is legally and factually insufficient evidence of a duty to disclose or any failure to disclose*

     a.    <u>There is legally and factually insufficient evidence of a *duty* to disclose</u>

Question No. 1 presented the jury with alternative instructions on intentional misrepresentation and a failure to disclose. 19CR:3266. Samson objected to these instructions because there was no evidence raising a duty to disclose. 17RR:28.

Whether a party has a duty to disclose is a question of law. *Bradford*, 48 S.W.3d at 755. "Generally, no duty of disclosure arises without evidence of a confidential or fiduciary relationship." *Ins. Co. of N. Am. v. Morris,* 981 S.W.2d 667, 674 (Tex. 1998).

Restatement of Torts §551 describes other circumstances where parties may have a duty to disclose. RESTATEMENT (SECOND) OF TORTS, §551 (1977). Here, the instruction apparently was based on an alleged duty to disclose "subsequently acquired information." *Id*. But the Supreme Court has "never adopted section 551." *Bradford*, 48 S.W.3d at 756.[9] Samson did not have a fiduciary or

---

[9] As the Fifth Circuit noted, "[a] reasonable jurist might well conclude … that a duty to disclose exists in Texas only in the context of a confidential or fiduciary relationship." *United Teacher Assocs. Ins. Co. v. Union Labor Life Ins. Co.*, 414 F.3d 558, 566 (5th Cir. 2005). Nevertheless, "courts after *Bradford* (including [the Fifth Circuit]) have not gotten the message, but have

40

confidential relationship with Plaintiffs that could create a duty to disclose. *See HECI Exploration Co. v. Neel*, 982 S.W.2d 881, 888 (Tex. 1998). There was no duty to disclose as a matter of law in this case.

Even if there were a duty to disclose outside a fiduciary or confidential relationship, that duty would not have existed here. In this case, the "duty to disclose" supposedly arose "when a party makes a representation and later acquires new information which makes the representation untrue or misleading…." 19CR:3266 (jury instructions). Under that circumstance, there is supposedly a duty to "disclose such information to anyone whom [the party] knows to be still acting on the basis of the original statement." *Id.* Plaintiffs asserted Samson had a duty to notify Plaintiffs of a change made to its plat in November 2001, correcting the bottom-hole location. 17RR:8.

In order for a duty to disclose to exist under these instructions, there had to be sufficient evidence Samson knew (1) Hooks had relied on the "1400´± Scaled" notation and (2) was "still acting on the basis of the original statement." 19CR:3266; *see also* RESTATEMENT §551. There was no (and insufficient) evidence of either of these two elements. First, there is legally and factually insufficient evidence Samson knew Hooks had used the plat to determine whether the well was 1320 feet from his lease. Second, Plaintiffs had already taken the one

instead continued to find that a duty to disclose can exist in Texas absent a confidential or fiduciary relationship." *Id.*

41

action Hooks testified they took based on the plat—signing a written consent to pooling on May 25, 2001. Since the plat was not corrected until November 2001, there is no or insufficient evidence Plaintiffs were "still acting on the basis of the original statement."

        b.     <u>There is legally and factually insufficient evidence of a *failure* to disclose</u>

The charge defined a "failure to disclose" as:

> [1] the party fails to disclose a material fact within the knowledge of that party; [2] the party knows that the other party is ignorant of the fact and does not have an equal opportunity to discover the truth; [3] the party intends to induce the other party to take some action by failing to disclose the fact; and [4] the other party suffers injury as a result of acting without knowledge of the undisclosed fact. [19CR:3266.]

Bearing in mind the alleged "failure to disclose" was of Samson's November 2001 plat (17RR:8), there was no or insufficient evidence of three of the four stated elements. Skipping to the <u>third element</u>, there was no or insufficient evidence Samson intended to induce Hooks to do anything when it sent him the original plat, or when it did not send him the corrected plat. There was no or insufficient evidence Samson knew Hooks was trying to determine whether the bottom hole was within 1320 feet of Plaintiffs' lease; Hooks had not said that was why he wanted the plat. 12RR:124; 13RR:25. On the <u>fourth element</u>, Plaintiffs suffered no injury because of the alleged subsequent nondisclosure. The only injury of which Plaintiffs complain is their granting written consent to pooling. They had already

sustained that supposed "injury" previously when they agreed to include their 50 acres in the unit; that occurred significantly before the time Samson corrected the plat.

The second element calls for sufficient evidence Samson knew Hooks was ignorant of the well's distance from his land and did not "have an equal opportunity to discover the truth…." 19CR:3266. As stated above, there is no or insufficient evidence Samson knew Hooks was silently questioning the bottom hole's distance from his lease line. Moreover, there is no evidence Plaintiffs lacked an equal opportunity to discover the truth. Hooks could have directly *asked* Samson whether the well's bottom hole was within 1320 feet of Plaintiffs' lease or whether the offset obligations had been triggered; but he did not. He was an experienced Texas oil and gas attorney who could have requested the directional survey from Samson. But he did not do that either.

Furthermore, Hooks could have reviewed publicly-available records. "[F]ilings and other materials publicly available from the Railroad Commission are a ready source of information…." *HECI*, 982 S.W.2d at 887. "As owners of an interest in the mineral estate, [Plaintiffs] had some obligation to exercise reasonable diligence in protecting their interests." *Id*. at 886.[10] The Texas

---

[10] The Supreme Court fraud holdings were limited to the limitations issue. 457 S.W.3d at 61. Its holdings and other statements do not assert Plaintiffs did not have *access to* the Railroad

43

Administrative Code requires a directional survey be filed at the Railroad Commission.[11] 16 Tex. Admin. Code §3.11 (2015). Parties are presumed to know the law. *See Greater Houston Transp. Co. v. Phillips*, 801 S.W.2d 523, 525 n.3 (Tex. 1990) ("all persons are presumed to know the law.").

In accordance with Railroad Commission requirements, a directional survey had been filed with the Railroad Commission six months before Lanoue contacted Hooks. DX5. Hooks could have used it to determine (or have someone determine) the well's precise bottom hole location. DX5; 12RR:80; 16RR:53-54, 72, 85-86, 102-03. A plat (the "Schlumberger plat") was filed along with the survey. DX13. Although "some data on the plat does not completely correspond to the data on a later correct plat," the Supreme Court noted "the plat correctly placed the bottom hole within the protected zone." 457 S.W.3d at 56 n. 4. In fact, the Schlumberger plat shows the location of the well's bottom hole as being only slightly further away from Plaintiffs' lease than the 1080 feet originally planned. Thus, Plaintiffs had access to official records showing the well's bottom hole was within 1320 feet of Plaintiffs' lease.

There is legally and factually insufficient evidence of a failure to disclose.

---

Commission records for purposes of a duty to disclose or that Plaintiffs did not have "an equal opportunity to discover the truth."

[11] A directional (or inclination) survey is "[a] well survey that measures the degree of departure of a hole from the vertical and the direction of the departure." 8 H. WILLIAMS & C. MEYERS, OIL AND GAS LAW 265 (2008).

**C.      There is Legally and Factually Insufficient Evidence of Statutory Fraud**

In Question No. 2, the jury found Samson violated Tex. Bus. & Com. Code §27.01(a), which proscribes fraud in a real estate transaction. That statute is a form of penalty and is strictly construed. *Porter v. Irvine*, 658 S.W.2d 711, 715 (Tex. App.—Houston [1st Dist.] 1983, no writ); *Ratcliff v. Trenholm*, 596 S.W.2d 645, 650 (Tex. Civ. App.—Tyler 1980, writ ref'd n.r.e.).

1.      *Statutory fraud does not apply to this case because there is no real estate transaction of the type required by that statute*

The May 25, 2001 consent to pooling did not effect a sale of real estate. Rather, it granted consent for Samson to pool a mineral interest Samson already held under Plaintiffs' Jefferson County Lease. The agreement did not involve a transaction within §27.01.

Texas courts hold §27.01 is limited to misrepresentations made to induce another into a contract "for *the sale* of land or stock." *Burleson State Bank v. Plunkett*, 27 S.W.3d 605, 611 (Tex. App.—Waco 2000, pet. denied) (emphasis added); *Nolan v. Bettis*, 577 S.W.2d 551, 556 (Tex. Civ. App.—1979, writ ref'd n.r.e.). The statute does not apply where there is "no sale of real estate … as contemplated by the statute." *Life Ins. Co. v. Murray Inv. Co.*, 646 F.2d 224, 227 n.2 (5th Cir. 1981). Here, there was no such sale. Samson gained a limited power to pool a mineral estate it already owned as lessee.

45

2. *There is legally and factually insufficient evidence of the elements of statutory fraud*

For the same reasons there was legally and factually insufficient evidence of common law fraud, the evidence was equally lacking as to statutory fraud. Statutory fraud requires proof of a misrepresentation of a material fact, intent to induce reliance, and reasonable reliance by the person entering the contract. *Schlumberger Tech. Corp. v. Swanson*, 959 S.W.2d 171, 182 (Tex. 1997); *Petras v. Criswell*, 248 S.W.3d 471, 475 (Tex. App.—Dallas 2008, no pet.); *Spethmann v. Anderson*, 171 S.W.3d 680, 688 n.1 (Tex. App.—Dallas 2005, no pet.).

As with common law fraud, "a representation is not material if it is 'vague and indefinite in its nature and terms.'" *In re Webber,* 350 B.R. 344, 367 (Bankr. S.D. Tex. 2006); *see also Sawyer*, 430 S.W.3d at 401; *Montgomery Cnty.*, 965 S.W.2d at 503. The "1400´± Scaled" line was indefinite and could not have been the basis of a material representation. *See Bradford*, 48 S.W.3d at 759; *Slagle*, 237 S.W.2d at 433-34. Nor could Hooks justifiably rely on the "1400´±" description. *See Lewis*, 343 F.3d at 546-47; *Montgomery Cnty.*, 965 S.W.2d at 503. Likewise, there is no and insufficient evidence Samson intended to use the plat to convince Hooks the well was more than 1320 feet from his property. There is legally and factually insufficient evidence of a misrepresentation, reliance, or intent to support the jury's finding on Question No. 2.

46

Since statutory fraud fails, the judgment's award of expert witness fees and deposition costs, which rest on §27.01(e), should be reversed.

**D. There is Factually Insufficient Evidence to Support the Jury's Finding that Plaintiffs Could Not Have Discovered the Alleged Fraud Claim until April 2007**

Plaintiffs consented in 2001 to Samson's pooling of acreage from their Jefferson County lease to form the BSM1 unit. PX65 (agreement), PX157 (consenting again as to interest specified in PX156). Over 5 years later, in November 2006, Plaintiffs joined the already-pending and consolidated *Lee* and *Klorer* actions. 3CR:440; 12RR:165-67; 13RR:50-51. The *Lee* and *Klorer* actions did not include fraud allegations. 1CR:2, 114; 2CR:297; 3CR:391, 413. Plaintiffs did not plead fraud until May 2007, nearly 6 years after Plaintiffs consented to the unit. 4CR:467, 490-92. The statute of limitations for fraud is four years. *Williams v. Khalaf*, 802 S.W.2d 651, 652 (Tex. 1990). Plaintiffs cannot legally prejudice Samson by sitting on claims for so long.

With regard to limitations, the jury was asked: "By what date should the Hooks, in the exercise of reasonable diligence, have discovered the fraud of Samson?" 19CR:3274. Hooks testified the alleged fraud was "discovered" in Spring 2007. 12RR:165-67; 13RR:50-51. Initially, the jury answered the limitations question: "Hooks Birthday." 19CR:3274. Hooks had met Paul Simpson, Plaintiffs' lead trial lawyer, on Hooks' birthday in 2006 at a lunch meeting of the

47

Houston Bar Association's Oil Gas and Mineral Law section. 12RR:165-66. Instructed to clarify their answer, the jury responded "April 2007"—months after Hooks' birthday. 19CR:3274; 12RR:165-66.

There is factually insufficient evidence to support the jury's finding that Plaintiffs should not have discovered facts putting them on notice of the alleged fraud before April 2007.

The following testimony is the only evidence touching on why Plaintiffs supposedly should not have, in the exercise of reasonable diligence, discovered their fraud claim until 2007:

> Q.  Well, at what point in time just generally did you-all, through the discovery process, uncover what had happened to you?
>
> A.  Oh, I think it was in the spring, the following spring that information came out. [12RR:167.]
>
> ***
>
> Q.  Now, once—I guess it was in the fall of 2006 when you and Mr. Simpson ran into each other up at the Houston Club, right?
>
> A.  Yes.
>
> Q.  And that's the first time that you—or sometime thereafter—and I don't know if it was that day or when—but at some point then you became, you know, unhappy and felt like you had been defrauded, right?
>
> A.  After some further information came to light that that was apparently the situation. [13RR:50-51.]

That is it: a simple bald-faced statement something came to light sometime during the spring of 2007 in discovery. There is no explanation why the claim—

which at least could have been discovered in various separate public records—could not have been discovered previously. There is no explanation why discovery was needed to find out about the fraud claim. There is no explanation what facts discovery revealed to Plaintiffs that put them on notice of alleged fraud. Nothing. There is the bare assertion, and nothing more.

The fraud claim is based on the location of a well. That well had been in the same place since July 2000 when Schlumberger ran the directional survey and since August 2000 when Schlumberger filed that survey in the Railroad Commission records. It is not as if Plaintiffs were dealing with a moving target. The well's bottom-hole location has been in the same place since the summer of 2000. Why it took Plaintiffs nearly seven years to locate the well's bottom-hole is a mystery.

Moreover, the "April 2007" answer is wholly unsupported by the uncontradicted evidence Plaintiffs, themselves, put in the record. Plaintiffs acknowledge Samson filed a *correct* plat in the official public records of both Hardin and Jefferson Counties in January and February 2003. 16RR:13 (Plaintiffs' cross-examination); PX19. That plat showed the correct bottom-hole location for the BSM1 well and was attached to an amended unit designation. 11RR:183-84; 12RR:6-7; 16RR:13; PX19.

So according to Plaintiffs' own evidence, *the official public land records of Jefferson County contained correct bottom-hole location information more than four years prior to the date Plaintiffs filed their fraud claims*.

Plaintiffs did not introduce a scintilla of evidence regarding why "in the exercise of reasonable diligence" Hooks should not have discovered the alleged fraud before April 2007. Plaintiffs provided no explanations or details, but only a bare assertion of when the alleged fraud was actually discovered, without further explanation. Evidence is insufficient when it is only "generalized" and "conclusory." *Serv. Corp. Int'l v. Guerra*, 348 S.W.3d 221, 232 (Tex. 2011). "Bare assertions" with no accompanying explanation do not provide sufficient evidence to pass the scintilla threshold. *Jelinek v. Casas*, 328 S.W.3d 526, 540 (Tex. 2010).

If Hooks' testimony were sufficient to establish when facts putting him on notice of alleged fraud should have been discovered in the exercise of reasonable diligence, then there is little reason to have limitations in fraud cases. His testimony was, in essence, "we discovered the claim when we discovered it." So long as someone testifies a claim was not discovered until it was discovered, then all fraud claims and all claims subject to the discovery rule will be timely filed.

The question was "By what date *should* the Hooks, *in the exercise of reasonable diligence*, have discovered the fraud of Samson?" 19CR:3274 (Question 9, emphasis added). There was no evidence concerning the "should" part

of this inquiry and there was no evidence concerning the "exercise of reasonable diligence" inquiry. There was only an answer to the unasked and irrelevant question, "when did you happen to discover the alleged fraud?"

There is factually insufficient evidence to support the jury's response to Question 9, and this Court should remand for a new trial on the limitations issue.

**E.      There is Legally and Factually Insufficient Evidence to Support the Fraud Damages Finding**

Plaintiffs' evidence was of a legally incorrect measure of damages.[12]   The judgment for $20,081,638.07 for "damages proximately caused by fraud" should be reversed. 19CR:3268 (verdict); 1Supp2CR:6 (judgment). There is no evidence and factually insufficient evidence to support the jury's answer to Question 3.

Leading up to trial, Plaintiffs pleaded, first, that they were not in the BSM1 unit and Samson had breached the Jefferson County lease by not meeting its offset obligations. 16CR:2756-57. In the alternative, Plaintiffs pleaded that, if they were in the unit, it was because Samson defrauded them into giving consent. 16CR:2759. The trial court granted Samson's motions for summary judgment on Plaintiffs' offset obligations breach of lease claims. 18CR:3162. That left Plaintiffs with only a fraud-in-the-inducement claim. But Plaintiffs continued to seek the identical contract measure of damages, even including damages for a well as to

---

[12] Samson repeatedly objected to Plaintiffs' use of an incorrect measure of damages. 18CR:3171-73, 3200-07, 3232; 19CR:3322-26, 3353-58; 10RR:43-44; 17RR:10-14.

51

which they admitted there was no fraud. So Plaintiffs pursued fraud liability, but sought breach of contract damages. Awarding judgment for contract damages was error. There was no legally or factually sufficient evidence to support the damages awarded.

Because Plaintiffs chose to pursue an incorrect measure of damages, there is no evidence of damages. The damages testimony is based on a flawed methodology and is "no evidence" of damages or causation. *City of Keller*, 168 S.W.3d at 813; *Kerr-McGee Corp. v. Helton*, 133 S.W.3d 245, 247 (Tex. 2004), *abrogated in part on other grounds*, *Coastal Oil & Gas Trust v. Garza Energy Trust,* 268 S.W.3d 1, 18-19 (Tex. 2008).

For all the following reasons, the jury's fraud damages award was unsupported and should be reversed and either rendered or remanded:

1. *Plaintiffs did not prove fraud damages and, instead, proved only the same damages they would have presented for the breach of oil and gas lease claim they previously lost on summary judgment*

There are two measures of fraud damages for the necessary and usual result of fraud: (1) out-of-pocket and (2) benefit-of-the-bargain. *Baylor Univ. v. Sonnichsen*, 221 S.W.3d 632, 636 (Tex. 2007); *Fortune Prod. Co. v. Conoco, Inc.*, 52 S.W.3d 671, 681 (Tex. 2000). Out-of-pocket damages are restitutionary damages that "measure the difference between the value of that which was parted with and the value of that which was received." *Sonnichsen*, 221 S.W.3d at 636;

52

*see also Formosa Plastics Corp. v. Presidio Eng'rs & Contractors, Inc.,* 960 S.W.2d 41, 49 (Tex. 1998). Benefit-of-the-bargain damages derive from an expectancy theory and "evaluate the difference between the value that was represented and the value actually received." *Id*. The damages for statutory fraud are measured in the same way as common law fraud. *Scott v. Sebree*, 986 S.W.2d 364, 368 (Tex. App.—Austin 1999, pet. denied). Leading up to trial, Plaintiffs pleaded an out-of-pocket damages measure (16CR:2760-61), but the evidence does not fit within that measure.

The charge did not instruct the jury to find either out-of-pocket damages or benefit-of-the-bargain damages. 19CR:3268. Instead, it asked only about Plaintiffs' "lost income." 19CR:3268. After trial, Plaintiffs' motion for judgment plainly admitted the judgment "is based on contract, *i.e.*, Plaintiffs' oil and gas leases with Samson." 19CR:3281. Plaintiffs elected to present *only* contract damages to the jury. The judgment rests on fraud liability findings, but on contract damages.

Calculations that take into account "expected lost profits on a bargain that was never made" are not properly a part of an out-of-pocket calculation. *Formosa Plastics,* 960 S.W.2d at 49. Plaintiffs' damages formula was composed entirely of lost profits in the form of lost income. 19CR:3268. That was the only measure of damages asked of the jury. *Id*. Plaintiffs did not plead for or seek benefit of the bargain damages.

53

2.    *Plaintiffs never pleaded for consequential damages; they only pleaded for out-of-pocket damages*

In their previous briefing to this Court, Plaintiffs argued compensatory royalty damages were permissible consequential damages. But, Plaintiffs were required to plead for consequential damages. Tex. R. Civ. P. 56; *Burbage*, 447 S.W.3d at 261 n.6; *Statewide Bank and SN Servicing Corp. v. Keith,* 301 S.W.3d 776, 786 (Tex. App.—Beaumont 2009, pet. abated). Although Plaintiffs' petition mentioned compensatory royalties, it did so only in relation to their out-of-pocket measure of damages.[13] Plaintiffs did not plead for compensatory royalties as consequential damages. 16CR:2741-73. In fact, Plaintiffs never mentioned the term "consequential damages" or "lost profits" anywhere in their pleading. Accordingly, they were not entitled to recover consequential damages.

3.    *Plaintiffs were not entitled to consequential damages as a part of an out-of-pocket measure of recovery*

Plaintiffs clearly pled an out-of-pocket measure of recovery. 16CR:2760-61. Out-of-pocket damages are purely restitutionary. What Plaintiffs submitted to the jury was a lost profits measure of damages, which they now assert were actually consequential damages. "Lost profits is not a calculation of out-of-pocket damages." *Case Corp. v. Hi-Class Bus. Sys. of Am., Inc.*, 184 S.W.3d 760, 778-79

---

[13] They pled: "The Landowners are thus entitled to damages equal to at least the difference between the value of that with which they parted, and the value they actually received…. Such damages would equal at least the compensatory royalties the Landowners would have been due under the Hooks Jefferson County lease in the absence of any pooling…."  16CR:2760-61.

(Tex. App.—Dallas 2005, pet. denied); *accord, Formosa Plastics*, 960 S.W.2d at 49-50. Under the out-of-pocket measure Plaintiffs pleaded, they were not entitled to recover lost profit-compensatory damages.

4. *Furthermore, Plaintiffs could not seek compensatory damages unless they set aside the pooling agreement, which is something they never sought to do*

Plaintiffs' evidence was of an alleged fraud-in-the-inducement claim. They claimed Samson supposedly made misrepresentations to convince Plaintiffs to sign a pooling consent they otherwise would not have signed. On their fraud-in-the-inducement claim, Plaintiffs had a choice. They could stand on the bargain and recover fraud damages, or they could seek rescission of their consent to pool. *See Fortune Prod.*, 52 S.W.3d at 676-77. They could not do both. Yet, Plaintiffs never attempted to set aside the pooling agreement and—to this day—have accepted substantial royalty payments paid to them solely because of that pooling agreement.

The problem is Plaintiffs waited too long before suing under their breach of lease theory; limitations lapsed on that claim. So Plaintiffs could not sue on the underlying contract. And, importantly, as the Supreme Court has pointed out, Plaintiffs cannot sue through fraud to seek their contractual damages if the contract is unenforceable. *Sonnichsen*, 221 S.W.3d at 637. Importantly, however, Plaintiffs

cannot remain a part of the pooled unit and then pretend for damages purposes that their lease is not a part of the unit.[14]

Plaintiffs had their opportunity to seek a proper measure of damages. They refused to do so. Having had that opportunity, and having failed to prove damages under a correct legal measure, this Court should render judgment against Plaintiffs. *See, e.g., Goldman v. Olmstead*, 414 S.W.3d 346, 363-64 (Tex. App.—Dallas 2013, pet. denied).

5. *Plaintiffs were not entitled to their compensatory royalty damages based on production from the DuJay1 well*

Even if consequential damages were permitted, "lost profits" based on the DuJay1 well are not recoverable. The DuJay1 well is the source of half the $20 million in fraud damages. When asked at trial, Hooks flatly admitted no one had done "anything to deceive [him] or defraud [him] with respect to the DuJay1 well." 13RR:53.

Samson contacted Plaintiffs about pooling their lease into the BSM1 unit in February 2001, and Plaintiffs consented to pool in May 2001. PX65. Plaintiffs received their first check for unit production in September 2001. PX552. Samson did not begin drilling the DuJay1 well until *October* 2001. PX565. The proximate cause standard applicable to consequential damages requires proof of cause in fact

---

[14] Because Plaintiffs did not set aside their pooling consent, they should receive no damages. At a minimum, however, Samson should receive credit for the payments it has been making to Plaintiffs on the BSM1 unit since the time of Plaintiffs' damages calculations for trial.

and forseeability. *IHS Cedars Treatment Ctr. v. Mason*, 143 S.W.3d 794, 798-99 (Tex. 2004); *see also Fazio v. Cypress/GR Houston I, L.P.*, 403 S.W.3d 390 (Tex. App.—Houston [1st Dist.] 2013, pet. denied) (damages measured at the time of the fraud, not some future time). If the initial act merely creates a condition by which the second act could occur, the resulting harm is not a cause in fact. *IHS*, 143 S.W.3d at 799. Here, there would have to be evidence Samson would have drilled the DuJay1 well (1) even if Plaintiffs had not agreed to pool; (2) within 1320 feet of Plaintiffs' tract; and (3) not released Plaintiffs' tract to address offset issues.[15] *See Lee & Lee Int'l, Inc. v. Lee*, 261 F. Supp. 2d 665, 677 (N.D. Tex. 2003); *see also Tracy v. Annie's Attic, Inc.*, 840 S.W.2d 527, 537 (Tex. App.—Tyler 1992, writ denied). There was no evidence of these things.

It was error to award damages based on the DuJay1 well and this Court should reverse the judgment for fraud damages.

6. *The fraud damages improperly include "late charges" of 18% compounded monthly*

Approximately two-thirds of Plaintiffs' fraud damages—an astonishing $13 million—are not actual damages at all. Instead, that sum is a "late charge" measured at the rate of 18% compounded monthly. PX608. Those charges are

---

[15] Samson was authorized under Plaintiffs' Jefferson County lease at any time to release "any portion or portions" of the lease "and be relieved of all obligations as to the acreage surrendered…." PX25¶IV(B). This was not tied to the offset obligations paragraph. So, if Samson had known any of its well locations were a problem for Plaintiffs, Samson could have released all or a portion of Plaintiffs' lease.

improper and the fraud damages judgment should be reversed on that ground as well.

Plaintiffs' "late charge" damages are another way in which Plaintiffs are attempting to convert their barred contract case into fraud damages. The Jefferson County lease states: "All past due *royalties* (including any compensatory royalties payable under Paragraph VI.B) shall be subject to a Late Charge based on the amount due and calculated at the maximum rate allowed by law…." PX25 ¶XVII(C) (emphasis added).

"Late charges" are not proper out-of-pocket damages.[16] The "late charges" should not be included in Plaintiffs' fraud damages. Those charges were a part of Plaintiffs' breach of lease claim they lost on summary judgment. Those charges are not part of any fraud claim. With a fraud claim, the aggrieved party can seek prejudgment interest, not "late charges." And the prejudgment interest is to be assessed by the court, not the jury. *See Olympia Marble & Granite v. Mayes*, 17 S.W.3d 437, 441 (Tex. App.—Houston [1st Dist.] 2000, no pet.).

Moreover, the Supreme Court directly addressed this issue. The Court restricted the 18% interest rate to "past due royalties" and held that rate could not apply to other claims:

---

[16] Because Plaintiffs did not seek consequential damages at all in connection with their fraud claims, they did not plead for late charges as fraud consequential damages. Although Plaintiffs pleaded for late charges as a part of their contract claims, *they never pled for late charges as a part of their fraud claim*. 16CR:2753 (contract), 2757-58 (contract); 2765 (interest and attorneys' fees under Natural Resources Code), 2771 (maximum damages).

58

The leases only impose "the maximum [interest] rate allowed by law" for past-due royalties. Accordingly, to the extent Hooks recovers for past due royalties, he is entitled to an 18% interest rate. For other recoveries, the statutory rate of 5% applies because Hooks has not directed us to any portion of the leases providing otherwise.

457 S.W.3d at 69-70.

Regardless how Plaintiffs measured their alleged fraud damages, those damages are damages for fraud, not breach of lease. Accordingly, Plaintiffs' fraud cause of action is an "other recovery" for which "the statutory rate of 5% applies." 457 S.W.3d at 70. As it stands, there is no (and insufficient) evidence of any fraud damages. But, if any portion of Plaintiffs' fraud damages survive, the trial court must be restricted to adding 5% simple prejudgment interest to those damages. And the post-judgment interest would also be 5%.

7. *The damages have to be reversed because they include incremental formation production damages, which the Supreme Court held were improper*

The fraud damages included Plaintiffs' formation production damages within the damages calculation. The exhibit on which the jury based its damages was PX608. That exhibit calculated fraud damages as $20,081,638.07. PX608. The jury awarded precisely that amount: $20,081,638.07. 19CR:3268. PX608 is titled "Summary of Lost Compensatory Royalty *with Incremental Formation Production*." So, the jury's damages award included formation production amounts.

The Supreme Court held this Court was correct in determining Plaintiffs were not entitled to formation production damages. 457 S.W.3d at 64-65. As a consequence, the fraud damages must be reversed for improperly including formation production damages.

8.    *If this Court reverses and remands for a new trial on fraud damages, then fraud liability will have to be retried as well*

Rule of Appellate Procedure 44.1 dictates, if this Court orders a new trial on damages, it must also order a new trial on liability:

> (b) *Error Affecting Only Part of Case*. If the error affects part of, but not all, the matter in controversy and that part is separable without unfairness to the parties, the judgment must be reversed and a new trial ordered only as to the part affected by the error. *The court may not order a separate trial solely on unliquidated damages if liability is contested.*

Tex. R. App. P. 44.1(b) (emphasis added). There is a companion rule for the decisions of the Supreme Court. *See* Tex. R. App. P. 61.2. There is no question this rule means what it says. "Failure to comply with this rule is reversible error." *Rancho La Valencia, Inc. v. Aquaplex, Inc.*, 383 S.W.3d 150, 152 (Tex. 2012).

There is no question here damages are unliquidated and liability is contested. That being the case, if this Court reverses for a new trial on damages, it must also remand for a new trial on fraud liability.

**F. The Court Must Also Remand the Favored Nations Damages for a Recalculation and Should Determine Issues Regarding the Application of Prejudgment Interest to Newly Awarded Favored Nations Damages**

As with the fraud damages, the favored nations damages wrongly include formation production damages. The judgment awards a total of $848,854 for the favored nations claim. 1Supp2dCR:6. The parties had stipulated to different amounts in accordance with whether formation production damages should be included with the favored nations damages. Court ExA. The amount in the judgment includes formation production. *Id.* The stipulation for favored nations damages without formation production was $431,450.71. *Id.* As a result, the judgment needs to be reversed on this ground as well.

It can be expected that Plaintiffs will request that their favored nations decimal increases be paid to them for production occurring after the end of May 2008. Furthermore, should this Court reverse and render judgment on the fraud portion of the case, Plaintiffs will also seek favored nations damages on the BSM1 well because favored nations damages were initially included in their fraud damages.

In the trial of this action, Plaintiffs relied on the late payments provision to calculate their prejudgment interest. That provision states:

> All past due royalties (including any compensatory royalties payable under Paragraph VI.B) shall be subject to a Late Charge based on the amount due and calculated at the maximum rate allowed by law commencing on the day after the last day on which such monthly

61

royalty payment could have been timely made and for every calendar month and/or fraction thereof from the due date until paid, plus attorney's fees, court costs, and other costs in connection with the collection of the unpaid amounts. Any Late Charge that may become applicable shall be due and payable on the last day of each month when this provision becomes applicable.

PX25, PX 26, PX27¶XVII(C). The Supreme Court held this language set an interest rate of 18% for past due royalties, but "only" for past due royalties.

Plaintiffs assumed previously the late payment provision meant they would receive 18% prejudgment interest *compounded monthly* as prejudgment interest. But there is nothing in the late payment provision saying that. And there is nothing in the Supreme Court's decision saying that either.

Typically, prejudgment interest is computed as simple interest. *Johnson & Higgins of Texas, Inc. v. Kenneco Energy, Inc.*, 962 S.W.2d 507, 532 (Tex. 1998) (prejudgment interest is calculated as simple interest). The question is whether there is anything in the leases changing the simple interest rate for prejudgment interest. The answer is "no."

Another appellate court has previously decided this question in Samson's favor. The language of Plaintiffs' leases is very similar to the contract at issue in *Pegasus Energy Grp., Inc. v. Cheyenne Petroleum Co.,* 3 S.W.3d 112, 123 (Tex. App.—Corpus Christi 1999, no pet.). In *Pegasus*, the contract provided if a required payment was not timely made, "the unpaid balance shall bear interest monthly at the… maximum contract rate permitted by the applicable usury laws in

the [applicable] state." *Id.* (emphasis added). In calculating the prejudgment interest due under that contract, the court held *Kenneco* applied and prejudgment interest was to be computed as simple interest. *Id.* at 124-25.

When this case is remanded for a recalculation of the favored nations damages, the prejudgment interest awarded as to those damages should be simple interest.

## PRAYER FOR RELIEF

Appellant Samson prays that the Court will again reverse the trial court's judgment on the fraud claim and render judgment that Plaintiffs take nothing on their fraud claim. In the alternative, Samson prays that the Court reverse and remand for a new trial on the fraud liability and fraud damages claims as well as the fraud limitations defense.

In the further alternative, Samson prays that the Court will reform the judgment to eliminate improper damages awards identified in this brief, including formation production damages, late charges, fraud damages attributable to the DuJay 1 well, witness fees, and deposition costs in accordance with Samson's arguments set out above, and to reduce the prejudgment and postjudgment interest rate to the proper rate of 5%. Further, this Court should remand for the trial court to credit Samson for the royalty payments it has made to Plaintiffs based on

63

production from the BSM1 unit since the damages were calculated prior to the judgment.

Additionally, Samson requests that the favored nations damages be remanded for a recalculation and that prejudgment interest be assessed on any new calculations of favored nations damages using a simple interest rate for prejudgment interest. Samson further requests its costs and any additional relief to which it may have shown itself entitled.

Respectfully submitted,

LOCKE LORD LLP


/s/ Cynthia K. Timms
Michael V. Powell
  *mpowell@lockelord.com*
   State Bar No. 162004400
Cynthia K. Timms
 *ctimms@lockelord.com*
   State Bar No. 11161450
LOCKE LORD LLP
2200 Ross Avenue, Suite 2200
Dallas, Texas 75201-6776
(214) 740-8000
(214) 740-8800 (Fax)

M.C. Carrington
  State Bar No. 03880800
MEHAFFY WEBER P.C.
P.O. Box 16
Beaumont, Texas  77704
Telephone:  (409) 835-5011
Facsimile: (409) 835-5177

Dick Watt
  State Bar No. 20977700
WATT BECKWORTH THOMPSON
HENNEMAN & SULLIVAN LLP
1800 Pennzoil Place, South Tower
711 Louisiana Street
Houston, Texas  77002
Telephone:  (713) 650-8100
Facsimile:  (713) 650-8141

**ATTORNEYS FOR APPELLANT
SAMSON LONE STAR LIMITED
PARTNERSHIP N/K/A SAMSON
EXPLORATION LLC**

# CERTIFICATE OF COMPLIANCE

Pursuant to Texas Rule of Appellate Procedure 9.4(i)(3), as amended effective December 1, 2012, the undersigned certifies that this Brief complies with the length limitations of Rule 9.4(i) and the typeface requirements of Rule 9.4(e).

1.     Exclusive of the contents excluded by Rule 9.4(i)(1), this Brief contains 14,969 words as counted by the Word Count function (including textboxes, footnotes, and endnotes) of Microsoft Office Word 2010.

2.     This Brief has been prepared in proportionally spaced typeface using:

Software Name and Version:  Microsoft Office Word 2010

Typeface Name:  Times New Roman

Font Size:  14 point

/s/     Cynthia K. Timms
Cynthia K. Timms

## CERTIFICATE OF SERVICE

I hereby certify that on the 6th day of July, 2015, a true and correct copy of Samson's Supplemental Appellant's Brief was served by eFile Texas on Appellees through their counsel of record listed below:


Paul F. Simpson
McGinnis, Lochridge, & Kilgore L.L.P.,
1111 Louisiana
Suite 4500
Houston, Texas 77002
psimpson@mcginnislaw.com

Patton G. Lochridge
J. Derrick Price
600 Congress Avenue
Suite 2100
Austin, Texas 78701
plochridge@mcginnislaw.com

David M. Gunn
Beck Redden & Secrest, L.L.P.
OneHouston Center
1221 McKinney St., Suite 4500
Houston, Texas 77010-2010
dgunn@brsfirm.com

Jon B. Burmeister
Moore Landrey, L.L.P.
905 Orleans Street
Beaumont, Texas 77701
jburmeister@moorelandrey.com


/s/     Cynthia K. Timms
Cynthia K. Timms

No. 1-09-00328-CV

In the

𝔉irst ℭourt of 𝔄ppeals

ℌouston, ℭexas

Samson Lone Star, Limited Partnership n/k/a Samson Exploration LLC

*Appellant—Cross Appellee,*

v.

Charles G. Hooks III, Individually and as Independent Executor of the Estate of Charles G. Hooks, Jr., as Trustee of the Scott Ira McKeever Trust and the David Wayne McKeever Trust, and on behalf of Chas. G. Hooks & Son, a General Partnership; McKeever Partnership, Ltd.; Charles G. Hooks III and Sue Ann Hooks, as Co-Trustees Under the Will of Charles G. Hooks, Sr.

*Appellees—Cross-Appellants.*

*Appeal from Cause B173008-B, 60th District Court*
*Jefferson County, Texas*

_____

**APPENDIX TO SAMSON'S SUPPLEMENTAL APPELLANT'S BRIEF**

Tab

Final Judgment (1Supp2d CR:4-11) ............................................................... Tab A

Charge of the Court (19CR:3262-76) ............................................................. Tab B

Damages Stipulation (Court Ex. A) ................................................................ Tab C

*Samson v. Hooks* Ct. App. Opinion (389 S.W.3d 409) ................................... Tab D

*Hooks v. Samson* Tex. S. Ct. Opinion (457 S.W.3d 52) .................................. Tab E

| | | |
|---|---|---|
| CHARLES G. HOOKS III, | § | IN THE DISTRICT COURT OF |
| INDIVIDUALLY AND AS | § | |
| INDEPENDENT EXECUTOR OF THE | § | |
| ESTATE OF CHARLES G. HOOKS, JR., | § | |
| AS TRUSTEE OF THE SCOTT IRA | § | |
| MCKEEVER TRUST AND THE DAVID | § | |
| WAYNE MCKEEVER TRUST, AND ON | § | |
| BEHALF OF CHAS. G. HOOKS & SON, A | § | |
| GENERAL PARTNERSHIP; MCKEEVER | § | |
| PARTNERSHIP, LTD; CHARLES G. | § | JEFFERSON COUNTY, TEXAS |
| HOOKS III AND SUE ANN HOOKS, AS | § | |
| CO-TRUSTEES UNDER THE WILL OF | § | |
| CHARLES G. HOOKS, SR., | § | |
| Plaintiffs, | § | |
| | § | |
| vs. | § | |
| | § | |
| SAMSON LONE STAR, L.P., | § | |
| Defendant. | § | 60TH JUDICIAL DISTRICT |

## FINAL JUDGMENT

On November 3, 2008, came on to be heard the above styled and numbered cause. Plaintiffs Charles G. Hooks III, Individually and as Independent Executor of the Estate of Charles G. Hooks, Jr., as Trustee of the Scott Ira Mckeever Trust and the David Wayne McKeever Trust, and on Behalf of Chas. G. Hooks & Son, a General Partnership; McKeever Partnership, Ltd; Charles G. Hooks III and Sue Ann Hooks, as Co-Trustees under the Will of Charles G. Hooks, Sr. (collectively, "the Hooks"), appeared by duly designated representatives and by and through attorneys of record and announced ready for trial. Defendant Samson Lone Star Limited Partnership, n/k/a Samson Lone Star, L.L.C. ("Samson"), appeared by representative and by and through attorneys of record and also announced ready for trial.

WHEREUPON, a jury having been previously demanded, twelve (12) qualified jurors were duly selected, impaneled, and sworn. The cause then proceeded to trial with the making of opening statements by the parties, followed by introduction of evidence. On November 10, 2008,

4

after Plaintiffs completed their case-in-chief, Defendant filed a Motion for Directed Verdict, which the Court denied. On November 12, 2008, after conclusion of the evidence, with Plaintiffs and Defendant having rested their cases in open court, the Court submitted the questions of fact to the jury on special issues. On November 13, 2008, the jury announced that it had reached a verdict and returned it to the Court. The jury's verdict was as follows:

> In response to Question No. 1, the jury found by a vote of eleven (11) to one that Samson committed fraud against the Hooks;

> In response to Question No. 2, the jury found by a vote of eleven (11) to one that Samson committed statutory fraud against the Hooks;

> In response to Question No. 3, the jury found by a vote of eleven (11) to one that the sum of money if paid now in cash that would fairly and reasonable compensate the Hooks for their damages proximately caused by such fraud is $20,081,638.07;

> The jury did not answer Questions Nos. 4, 5, 6, or 7;

> In response to Question No. 8, the jury found by a vote of eleven (11) to one that Samson's failure to pay royalty based on formation production resulted in underpayment of royalty under the three Hooks oil and gas leases entered as Exhibits 25, 26, and 27; and

> In response to Question No. 9, the jury found by a unanimous vote that the Hooks, in the exercise of reasonable diligence, should have discovered the fraud of Samson by April 2007.

The verdict form was signed by the eleven jurors who concurred in the answers to Questions Nos. 1, 2, 3, and 8. The Charge of the Court and verdict of the jury, which the Court hereby adopts, are incorporated herein by reference.

In addition, before trial, the Court had entered Orders on motions for partial summary judgment with regard to certain claims at issue in this case. The following Orders on motions for partial summary judgment are hereby reaffirmed and incorporated herein by reference:

> Order on Plaintiffs' First Amended Motion for Partial Summary Judgment (Tract 4/14 Leases), recommended by Special Master W. Frank Newton on July 29, 2008, and adopted by the Court on July 30, 2008; and

- 2 -

5

> Order Granting Plaintiffs' First Amended Motion for Partial Summary Judgment (Unpooling), recommended by Special Master W. Frank Newton on July 29, 2008, and adopted by the Court on July 30, 2008;

Therefore, IT IS ORDERED, ADJUDGED, AND DECREED as follows:

> Pursuant to the Order on Plaintiffs' First Amended Motion for Partial Summary Judgment (Tract 4/14 Leases), the royalty rate under the Hooks oil and gas leases at issue in this case (admitted as Exhibits 25, 26, and 27 at trial) has been equal to 28.28896% since November 2001; and

> Pursuant to the Order Granting Plaintiffs' First Amended Motion for Partial Summary Judgment (Unpooling), Defendant Samson must pay Plaintiffs royalty on production from Samson's Black Stone Minerals A-1 well based on the royalty revenue interest Plaintiffs are due pursuant to the Black Stone Minerals "A" No. 1 Gas Unit as described in Samson's Designation of Gas Unit for the Black Stone Minerals "A" No. 1 Gas Unit filed of record at Volume 1259, Page 237 of the Official Public Records of Hardin County, Texas.

Moreover, Plaintiffs and Defendant Samson entered into certain stipulations in connection with this case and entered into the Court's record. Accordingly, the following stipulations are incorporated herein by reference:

> Stipulation (regarding damages) signed by counsel for the parties and filed November 7, 2008; and

> Stipulation Regarding Attorneys' Fees signed by counsel for the parties and filed October 31, 2008.

THEREFORE, pursuant to the jury's verdict, the Court's Orders on Motions for Partial Summary Judgment, and the parties' Stipulations cited above, it is ORDERED, ADJUDGED, AND DECREED that Plaintiffs have and recover actual damages from Defendant Samson as follows:

| | |
|---|---|
| Damages proximately caused by fraud: | $20,081,638.07 |
| Damages for breach of Most Favored Nations Clause : | $ 848,854.01 |
| Damages for "Unpooling" claim related to Black Stone Minerals A-1 well: | $ 766,626.85 |
| Damages Related to Ad Valorem Taxes: | $ 52,257.22 |
| Total Damages: | $21,749,376.15 |

- 3 -

6

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that Plaintiffs shall have and recover from Defendant Samson attorneys' fees in the following amounts under the following circumstances (pursuant to the parties' Stipulation Regarding Attorneys' Fees): the sum of $300,000 for services rendered through the trial of this case; an additional $50,000 in the event of an appeal to the Court of Appeals; an additional $10,000 if a petition for review is filed with the Texas Supreme Court; and an additional $10,000 if the Texas Supreme Court grants the petition for review.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that, Plaintiffs shall have and recover from Samson the following expert witness fees: for Nedra Foster, $47,351.79; and for Charles E. Graham, $58,689.07.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that, Plaintiffs shall have and recover from Samson $5,493.51 for costs for copies of depositions;

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that all costs of court spent or incurred in this case are adjudged against Defendant Samson, and that Plaintiffs shall have and recover from Samson all costs of court incurred by Plaintiffs.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that, in addition to the foregoing, Plaintiffs shall have and recover from Samson post-judgment interest on the total amount of this judgment, including damages, attorneys' fees, expert witness fees, and costs of court, at the rate of 18%, compounded annually.

7

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED as follows:

> Defendant Samson shall pay Plaintiffs royalty on production from Samson's Black Stone Minerals A-1 well, commencing with production after May 2008, based on the royalty revenue interest Plaintiffs are due pursuant to the Black Stone Minerals "A" No. 1 Gas Unit as described in Samson's Designation of Gas Unit for the Black Stone Minerals "A" No. 1 Gas Unit filed of record at Volume 1259, Page 237 of the Official Public Records of Hardin County, Texas;

> Any royalty owed on production after May 2008 under Plaintiffs' oil and gas leases at issue in this case (admitted as Exhibits 25, 26, and 27 at trial) shall be based on a royalty rate of 28.28896%;

> Any royalty owed on gas production after May 2008 under the oil and gas leases at issue in this case (admitted as Exhibits 25, 26, and 27 at trial) shall be based on formation production gas volumes as reported on Texas Railroad Commission records;

> Defendant Samson shall be liable for all ad valorem taxes levied upon Plaintiffs' interest in the oil and gas leases at issue (admitted as Exhibits 25, 26, and 27 at trial) after November 2007, as long as those leases remain in effect; and

> Defendant Samson shall provide Plaintiffs with the following notices and information as required by the oil and gas leases at issue in this case while those leases are in effect:

- Copies of all electric logs, formation surveys, or any other test made in a well or wells on the land described in the leases or units into which they were pooled;

- Copies of written designations of production units;

- Copies of all applications and reports filed with the Texas Railroad Commission in connection with Samson's operations under Plaintiffs' Leases;

- Advanced notice of any deductions or adjustments against present or future royalty payments for royalty payments previously paid, with full explanation of such overpayment;

- Title opinions;

- Daily operation reports during drilling, completion, or reworking operations;

- Seismic or other geophysical data obtained by Samson on the leased premises or units into which the leased premises are pooled, including basic data, scaled and platted maps, and final stacked and migrated seismic data at all depths across such acreage (for which Plaintiffs will use their best efforts during the term of the applicable Lease to maintain all such data so provided in confidence until otherwise released from this

-5-

8

obligation by Samson or until Samson releases such data to the general oil and gas industry, whichever occurs earlier; and

- Notice of any oil and gas lease Samson enters into covering any land within three miles of the exterior boundary of the leased premises or units into which the leased premises are pooled.

All writs and processes for the enforcement and collection of this judgment or the costs of court may issue in accordance with the law if this judgment is not timely paid.

IT IS FINALLY ORDERED, ADJUDGED, AND DECREED that any relief requested in this case but not expressly granted herein is DENIED.

This is a final judgment that disposes of all parties, claims, and counterclaims, and is appealable.

SIGNED this 11 day of December, 2008.

JUDGE PRESIDING

**APPROVED AS TO FORM:**

McGINNIS, LOCHRIDGE & KILGORE, L.L.P.

By: _____
Paul F. Simpson
State Bar No. 18403800
3200 One Houston Center
1221 McKinney Street
Houston, Texas 77010
713-615-8500 Telephone
713-615-8585 Facsimile

Patton G. Lochridge
State Bar No. 12458500
Don H. Magee
State Bar No. 12811800
J. Derrick Price
State Bar No. 24041726
600 Congress Avenue, Suite 2100
Austin, Texas 78701
(512) 495-6000 Telephone
(512) 495-6093 Facsimile

RIENSTRA, DOWELL & FLATTEN
Gerald R. Flatten
State Bar No. 07112500
595 Orleans, Suite 1007
Beaumont, Texas 77701
(409) 833-6317 Telephone
(409) 833-9560 FAX

MOORE LANDREY, L.L.P.
Jon B. Burmeister
State Bar No. 03425500
390 Park Street, Suite 500
Beaumont, Texas 77701
(409) 835-3891 Telephone
(409) 835-2707

**ATTORNEYS FOR PLAINTIFFS,
CHARLES G. HOOKS III, ET AL.**

10

**APPROVED AS TO FORM:**

MEHAFFYWEBER, P.C.

By: _____
M.C. Carrington
State Bar No. 03880800
Matt Marchak
State Bar No. 024037025
Post Office Box 16
Beaumont, Texas 77704
(409) 835-5011 Telephone
(409) 835-5177 Facsimile

WATT BECKWORTH THOMPSON & HENNEMAN, L.L.P.
Dick Watt
State Bar No. 20977700
John B. Beckworth
State Bar No. 202021500
T. Neal Nobles
State Bar No. 24007753
Katherine W. Strange
State Bar No. 24043942
1800 Pennzoil Place, South Tower
711 Louisiana Street
Houston, Texas 77002
(713) 650-8100 Telephone
(713) 650-8141 Facsimile

**ATTORNEYS FOR DEFENDANT
SAMSON LONE STAR, L.P., n/k/a
SAMSON LONE STAR, L.L.C.**

- 8 -

11



ORIGINAL

CAUSE NO. B173008-B

CHARLES G. HOOKS III, et al.,      §      IN THE DISTRICT COURT OF
           Plaintiffs,      §
           §
vs.            §      JEFFERSON COUNTY, TEXAS
           §
SAMSON LONE STAR, L.P.,      §
           Defendant.      §      60TH JUDICIAL DISTRICT

## CHARGE OF THE COURT

LADIES AND GENTLEMEN OF THE JURY:

This case is submitted to you by asking questions about the facts, which you must decide from the evidence you have heard in this trial. You are the sole judges of the credibility of the witnesses and the weight to be given their testimony, but in matters of law, you must be governed by the instructions in this charge. In discharging your responsibility on this jury, you will observe all the instructions which have previously been given you. I shall now give you additional instructions which you should carefully and strictly follow during your deliberations.

1. Do not let bias, prejudice or sympathy play any part in your deliberations.

2. In arriving at your answers, consider only the evidence introduced here under oath and such exhibits, if any, as have been introduced for your consideration under the rulings of the court, that is, what you have seen and heard in this courtroom, together with the law as given you by the court. In your deliberations, you will not consider or discuss anything that is not represented by the evidence in this case.

3. Since every answer that is required by the charge is important, no juror should state or consider that any required answer is not important.

4. You must not decide who you think should win, and then try to answer the questions accordingly. Simply answer the questions, and do not discuss nor concern yourselves with the effect of your answers.

5. You will not decide the answer to a question by lot or by drawing straws, or by any other method of chance. Do not return a quotient verdict. A quotient verdict means that the jurors agree to abide by the result to be reached by adding together each juror's figures and dividing by the number of jurors to get an average. Do not do any trading on your answers; that is, one juror should not agree to answer a certain question one way if others will agree to answer another question another way.

6. Unless otherwise instructed, you may answer a question upon the vote of ten or more jurors. If you answer more than one question upon the vote of ten or more jurors, the same group of at least ten of you must agree upon the answers to each of those questions.

These instructions are given you because your conduct is subject to review the same as that of the witnesses, parties, attorneys and the judge. If it should be found that you have disregarded any of these instructions, it will be jury misconduct and it may require another trial by another jury; then all of our time will have been wasted.

The presiding juror or any other who observes a violation of the court's instructions shall immediately warn the one who is violating the same and caution the juror not to do so again.

When words are used in this charge in a sense that varies from the meaning commonly understood, you are given a proper legal definition, which you are bound to accept in place of any other meaning.

Answer "Yes" or "No" to all questions unless otherwise instructed. A "Yes" answer must be based on a preponderance of the evidence unless you are otherwise instructed. If you do not find that a preponderance of the evidence supports a "Yes" answer, then answer "No." The term "preponderance of the evidence" means the greater weight and degree of credible evidence admitted in this case. Whenever a question requires an answer other than "Yes" or "No," your answer must be based on a preponderance of the evidence unless you are otherwise instructed.

## General Instruction: Circumstantial Evidence

A fact may be established by direct evidence or by circumstantial evidence, or both. A fact is established by direct evidence when proved by documentary evidence or by witnesses who saw the act done or heard the words spoken. A fact is established by circumstantial evidence when it may be fairly and reasonably inferred from other facts proved.

## General Instruction: Corporations

The defendant is a corporation. All persons are equal before the law, and a corporation is entitled to the same consideration you give any other person. Certain rules define how corporations act and are held responsible for acts or omissions:

A corporation acts through its officer, agents, and employees. Unless otherwise indicated in this charge, any act or omission of any officer, agent, or employee of any of the defendants is the act or omission of that defendant if it occurred while acting within the scope of his actual or apparent authority in the performance of his duties for that defendant.

A corporation is held responsible for the knowledge possessed by those people who are its representatives or agents acting within the scope of their actual or apparent authority.

## General Instruction: Damages

Damages, if any, must be proven with a reasonable degree of certainty. This does not, however, require proof as to an absolute mathematical certainty. If a wrong has been done from which monetary loss results, you may make a just and reasonable estimate of damages based on relevant data, including opinion evidence, even if the extent of the injury cannot be proven precisely. Damages cannot be remote or contingent.

In answering questions about damages, answer each question separately. Do not increase or reduce the amount in one answer because of the instructions in or your answers to any other questions about damages. Do not speculate about what any party's ultimate recovery may or may not be. Any recovery will be determined by the court when it applies the law to your answers at the time of judgment.

## DEFINITIONS, QUESTIONS, AND SPECIAL INSTRUCTIONS

The "Hooks" means Plaintiffs Charles G. Hooks III, Individually and as Independent Executor of the Estate of Charles G. Hooks, Jr., as Trustee of the Scott Ira Mckeever Trust and the David Wayne McKeever Trust, and on Behalf of Chas. G. Hooks & Son, a General Partnership; McKeever Partnership, Ltd; and Charles G. Hooks III and Sue Ann Hooks, as Co-Trustees under the Will of Charles G. Hooks, Sr.

"Samson" means Defendant Samson Lone Star, L.P.

The Hooks Leases means the three Oil, Gas and Liquid Hydrocarbon Leases granted by the Hooks to Samson and entered as Exhibits 25, 26, and 27 in this case.

## Question No. 1

Did Samson commit fraud against the Hooks?

Fraud occurs when—

    a.      a party makes a material misrepresentation,

    b.      the misrepresentation is made with knowledge of its falsity or made recklessly without any knowledge of the truth and as a positive assertion,

    c.      the misrepresentation is made with the intention that it should be acted on by the other party, and

    d.      the other party relies on the misrepresentation and thereby suffers injury.

"Misrepresentation" means a false statement of fact.

You are instructed that when a party makes a representation and later acquires new information which makes the representation untrue or misleading, the party must disclose such information to anyone whom he knows to be still acting on the basis of the original statement. In such instance, fraud also occurs when—

    a.      the party fails to disclose a material fact within the knowledge of that party,

    b.      the party knows that the other party is ignorant of the fact and does not have an equal opportunity to discover the truth,

    c.      the party intends to induce the other party to take some action by failing to disclose the fact, and

    d.      the other party suffers injury as a result of acting without knowledge of the undisclosed fact.

Answer "Yes" or "No": Yes _11-1_

## Question No. 2

Did Samson commit Statutory Fraud against the Hooks?

Statutory Fraud occurs when—

      a.     there is a false representation of a past or existing material fact,

      b.     the false representation is made to a person for the purpose of inducing that person to enter into a contract, and

      c.     the false representation is relied on by that person in entering into that contract.

Answer "Yes" or "No": Yes (1 - )

If your answer to Question No. 1 or Question No. 2 is "Yes," then answer the following question. Otherwise, do not answer the following question.

## Question No. 3

What sum of money, if any, if paid now in cash, would fairly and reasonably compensate the Hooks for their damages, if any, that were proximately caused by such fraud?

> "Proximate cause" means that cause which, in a natural and continuous sequence, produces an event, and without which cause such event would not have occurred. In order to be a proximate cause, the act or omission complained of must be such that a person using the degree of care required of him would have foreseen that the event, or some similar event, might reasonably result therefrom. There may be more than one proximate cause of an event.

Consider the following elements of damages, if any, and none other:

> Lost income to the Hooks that was a natural, probable, and foreseeable consequence of Samson's fraud.

Do not speculate about what any party's ultimate recovery may or may not be. Any recovery will be determined by the court when it applies the law to your answers at the time of judgment. Do not add any amount for interest on damages, if any.

Answer separately in dollars and cents: $ 20,081,638.07

Yes 11—1

Answer the following question only if you unanimously answered "Yes" to Question No. 1. Otherwise, do not answer the following question.

To answer "Yes" to the following question, your answer must be unanimous. You may answer "No" to the following question only upon a vote of ten or more jurors. Otherwise, do not answer the following question.

## Question No. 4

Do you find by clear and convincing evidence that the harm to the Hooks resulted from fraud?

"Clear and convincing evidence" means the measure or degree of proof that produces a firm belief or conviction of the truth of the allegations sought to be established.

Answer "Yes" or "No": _____

If you unanimously answered Question No. 2 "Yes," then answer the following question. Otherwise, do not answer the following question.

## Question No. 5

Do you find by clear and convincing evidence that Samson had actual awareness of the falsity of the representation or promise you found to be fraud in Question No. 2?

> "Clear and convincing evidence" means the measure or degree of proof that produces a firm belief or conviction of the truth of the allegations sought to be established.

> Actual awareness may be inferred where objective manifestations indicate a person acted with actual awareness.

Answer "Yes" or "No": _____

If you unanimously answered "Yes" to Question No. 4 or Question No. 5, answer the following question. Otherwise, do not answer the following question.

You must unanimously agree on the amount of any award of exemplary damages.

## Question No. 6

What sum of money, if any, if paid now in cash, should be assessed against Samson and awarded to the Hooks as exemplary damages, if any, for the conduct found in response to either Question No. 4 or Question No. 5?

> "Exemplary damages" means an amount that you may in your discretion award as a penalty or by way of punishment.
>
> Factors to consider in awarding exemplary damages, if any, are—
>
> a. The nature of the wrong.
>
> b. The character of the conduct involved.
>
> c. The degree of culpability of Samson.
>
> d. The situation and sensibilities of the parties concerned.
>
> e. The extent to which such conduct offends a public sense of justice and propriety.
>
> f. The net worth of Samson.
>
> Answer in dollars and cents, if any.

Answer: $_____

3271

If you unanimously answered "Yes" to Question No. 4 or Question No. 5, answer the following question. Otherwise, do not answer the following question.

To answer "Yes" to the following question, your answer must be unanimous. You may answer "No" to the following question only upon a vote of ten or more jurors. Otherwise, you must not answer the following question.

## Question No. 7

Do you find beyond a reasonable doubt that Samson secured execution by the Hooks of a document by deception, and was the value of the property affected $1,500 or more?

> "Securing the execution of a document by deception" occurs when a person causes another person to sign any document affecting property, and does so by deception, with the intent to defraud or harm any person.

> A person acts with intent with respect to the nature of his conduct or to a result of his conduct when it is the conscious objective or desire to engage in the conduct or cause the result.

> "Deception" means creating or confirming by words or conduct a false impression of law or fact that is likely to affect the judgment of another in the transaction, and that the actor does not believe to be true.

> "Property" means: (a) real property; (b) tangible or intangible personal property, including anything severed from land; or (c) a document, including money, that represents or embodies anything of value.

You are instructed that "beyond a reasonable doubt" means proof of such a convincing character that you would be willing to rely and act upon it without hesitation in the most important of your own affairs.

Answer "Yes" or "No": _____

## Question No. 8

Did Samson's failure to pay royalty based on formation production result in underpayment of royalty under the Hooks Leases?

Answer "Yes" or "No": Yes  11 – 1

3283

If your answer to Question No. 1 or Question No. 2 is "Yes," then answer the following question. Otherwise, do not answer the following question.

**Question No. 9**

By what date should the Hooks, in the exercise of reasonable diligence, have discovered the fraud of Samson?

Answer with a date in the blank below: *April 1*

Answer: *Hook's Birthday 2007*
*Yes. 12-1*

After you retire to the jury room, you will select your own presiding juror. The first thing the presiding juror will do is to have this complete charge read aloud and then you will deliberate upon your answers to the questions asked.

It is the duty of the presiding juror –

1.　　　to preside during your deliberations,

2.　　　to see that your deliberations are conducted in an orderly manner and in accordance with the instructions in this charge,

3.　　　to write out and hand to the bailiff any communications concerning the case that you desire to have delivered to the judge,

4.　　　to vote on the questions,

5.　　　to write your answers to the questions in the spaces provided, and

6.　　　to certify to your verdict in the space provided for the presiding juror's signature or to obtain the signatures of all the jurors who agree with the verdict if your verdict is less than unanimous.

You should not discuss the case with anyone, not even with other members of the jury, unless all of you are present and assembled in the jury room. Should anyone attempt to talk to you about the case before the verdict is returned, whether at the courthouse, at your home, or elsewhere, please inform the judge of this fact.

When you have answered all the questions you are required to answer under the instructions of the Court, and your presiding juror has placed your answers in the spaces provided and signed the verdict as presiding juror or obtained the signatures, you will inform the bailiff at the door of the jury room that you have reached a verdict. You will then return into court with your verdict.

JUDGE PRESIDING

# CERTIFICATE

We, the jury, have answered the above and foregoing questions as herein indicated, and herewith return same into Court as our verdict.

(To be signed by the presiding juror if unanimous.)

_John B. Blake._
PRESIDING JUROR

John B. Blake
Printed Name of Presiding Juror

(To be signed by those rendering the verdict if not unanimous.)

| | Jurors' Signatures | Jurors' Printed Names |
|---|---|---|
| 1. | _(signature)_ | Jason Castillo |
| 2. | _(signature)_ | Marvin C Davis |
| 3. | _(signature)_ | JUDITH WOOD |
| 4. | _(signature)_ | Darrell Gibbs |
| 5. | _(signature)_ | WILMA JOHNSON |
| 6. | _(signature)_ | Shaquira Jones |
| 7. | _(signature)_ | Ashley Molo |
| 8. | _(signature)_ | Jeremy Gordon |
| 9. | _John B. Blake._ / _(signature)_ | John B. Blake. / JoAnn King |
| 10. | _(signature)_ | Jake Speed |
| 11. | _(signature)_ | Barbara E. Smith |

SCANNED

3276

| | | |
|---|---|---|
| CHARLES G. HOOKS III, et al., | § | IN THE DISTRICT COURT OF |
| Plaintiffs, | § | |
| | § | |
| vs. | § | JEFFERSON COUNTY, TEXAS |
| | § | |
| SAMSON LONE STAR, L.P., | § | |
| Defendant. | § | 60TH JUDICIAL DISTRICT |

## STIPULATION

Plaintiffs Charles G. Hooks III, et al. and Defendant Samson Lone Star, L.P. enter into this Stipulation as to certain damages claimed by Plaintiffs. All parties reserve their respective rights on all appellate issues (except as to ad valorem taxes), and by entering into this Stipulation do not waive any rights as they relate to liability issues (except as to ad valorem taxes) or any liability issues not addressed herein (including any offset claims). Further, Plaintiffs do not waive their objection to this method of proving up its damages under its various causes of action.

## Damages Related to Most Favored Nations Clause (Lease ¶ XXIX)[1]

Unpaid royalty on production through May 2008, plus Late Charges as of August 1, 2008, for the Joyce DuJay No. 1 Gas Unit, Well No. 1, and Joyce DuJay A. No. 1 gas Unit, Well No. 1, but *not including* Plaintiffs' claims for royalty based on Formation Production:

> Lost Royalty $212,825.25
> Late Charges $218,625.46

Unpaid royalty on production through May 2008, plus Late Charges as of August 1, 2008, for the Joyce DuJay No. 1 Gas Unit, Well No. 1, and Joyce DuJay A. No. 1 gas Unit, Well No. 1, but *including* Plaintiffs' claims for royalty based on Formation Production[2]:

---

[1] See Order on Plaintiffs' First Amended Motion for Partial Summary Judgment (Tract 4/14 Leases).

[2] Entitlement to royalty payment on Incremental Natural Gas Formation Production is an unresolved issue as of the date of this Stipulation.

Lost Royalty $416,324.65
Late Charges $432,529.36

## Damages Related Solely to Formation Production (Lease ¶ III)

Incremental unpaid royalty on formation production through May 2008, plus Late Charges as of August 1, 2008, for the Joyce DuJay No. 1 Gas Unit, Well No. 1, and Joyce DuJay A. No. 1 gas Unit, Well No. 1, but *not including* Plaintiffs' claims for Most Favored Nations royalty:

Lost Royalty $179, 839.66
Late Charges $189,034.41

## Damages Related to "Unpooling" Claim[3]

Unpaid royalty on the Blackstone Minerals A-1 well on production through May 2008, plus Late Charges as of August 1, 2008, assuming application of the Most Favored Nations Clause (Lease ¶ XXIX), but *not including* Plaintiffs' claims for royalty based on Formation Production:

Lost Royalty $268,006.98
Late Charges $446,252.13

Unpaid royalty on the Blackstone Minerals A-1 well on production through May 2008, plus Late Charges as of August 1, 2008, assuming application of the Most Favored Nations Clause (Lease ¶ XXIX), and *including* Plaintiffs' claims for royalty based on Formation Production[4]:

Lost Royalty $288,652.54
Late Charges $477,974.31

---

[3] Pursuant to Order Granting Plaintiffs' First Amended Motion for Partial Summary Judgment (Unpooling) of July 30, 2008.

[4] See footnote 2, supra

Unpaid royalty on the Blackstone Minerals A-1 well on production through May 2008, plus Late Charges as of August 1, 2008, *including* Plaintiffs' claims for royalty based on Formation Production, but *excluding* Plaintiffs claims based on the Most Favored Nations Clause (Lease ¶ XXIX):

> Lost Royalty $259,978.40
> Late Charges $433,775.24

Unpaid royalty on the Blackstone Minerals A-1 well on production through May 2008, plus Late Charges as of August 1, 2008, *excluding* Plaintiffs' claims based on *both* the Most Favored Nations Clause (Lease ¶ XXIX), and for royalty based on Formation Production:

> Lost Royalty $241,447.33
> Late Charges $405,075.61

## Liability and Damages Related to Ad Valorem Taxes

Samson owes Plaintiffs $52,257.22 for reimbursement of ad valorem taxes paid through November, 2007. Plaintiffs agree not to claim, and waive any claim, that Samson owes Plaintiffs Late Charges for such ad valorem taxes or reimbursement.

## AGREED:

Paul Simpson
State Bar No. 18403800
MCGINNIS LOCHRIDGE & KILGORE LLP
3200 One Houston Center
1221 McKinney Street
Houston, Texas 77010
713-615-8500 Telephone
713-615-8585 Facsimile

Patton G. Lochridge
State Bar No. 12458500
Don H. Magee
State Bar No. 12811800
J. Derrick Price
State Bar No. 24041726
MCGINNIS LOCHRIDGE & KILGORE LLP
600 Congress Avenue, Suite 2100
Austin, Texas 78701
(512) 495-6000 Telephone
(512) 495-6093 Facsimile

Gerald R. Flatten
State Bar No. 07112500
RIENSTRA, DOWELL & FLATTEN
595 Orleans, Suite 1007
Beaumont, Texas 77701
(409) 833-6317 Telephone
(409) 833-9560 FAX

Jon B. Burmeister
State Bar No. 03425500
MOORE LANDREY, L.L.P.
390 Park Street, Suite 500
Beaumont, Texas 77701
(409) 835-3891 Telephone
(409) 835-2707

By: _Paul F. Simpson by Pekka S. Lickije (w/permission)_
Paul F. Simpson

**ATTORNEYS FOR PLAINTIFFS, CHARLES G. HOOKS III, ET AL.**

M. C. Carrington
Mehaffy Weber
P.O. Box 16
Beaumont, TX 77704

Dick Watt
1800 Penzoil Place, South Tower
711 Louisiana Street
Houston, Texas 77002

By: _____
Dick Watt

**ATTORNEYS FOR DEFENDANT, SAMSON LONE STAR, L.P.**

- 4 -

KeyCite Red Flag - Severe Negative Treatment

**Judgment Affirmed in Part, Reversed in Part by** Hooks v. Samson Lone Star, Limited Partnership, Tex., January 30, 2015

389 S.W.3d 409
Court of Appeals of Texas,
Houston (1st Dist.).

SAMSON LONE STAR, LIMITED PARTNERSHIP n/k/a Samson Lone Star L.L.C., Appellant,

v.

Charles G. HOOKS, III, Individually and as Independent Executor of the Estate of Charles G. Hooks, Jr., as Trustee of the Scott Ira McKeever Trust and the David Wayne McKeever Trust, and on behalf of Chas. G. Hooks & Son, a General Partnership; McKeever Partnership, Ltd.; Charles G. Hooks, III and Sue Ann Hooks, as Co–Trustees under the Will of Charles G. Hooks, Sr., Appellees.

No. 01–09–00328–CV.  |  May 31, 2012.  |  Opinion
Dissenting and Concurring on Rehearing March 1, 2012.

**Synopsis**
**Background:** Oil and gas lessors brought action against lessee alleging breach of contract, fraud, fraudulent concealment, statutory fraud, negligent misrepresentation, violation of the Texas Natural Resources Code for failure to properly pay royalties, statutory negligence, and common law negligence per se, and sought injunctive relief and declaratory judgment. The 60th District Court, Jefferson County, Gary Sanderson, J., granted lessee partial summary judgment and entered a jury verdict in favor of lessors on remaining claims.

**Holdings:** On cross appeals, and on rehearing, the Court of Appeals, Evelyn V. Keyes, J., held that:

[1] lessors' fraud claims concerning the pooling of interests accrued under discovery rule no later than date when information concerning actual location of bottom hole of disputed well was a matter of public record;

[2] lessors accepted and ratified the amendment and redesignation of original unit into pooled units;

[3] the most favored nations clauses in leases did not apply to trigger royalties payable to the lessors equal to those payable under settlement agreement reached between lessee and State;

[4] formation production clause in leases did not operate to double the amount of royalties owed on the liquid condensate produced from well;

[5] trial court abused its discretion by including permanent injunctive relief in its order;

[6] a stipulated payment of ad valorem taxes by lessee did not entitle lessors to claim attorney fees as prevailing parties under a separate pre-trial fee stipulation; and

[7] postjudgment interest on ad valorem taxes that lessee was obligated to pay pursuant to stipulation was to be calculated based on statutory rate.

Affirmed in part and reversed in part.

Jim Sharp, J., issued an opinion concurring in part and dissenting in part.

West Headnotes (50)

**[1]**     **Fraud** 🗝 Elements of Actual Fraud

　　184　Fraud

　　184I　Deception Constituting Fraud, and Liability Therefor

　　184k2　Elements of Actual Fraud

　　184k3　In general

To prove fraud, a plaintiff must show that the defendant made (1) a material misrepresentation (2) that was either known to be false when made or was asserted without knowledge of its truth (3) which was intended to be relied upon (4) which was indeed relied upon and (5) which caused injury.

Cases that cite this headnote

**[2]**     **Fraud** 🗝 Acts induced by fraud

　　184　Fraud

　　184I　Deception Constituting Fraud, and Liability Therefor

　　184k24　Acts induced by fraud

To prove fraudulent inducement, the elements of fraud must be established as they relate to a contract.

Cases that cite this headnote

**[3]**     **Limitation of Actions** 🗝 Nature of statutory limitation

　　241　Limitation of Actions

　　241I　Statutes of Limitation

　　241I(A)　Nature, Validity, and Construction in General

　　241k1　Nature of statutory limitation

Statutes of limitations are intended to compel plaintiffs to assert their claims within a reasonable period of time while the evidence is fresh in the minds of the parties and witnesses.

Cases that cite this headnote

**[4]**     **Limitation of Actions** 🗝 Causes of action in general

　　241　Limitation of Actions

　　241II　Computation of Period of Limitation

　　241II(A)　Accrual of Right of Action or Defense

　　241k43　Causes of action in general

As a general rule, a cause of action accrues and the statute of limitations begins to run when facts come into existence that authorize a party to seek a judicial remedy.

Cases that cite this headnote

**[5]**     **Limitation of Actions** 🗝 Causes of action in general

**Limitation of Actions** 🗝 In general; what constitutes discovery

**Limitation of Actions** ☞ Knowledge as to extent of harm or damage

241  Limitation of Actions

241II  Computation of Period of Limitation

241II(A)  Accrual of Right of Action or Defense

241k43  Causes of action in general

241  Limitation of Actions

241II  Computation of Period of Limitation

241II(F)  Ignorance, Mistake, Trust, Fraud, and Concealment or Discovery of Cause of Action

241k95  Ignorance of Cause of Action

241k95(1)  In general;  what constitutes discovery

241  Limitation of Actions

241II  Computation of Period of Limitation

241II(F)  Ignorance, Mistake, Trust, Fraud, and Concealment or Discovery of Cause of Action

241k95  Ignorance of Cause of Action

241k95(1.5)  Knowledge as to extent of harm or damage

In most circumstances, a cause of action accrues when a wrongful act causes a legal injury, regardless of when the plaintiff learns of that injury or if all resulting damages have yet to occur; however, the discovery rule exception to the statute of limitations operates to defer accrual of a cause of action until the plaintiff knew or, by exercising reasonable diligence, should have known of the facts giving rise to the cause of action.

Cases that cite this headnote

**[6]**    **Limitation of Actions** ☞ Discovery of Fraud

241  Limitation of Actions

241II  Computation of Period of Limitation

241II(F)  Ignorance, Mistake, Trust, Fraud, and Concealment or Discovery of Cause of Action

241k98  Fraud as Ground for Relief

241k100  Discovery of Fraud

241k100(1)  In general

The statute of limitations for fraud begins to run from the time the party knew of the misrepresentation. V.T.C.A., Civil Practice & Remedies Code § 16.004(a)(4).

Cases that cite this headnote

**[7]**    **Limitation of Actions** ☞ What constitutes discovery of fraud

241  Limitation of Actions

241II  Computation of Period of Limitation

241II(F)  Ignorance, Mistake, Trust, Fraud, and Concealment or Discovery of Cause of Action

241k98  Fraud as Ground for Relief

241k100  Discovery of Fraud

241k100(12)  What constitutes discovery of fraud

Oil and gas lessors' fraud claims against lessee, based on lessee's alleged false representations as to location of well to induce lessors to agree to amend lease to allow a portion of it to be pooled, accrued under the discovery rule no later than date when the necessary information concerning actual location of bottom hole of well was a matter of public record. V.T.C.A., Civil Practice & Remedies Code § 16.004(a)(4).

Cases that cite this headnote

**[8]**    **Limitation of Actions** ☞ Diligence in discovering fraud

241  Limitation of Actions

241II  Computation of Period of Limitation

241II(F)  Ignorance, Mistake, Trust, Fraud, and Concealment or Discovery of Cause of Action

241k98  Fraud as Ground for Relief

241k100  Discovery of Fraud

241k100(11)  Diligence in discovering fraud

Statute of limitations for fraud begins to run when the claimant knew or could have discovered the fraud by the exercise of reasonable diligence. V.T.C.A., Civil Practice & Remedies Code § 16.004(a)(4).

Cases that cite this headnote

**[9]**   **Limitation of Actions**  ⚷ Questions for Jury

241  Limitation of Actions

241V  Pleading, Evidence, Trial, and Review

241k199  Questions for Jury

241k199(1)  In general

When a cause of action accrues for limitations purposes is normally a question of law.

Cases that cite this headnote

**[10]**   **Mines and Minerals**  ⚷ In general;  general rules of construction

260  Mines and Minerals

260II  Title, Conveyances, and Contracts

260II(C)  Leases, Licenses, and Contracts

260II(C)3  Construction and Operation of Oil and Gas Leases

260k73  In general;  general rules of construction

An oil and gas lease is a contract and is therefore interpreted as such.

Cases that cite this headnote

**[11]**   **Contracts**  ⚷ Language of contract

95  Contracts

95II  Construction and Operation

95II(A)  General Rules of Construction

95k147  Intention of Parties

95k147(2)  Language of contract

When construing a contract, the primary goal of the courts is to give effect to the parties' written expression of their intent.

Cases that cite this headnote

**[12]**   **Mines and Minerals**  ⚷ In general;  general rules of construction

260  Mines and Minerals

260II  Title, Conveyances, and Contracts

260II(C)  Leases, Licenses, and Contracts

260II(C)3  Construction and Operation of Oil and Gas Leases

260k73  In general;  general rules of construction

The courts will enforce the intentions of the parties to an unambiguous oil and gas lease as expressed in the lease.

Cases that cite this headnote

**[13]**    **Contracts** 🔑 Construction as a whole

**Contracts** 🔑 Extrinsic circumstances

95   Contracts

95II   Construction and Operation

95II(A)   General Rules of Construction

95k143.5   Construction as a whole

95   Contracts

95II   Construction and Operation

95II(A)   General Rules of Construction

95k169   Extrinsic circumstances

In determining the agreement, the court examines all parts of the contract and the circumstances surrounding its formulation.

Cases that cite this headnote

**[14]**    **Mines and Minerals** 🔑 Community leases, unitization, or pooling arrangements

260   Mines and Minerals

260II   Title, Conveyances, and Contracts

260II(C)   Leases, Licenses, and Contracts

260II(C)3   Construction and Operation of Oil and Gas Leases

260k79   Rent or Royalties

260k79.1   In General

260k79.1(5)   Community leases, unitization, or pooling arrangements

With respect to oil and gas royalty interest owners, pooling results in a cross-conveyance of interests in land by agreement among the participating parties, each of whom obtains an undivided joint ownership in the royalty earned from the land in the block created by the agreement and each of whom receives royalty on the basis of the percentage of that party's acreage to the whole block; pooling effects a cross-conveyance among the owners of the minerals under the various tracts in the pool so that all cotenants own undivided interests under the unitized tract in the proportion that their contribution bears to the unitized tract.

Cases that cite this headnote

**[15]**    **Mines and Minerals** 🔑 Community leases, unitization, or pooling arrangements

260   Mines and Minerals

260II   Title, Conveyances, and Contracts

260II(C)   Leases, Licenses, and Contracts

260II(C)3   Construction and Operation of Oil and Gas Leases

260k79   Rent or Royalties

260k79.1   In General

260k79.1(5)   Community leases, unitization, or pooling arrangements

When an oil and gas lease is executed by all of the owners of different mineral interests in two or more tracts, the royalties payable under the lease will be pooled, and all royalty interest owners in the land subject to the lease will share in production, no matter where the well is drilled on the leasehold.

2 Cases that cite this headnote

**[16]**    **Mines and Minerals** 🔑 Place or portion developed; pooled or unitized tracts

**Mines and Minerals** 🔑 Community leases, unitization, or pooling arrangements

260   Mines and Minerals

260II   Title, Conveyances, and Contracts

260II(C)   Leases, Licenses, and Contracts

260II(C)3   Construction and Operation of Oil and Gas Leases

260k78   Testing or Working

260k78.1   Construction, Breach, and Penalties

260k78.1(7)   Place or portion developed;  pooled or unitized tracts

260   Mines and Minerals

260II   Title, Conveyances, and Contracts

260II(C)   Leases, Licenses, and Contracts

260II(C)3   Construction and Operation of Oil and Gas Leases

260k79   Rent or Royalties

260k79.1   In General

260k79.1(5)   Community leases, unitization, or pooling arrangements

An oil and gas lessee has no power to pool without the lessor's express authorization, usually contained in the lease's pooling clause.

Cases that cite this headnote

[17]   **Mines and Minerals** 🗝 Place or portion developed;  pooled or unitized tracts

**Mines and Minerals** 🗝 Community leases, unitization, or pooling arrangements

260   Mines and Minerals

260II   Title, Conveyances, and Contracts

260II(C)   Leases, Licenses, and Contracts

260II(C)3   Construction and Operation of Oil and Gas Leases

260k78   Testing or Working

260k78.1   Construction, Breach, and Penalties

260k78.1(7)   Place or portion developed;  pooled or unitized tracts

260   Mines and Minerals

260II   Title, Conveyances, and Contracts

260II(C)   Leases, Licenses, and Contracts

260II(C)3   Construction and Operation of Oil and Gas Leases

260k79   Rent or Royalties

260k79.1   In General

260k79.1(5)   Community leases, unitization, or pooling arrangements

For pooling to be valid, it must be done in accordance with the terms of the methods and purposes specified in the oil and gas lease.

Cases that cite this headnote

[18]   **Mines and Minerals** 🗝 Place or portion developed;  pooled or unitized tracts

**Mines and Minerals** 🗝 Community leases, unitization, or pooling arrangements

260   Mines and Minerals

260II   Title, Conveyances, and Contracts

260II(C)   Leases, Licenses, and Contracts

260II(C)3   Construction and Operation of Oil and Gas Leases

260k78   Testing or Working

260k78.1   Construction, Breach, and Penalties

260k78.1(7)   Place or portion developed;  pooled or unitized tracts

260   Mines and Minerals

260II   Title, Conveyances, and Contracts

260II(C)  Leases, Licenses, and Contracts

260II(C)3  Construction and Operation of Oil and Gas Leases

260k79  Rent or Royalties

260k79.1  In General

260k79.1(5)  Community leases, unitization, or pooling arrangements

Good-faith pooling of oil and gas leases can be exercised multiple times; however, the lessors' land may be pooled only to the extent stipulated in the lease.

Cases that cite this headnote

**[19]**   **Mines and Minerals**  ⚷ Place or portion developed; pooled or unitized tracts

**Mines and Minerals**  ⚷ Community leases, unitization, or pooling arrangements

260  Mines and Minerals

260II  Title, Conveyances, and Contracts

260II(C)  Leases, Licenses, and Contracts

260II(C)3  Construction and Operation of Oil and Gas Leases

260k78  Testing or Working

260k78.1  Construction, Breach, and Penalties

260k78.1(7)  Place or portion developed; pooled or unitized tracts

260  Mines and Minerals

260II  Title, Conveyances, and Contracts

260II(C)  Leases, Licenses, and Contracts

260II(C)3  Construction and Operation of Oil and Gas Leases

260k79  Rent or Royalties

260k79.1  In General

260k79.1(5)  Community leases, unitization, or pooling arrangements

When pooling oil and gas leases, joinder by all interest owners is not necessary for a pooled unit to be valid; rather, a tenant in common has the legal right to incorporate a pooling agreement into an original oil and gas lease without the consent or joinder of the other cotenants, creating a valid contract binding the undivided interest of the cotenant making the agreement.

1 Cases that cite this headnote

**[20]**   **Mines and Minerals**  ⚷ Place or portion developed; pooled or unitized tracts

**Mines and Minerals**  ⚷ Extent of production, paying quantities, and marketing

260  Mines and Minerals

260II  Title, Conveyances, and Contracts

260II(C)  Leases, Licenses, and Contracts

260II(C)3  Construction and Operation of Oil and Gas Leases

260k78  Testing or Working

260k78.1  Construction, Breach, and Penalties

260k78.1(7)  Place or portion developed; pooled or unitized tracts

260  Mines and Minerals

260II  Title, Conveyances, and Contracts

260II(C)  Leases, Licenses, and Contracts

260II(C)3  Construction and Operation of Oil and Gas Leases

260k78  Testing or Working

260k78.1  Construction, Breach, and Penalties

260k78.1(8)  Extent of production, paying quantities, and marketing

The timely completion of a producing well under the terms of the pooling agreement and within the unit area set out in the unitization agreement will serve to continue the lease in full force and effect so long as gas is being produced in commercial quantities.

Cases that cite this headnote

[21]   **Mines and Minerals** 🔑 Community leases, unitization, or pooling arrangements

260   Mines and Minerals
260II   Title, Conveyances, and Contracts
260II(C)   Leases, Licenses, and Contracts
260II(C)3   Construction and Operation of Oil and Gas Leases
260k79   Rent or Royalties
260k79.1   In General
260k79.1(5)   Community leases, unitization, or pooling arrangements

A cotenant who enters into an oil and gas lease binding its royalty interest in the completed and producing well and who accepts its pro rata share in the royalties from the well calculated under the terms of the unitization agreement is estopped to deny the validity of the unitization agreement as to its interest therein.

Cases that cite this headnote

[22]   **Mines and Minerals** 🔑 Place or portion developed; pooled or unitized tracts

260   Mines and Minerals
260II   Title, Conveyances, and Contracts
260II(C)   Leases, Licenses, and Contracts
260II(C)3   Construction and Operation of Oil and Gas Leases
260k78   Testing or Working
260k78.1   Construction, Breach, and Penalties
260k78.1(7)   Place or portion developed; pooled or unitized tracts

An oil and gas lessee cannot unilaterally terminate a unit that has a producing pooled well; rather, for a lessee to terminate a unit, either the lessors must agree to the unpooling or the lease must expressly authorize such termination.

Cases that cite this headnote

[23]   **Mines and Minerals** 🔑 Community leases, unitization, or pooling arrangements

260   Mines and Minerals
260II   Title, Conveyances, and Contracts
260II(C)   Leases, Licenses, and Contracts
260II(C)3   Construction and Operation of Oil and Gas Leases
260k79   Rent or Royalties
260k79.1   In General
260k79.1(5)   Community leases, unitization, or pooling arrangements

When a mineral interest owner accepts royalty checks from a pooled oil and gas unit, he has accepted that unit.

2 Cases that cite this headnote

[24]   **Estoppel** 🔑 Contracts

**Mines and Minerals** 🔑 Community leases, unitization, or pooling arrangements

156   Estoppel
156III   Equitable Estoppel

156III(B)  Grounds of Estoppel

156k89  Acquiescence

156k92  Acceptance of Benefits

156k92(2)  Contracts

260  Mines and Minerals

260II  Title, Conveyances, and Contracts

260II(C)  Leases, Licenses, and Contracts

260II(C)3  Construction and Operation of Oil and Gas Leases

260k79  Rent or Royalties

260k79.1  In General

260k79.1(5)  Community leases, unitization, or pooling arrangements

Under the doctrine of equitable estoppel, mineral interest owners can not repudiate a pooled oil and gas unit designation after accepting royalties attributable to that unit.

1 Cases that cite this headnote

**[25]**   **Estoppel**  👈  Contracts

**Mines and Minerals**  👈  Community leases, unitization, or pooling arrangements

156  Estoppel

156III  Equitable Estoppel

156III(B)  Grounds of Estoppel

156k89  Acquiescence

156k92  Acceptance of Benefits

156k92(2)  Contracts

260  Mines and Minerals

260II  Title, Conveyances, and Contracts

260II(C)  Leases, Licenses, and Contracts

260II(C)3  Construction and Operation of Oil and Gas Leases

260k79  Rent or Royalties

260k79.1  In General

260k79.1(5)  Community leases, unitization, or pooling arrangements

By accepting royalty checks from amended and redesignated pooling units, which oil and gas lessors had been notified replaced the original unit, and by not asserting any rights to royalties from original unit or making any timely claim against lessee in regard to the amendment and redesignation of original unit, lessors accepted and ratified the amendment and redesignation and were estopped to assert an interest in royalties from production from well within the unit area set out in the unitization agreement.

Cases that cite this headnote

**[26]**   **Mines and Minerals**  👈  Community leases, unitization, or pooling arrangements

260  Mines and Minerals

260II  Title, Conveyances, and Contracts

260II(C)  Leases, Licenses, and Contracts

260II(C)3  Construction and Operation of Oil and Gas Leases

260k79  Rent or Royalties

260k79.1  In General

260k79.1(5)  Community leases, unitization, or pooling arrangements

Under its plain terms, the most favored nations clause in the lessors' oil and gas leases did not apply to trigger royalties payable to the lessors equal to those payable under the settlement agreement reached between lessee and the State; the pooling agreement executed by lessee and the State did not constitute a third party lease so that lessee's obligation

to pay the lessors increased royalties under the clause was triggered, but rather the difference between the royalties payable to the State on production from the pooled unit and the royalties paid to lessors represented the amount agreed upon by lessee and the State to induce it to accept the amended unit in place of the conflicting unit and to compensate the State for its loss of royalties from the former well due to lessee's amendment and redesignation of the new unit.

Cases that cite this headnote

**[27]**  **Sales** 🔑 Amount agreed on

343  Sales

343II  Construction of Contract

343k74  Price, Expenses, and Costs of Transportation

343k75  Amount agreed on

A "most favored nations clause" is a vendor protection clause that enables the vendor to receive the benefit of increases in the market price of his product over the term of a long range contract with a purchaser.

Cases that cite this headnote

**[28]**  **Sales** 🔑 Amount agreed on

343  Sales

343II  Construction of Contract

343k74  Price, Expenses, and Costs of Transportation

343k75  Amount agreed on

A most favored nations clause, enabling the vendor to receive the benefit of increases in the market price of his product over the term of a long range contract with a purchaser, is enforced according to its terms.

Cases that cite this headnote

**[29]**  **Mines and Minerals** 🔑 Rights and liabilities

260  Mines and Minerals

260II  Title, Conveyances, and Contracts

260II(C)  Leases, Licenses, and Contracts

260II(C)3  Construction and Operation of Oil and Gas Leases

260k79  Rent or Royalties

260k79.1  In General

260k79.1(1)  Rights and liabilities

Under its plain language, the formation production clause in oil and gas leases did not operate to double the amount of royalties owed on the liquid condensate produced from the well; the clause did not state that lessee had to pay a 25% royalty on "formation production" in addition to royalty on gas and liquids as produced, but rather the unambiguous meaning of the lease provisions was that the lessors were entitled to a 25% royalty on all gas and liquid hydrocarbons at the time proceeds were received from their sale.

1 Cases that cite this headnote

**[30]**  **Contracts** 🔑 Ambiguity in general

95  Contracts

95II  Construction and Operation

95II(A)  General Rules of Construction

95k176  Questions for Jury

95k176(2)  Ambiguity in general

Whether a contract is ambiguous is a question of law for the court.

Cases that cite this headnote

**[31]** **Contracts** 🔑 Construction as a whole

**Contracts** 🔑 Construing whole contract together

95 Contracts
95II Construction and Operation
95II(A) General Rules of Construction
95k143.5 Construction as a whole
95 Contracts
95II Construction and Operation
95II(A) General Rules of Construction
95k147 Intention of Parties
95k147(3) Construing whole contract together

Court construes the parties' intentions as expressed in a contract, considering the entire writing and attempting to harmonize and give effect to all of the contract's provisions with reference to the whole agreement.

Cases that cite this headnote

**[32]** **Contracts** 🔑 Subject, object, or purpose as affecting construction

**Contracts** 🔑 Reasonableness of construction

95 Contracts
95II Construction and Operation
95II(A) General Rules of Construction
95k143 Application to Contracts in General
95k143(4) Subject, object, or purpose as affecting construction
95 Contracts
95II Construction and Operation
95II(A) General Rules of Construction
95k151 Language of Instrument
95k154 Reasonableness of construction

Courts construe contracts from a utilitarian standpoint bearing in mind the particular business activity sought to be served and will avoid when possible and proper a construction which is unreasonable, inequitable, and oppressive.

Cases that cite this headnote

**[33]** **Contracts** 🔑 Existence of ambiguity

**Contracts** 🔑 Ambiguity in general

95 Contracts
95II Construction and Operation
95II(A) General Rules of Construction
95k143 Application to Contracts in General
95k143(2) Existence of ambiguity
95 Contracts
95II Construction and Operation
95II(A) General Rules of Construction
95k176 Questions for Jury
95k176(2) Ambiguity in general

If, after the rules of construction are applied, the contract can be given a definite or certain legal meaning, it is unambiguous and court construes it as a matter of law.

1 Cases that cite this headnote

[34]    **Injunction** 🗝️ Grounds in general; multiple factors

212  Injunction

212I  Injunctions in General; Permanent Injunctions in General

212I(B)  Factors Considered in General

212k1032  Grounds in general; multiple factors

A permanent injunction is proper only when there is evidence of four elements: (1) a wrongful act; (2) imminent harm; (3) irreparable injury; and (4) no adequate remedy at law.

Cases that cite this headnote

[35]    **Appeal and Error** 🗝️ Injunction

30  Appeal and Error

30XVI  Review

30XVI(H)  Discretion of Lower Court

30k950  Provisional Remedies

30k954  Injunction

30k954(1)  In general

Ruling granting a permanent injunction is reviewed for an abuse of discretion.

Cases that cite this headnote

[36]    **Injunction** 🗝️ Contracts

212  Injunction

212IV  Particular Subjects of Relief

212IV(K)  Contracts

212k1351  In general

Courts do not enforce contractual rights by permanent injunction unless the complaining party can show an inadequate remedy at law and irreparable injury.

Cases that cite this headnote

[37]    **Injunction** 🗝️ Contracts

**Specific Performance** 🗝️ Performance impossible

212  Injunction

212IV  Particular Subjects of Relief

212IV(K)  Contracts

212k1351  In general

358  Specific Performance

358I  Nature and Grounds of Remedy in General

358k11  Defenses or Objections to Relief

358k13  Performance impossible

In order to grant specific performance of a contract via an injunction, present performance of the contract's terms must be possible.

1 Cases that cite this headnote

**[38]    Specific Performance** 🔑 Contracts for continuous acts during long period

358    Specific Performance

358II    Contracts Enforceable

358k75    Contracts for continuous acts during long period

A court should not decree by specific performance future contractual performance requiring a party to perform a continuous series of acts, extending through a long period of time, over which the court exercises its supervision.

1 Cases that cite this headnote

**[39]    Action** 🔑 Legal or Equitable

13    Action

13II    Nature and Form

13k21    Legal or Equitable

13k21.1    In general

Unless a significant public interest is involved, parties to a contract are left to their remedies at law.

Cases that cite this headnote

**[40]    Mines and Minerals** 🔑 Judgment and relief;  damages

**Mines and Minerals** 🔑 Actions

260    Mines and Minerals

260II    Title, Conveyances, and Contracts

260II(C)    Leases, Licenses, and Contracts

260II(C)3    Construction and Operation of Oil and Gas Leases

260k78    Testing or Working

260k78.7    Actions

260k78.7(6)    Judgment and relief;  damages

260    Mines and Minerals

260II    Title, Conveyances, and Contracts

260II(C)    Leases, Licenses, and Contracts

260II(C)3    Construction and Operation of Oil and Gas Leases

260k79    Rent or Royalties

260k79.7    Actions

There was no evidence that oil and gas lessors were in danger of imminent harm or irreparable injury from lessee's failure to pay them production royalties or ad valorem taxes or failure to provide them with lease notices and information, as required for a grant of permanent injunction requiring lessee to fulfill certain contractual provisions upon pain of contempt of court.

Cases that cite this headnote

**[41]    Mines and Minerals** 🔑 Judgment and relief;  damages

**Mines and Minerals** 🔑 Actions

260    Mines and Minerals

260II    Title, Conveyances, and Contracts

260II(C)    Leases, Licenses, and Contracts

260II(C)3    Construction and Operation of Oil and Gas Leases

260k78  Testing or Working

260k78.7  Actions

260k78.7(6)  Judgment and relief; damages

260  Mines and Minerals

260II  Title, Conveyances, and Contracts

260II(C)  Leases, Licenses, and Contracts

260II(C)3  Construction and Operation of Oil and Gas Leases

260k79  Rent or Royalties

260k79.7  Actions

Oil and gas lessors failed to show that they had no adequate remedy at law for their grievances against lessee, as required for grant of permanent injunction requiring lessee to fulfill certain contractual provisions upon pain of contempt of court, in action arising from lessee's failure to pay production royalties and ad valorem taxes and failure to provide lessors with lease notices and information.

Cases that cite this headnote

[42]  **Mines and Minerals**  ☛ Judgment and relief; damages

260  Mines and Minerals

260II  Title, Conveyances, and Contracts

260II(C)  Leases, Licenses, and Contracts

260II(C)3  Construction and Operation of Oil and Gas Leases

260k78  Testing or Working

260k78.7  Actions

260k78.7(6)  Judgment and relief; damages

Permanent injunction requiring oil and gas lessee to fulfill certain contractual provisions with lessor upon pain of contempt of court impermissibly decreed future contractual performance; the possibility of present performance was required.

Cases that cite this headnote

[43]  **Mines and Minerals**  ☛ Judgment and relief; damages

**Mines and Minerals**  ☛ Actions

260  Mines and Minerals

260II  Title, Conveyances, and Contracts

260II(C)  Leases, Licenses, and Contracts

260II(C)3  Construction and Operation of Oil and Gas Leases

260k78  Testing or Working

260k78.7  Actions

260k78.7(6)  Judgment and relief; damages

260  Mines and Minerals

260II  Title, Conveyances, and Contracts

260II(C)  Leases, Licenses, and Contracts

260II(C)3  Construction and Operation of Oil and Gas Leases

260k79  Rent or Royalties

260k79.7  Actions

A stipulated payment of ad valorem taxes by oil and gas lessee did not entitle lessors to claim attorney fees as prevailing parties under a separate pre-trial fee stipulation in lessors' action alleging fraud, formation production, unpooling, and most favored nations claims, where nothing in the ad valorem tax stipulation indicated that it was intended to constitute an admission that the lessors had prevailed on that issue.

Cases that cite this headnote

**[44]    Stipulations** 🔑 Conclusiveness and Effect

363   Stipulations

363k15   Conclusiveness and Effect

363k16   In general

A stipulated agreement between the parties will not be given greater effect than intended.

Cases that cite this headnote

**[45]    Stipulations** 🔑 Stipulation as to evidence

363   Stipulations

363k15   Conclusiveness and Effect

363k18   Matters Concluded

363k18(6)   Stipulation as to evidence

A stipulation will not be construed as an admission of a fact intended to be controverted.

Cases that cite this headnote

**[46]    Mines and Minerals** 🔑 Licenses; severance and production taxes

260   Mines and Minerals

260III   Operation of Mines, Quarries, and Wells

260III(A)   Statutory and Official Regulations

260k87   Licenses; severance and production taxes

Postjudgment interest on ad valorem taxes that oil and gas lessee was obligated to pay pursuant to stipulation with lessors was to be calculated based on statutory rate, where stipulation did not provide an interest rate. V.T.C.A., Finance Code § 304.003.

Cases that cite this headnote

**[47]    Interest** 🔑 On Judgments

219   Interest

219II   Rate

219k38   On Judgments

219k38(1)   In general

When the interest rate is not specified in a contract, postjudgment interest should be calculated based on the statutory rate. V.T.C.A., Finance Code § 304.003.

Cases that cite this headnote

**[48]    Evidence** 🔑 Weights, measures, and values

157   Evidence

157I   Judicial Notice

157k18   Weights, measures, and values

Court of Appeals may take judicial notice of the correct, published prime rate on an appeal involving a dispute as to postjudgment interest not specified in a contract. V.T.C.A., Finance Code § 304.003.

Cases that cite this headnote

**[49]** **Limitation of Actions** 🔑 Breach of contract in general

**Mines and Minerals** 🔑 Protection against waste or drainage; offset wells

241 Limitation of Actions

241II Computation of Period of Limitation

241II(A) Accrual of Right of Action or Defense

241k46 Contracts in General

241k46(6) Breach of contract in general

260 Mines and Minerals

260II Title, Conveyances, and Contracts

260II(C) Leases, Licenses, and Contracts

260II(C)3 Construction and Operation of Oil and Gas Leases

260k78 Testing or Working

260k78.1 Construction, Breach, and Penalties

260k78.1(11) Protection against waste or drainage; offset wells

Oil and gas lessors' claims that lessee breached its offset obligations were breach of contract claims that accrued at the time of the breach.

Cases that cite this headnote

**[50]** **Limitation of Actions** 🔑 Breach of contract in general

241 Limitation of Actions

241II Computation of Period of Limitation

241II(A) Accrual of Right of Action or Defense

241k46 Contracts in General

241k46(6) Breach of contract in general

A breach of contract claim accrues for limitations purposes when the contract is breached.

Cases that cite this headnote

**\*415** On Appeal from the 60th District Court, Jefferson County, Texas, Trial Court Case No. B173008–B.[1]

[1] Originally appealed to the Ninth Court of Appeals, this case was transferred to this Court by the Texas Supreme Court pursuant to its docket equalization efforts. *See* TEX. GOV'T CODE ANN. § 73.001 (Vernon 2005).

**Attorneys and Law Firms**

Cynthia Keely Timms, Michael V. Powell, Locke Lord LLP, Dallas, TX, Dick Watt, Thomas Neal Nobles, Katherine W. Strange, Watt Beckworth Thompson Henneman & Sullivan, LLP, Houston, TX, M.C. Carrington, Mehaffy & Weber, Beaumont, TX, for Appellant.

David M. Gunn, Beck, Redden & Secrest, L.L.P., Paul F. Simpson, McGinnis, Lochridge & Kilgore, L.L.P., Houston, TX, Patton G. Lochridge, J. Derrick Price, Don. H. Magee, McGinnis, Lochridge & Kilgore, L.L.P., Austin, TX, Jon B. Burmeister, Moore Landry, Gerald R. Flatten, Beaumont, TX, for Appellees.

Panel consists of Justices KEYES, SHARP, and MASSENGALE.

**OPINION ON REHEARING**

EVELYN V. KEYES, Justice.

Following the issuance of our March 1, 2012 opinion and judgment on rehearing, appellant, Samson Lone Star, Limited Partnership *n/k/a* Samson Lone Star L.L.C. ("Samson"), moved for further rehearing on issues relating to the supersede as bond and surety. Appellees, Charles G. Hooks, et al. ("the Hooks"), moved for further rehearing asking this Court to clarify its ruling regarding post judgment interest. Subsequently, on April 16, 2012, the Hooks moved for en banc reconsideration of our March 1, 2012 opinion. We grant both motions for rehearing, withdraw our opinion and judgment of March 1, 2012, and issue this opinion and judgment in their stead. We dismiss the Hooks' April 16, 2012 motion for en banc reconsideration as moot. [2]

[2]    See *Brookshire Bros., Inc. v. Smith,* 176 S.W.3d 30, 40 & n. 2 (Tex.App.-Houston [1st Dist.] 2004, pet. denied).

This is an appeal from a final judgment against Samson for more than $21 million in favor of the Hooks. Samson has a number of oil and gas leases from landowners in Hardin and Jefferson Counties, including the Hooks. The judgment arises from an oil and gas case in which the Hooks brought suit against Samson with respect to three oil and gas leases, two in Hardin County, Texas (the "95–acre Lease" and the "10–acre Lease," collectively the "Hardin County Leases") and one in Jefferson County, Texas (the "Jefferson County Lease"). The Hooks sued Samson for breach of contract, fraud, fraudulent concealment, statutory fraud, negligent misrepresentation, violation of the Texas Natural Resources Code by failure to properly pay royalties, statutory negligence, common law negligence per se, injunctive relief, and declaratory judgment.

The trial court granted Samson's motion for partial summary judgment on whether it had breached certain offset obligations under the Leases. It also granted the Hooks' motions for summary judgment on claims for additional royalties related to their claims of "unpooling" with respect to the Hardin County Leases and breach of the "most favored nations" clause in both Hardin County Leases and the Jefferson County Lease.

The questions of whether Samson committed fraud against the Hooks with respect to a well drilled within the buffer zone of the Hooks' Jefferson County Lease **\*416** and whether it underpaid royalties by not paying royalties for "formation production" in all three Leases were tried to a jury. The trial court rendered judgment on the verdict, holding Samson liable to the Hooks for fraud and underpaid royalties, and it entered a final judgment that left intact the summary judgment in Samson's favor on offset obligations and the summary judgments in favor of the Hooks on their unpooling claim and their most favored nations clause claims. Samson has appealed the final judgment, and the Hooks have cross-appealed.

In eight issues, Samson complains that (1) there is legally and factually insufficient evidence of common law fraud; (2) there is legally and factually insufficient evidence of statutory fraud; (3) the statute of limitations bars the Hooks' fraud claims; (4) there is legally and factually insufficient evidence to support the jury's finding on fraud damages; (5) the trial court erred in interpreting the phrase "formation production" in the Hooks' Leases as requiring Samson to pay twice for molecules of gas produced as condensate; (6) the trial court erred in entering judgment in favor of the Hooks for additional royalties based on the unpooling issue with respect to the Hardin County Leases and on the most favored nations clauses in all three Leases; (7) the trial court erred in elevating lease provisions into a permanent injunction, and there is no evidence to support the injunction or attorney's fees; and (8) the trial court erred by granting post-judgment interest at the rate of 18%, compounded annually. [3]

[3]    This issue was added at Samson's request by order dated June 10, 2010, and both parties were required to and did file supplemental briefs thereon.

In a single issue, the Hooks complain on cross-appeal that the trial court erred in rendering summary judgment in favor of Samson on the issue of whether Samson breached certain offset obligations in the Hooks' leases. We affirm the trial court's summary judgment order in favor of Samson on its offset obligations.

With respect to Samson's appeal, we affirm the portion of the trial court's judgment awarding the Hooks reimbursement for ad valorem taxes as stipulated by the parties, and we reverse the remainder of the final judgment of the trial court and render judgment that the Hooks take nothing on those claims.

### I. *SAMSON'S APPEAL*

### A. BACKGROUND

**1. The Hooks' Jefferson County Lease and the BSM No. 1 Unit**

In 1999, the Hooks entered into the Jefferson County Lease with Samson. This lease covered 640 acres owned by the Hooks in the Dyches survey in Jefferson County, Texas and was bordered by Pine Island Bayou, which also serves as the county line between Jefferson and Hardin Counties.

Article VI of the Jefferson County Lease was a section called "Offset Obligations." In this section, Samson covenanted to operate the leased premises as a reasonably prudent operator would and to protect the leased premises from drainage. Article VI also contained specific obligations for Samson in case of potential drainage. This Article provided that if a gas well were completed within 1,320 feet from the leased premises, then, within 90 days from the date of the sale of first production from that well, Samson must take one of three actions: (1) drill an offset well; (2) pay the Hooks "compensatory royalties"—in addition to any royalties currently due—in a sum equal to the royalties that would be payable under the **\*417** Lease on the production from the adjacent or nearby producing well as if it had been producing on the leased premises; or (3) release the offset acreage. [4] The Jefferson County Lease did not provide for pooling.

[4]    Article VI(A) of the Jefferson County Lease provided, in pertinent part, as follows:

[I]n the event a well producing from a unit not comprised of acreage from the leased premises ... which has been classified as "gas" ... is completed on adjacent or nearby lands not more than one thousand three hundred and twenty feet (1,320') from the leased premises, or draining the leased premises, Lessee covenants and agrees to, within ninety (90) days from the date production is first sold, removed or otherwise marketed from said adjacent or nearby producing well, either (1) commence with due diligence operations for the actual drilling of an offset well on the leased premises to the base of the formation from which the adjacent or nearby producing well is producing, (2) pay Lessors as compensatory royalty, in addition to any royalties currently due, a sum equal to the royalties which would be payable under this lease on the production from said adjacent or nearby producing well had same been producing on the leased premises, or (3) in lieu of drilling such offset well or paying such compensatory royalty, release by recordable instrument the offset acreage, as hereinafter defined. "Offset Acreage," as used hereinabove, shall be defined as a unit which would surround such a well if same were completed on the leased premises; provided, however, that if any portion of the offset acreage would be included in a producing unit designated by Lessee hereunder, then if Lessee elects to surrender and release such offset acreage, it may retain and except from such release the producing stratum or strata included in such producing unit, but such offset acreage must conform to the depth, size and shape limitations contained in Paragraph V. herein. The provisions hereof shall apply regardless of whether lands upon which offset wells may be located are owned by Lessor or any of them or not, and with regard to wells located within the hereinabove prescribed distances from the leased premises, regardless of whether drainage is actually proved to be taking place or not. Notwithstanding anything herein to the contrary, Lessee shall have no obligations under this Article VI in the event a producing well on nearby or adjacent land is already offset by a well on the leased premises or on acreage pooled therewith producing from the same producing horizon from which production has been secured from any well on nearby or adjacent lands.

In April 2000, Samson began drilling a gas well, the Black Stone Minerals No. 1 (the "BSM No. 1 well"), on a tract it owned in Hardin County adjacent to the Hooks' 640–acre Jefferson County Lease. This adjacent tract was located in Hardin County. The surface drillsite was outside the 1,320–foot buffer zone around the Hooks' Jefferson County Lease that triggered Samson's offset obligations under Article VI(A) of the Lease. However, the well was a directional well that slanted away from the surface drillsite. Originally, the BSM No. 1 well was planned with a bottom hole location 1,080 feet from the Hooks' lease line on

the east, a location within the 1,320–foot buffer zone of the Hooks' Jefferson County Lease. This proposed well location was reflected on a plat titled "Proposed Well Location [BSM No.]1 Walker Pettitt League, A–43, Hardin County, Texas," which was prepared and signed by a third-party surveyor on March 22, 2000. The surveyor certified that "this is a true and correct plat based on a ground survey made under my supervision on March 22, 2000." This plat was filed with the Railroad Commission of Texas ("Railroad Commission").

The March 22, 2000 plat showed a 704–acre gas pooling unit (the "BSM No. 1 unit") designated by Samson that ran along Pine Island Bayou, the Hardin County/Jefferson County line, on the east. This line was also the western boundary of the tract containing the Hooks' Jefferson County Lease. The Hooks and their co-owners of the tract on which their Jefferson **\*418** County Lease was located were not named as lessors in the table shown on the plat of the designated unit. An arrow shown on the plat pointed to the location of the proposed bottom hole about at the beginning of a line that ran to the eastern line of the unit at Pine Island Bayou, the county line. Notations on the plat stated:

The Proposed Surface Location is:

630′ FSL x 1600′ FEL Survey

2750′± Scaled FWL x 3834′ FNL Unit.

The Proposed Bottom Hole Location is:

330′ FSL x 330′ FEL Survey

870′± Scaled FSL x 1080′± Scaled′ FEL Unit.

It is undisputed that "FSL" meant "From the Southern Line" of the Walker Pettitt Survey, "FNL" meant "From the Northern Line" of the Survey, and "FEL" meant "From the Eastern Line" of the Survey, which was the Hardin County/Jefferson County line at Pine Island Bayou. Thus, in this notation, the surface location of the BSM No. 1 well was 1,600 feet from the eastern line of the survey at Pine Island Bayou, and the proposed bottom hole location was about 1,080 feet from the eastern line, which marked the western line of the Hooks' Jefferson County Lease. The proposed bottom hole was therefore within the 1,320–foot buffer zone for the Jefferson County Lease.

Although the March 22, 2000 plat of the designated BSM No. 1 unit estimated the location of the proposed bottom hole location of the BSM No. 1 well, the exact bottom hole location of the well, following drilling, could only be ascertained from a directional survey. This survey was completed in July 2000 and was also filed with the Railroad Commission. Both parties agree that the survey showed the BSM No. 1 well to be bottomed 1,184 feet from the Hooks' Jefferson County Lease, within the 1,320–foot buffer zone of the Lease. Thus, Samson had an obligation under the terms of the "Offset Obligations" in the Hooks' Jefferson County Lease to (1) drill an offset well, (2) pay the Hooks "compensatory royalties," or (3) release the "offset acreage" within 90 days from the date production was first "sold, removed, or otherwise marketed" from the well.

The BSM No. 1 well was completed in August 2000, and the first gas sales occurred in late October 2000. Because the bottom hole of the well was within the 1,320–foot buffer zone of the Hooks' Jefferson County Lease, the first gas sales triggered Samson's offset obligations under the terms of the Lease. The Hooks complain, and the jury found, however, that Samson did not follow the provisions in Article VI(A) of the Jefferson County Lease, which provided that, within 90 days of the first sale of gas from a well within its buffer zone, Samson must drill an offset well, pay the Hooks compensatory royalties, or release the offset acreage. Instead, the jury found that Samson attempted to avoid those obligations by seeking to pool the Hooks' interest in the production from the BSM No. 1 well with those of other mineral owners, despite the lack of pooling authority in the Jefferson County Lease, while concealing the bottom hole location of the BSM No. 1 well.

In December 2000, Samson filed a P–12 "Pooling Authority" form with the Railroad Commission that reflected a reconfigured BSM No. 1 pooling unit. By letter, Samson informed the Commission that a portion of the 704 acres in the original BSM

No. 1 unit was to be put into a separate 308.41–acre pooling unit for the proposed Black Stone Minerals No. A–1 well (the "BSM A–1 well"). Attached to the letter was a "Certificate of Pooling Authority," which represented the Broussard tract, on which the Hooks' Jefferson County Lease lay, as one of the tracts whose mineral-rights owners either had **\*419** given Samson pooling authority under an instrument currently in effect or had pooled their interests into the reconfigured BSM No. 1 unit. Also attached was a plat of the redesignated704–acre pooling unit dated November 16, 2000 and certified by Samson's land man, Glenn Lanoue.

The arrows pointing to the surface and bottom hole locations on the November 16 plat of the redesignated BSM No. 1 unit were the same as those pointing to the proposed surface and bottom hole locations on the original March 22, 2000 plat of the unit. However, the acreage of the unit had been changed to show a different 704–acre configuration for the BSM No. 1 unit from that originally filed with the Railroad Commission. The redesignated BSM No. 1 unit, unlike the previously designated BSM No. 1 unit, extended beyond the eastern line of Hardin County at Pine Island Bayou into Jefferson County. The certificate, signed by Lanoue, stated that "this is a true and correct plat based on the best of my knowledge November 16, 2000."

On February 15, 2001, Samson sent the Hooks a letter offering to pool 50 acres covered by the Hooks' Jefferson County Lease into there designated BSM No. 1 gas pooling unit for the BSM No. 1 well. Attached to the letter was a copy of the plat of the reconfigured unit Samson had filed with the Railroad Commission in December 2000.

On February 20, 2001, before accepting Samson's offer to pool—which would require amendment of Article VI of the Hooks' Jefferson County Lease to permit pooling—Charles Hooks, the landowner and an attorney who had participated in a number of oil and gas deals, called Lanoue and sought more information. Charles Hooks inquired about the BSM No. 1 well's location and about how his property fit in the unit. Lanoue told him that the well was about 1,500 feet away from Pine Island Bayou, the boundary between Hardin and Jefferson Counties and the western line of the Hooks' Jefferson County Lease.

Hooks requested a plat showing where his acreage would lie within the proposed reconfigured BSM No. 1 unit. That same day, Lanoue sent Hooks the scaled plat of the redesignated BSM No. 1 pooling unit that Samson had filed with the Railroad Commission in December 2000. This plat was certified by Lanoue as "a true and correct plat based on the best of my knowledge December 28, 2000." A number of changes had been made to the March 22, 2000 plat showing the original BSM No. 1 gas pooling unit to reflect the redesignated unit. The plat of the reconfigured unit had different boundaries extending further west and also further east into Jefferson County, encompassing part of the Broussard tract on the east that had not been included in the original unit designation. The plat had been highlighted to show the location of the Hooks' 50 acres east of Pine Island Bayou.

Like the March 2000 plat of the original BSM No. 1 unit, the plat of the redesignated BSM No. 1 unit contained the arrow pointing to the location of the bottom hole, but it gave slightly changed coordinates from those of the proposed bottom hole of the BSM No. 1 well on the March 2000 plat. At trial, Lanoue testified that he changed these coordinates with a ruler. Also, instead of a line running from the proposed bottom hole location and showing ±1,080 feet to the eastern line of the unit at Pine Island Bayou, the plat showed a different line to the bayou with an undesignated starting point. The plat also showed an eastern border of the reconfigured BSM No. 1 unit beyond the bayou and encompassing a portion of the Hooks' Jefferson County Lease. Above the line was the designation "±1400#." An arrow stating **\*420** "BHL" and giving the well coordinates pointed to a point on the line about one quarter of the way from the western starting point of the line to the eastern end of the line at the bayou. Thus, if the designation "±1400#" were interpreted as the distance from the bottom hole to the bayou, the bottom hole of the BSM No. 1 well would be outside the 1,320 foot buffer zone for the Jefferson County Lease. However, if the "±1400#" designation were interpreted as the distance from the undesignated starting point of the line to the bayou and the arrow one-quarter of the way along it were interpreted as the bottom hole location, the bottom hole of the well would be within the buffer zone of the Hooks' Lease, triggering Samson's offset obligations under Article VI(A) of the Jefferson County Lease.

In addition, the plat stated:

The Bottom Hole Location is:

290′ FSL x 740′ FEL Survey

500′ Scaled FNL x 1400′± Scaled′ FEL Unit.

This language in the plat thus expressly stated that the bottom hole of the BSM No. 1 well was located about 1,400 feet from the eastern line of the redesignated BSM No. 1 unit, which encompassed the Hooks' 50 acres from their Jefferson County Lease between Pine Island Bayou and the eastern edge of the redesignated unit. According to this notation, the bottom hole of the BSM No. 1 well was within 1,320 feet of the "leased premises," and, therefore, inside the buffer zone for the Hooks' Jefferson County Lease

Lanoue testified at trial that he added the notation that showed the bottom hole of the BSM No. 1 well to be ±1,400 feet from the eastern line of the unit in August 2000 to reflect the newly shaped unit. He also testified that he got the notation "740 feet from the east line and 290 feet from the south line" "from myself." He did not go to the directional survey which had been previously completed to determine the exact location of the bottom hole. However, he intended the numbers to be "[a]s accurate as a land guy is using a ruler on a scaled piece of paper that might not even be to scale."

Hooks testified at trial, however, that Lanoue orally told him that the BSM No. 1 well was 1,500 feet from Pine Island Bayou. He then looked at the plat and concluded that the bottom hole location was approximately 1,400 feet west of Pine Island Bayou and thus outside the line that would have triggered the 1,320 foot offset provisions in the Jefferson County Lease. He made no other inquiries regarding the plat or the bottom hole of the well, and he did not check the records filed with the Railroad Commission to determine the exact location of the bottom hole.

After making the pooling offer to the Hooks, Lanoue executed the designation of the BSM No. 1 pooling unit in February 2001 and recorded it in the county's real property records on March 7, 2001, showing the Hooks as participating in the pool for the BSM No. 1 unit. However, the Hooks did not actually consent to pool the 50 acres from their Jefferson County Lease into the BSM No. 1 unit until May 25, 2001, and they conditioned their assent on a formal amendment to the lease which they were to prepare and submit to Samson. The Hooks did not prepare the formal amendment, however, and the parties never executed such an amendment. Instead, the Hooks agreed to a division order setting out their percentage distribution of the unit's proceeds, which stated that Samson would pay the Hooks royalties based on a stated percentage of their acreage in the unit to the entire acreage of the BSM No. 1 unit unless notified otherwise in writing.

 **\*421** After the Hooks agreed to be included in the BSM No. 1 unit, Samson sent royalty checks to them for their unit interest continuing through the time of trial, and the Hooks cashed the royalty checks. However, the royalty checks did not include additional compensatory royalties calculated under the terms of Article VI of the Hooks' Lease for a well drilled within the 1,320–foot buffer zone of the Hooks' Jefferson County Lease.

After the Hooks agreed to pool 50 acres of their Jefferson County Lease into the BSM No. 1 unit, Samson drilled a second well, the Joyce DuJay No. 1 well ("DuJay No. 1 well"), within the 1,320–foot buffer zone of the Hooks' Jefferson County Lease. That well was completed in January 2002 and made part of another pooling unit, the DuJay No. 1 unit, in which the Hooks also participated and from which they received royalties. This well was offset by the BSM No. 1 unit. Hooks testified that he was not defrauded with respect to the DuJay No. 1 unit.

**2. The Hooks' Hardin County Leases, the BSM A–1 Well and Pooling Unit, and the Hooks' "Unpooling" Claim**
In addition to their Jefferson County Lease, the Hooks also owned two leases in Hardin County near the BSM No. 1 well, the 95–acre and 10–acre Hardin County Leases. Unlike the Hooks' Jefferson County Lease, these Leases did provide for pooling in terms that were essentially the same with respect to the manner and methods of pooling.

The Hardin County Leases both contained language calling for an instrument "identifying and describing the pooled acreage" and stating that a "pooled unit shall become effective on the date such instrument or instruments are so filed for record." Article V(E) of the pooling provision in each Lease also stated that production from any part of a pooled unit that included the leased premises was considered production from the leased premises "regardless of whether ... such production was secured before or after the date of this lease or the date of the instrument designating the pooled unit." The 95–acre Lease provided in Article V(E) as follows:

E. *Lessee [Samson], at its option, is hereby given the right and power in its discretion to pool or combine, as to any one or more formations, the land covered by this Lease or any portion of said land, insofar only as gas or gas condensate rights are concerned ...* with other land, lease or leases in the immediate vicinity thereof, except to the extent and in the manner hereinafter stipulated. With respect to any such unit so formed, *Lessee shall execute in writing an instrument or instruments identifying and describing the pooled acreage, and file same for recording in the office of the County Clerk in Hardin County, Texas; and the pooled unit shall become effective on the date such instrument or instruments are so filed* for record. Notwithstanding anything hereof to the contrary, *pooled units created hereunder* and comprising all or part of the herein leased premises *shall not exceed the maximum acreage figures permitted for all production units of oil or gas wells completed at certain depths under Article V. hereof unless the Railroad Commission* of Texas or any governmental authority having and asserting jurisdiction over the subject matter thereof *prescribes for the drilling or operation of a well at a regular location, or permits for the obtaining of the maximum allowable from any well to be drilled, drilling, or already drilled, larger pooled units* than any of those herein permitted, then any such pooled unit may be established or enlarged to conform to the size either required of a well **\*422** or permitted for the obtaining of the maximum allowable. For any well drilled on and completed at depths beneath the surface of a tract covered by this lease there shall be no pooling with other lands, unless such tract is insufficient, due to either its lack of size or prior unitization hereunder, to comprise the maximum acreage figures permitted hereunder in which case all of said tract (95 acres more or less) or the then un-unitized portion of same shall be so pooled; and Lessee may include in such pooled unit such other acreage as may be available to comprise the maximum acreage figures permitted under the terms of this lease. *For a well drilled on or completed at depths beneath the surface of lands other than the herein leased premises, not less than all (100%) of the lands (95 acres more or less) or the then un-unitized portion of same shall be so pooled; and Lessee may include in such pooled unit such other acreage as may be available to comprise the maximum acreage figures permitted under the terms of this lease.*

*Operations for drilling on or production of gas from any part of the pooled unit* which includes all or a portion of the Leased Premises, regardless of whether such operations for drilling were commenced or such production was secured before or after the date of this lease or the date of the instrument designating the pooled unit, shall be considered as operations for drilling on or production of gas from the Leased Premises, whether or not the well or wells be located on the Leased Premises, and the entire acreage constituting such unit or units *shall be treated for all purposes, except the payment of royalties on production from the pooled unit, as if the same were included in this Lease.* The above right and power to pool may be exercised at any time and from time to time and before or after a well has been drilled, or while a well is being drilled. *Lessee may vacate any unit formed by it hereunder by instrument in writing filed for record in said county at any time when there is no unitized substance being produced from such unit.* The pooling for gas hereunder by Lessee shall also pool and unitize all liquid gas, and the royalty interest payable to Lessor thereon shall be computed the same as on gas. For the purpose of computing the royalties to which owners of royalties shall be entitled on production from each production unit, *there shall be allocated to the applicable separate tract acreage included in such production unit a pro rata portion of the production produced from such production unit.* Such allocation shall be on an acreage basis; that is to say, there shall be allocated to the applicable separate tract acreage within the unit that pro rata portion of the production produced from the production unit which the number of surface acres covered by such separate tract and included in the production unit bears to the total number of surface acres included in the production unit, commencing with the date of first production from the production unit.

(Emphasis added.)

In February 2001, Samson finished directionally drilling and completed the BSM A–1 well north of the BSM No. 1 well on Samson's own lease in Hardin County (the "Black Stone Minerals/FirnBank lease"). The mineral interests underlying this lease were owned 87.5% by Black Stone Minerals and 12.5% by FirnBank as cotenants.

Samson did not have the contractual authority to pool under its leases with either Black Stone Minerals or FirnBank. Samson therefore negotiated with the leaseholders for such a right and concluded that both of the lessors were in agreement. **\*423** Accordingly, on March 12, 2001, Samson filed a Unit Designation for a 704–acre unit called the Black Stone Minerals "A" No. 1 Gas Unit (the "BSM A–1 unit"). The BSM A–1 unit designation unitized the Black Stone Minerals/FirnBank lease, as well as the Hooks' 10–acre and 95–acre Hardin County Leases and other tracts, including leases beneath Pine Island Bayou owned by the State. The designation reflected that it was effective as of the date of first production, and it included a list of the leases pooled, including the Hooks' Hardin County Leases. The designation for the BSM A–1 unit included gas production at all depths between 6,000 and 13,800 feet, although the BSM A–1 well produced gas only from the shallow EY5 formation.

FirnBank consented to be pooled into the BSM A–1 Unit in May 2001. Samson also obtained written consent from the Hooks to pool their Hardin County Leases into the BSM A–1 unit. In addition, it obtained the agreement of the Texas General Land Office and the School Land Board (collectively, the "State of Texas"), who owned adjacent land, to pool that land into the unit. However, Black Stone Minerals, the 87.5% owner of the mineral interests underlying the drill site, declined to consent to the pooling unit.

Samson drilled and completed the BSM A–1 well, and the well began producing in June 2001 from the depth range of the formation at the horizon from 12,304 to 12,332 feet. In December 2001, Samson finished another gas well, the DuJay No. 1 well. The DuJay No. 1 well produced from some of the same land designated to the BSM A–1 unit, but it reached from 13,150 to 13,176 feet—a lower horizon than the BSM A–1 well. The DuJay No. 1 well began producing in January 2002.

In February 2002, after failing to receive Black Stone Minerals' consent to the BSM A–1 pooling unit, Samson amended the BSM A–1 unit designation. It executed and recorded a designation for a new unit, the Joyce DuJay No. 1 Gas unit ("DuJay No. 1 unit") that recited an effective date as of first production of the DuJay No. 1 well, i.e., January 2002. The DuJay No. 1 unit designated a new, smaller, 571–acre unit with a different name, different leases, different depths and different boundaries from the BSM A–1 unit. The DuJay No. 1 unit included some of the deeper strata of the originally designated BSM A–1 unit, but it excluded the EY5 horizon from which the BSM A–1 well was producing at 12,304 to 12,332 feet. Instead, the designated DuJay No. 1 unit pooled its leases as to gas well production from 12,800 feet and deeper, including some already-pooled depths carved out of the BSM A–1 unit (12,400–13,800 feet) and deeper strata (below 13,800 feet). Because of its depth limitations, the DuJay No. 1 unit included the DuJay No. 1 well, but not the shallower-completed BSM A–1 well. The designated acreage excluded most of the Black Stone Minerals/FirnBank lease, but it included the Hooks' Hardin County Leases and the State's leases.

Samson did not get consent from the Hooks to vacate or amend the BSM A–1 unit or to "unpool" their interests from the BSM A–1 unit or well. However, it informed the Hooks that the BSM A–1 unit had been amended and the unit name had been changed. It stated, "Please note that the Unit Designation for the Black Stone Minerals 'A' No. 1 is being amended and will now be called the Joyce DuJay No. 1 unit. No additional action is needed on your part." After the BSM A–1 unit was amended, reconstituted, and renamed the DuJay No. 1 unit, Samson paid, and the Hooks accepted, royalty payments from pooled production from the DuJay No. 1 well from the date of first production until **\*424** after commencement of trial in the instant case. The BSM A–1 well was produced as a lease well on Samson's Black Stone Minerals/FirnBank leases and was not included in any unit. Samson did not pay the Hooks royalties on the BSM A–1 well, and the Hooks took no action to enforce any rights with respect to the original BSM A–1 unit.

Subsequently, Samson drilled another DuJay well (the "DuJay A–1 well") and created a separate pooling unit for that well. The DuJay A–1 unit differed from the DuJay No. 1 unit by depth limitation and acreage. The DuJay A–1 well began producing on September 25, 2002. However, Samson did not file the DuJay A–1 unit designation until July 2003. The Hooks' Hardin County

Leases were likewise pooled into the designated DuJay A–1 unit, and the Hooks accepted royalties on the production from that unit as well from the date of first production until after trial had begun in the instant action.

### 3. The Hooks' Hardin County Leases and the "Most Favored Nation" Clause

The Hooks' Hardin County Leases also contained a "most favored nation" clause. This clause provided that, under certain circumstances, the royalties payable to the Hooks must be elevated to match the highest royalty payable to Samson's other lessors.

### 4. The Hooks' Leases and the "Formation Production Clause"

Article III(K) of each of the Hooks' Leases contained a "formation production clause." Article III provided that the Hooks were to receive as royalties 25% of "the market value at the wells" on the "gas, including casinghead gas or other gaseous substances produced from said land," or 25% of "the price received therefor by Lessee." Likewise, they were to receive as royalties 25% of "all liquid hydrocarbons that may be produced from said land." Article III(K) provided, "For the purposes of calculating all royalties payable under Article III herein, it is expressly provided that all such calculations shall be based on formation production as reported on Texas Railroad Commission forms P–1 and P–2."

## B. PROCEDURAL HISTORY

### 1. Trial Court Proceedings

In August 2004, several mineral-rights owners who had leased to Samson filed a suit against Samson styled *Joyce DuJay Lee v. Samson Lone Star.* The plaintiffs, who did not include the Hooks, complained about pooling issues unrelated to the BSM No. 1 well. In December 2004, other landowners, also not including the Hooks, filed a second action, styled *Thomas Klorer et al. v. Samson,* complaining about the same issues. In August 2005, these two actions were consolidated.

On his birthday in November 2006, Charles Hooks, as an oil and gas attorney, attended a seminar for oil and gas attorneys. There, he met an attorney who told him he was handling the *Klorer* and *Lee* cases against Samson.

On November 16, 2006, the Hooks were added to the consolidated suit in a Fifth Amended Petition. This petition alleged against Samson various breaches of contract and common law and statutory negligence related to the Hooks' Jefferson County Lease and their two Hardin County Leases. Among other things, the Hooks claimed that Samson had breached the Jefferson County Lease by not paying compensatory royalties based on the bottom hole of the BSM No. 1 well being within 1,320 feet from their Lease. The Hooks also claimed that Samson had improperly "unpooled" the BSM A–1 unit, and they sued to obtain all royalties they would have received from that unit as if all **\*425** the lessors, including Black Stone Minerals, had agreed to pool, to be added to the royalties they received from the DuJay No. 1 and DuJay A–1 units(the "unpooling claim"). The Hooks also asked for a declaratory judgment regarding the construction of the "most favored nations" clauses in their Leases, which they argued was triggered by a royalty paid to the State of Texas under a pooling agreement with Samson that was higher than the royalty paid to the Hooks under their pooling agreements. Finally, the Hooks sought the payment of royalties to them on "formation production" under the terms of all three Leases. The Hooks did not, however, plead any fraud claims at that time.

The Hooks added fraud, fraudulent inducement, and statutory fraud claims with respect to the Jefferson County Lease in a Sixth Amended Petition, filed on May 7, 2007. The Hooks alleged in the alternative (1) that their Jefferson County Lease had never been a part of the BSM No. 1 unit because no agreement to amend that Lease to allow pooling was entered, and, therefore, they were entitled to damages under the Lease for the loss of their rights to require Samson either to drill an offset well, pay them compensatory royalties, or release their acreage, and (2) that Samson had made false representations to them as to the configuration of the BSM No. 1 unit and the location of the BSM No. 1 well to induce them to agree to amend the Jefferson County Lease to allow a portion of it to be pooled in the BSM No. 1 well and unit(the "offset obligations claim"). They contended that Samson had falsely represented "that the [BSM No. 1] (gas) well was more than $1,320'$ from the nearest

lease line of the Hooks Jefferson County Lease" so that its offset obligations were not triggered under the Lease. The Hooks claimed that the representations were intended to save Samson from having to pay them the substantially greater compensatory royalties that would have been payable under the terms of the Lease for infringement of the 1,320–foot buffer zone.

In September 2007, the trial court severed the consolidated action against Samson into three different actions, one of which was the Hooks' action against Samson for fraud and breach of contract. [5]

[5]      The severed lawsuits are *Klorer v. Samson Lone Star,* No. B–173,008; *Bordages v. Samson Lone Star,* No. B–173,008–A; and *Hooks v. Samson Lone Star,* No. B–173,008–B. Only *Hooks* has gone to trial. *Klorer* and *Bordages* remain pending.

Subsequently, the Hooks moved for partial summary judgment on several of their claims based on the terms of their Leases. The Hooks moved for summary judgment on the unpooling claim, claiming that Samson did not have authority to vacate the BSM A–1 unit into which their Hardin County Leases were pooled and that, therefore, Samson had breached its lease contract by failing to pay them royalties on the BSM A–1 well. The Hooks also moved for summary judgment on their most favored nation claim, formation production claim, and offset claims. They argued that Samson failed to pay them "royalties based on a greater 'Most Favored Nations' rate and compensatory royalties on certain offset encroaching wells."

Samson moved for partial summary judgment on the offset obligations provision, on the formation production claims, and on the most favored nation claim. Samson also moved for summary judgment on the Hooks' unpooling claim on the basis of limitations.

The trial court granted the Hooks' motion for summary judgment and denied Samson's motion on the unpooling claim. It assessed damages of $766,626.85 against Samson on the Hooks' unpooling claim.

**\*426**  The trial court also granted the Hooks' summary judgment motion on their claim for breach of the most favored nations clause in their Hardin County Leases and awarded them $848,854.01 in damages.

The trial court granted Samson's motion for summary judgment for breach of the offset obligations provision in the Jefferson County Lease on limitations, and it denied the Hooks' corresponding motion. The trial court also disposed of some other contract claims by other partial summary judgment motions.

In 2008, the case went to trial solely on the Hooks' fraud claims with respect to the Jefferson County Lease and their formation production claims. The fraud claims included the Hooks' claims that Samson's landman, Lanoue, had made misrepresentations to them to get them to allow Samson to add their 50 acres subject to the Jefferson County Lease to the BSM No. 1 pooling unit for the BSM No. 1 well, which was within the 1,320–foot buffer zone for the Lease. The Hooks contended Samson made these misrepresentations to avoid abiding by the terms of Article VI(A) of the Jefferson County Lease, which they contended would have required Samson to drill an offset well, release their acreage, or pay them compensatory royalties, and, therefore, they were entitled to damages. The Hooks also claimed that they were entitled to additional royalties under the formation production clauses in both their Jefferson County and their Hardin County Leases.

The jury answered "yes" to the questions of whether Samson committed fraud and statutory fraud with respect to the BSM No. 1 well. It assessed damages against Samson for fraud in the amount of $20,081,638.07. The jury found that, in the exercise of reasonable diligence, the Hooks should have discovered Samson's fraud by Charles "Hook's Birthday April 2007." It did not respond, however, to the questions asking for a finding, by clear and convincing evidence, that the harm to the Hooks resulted from fraud or that Samson had actual awareness of the falsity of the representations or promise that the jury had found to be fraud. [6] Therefore, it did not award exemplary damages. The jury also did not respond to the question requesting it to "find beyond a reasonable doubt that Samson secured execution by the Hooks of a document by deception" and that the property had a value of $1,500 or more. [7]

6       Question Four, the question asking for a finding that the harm to the Hooks resulted from fraud, and Question Five, asking for a finding that Samson had actual awareness of the falsity of the representation, instructed the jury to answer the questions only if it unanimously answered "yes" to Questions One and Two. Only eleven of the twelve jurors answered "yes" to Questions One and Two; therefore, the jury properly refrained from answering Questions Four and Five.

7       Question Seven, seeking a finding that Samson secured execution of a document by deception, instructed the jury to answer the question only if it unanimously answered "yes" to Question Four or Five. Because the jury did not answer Question Four or Five, it properly refrained from answering Question Seven.

Finally, the jury found that Samson's failure to pay royalties based on formation production resulted in underpayment of royalties on all three of the Hooks' Leases.

The trial court entered final judgment on the jury's verdict, awarding the Hooks $20,081,638.07 for damages proximately caused by Samson's fraud with respect to the BSM No. 1 well. The final judgment also reaffirmed and incorporated the trial court's previous summary judgment rulings in favor of the Hooks. In addition to the fraud award, the judgment awarded **\*427** the Hooks$766,626.85 in damages for the "unpooling" claim related to the BSM A–1 well, $848,854.01 in damages for breach of the Leases' most favored nations clause, and $52,257.22 in damages related to ad valorem taxes. [8] Finally, the final judgment included an award of attorney's fees, expert witness fees, costs for copies of depositions, and pre- and post-judgment interest in favor of the Hooks.

8       At trial, Samson stipulated that it owed the Hooks $52,257.22 for ad valorem taxes that the Hooks had paid through November 2007. This stipulation and the amount of ad valorem taxes owed by Samson to the Hooks is not challenged on appeal.

### 2. Claims on Appeal

Samson has appealed the judgment on the trial verdict and the partial summary judgments entered against it, and the Hooks have cross-appealed the partial summary judgments entered against them, all of which were incorporated in the final judgment.

Samson contends on appeal that the trial court erred in entering judgment on the jury's finding that it committed fraud with respect to the Hooks' Jefferson County Lease and that it withheld royalties on formation production with respect to all three of the Hooks' claims. It also contends that the trial court erred in granting the Hooks' motion for summary judgment on their unpooling claim with respect to the BSM A–1 well, in granting summary judgment on the Hooks' claim for royalties under the most favored nations clause in their Jefferson and Hardin County Leases, and in denying its own motion for summary judgment on those claims. Finally, Samson contends that the trial court erred by granting a permanent injunction in its final judgment requiring Samson to fulfill certain contract provisions on pain of contempt of court, that it erred in awarding attorney's fees to the Hooks, and that it erred in awarding the Hooks 18% post-judgment interest compounded annually.

The Hooks contend on cross-appeal that the trial court erred in ruling in Samson's favor on their claims that Samson breached the offset obligations clause in the Hardin County Leases.

### C. DISCUSSION

### 1. The Trial Court's Judgment on the Hooks' Fraud Claims with Respect to the Jefferson County Lease

In its third issue, Samson contends (1) that there is legally and factually insufficient evidence to support the jury's finding that the Hooks could not have discovered their fraud claims until April 2007 and (2) that the statute of limitations bars the Hooks' claim for fraud, fraudulent inducement, and statutory fraud with respect to the Jefferson County Lease.

[1]  [2]  To prove fraud, a plaintiff must show that the defendant made (1) a material misrepresentation (2) that was either known to be false when made or was asserted without knowledge of its truth (3) which was intended to be relied upon (4) which was indeed relied upon and (5) which caused injury. *Dow Chem. Co. v. Francis,* 46 S.W.3d 237, 242 (Tex.2001). To

prove fraudulent inducement, these same elements of fraud must be established as they relate to a contract. *Coastal Bank SSB v. Chase Bank of Tex., N.A.,* 135 S.W.3d 840, 843 (Tex.App.-Houston [1st Dist.] 2004, no pet.). The statute of limitations for fraud is four years. TEX. CIV. PRAC. & REM.CODE ANN. § 16.004 (Vernon 2002).

 **[3]** **[4]** **[5]** "Statutes of limitations are intended to compel plaintiffs to assert their claims 'within a reasonable period of time while the evidence is fresh in the minds of the parties and witnesses.' " *Wagner &* **\*428** *Brown, Ltd. v. Horwood,* 58 S.W.3d 732, 734 (Tex.2001) (quoting *Computer Assocs. Int'l, Inc. v. Altai, Inc.,* 918 S.W.2d 453, 455 (Tex.1996)). "As a general rule, a cause of action accrues and the statute of limitations begins to run when facts come into existence that authorize a party to seek a judicial remedy." *Provident Life & Accident Ins. Co. v. Knott,* 128 S.W.3d 211, 221 (Tex.2003). In most circumstances, "a cause of action accrues when a wrongful act causes a legal injury, regardless of when the plaintiff learns of that injury or if all resulting damages have yet to occur." *Id.*

 **[6]** The statute of limitations for fraud is four years. TEX. CIV. PRAC. & REM.CODE ANN. § 16.004(a)(4) (Vernon 2002); *Exxon Corp. v. Emerald Oil & Gas Co.,* 348 S.W.3d 194, 216 (Tex.2011). "The statute of limitations for fraud begins to run from the time the party knew of the misrepresentation." *Emerald Oil,* 348 S.W.3d at 216; *see also Little v. Smith,* 943 S.W.2d 414, 420 (Tex.1997) ("Generally, in a case of fraud the statute of limitations does not commence to run until the fraud is discovered or until it might have been discovered by the exercise of reasonable diligence.").

 **[7]** The Hooks claimed, and the jury found, that in making their determination to agree to the pooling of 50 acres of their Jefferson County Lease in the BSM No. 1 unit, they relied solely on Lanoue's oral statement that the BSM No. 1 well was about 1,500 feet from their Lease line and on Charles Hooks' interpretation of the plat of the BSM No. 1 unit provided to him in response to his conversation with Lanoue on February 15, 2001. The Hooks also contended, and the jury found, that they did not discover that the bottom hole of the BSM No. 1 well was within their 1,320–foot buffer zone, entitling them to additional compensation royalties, until well within the limitations period as extended by application of the discovery rule.[9] Specifically, the Hooks claimed that they relied on Charles Hooks' interpretation of the designation "±1400#" on the line on the plat of the redesignated unit drawn from an undesignated point to Pine Island Bayou as meaning that the bottom hole of the BSM No. 1 well was about 1,400 feet, or more than 1,320 feet, from their Lease, and, therefore, outside the buffer zone. They did not inquire into seemingly contradictory information in that document showing an arrow pointing to the bottom hole of the BSM No. 1 well about one-quarter of the way along the 1,400–foot line from an undesignated point to Pine Island Bayou, the western line of their Jefferson County Lease. Nor did they inquire into the notation that the bottom hole was about 1,400 feet "FEL unit," i.e., from the eastern line of the reconfigured BSM No. 1 unit, which included 50 acres of their Jefferson County Lease. Both of these notations would have indicated to them that the bottom hole of the BSM No. 1 well was clearly within the Lease's 1,320–foot buffer zone. Similarly, the Hooks did not seek available records from either Samson or the Railroad Commission that would have shown them the actual location of the BSM No. 1 well's bottom hole.

[9] Although the jury found that the Hooks' cause of action for fraud accrued on "Hooks' birthday April 2007," the record shows that Hooks' birthday was in November and that it was on his birthday in November 2006 that he attended the seminar for oil and gas attorneys where he first heard about the other mineral-rights owners' suits against Samson.

Had the Hooks exercised reasonable diligence, they should have known of the exact location of the bottom hole when the directional survey was filed with the Railroad Commission in July 2000. *See Emerald Oil,* 348 S.W.3d at 216; **\*429** *Little,* 943 S.W.2d at 420. Charles Hooks was an oil and gas attorney and had participated in more than 100 oil and gas leases at the time of trial, and he knew that Lanoue had certified the plat furnished to Hooks as being made on his own knowledge in December 2000, but he never sought to investigate the results of the directional survey filed with the Railroad Commission in July 2000, which showed the exact location of the bottom hole. Nor did the Hooks conduct due diligence in seeking the plat of the originally designated BSM No. 1 unit certified by the surveyor in March 2000, showing the proposed bottom hole of the BSM No. 1 well, which was likewise filed with the Railroad Commission in July 2000. Both of these publicly available documents would have shown that the well was proposed to be and was bottomed within the 1,320–foot buffer zone of the Jefferson County Lease, triggering Samson's obligations to them under Article VI(A) of that Lease. Any inquiry into the records

available from the lessee, Samson, or from the Railroad Commission would have shown the Hooks the actual location of the BSM No. 1 well's bottom hole in February 2001, when pooling was first proposed to them.

The Hooks' fraud claims were not filed until May 2007, more than six years after pooling was proposed to them by Samson. We conclude that the Hooks knew or should have known information that led to the discovery of the alleged fraud no later than February 2001, as the necessary information was a matter of public record at that time. *See BP Am. Prod. Co. v. Marshall, 342 S.W.3d 59, 66 (Tex.2011)* (holding that information disclosing lessee's failure to continue good faith efforts to develop oil and gas lease was available from public records and "from several other sources, including the lessee"); *HECI Exploration Co. v. Neel, 982 S.W.2d 881, 886 (Tex.1998)* (holding that, because several sources of information about common reservoirs and operations are available to royalty owners, including Railroad Commission records, discovery rule deferring accrual of cause of action does not apply to claims of royalty owners for damage to common oil and gas reservoir).

 **[8]**    The statute of limitations for fraud begins to run when the claimant knew or could have discovered the fraud by the exercise of reasonable diligence. *See Little, 943 S.W.2d at 420.* Thus, the statute of limitations began to run in February 2001, but the Hooks did not file suit until May 2007, which is well outside the limitations period. *See Emerald Oil, 348 S.W.3d at 216.* We hold that the Hooks' fraud claims are barred by limitations as a matter of law.

On rehearing, the Hooks argue that the issue of when they could have discovered the fraud was a question for the jury, citing *Lesley v. Veterans Land Board, 352 S.W.3d 479, 485–86 (Tex.2011).* That case addressed an alleged mistake in a reservation of a mineral interest. *Id.* The supreme court held that there were fact issues as to whether this mistake was so plain as to charge the grantor with knowledge of the mistake. *Id.* at 486. The court concluded, "In these circumstances, it cannot be said that, as a matter of law, Lesley knew or should have known of the mistake in her deed when she executed it. Whether her claim for reformation is barred by limitations involves disputed facts." *Id.* This scenario is distinguishable from the present case.

 **[9]**    When a cause of action accrues is normally a question of law. *Emerald Oil, 348 S.W.3d at 202.* Our analysis of when the Hooks knew or should have known of facts that in the exercise of reasonable diligence would have led to the discovery of the alleged wrongful act demonstrates  **\*430**  that they should have known of the alleged fraud, as a matter of law, in February 2001, more than six years before they filed suit. There is no disputed fact issue here regarding whether this information was plain enough to charge the Hooks with this knowledge—it is undisputed that this information was readily available in Samson's records and in the records filed with the Railroad Commission. Moreover, there was sufficient information available on the plat of the redesignated BSM No. 1 unit—namely the information that the bottom hole of the well was "±1400" feet from the eastern line of the unit that encompassed their 50 acres—that should have put them on inquiry notice. Thus, the reasoning in *Lesley* does not apply in this case.

We sustain Samson's third issue.

## 2. Summary Judgments Entered Against Samson on the Hardin County Leases

### (a) Samson's "Unpooling" of the BSM A–1 Unit

In its sixth issue, Samson challenges the trial court's summary judgment awarding the Hooks damages on their claim for royalties from the BSM A–1 unit due to Samson's improper unpooling of that unit.

Samson contends that because Black Stone Minerals, the 87.5% owner of the mineral rights on the drill site tract did not consent to pooling, (although FirnBank, the owner of a 12.5% interest in the mineral rights did), the "essential purpose for forming that unit had failed" and the BSM A–1 unit as originally designated was not formed. Thus, the amendment of the unit to exclude the non-consenting drill site mineral owner, Black Stone Minerals, was justified. Samson further argues that, after the BSM A–1 unit was amended and renamed the DuJay No. 1 unit, the Hooks accepted royalty payments from production on both DuJay

units, which gave the Hooks a higher percentage of the production than they would have received under the BSM A–1 unit. Samson argues that, by accepting the royalty payments from the DuJay No. 1 well and the DuJay A–1 well, the Hooks accepted the amendment to the BSM A–1 unit and they understood and acknowledged that the BSM A–1 unit was not formed.

Alternatively, Samson argues that, if the amendment to the BSM A–1 unit was improper, the BSM A–1 unit still exists and the Hooks should have been paid in accordance with their interests in that unit, not in accordance with their interest in the two DuJay units, which were improperly formed. Moreover, it argues that the extent of the unit must be limited to FirnBank's 12.5% interest in the drill site tract because only FirnBank consented to pool its undivided interest in the gas produced from the BSM A–1 well.

The Hooks argue that the BSM A–1 unit was validly formed when FirnBank, the owner of a 12.5% undivided interest in the mineral rights to the drill site, consented to the unit and that this pooled unit could not be vacated or amended so long as gas continued to be produced from the BSM A–1 well. The Hooks agreed to the pooling of their Hardin County Leases in the BSM A–1 unit. Therefore, they argue, they are entitled to royalties from the BSM A–1 well in addition to the royalties they accepted from their participation in the DuJay No. 1 and DuJay A–1 pooling units.

**[10]    [11]    [12]    [13]**    An oil and gas lease is a contract and is therefore interpreted as such. *Tittizer v. Union Gas Corp.,* 171 S.W.3d 857, 860 (Tex.2005). When construing a contract, the primary goal of the courts is to give effect to the parties' written expression of their intent. *PG & E Gas*  **\*431**  *Transmission v. City of Edinburg,* 59 S.W.3d 225, 227 (Tex.App.-Corpus Christi 2001, no pet.). The courts will enforce the intentions of the parties to an unambiguous oil and gas lease as expressed in the lease. *Tittizer,* 171 S.W.3d at 860. In determining the agreement, the court examines all parts of the contract and the circumstances surrounding its formulation. *Columbia Gas Transmission Corp. v. New Ulm Gas, Ltd.,* 940 S.W.2d 587, 591 (Tex.1996); *PG & E Gas Transmission,* 59 S.W.3d at 227–28.

**[14]    [15]**    With respect to royalty interest owners, "pooling results in 'a cross-conveyance of interests in land by agreement among the participating parties, each of whom obtains an undivided joint ownership in the royalty earned from the land in the "block" created by the agreement' " and each of whom receives royalty on the basis of the percentage of that party's acreage to the whole block. *Browning Oil Co. v. Luecke,* 38 S.W.3d 625, 633 (Tex.App.-Austin 2000, pet. denied) (quoting *MCZ, Inc. v. Triolo,* 708 S.W.2d 49, 52–53 (Tex.App.-Houston [1st Dist.] 1986, writ ref'd n.r.e.)). In other words, pooling effects a cross-conveyance among the owners of the minerals under the various tracts in the pool so that all cotenants own undivided interests under the unitized tract in the proportion that their contribution bears to the unitized tract. *Montgomery v. Rittersbacher,* 424 S.W.2d 210, 213 (Tex.1968). Thus, when an oil and gas lease is executed by all of the owners of different mineral interests in two or more tracts, the royalties payable under the lease will be pooled, and all royalty interest owners in the land subject to the lease will share in production, no matter where the well is drilled on the leasehold. *London v. Merriman,* 756 S.W.2d 736, 739 (Tex.App.-Corpus Christi 1988, writ denied).

**[16]    [17]    [18]**    An oil and gas lessee has no power to pool, however, without the lessor's express authorization, usually contained in the lease's pooling clause. *Tittizer,* 171 S.W.3d at 860; *Se. Pipe Line Co. v. Tichacek,* 997 S.W.2d 166, 170 (Tex.1999); *Luecke,* 38 S.W.3d at 634 (holding that lessee's authority to pool is derived solely from terms of lease, and lessee has no power to pool absent express authority). "For pooling to be valid, it must be done in accordance with the terms of the methods and purposes specified in the lease." *Tittizer,* 171 S.W.3d at 860; *Tichacek,* 997 S.W.2d at 170. Good-faith pooling can be exercised multiple times. *See Expando Prod. Co. v. Marshall,* 407 S.W.2d 254, 259–60 (Tex.Civ.App.-Fort Worth 1966, writ ref'd n.r.e.). However, "[t]he lessors' land may be pooled only to the extent stipulated in the lease." *Tittizer,* 171 S.W.3d at 860 (quoting *Jones v. Killingsworth,* 403 S.W.2d 325, 327–28 (Tex.1965)).

**[19]    [20]    [21]**    Joinder by all interest owners is not necessary for a pooled unit to be valid. *See Ladd Petroleum Corp. v. Eagle Oil & Gas Co.,* 695 S.W.2d 99, 106 (Tex.App.-Fort Worth 1985, writ ref'd n.r.e.); *see also Whelan v. Placid Oil Co.,* 274 S.W.2d 125, 128 (Tex.Civ.App.-Texarkana 1954, writ ref'd n.r.e.) (holding that tenant in common has right to execute lease on his undivided interest in common property, notwithstanding nonjoinder of cotenant); *Donnan v. Atl. Richfield,* 732 S.W.2d 715, 717 (Tex.App.-Corpus Christi 1987, no writ) (stating that cotenant has right to incorporate pooling agreement into oil or gas

lease without consent or joinder of cotenants, thereby binding his undivided interest). Rather, a tenant in common has the legal right to incorporate a pooling agreement into an original oil and gas lease without the consent or joinder of the other cotenants, creating a valid contract binding the undivided interest of the cotenant *432 making the agreement. *Whelan,* 274 S.W.2d at 128. In such a case, the timely completion of a producing well under the terms of the pooling agreement and within the unit area set out in the unitization agreement will serve to continue the lease in full force and effect so long as gas is being produced in commercial quantities. *Id.* A cotenant who enters into such a lease binding its royalty interest in the completed and producing well and who accepts its pro rata share in the royalties from the well calculated under the terms of the unitization agreement is estopped to deny the validity of the unitization agreement as to its interest therein. *Id.* at 129.

 [22]     A lessee cannot unilaterally terminate a unit that has a producing pooled well. *See Ladd Petroleum Corp.,* 695 S.W.2d at 106–07. Rather, for a lessee to terminate a unit, either the lessors must agree to the unpooling or the lease must expressly authorize such termination. *Id.* at 107; *see Williamson v. Mobil Producing Tex. & N.M., Inc.,* 737 S.W.2d 917, 921 (Tex.App.-Beaumont 1987, writ denied) ("So, clearly, the lessee, if it is 'after the discovery of the same,' can change the pooling unit only subsequent to the cessation of production....").

 [23]     [24]     When a mineral interest owner—a lessor—accepts royalty checks from a pooled unit, he has accepted that unit. *See Montgomery,* 424 S.W.2d at 214–15. Under the doctrine of equitable estoppel, mineral interest owners can not repudiate a unit designation after accepting royalties attributable to that unit. *Cambridge Prod. Inc. v. Geodyne Nominee Corp.,* 292 S.W.3d 725, 732 (Tex.App.-Amarillo 2009, pet. denied).

Here, The Hardin County Leases granted Samson the authority to pool those leases with other land or leases. Under that authority, Samson obtained the Hooks' agreement to pool their interests with the undivided interests of the two drill site lessors, Black Stone Minerals and FirnBank, in the BSM A–1 unit. One of the two drillsite lessors—FirnBank—consented to the BSM A–1 unit. In addition, Samson pooled other lands and its own working interests into that unit. However, Black Stone Minerals refused to pool. Samson had no authority to pool Black Stone Minerals' interests without its express consent. *See Tittizer,* 171 S.W.3d at 860; *Tichacek,* 997 S.W.2d at 170; *Luecke,* 38 S.W.3d at 634. But it did not lack authority to form a gas production unit that included the mineral interests of Black Stone Minerals's cotenant, FirnBank. *See Ladd Petroleum Corp.,* 695 S.W.2d at 106; *Whelan,* 274 S.W.2d at 128.

We agree with the Hooks that the originally designated BSM A–1 unit was validly formed, creating a valid contract binding FirnBank, the cotenant making the agreement, and the Hooks. *See Whelan,* 274 S.W.2d at 128. Thus, the Hardin County Leases and FirnBank's undivided 12.5% interest in the acreage of the designated unit, as well as the leases of the other consenting landowners, constituted a valid pooling unit. However, FirnBank pooled only its own undivided 12.5% interest in the production from the BSM A–1 unit. *See id.* at 129. The BSM A–1 unit that was created for the BSM A–1 well did not include the interest of Black Stone Minerals, who had not consented to pool its undivided mineral interest in the drill site lease, as a lessor. *See Tittizer,* 171 S.W.3d at 860; *Tichacek,* 997 S.W.2d at 170; *Luecke,* 38 S.W.3d at 634. Neither FirnBank nor the Hooks had the authority to bind Black Stone Minerals to their own agreement to pool. *See Montgomery,* 424 S.W.2d at 213; *Whelan,* 274 S.W.2d at 128.

 [25]     While there was production from the original BSM A–1 unit, Samson had no *433 authority to dissolve that unit. *See Williamson,* 737 S.W.2d at 921. Nevertheless, when Black Stone Minerals refused to pool, Samson treated the BSM A–1 well as continuing as an independent lease well on the Black Stone Minerals/FirnBank Lease that was not pooled in any unit. Samson did not pay the Hooks royalties on the production from the BSM A–1 well, nor did the Hooks complain that they were not receiving royalties. Instead, it amended and redesignated the pooling unit to exclude the BSM A–1 well and the EY5 formation from which it was producing, which Samson renamed the DuJay No. 1 unit.

Samson pooled the Hooks' interests and those of the other interest holders in the originally designated BSM A–1 unit into both the DuJay No. 1 unit and the DuJay A–1 unit, pursuant to its right under the Hardin County Leases to exercise pooling authority multiple times, "at any time and from time to time...." Samson notified the Hooks, stating, "Please note that the Unit

Designation for the Black Stone Minerals 'A' No. 1 is being amended and will now be called the Joyce DuJay No. 1 Unit. No additional action is needed on your part."

The amended unit and redesignated pooling unit included reduced acreage from the Black Stone Minerals/FirnBank lease as well as the Hooks' Hardin County Leases and others from the original BSM A–1 unit, including the State's leases. Although the new DuJay No. 1 unit did not include the horizon from which the BSM A–1 well was producing, it did include deeper strata that had been included in the original BSM A–1 unit, including the depths from which the DuJay No. 1 well was producing. Subsequently, Samson designated a second new gas production unit that overlapped with the original BSM A–1 unit, which it named the DuJay A–1 unit. The DuJay A–1 unit included different strata not included in the DuJay No. 1 unit.

The completion of a producing well, the BSM A–1, within the unit area set out in the unitization agreement served to continue the leases granted to Samson by FirnBank, the Hooks, and the other landowners in full force and effect so long as any "unitized substance" continued to be produced from the BSM A–1 well, subject to unpooling through agreement of the lessors or through cessation of the production of unitized substance as provided in the habendum clause of the Hardin County Leases. *See Ladd Petroleum Corp.,* 695 S.W.2d at 107; *Whelan,* 274 S.W.2d at 128. Therefore, Samson's redesignation of the BSM A–1 unit constituted a breach of the Hardin County Leases by Samson, as did its failure to pay the Hooks royalties on the production from the BSM A–1 well unless the lessors agreed to the unpooling.

The Hooks took no action to assert any rights under the originally designated BSM A–1 unit in response to Samson's amendment and redesignation of the BSM A–1 unit as the DuJay No. 1 unit and its subsequent designation of the DuJay A–1 unit until they filed suit for breach of contract against Samson in November 2006, more than four years from the date of first production and more than four years from the date the BSM A–1 unit was amended and redesignated and the Hooks were notified. Instead, the Hooks expressly agreed to accept the redesignation and terms of the new units, binding themselves to accept royalties pursuant to their pro rata share of the royalties from the DuJay No. 1 and DuJay A–1 units as calculated under the terms of the DuJay No. 1 and DuJay A–1 unitization agreements, and they did accept royalties from the production of both DuJay units until the time of trial in this case.

**\*434** We conclude that, by accepting royalty checks from the amended and redesignated pooling units, the DuJay No. 1 and DuJay A–1 units, which they had been notified replaced the BSM A–1 unit, and by not asserting any rights to royalties from the original BSM A–1 unit or making any timely claim against Samson in regard to the amendment and redesignation of the BSM A–1 unit, the Hooks accepted and ratified the amendment and redesignation of the units. *See Fortune Prod. Co. v. Conoco, Inc.,* 52 S.W.3d 671, 678 (Tex.2000) (stating that ratification is adoption or confirmation by person with knowledge of all material facts of prior act which he had right to repudiate); *Montgomery,* 424 S.W.2d at 214–15.

We hold, therefore, that the Hooks are estopped to assert an interest in royalties from production from the BSM A–1 well by their ratification of the amended and redesignated BSM A–1 unit.

We sustain Samson's sixth issue.

*(b) The Hooks' Summary Judgment on the "Most Favored Nations" Clause in the Jefferson and Hardin County Leases*

 [26]    In its seventh issue, Samson claims that the trial court erred in rendering summary judgment in the Hooks' favor on the "most favored nations" lease clause contained in all three of the Hooks' Leases. This clause provided that, under certain circumstances, the royalties payable to the Hooks must be elevated to match the highest royalty payable to Samson's other lessors. Specifically, the clause provides:

   XXIX. *MOST FAVORED NATIONS CLAUSE*

If Lessee shall enter into an oil and gas lease(s) part of which is located within three (3) miles of any exterior boundary of the subject lands covered by the Subject Lease, hereinafter referred to as "Third Party Lease," Lessee shall notify Lessor of such fact. If the reserved royalty or the amount per acre payable for delay rentals, shut-in rentals or minimum royalty, at any time payable under such Third Party Lease, is higher than the like royalty and amounts payable as provided in the Subject Lease, the royalty or amount payable per acre in the Subject Lease, which is less than that provided in the Third Party Lease shall be immediately increased so that it will equal the royalty or other amounts payable under the Third Party Lease. The subject Lease and the Third Party Lease must be calculated in substantially the same manner, such that the comparison of the Subject Lease and the Third Party Lease is based on the same effective net royalty or other payments, and that same shall include or deduct the same types of charges, taxes and other burdens from such interests.

The trial court granted summary judgment in the Hooks' favor, holding that this clause was triggered by royalty paid to the State of Texas under a pooling agreement with Samson that was higher than the royalty due to the Hooks.

It is undisputed that the State of Texas's lease under Pine Island Bayou ("State of Texas Lease") is a "Third Party Lease" within the meaning of that term in the most favored nations clause in the Leases in that it covers land located within three miles of the lands covered by the Hooks' Leases. The State, like FirnBank and the Hooks, originally consented to pooling to form the BSM A–1 unit. It declined, however, to consent to the subsequent DuJay No. 1 unit. In order to obtain the State's consent to pool its lease under Pine Island Bayou into the DuJay No. 1 unit, Samson entered into a pooling agreement wherein Samson became obligated to pay the State **\*435** a 28.28896% royalty on production from the DuJay No. 1 well, as opposed to the 25% it had been paying the State and was paying to the Hooks. The issue, therefore, is whether the pooling agreement executed by Samson and the State constitutes a "Third Party Lease," i.e., an oil and gas lease located within three miles of any exterior boundary of any of the Hooks' Leases with a higher royalty than that provided for in the Hooks' Leases, so that Samson's obligation to pay the Hooks increased royalties under the most favored nations clause in those leases was triggered.

 **[27]**    **[28]**    A most favored nations clause is "a vendor protection clause [that] enables the vendor to receive the benefit of increases in the market price of his product over the term of a long range contract with a purchaser." *Lone Star Gas Co. v. Howard Corp.,* 556 S.W.2d 372, 374 (Tex.Civ.App.-Texarkana 1977, writ ref'd n.r.e.). Such a clause is enforced according to its terms. *See id.* at 375–76.

The most favored nations clause in the Leases referred specifically to Samson's obligation to pay the Hooks royalty per acre equal to that payable under any Third Party "oil and gas lease(s) part of which is located within three (3) miles of any exterior boundary of the subject lands covered by [the Hooks'] Lease that Samson entered." Here, however, Samson did not enter an "oil and gas lease" with the State that required it to pay higher royalties per acre than it was paying the Hooks under their Leases. It entered a settlement agreement, called a "Pooling Agreement," that raised only the royalty payable to the State on production from the DuJay No. 1 unit.

The difference between the royalties payable to the State on production from the DuJay No. 1 unit and the royalties paid to the Hooks did not represent a difference in the market price of gas at the time the pooling agreement was entered; nor did it represent a general increase in the royalty rate on the State's leases. It was an amount agreed upon by Samson and the State to induce the State to accept the amended unit in place of the BSM A–1 unit and to compensate the State for its loss of royalties from the BSM A–1 well due to Samson's amendment and redesignation of the BSM A–1 unit as the DuJay No. 1, excluding the BSM A–1 well formation.

We conclude that, under its plain terms, the most favored nations clause in the Hooks' Leases does not apply to trigger royalties payable to the Hooks equal to those payable under the settlement agreement reached between Samson and the State. Therefore, we hold that the trial court erred in granting the Hooks' motion for summary judgment for damages under the most favored nations clause in the Hardin County Leases.

We sustain Samson's seventh issue.

### 3. The Hooks' Claims Under the Formation Production Clause in the Jefferson and Hardin County Leases

 [29]    In its fifth issue, Samson complains about the jury's finding, in response to Question Number 8, that Samson's failure to pay royalty based on formation production resulted in underpayment of royalty under the Hooks' Jefferson and Hardin County Leases and the trial court's judgment awarding the Hooks damages based on the formation production clause in the Leases. Samson contends the issue was erroneously submitted to the jury because the construction of the contractual provision involved was a question of law for the trial court; therefore, the jury's response to Question Number 8 is immaterial. Samson argues that, as a matter of law, the lease provision in question, properly  **\*436**  construed, does not require Samson to pay for formation production, as this would require it to pay twice for molecules of gas produced at the surface of the well as liquid condensate. It also contends that there is legally and factually insufficient evidence that the Hooks' Leases required Samson to pay twice for those molecules of gas. It states that, by giving effect to the jury's answer to Question Number 8, the trial court increased all the other categories of damages assessed against it.

Condensate consists of "hydrocarbons that exist in the form of gas when contained in the natural gas reservoir underground, which condense into liquid form when released from the reservoir's higher pressure and temperature." *Bowden v. Phillips Petroleum Co.,* 247 S.W.3d 690, 704 n. 7 (Tex.2008). When gas is produced, it goes through a mechanical separator through which condensate drops out as a liquid at the wellhead. The Railroad Commission has implemented a system by which producers report the amount of gas in the reservoir before it is produced. This system requires producers to use a formula to calculate the volume of reservoir gas produced at the surface as a liquid. "Formation production" is thus the calculation of the total amount of natural gas taken from the reservoir in whatever form it arrives at the surface, whether in the form of gas or in the form of liquid condensate. Formation production calculations allow the Railroad Commission to track the amount of gas coming out of the ground to avoid overproduction.

Article III of each of the Hooks' Leases contained several paragraphs specifying how royalties were to be paid. It reads in pertinent part:

III *ROYALTIES:*

Lessors reserve for themselves ... the following royalties ...

....

B. (1) On gas, including casing head gas or other gaseous substances produced from said land, *Twenty–Five* percent (25%) of the market value at the wells of such gas, or *Twenty–Five* percent (25%) of the price received therefor by Lessee, whichever is greater ...

D. An equal *Twenty–Five* percent (25%) part of all other liquid hydrocarbons that may be produced from said land ...

....

K. For the purposes of calculating all royalties payable under Article III herein, it is expressly provided that all such calculations shall be based on formation production as reported on Texas Railroad Commission forms P–1 and P–2.

The Hooks base their formation production argument on Article III(K). They contend that although this provision expressly refers to the entirety of Article III, which covers payments for both liquids and gas, it requires that all calculations shall be based on gas as it exists in the reservoir so that royalties must be paid on liquid condensate both as it is produced in liquid form and as it exists in gaseous form in the reservoir.

 [30]    [31]    [32]    [33]    The interpretation of the formation production provision in the Hooks' Leases is a matter of contract construction. Whether a contract is ambiguous is a question of law for the court. *J.M. Davidson, Inc. v. Webster,* 128 S.W.3d 223,

229 (Tex.2003). We construe the parties' intentions as expressed in the document, considering the entire writing and attempting to harmonize and give effect to all of the contract's provisions with reference to the whole agreement. *Frost Nat'l Bank v. L & F Distribs.,* 165 S.W.3d 310, 311–12 (Tex.2005). "We construe contracts **\*437** 'from a utilitarian standpoint bearing in mind the particular business activity sought to be served' and 'will avoid when possible and proper a construction which is unreasonable, inequitable, and oppressive.' " *Id.; accord Ace Ins. Co. v. Zurich Am. Ins. Co.,* 59 S.W.3d 424, 428 (Tex.App.-Houston [1st Dist.] 2001, pet. denied). If, after the rules of construction are applied, the contract can be given a definite or certain legal meaning, it is unambiguous and we construe it as a matter of law. *Frost Nat'l Bank,* 165 S.W.3d at 312.

Article III of the Hooks' Leases, governing the payment of royalties, addresses a number of royalty payment issues. In each case, it unambiguously states that Samson will pay 25% of the proceeds it receives, whether for gas or for liquids, as royalties to the Hooks unless the proceeds are below market value, in which case it must pay 25% of market value. In no place do the Leases state that, having paid royalties to the Hooks from the proceeds it receives on the sale of gas or liquid condensate, Samson must pay for the condensate a second time as it existed as gas in the reservoir. Article III does not state that Samson must pay a 25% royalty on "formation production" in addition to royalty on gas and liquids as produced, and we decline to read that provision into the unambiguous language of the Lease. *See Mann Frankfort Stein & Lipp Advisors Inc. v. Fielding,* 289 S.W.3d 844, 850 (Tex.2009) ( "[T]erms are to be implied in contract, not because they are reasonable, but because they are necessarily involved in the contractual relationship, such that the parties must have intended them and must have failed to express them only because of sheer inadvertence or because they are too obvious to need expression."). We agree with Samson that the unambiguous meaning of these lease provisions is that the Hooks are entitled to a 25% royalty on all gas and liquid hydrocarbons at the time proceeds are received from their sale.

We hold that, under its plain language, the formation production clause in Article III(K) of the Hooks' Jefferson County and Hardin County Leases does not operate to double the amount of royalties owed on the liquid condensate produced from the well. Therefore, the trial court erred in awarding the Hooks damages calculated under the formation production clause in their Leases.

We sustain Samson's fifth issue.

### 4. The Trial Court's Grant of a Permanent Injunction

In its eighth issue, Samson claims that the trial court erred by granting a permanent injunction in its judgment that requires it to fulfill certain contractual provisions upon pain of contempt of court. Samson claims that no evidence was presented of the elements necessary for a permanent injunction.

The first item of injunctive relief requires Samson to pay the Hooks royalty on production from the BSM A–1 well commencing with production after May 2008. The fourth item states that Samson shall be liable for all ad valorem taxes on the Hooks' interests in the oil and gas leases at issue after November 2007, as long as those leases are in effect. The fifth item requires Samson to provide the Hooks with certain notices and information "as required by the oil and gas leases in this case while those leases are in effect."

 [34]   [35]   [36]   [37]   [38]   [39]   A permanent injunction is proper only when there is evidence of four elements: (1) a wrongful act; (2) imminent harm; (3) irreparable injury, and (4) no adequate remedy at law. *Jordan v. Landry's Seafood Rest., Inc.,* 89 S.W.3d 737, 742 (Tex.App.-Houston [1st Dist.] 2002, pet. denied). The ruling is reviewed for an abuse of discretion. *Id.* Courts do not **\*438** enforce contractual rights by permanent injunction unless the complaining party can show an inadequate remedy at law and irreparable injury. *Cytogenix, Inc. v. Waldroff,* 213 S.W.3d 479, 487 (Tex.App.-Houston [1st Dist.] 2006, pet. denied). Moreover, in order to grant specific performance of a contract via an injunction, present performance of the contract's terms must be possible. *Id.* "A court should not decree future contractual performance by requiring a party to perform a continuous series of acts, extending through a long period of time, over which the court exercises its supervision." *Id.* Unless a "significant public interest" is involved, parties to a contract are "left to their remedies at law." *Id.*

 **[40]** **[41]** **[42]** The Hooks have failed to cite to us any evidence showing that they are in danger of imminent harm or irreparable injury from Samson's failure to pay them royalties on production from the BSM A–1 well or ad valorem taxes or failure to provide them with lease notices and information. Nor have they shown that they have no adequate remedy at law for their grievances. Moreover, at least three of the items of injunctive relief decree future contractual performance, which is forbidden by *Cytogenix. Id.* Accordingly, we conclude that the trial court abused its discretion by including injunctive relief in its order (1) in the absence of any evidence of the elements of a permanent injunction and (2) when the injunctive relief decrees future contractual performance.

We sustain Samson's fifth issue.

### 5. Attorney's Fees and Post judgment Interest Rate

 **[43]** In its eighth issue, Samson complains about the grant of attorney's fees in the final judgment. The parties stipulated that the Hooks' right to collect attorney's fees was contingent on the Hooks prevailing at trial and on appeal. During trial, the parties also stipulated that Samson owed the Hooks $52,257.22 related to ad valorem taxes. Although Samson asked this Court to reverse the trial court's judgment "in its entirety," the parties do not challenge the agreement as to Samson's payment of ad valorem taxes. However, the Hooks argue on rehearing that Samson's stipulation regarding ad valorem taxes means that the Hooks prevailed on a claim, and, thus, they are entitled to stipulated attorney's fees under the terms of a separate pre-trial fee stipulation.

The pre-trial fee stipulation provided that the stipulated attorney's fees "are owed to [the Hooks] by [Samson] if [the Hooks] prevail on any of their claims." The agreement then provided specific exceptions for claims not relevant here. The parties made a separate stipulation during trial that addressed the issue of the ad valorem taxes.

 **[44]** **[45]** An "agreement between the parties will not be given greater effect than intended," and "[a] stipulation will not be construed as an admission of a fact intended to be controverted." *Austin v. Austin,* 603 S.W.2d 204, 207 (Tex.1980). Nothing in the ad valorem tax stipulation indicated that it was intended to constitute an admission that the Hooks had prevailed on that issue. Thus, the stipulated payment of ad valorem taxes does not entitle the Hooks to claim attorney's fees. *See id.* Because we have reversed the portions of the judgment in favor of the Hooks on which they could claim to be prevailing parties, and upon which their right to attorney's fees is contingent, we conclude that the Hooks are not entitled to attorney's fees.

We sustain Samson's eighth issue.

 **[46]** Additionally, in two sentences in its appellate brief, Samson claimed that **\*439** "[i]t was error to award post judgment interest of 18% compounded annually. Instead, the post judgment interest should be at the same rate as a proper prejudgment interest rate." We asked for and received supplemental briefing from both parties on this issue. The supplemental issue, as phrased by Samson, is as follows: "Should the post judgment interest rate be 5% as set by Texas Finance Code § 304.003, rather than the rate of 18% as stated in the Final Judgment?" In its supplemental briefing and in its motion for rehearing filed on March 16, 2012, the Hooks argue that post judgment interest should be awarded at the "maximum allowed by law (per the leases)." However, the agreement under which Samson is obligated to pay the ad valorem taxes, the only recovery to which the Hooks are entitled, is the stipulation entered by the parties during trial, not the leases. The ad valorem tax stipulation does not provide an interest rate.

 **[47]** **[48]** When the interest rate is not specified in a contract, post judgment interest should be calculated based on the statutory rate provided in Texas Finance Code section 304.003. *See* TEX. FIN.CODE ANN. § 304.003 (Vernon 2006) (providing judgment interest rate when interest rate or time price differential is not in contract). Section 304.003(b) provides that, "[o]n the 15th day of each month, the consumer credit commissioner shall determine the post judgment interest rate to be applied to a money judgment rendered during the succeeding calendar month." *Id.* § 304.003(b). Section 304.003(c) provides that, with exceptions not applicable here, "[t]he post judgment interest rate is ... the prime rate as published by the Board of Governors of the Federal Reserve System on the date of computation" or "five percent a year if the prime rate ... described by Subdivision (1) is less than five percent." *Id.* § 304.003(c)(*l*)-(2). The prime rate is published in the Texas Register by the Secretary of State.

*Id.* § 304.004 (Vernon 2006). This Court may take judicial notice of the correct, published rate on appeal. *See Office of Pub. Util. Counsel v. Pub. Util. Comm'n of Tex.,* 878 S.W.2d 598, 600 (Tex.1994).

Here, when the trial court entered its final judgment on December 11, 2008, the judgment interest rate according to the consumer credit commissioner was five percent. *See* Judgment Rate Summary, http://www.occc.state.tx. us/pages/int_rates/Index.html (last visited May 22, 2012). Thus, the post judgment interest rate on Samson's obligation to pay the stipulated ad valorem taxes should be five percent. *See* TEX. FIN.CODE ANN. § 304.003(c).

We sustain Samson's issue on the post judgment interest rate.

## C. CONCLUSION

We reverse the trial court's final judgment awarding the Hooks damages on their fraud, fraudulent inducement, statutory fraud, and formation production claims and render judgment that the Hooks take nothing by these claims. We likewise reverse the trial court's final judgment as it reaffirms and incorporates its summary judgments on the Hooks' unpooling and most favored nations claims and render judgment that the Hooks take nothing by these claims. Because of our holding on these issues, we vacate the trial court's award of attorney's fees. Finally, we vacate the permanent injunction entered against Samson by the trial court. We further hold that the proper post judgment interest rate is five percent.

## II. *THE HOOKS' CROSS–APPEAL*

Before trial, the Hooks and Samson filed cross-motions for summary judgment on the issue of whether Samson breached the **\*440** offset obligations in the Hardin County Leases. The trial court granted Samson's motion and denied the Hooks' motion on this issue without stating its reasons.

The Hooks filed a cross-appeal claiming, in one issue, that the trial court erred in granting Samson's motion for summary judgment and denying their own. The Hooks include in this issue sub-issues regarding the correct interpretation of Samson's offset obligations under the Jefferson County and Hardin County Leases, an exception in the Leases for pre-existing wells, and the statute of limitations.

Samson contends that the Hooks have waived their appeal of the summary judgments by failing to preserve it. It further argues that the trial court correctly interpreted the Hardin County Leases with respect to the issues raised by the Hooks on cross-appeal and correctly rendered summary judgment holding that the Hooks' offset claims are contract claims that are barred by limitations.

## A. STANDARD OF REVIEW

To prevail on a summary judgment motion, a movant has the burden of proving that it is entitled to judgment as a matter of law and that there is no genuine issue of material fact. TEX.R. CIV. P. 166a(c); *Cathey v. Booth,* 900 S.W.2d 339, 341 (Tex.1995). Neither party herein argues that a genuine issue of material fact exists which precludes summary judgment; instead, both claim that, as a matter of law, they are entitled to summary judgment based on the language of the Leases.

## B. STATUTE OF LIMITATIONS

[49]    [50]    The Hooks' claims that Samson breached its offset obligations are breach of contract claims. The four-year statute of limitations applies to the Hooks' contract claims. *See Stine v. Stewart,* 80 S.W.3d 586, 592 (Tex.2002); *HECI Exploration*

*Co.,* 982 S.W.2d at 885. "It is well-settled law that a breach of contract claim accrues when the contract is breached." *Stine,* 80 S.W.3d at 592.

Here, Samson's alleged breach of its offset obligations occurred ninety days from the date of first production from the wells in question. For the BSM No. 1 well, the ninety days ran in January 2001. For the BSM A–1 well, the ninety days ran in September 2001. The Hooks did not file suit until November 2006, more than five years later.

We conclude that the Hooks' cause of action for Samson's breach of its offset obligations was barred by the four-year statute of limitations.

Because our resolution of this issue is dispositive, we do not reach the other sub-issues raised in the Hooks' cross-appeal. [10]

[10]     Likewise, we do not reach Samson's claims of waiver.

We overrule the Hooks' issue on cross-appeal.

### III. *CONCLUSION*

We modify the applicable post judgment interest rate to five percent and affirm the portion of the trial court's judgment awarding the Hooks $52,257.22 related to ad valorem taxes as stipulated by the parties. We reverse the remaining portions of the final judgment of the trial court, including the awards to the Hooks of $20,081,638.07 for damages proximately cause by fraud, $848,854.01 for damages for breach of the most favored nations clause, and $766,626.85 for damages for "unpooling" related to the BSM A–1 well, attorney's fees, other fees and costs. We hold that the Hooks take nothing by those **\*441** claims, and we vacate the permanent injunction entered against Samson.

Justice SHARP, concurring in part and dissenting in part.

### DISSENTING AND CONCURRING OPINION ON REHEARING

JIM SHARP, Justice.

I withdraw my dissenting and concurring opinion dated August 25, 2011 and substitute this opinion in its stead. I continue to dissent in part and concur in part.

It is undisputed that Samson drilled a directional well bottomed within the "buffer zone" established in the Hooks' Jefferson County Lease (the "Lease") and failed to elect between the three alternatives outlined in the Lease, thus exposing itself to liability for breach of contract. If the Lease had allowed pooling, Samson could have solved the problem by pooling the lands covered by the Lease with the adjacent lands. The Lease, however, did not allow pooling.

Samson's solution to this problem was to begin misrepresenting various "facts" to escape the consequences of its actions. Its landman, Lanoue, filed papers with the Railroad Commission falsely certifying that Samson had pooling authority from the Hooks. He later filed paperwork in the county's real property records falsely indicating that the Hooks had already agreed to pool. Lanoue then sent a letter to the Hooks asking them to agree to pool the westernmost 50 acres of the Hooks' acreage in the Lease into the BSM 1 Unit. When Charles Hooks called Lanoue and asked for more information about the well's location, Lanoue represented to Hooks that the well was located approximately 1500 feet from the lease line, a location outside the buffer zone. When Charles Hooks asked for a plat, Lanoue faxed him one that represented a bottom-hole location that was +/–1400 feet from the lease line, the accuracy of which he, Lanoue, had certified with no reference to an actual bottom-hole

location, although it was ascertainable from a prior directional survey. Instead, when asked the origin of those measurements, he answered: "I got them from myself." On this basis the Hooks agreed to the formation of the unit.

Thus it is clear that Samson, through its representative, took action to cover up its own error by both oral and written misrepresentations to its lessor, born of "assuming" and "hoping." It is further clear that the Hooks, after asking for and receiving verification of Lanoue's oral representation in the form of a plat, believed its lessee's representations and made no attempt to go beyond them to discover the truth or falsity thereof. On these facts, the majority has found that the discovery rule does not apply to the Hooks' fraud, fraudulent inducement, and statutory fraud claims and that they are barred by limitations as a matter of law.

I reluctantly concur, based on the Texas Supreme Court's holding in *BP America Production Co. v. Marshall,* 342 S.W.3d 59 (Tex.2011). In that case, the Texas Supreme Court makes clear that no lies on the part of a lessee, however self-serving and egregious, are sufficient to toll limitations, as long as it is technically possible for the lessor to have discovered the lie by resort to the Railroad Commission records. This burden the Court imposes upon lessors is severe. It is now a lessor's duty to presume that any statement made by its lessee is false and to ransack the esoteric and oft-changing records at the Railroad Commission to discover the truth or falsity of its lessee's statements. If, as is often the case, these records are technical in nature and require expert review to ferret out the truth, it is the lessor's job to hire experts out of its own pocket to perform **\*442** such a review. If a lessor fails to take these steps, then it will have failed in exercising reasonable diligence to protect its mineral interests and, if the lessee's fraud is successful for longer than the limitations period, the lessor's claims will be barred by limitations.

Such is the case here. Had the Hooks presumed that Samson's oral representations, followed by written representations, about the bottom-hole location of the well were false, and had they hired an expert to resort to Railroad Commission records to trace the various filings (some of which were also false), that expert could have hit upon the directional survey and, by virtue of his expertise, interpreted it to prove the falsity of the representations. Instead they merely relied on the oral and written representations of their lessee, without undergoing what doubtless seemed to them the useless expense of hiring an expert to rake through the Railroad Commission records with an eye towards exposing a potential falsehood.

I believe the Texas Supreme Court has placed an unnecessary and very heavy burden on lessors by its ruling in *BP America,* one that will result either in much money being spent unnecessarily on prophylactic forensic review of Railroad Commission records or in many viable claims being lost to limitations. As we are, however, bound to follow the Court's rulings, I reluctantly concur in that part of the opinion that finds the Hooks' fraud, fraudulent inducement, and statutory fraud claims barred by limitations as a matter of law.

I dissent, however, to that part of the majority's opinion that sustains Samson's challenge to the trial court's findings concerning "unpooling" by amending a unit.

Early in 2001, Samson drilled the Black Stone Minerals No. A–1 well ("BSM A-l Well") on a separate Samson lease. The mineral interests underlying this lease were owned 87.5% by Black Stone Minerals and 12.5% by FirnBank.

Because Samson was without contractual authority to pool pursuant to its leases with either Black Stone or FirnBank, it sought to negotiate with them for such a right. Before such agreement, if any, was reached, however, Samson unilaterally concluded that both of the lessors were in agreement. Pursuant to this unilateral conclusion, in March 2001, Samson filed a unit designation for a 704–acre unit called the Black Stone Minerals "A" No. 1 Gas Unit (the "BSM A-l Unit"), which unitized the above-described leases as well as the Hooks' Hardin County leases (the "Hardin County Leases"). The designation recited that it was effective as of the date of first production. Firnbank consented to the pooling in May 2001. Written consent to pool was also obtained from the Hooks. The 87.5% interest owner, Black Stone Minerals, however, declined to consent.

Samson drilled and completed the BSM A–1 Well and it began producing in June 2001 from the depth range of the BSM A–1 Unit as designated by Samson. In December 2001, Samson finished another gas well ("Joyce DuJay No. 1 Well") from the surface of the BSM A–1 Unit that was completed within the area and depth limits of the BSM A–1 Unit. In February 2002,

Samson executed and recorded a designation for a Joyce DuJay No. 1 Gas Unit ("DuJay 1 Unit") that recited an effective date as of first production of the DuJay No. 1 Well. Although termed an "Amendment" of the BSM A–1 Unit, it designated a new, smaller, 570–acre unit with a different name, different leases, different depths and different boundaries than the BSM A–1 Unit. The DuJay 1 Unit included some of the deeper strata of the BSM A–1 Unit, but excluded the horizon from which the BSM A–1 Well was producing. Thereafter, the BSM A–1 Well was produced as a **\*443** lease well, not included in any unit. Subsequently, Samson drilled another DuJay well ("DuJay A–1") and created a separate unit for that well (the "DuJay A–1 Unit"). The DuJay A–1 Unit differed from the DuJay 1 Unit by depth limitation and acreage. The Hooks' Hardin County Leases were listed in all three unit designations: the BSM A–1, the DuJay 1, and the DuJay A–1.

Samson claimed that the DuJay 1 Unit was an "amendment" of the BSM A–1 and thus that the BSM A–1 Unit no longer existed. In other words, it took the position that, because it failed to sign up all the other leaseholders in the BSM A–1 Unit, it could "de-designate" the earlier-designated BSM A–1 Unit. If Samson was correct, it did not need to pay the Hooks for their proportionate share of the BSM A–1 Well; if not, it did.

The Hooks moved for summary judgment claiming that Samson had no authority to terminate or invalidate the BSM A–1 Unit and therefore had breached its lease contract by failing to pay the Hooks royalties on the BSM A–1 Well. The trial court granted this motion. Samson, in its sixth point, contends that the trial court erred in granting this motion (and in denying its own cross-motion).

The majority opinion holds that, by accepting royalties from the DuJay 1 and DuJay A–1 Units, the Hooks "accepted" those units and thus, "[t]heir interest in the BSM A–1 unit was, therefore, terminated, and they are estopped to deny the validity of the unitization agreements for the DuJay 1 and DuJay A–1 as to their interest therein." The majority bases this decision on its conclusion that "a previously designated unit necessarily terminates upon the agreement of all the parties to the agreement to participate in a unit that is incompatible with the prior unit; and the parties who have consented to a new unitization of the same interests are estopped to deny termination of the prior inconsistent unit designation." The majority posits that accepting royalties from a unit the depth or acreage of which overlaps at all with any other unit amounts to a de facto agreement to terminate any earlier unit containing any part of the same depth or acreage.

The Hardin County Leases, however, contain no such limitations. Instead, the Hardin County Leases give Samson the right to exercise pooling authority multiple times, "at any time and from time to time." The language of the leases neither limits this pooling authority to certain depths, nor states or implies that pooling is only valid when the multiple pools do not overlap at any depth. To hold instead that the right to pool multiple times *is* limited to units that have no overlap is to imply a term in the contract that does not exist. A court is not free to make contracts for parties, nor must it imply terms in a contract without exercising extreme caution. *See Universal Health Servs., Inc. RCW v. Renaissance Women's Group, P.A.,* 121 S.W.3d 742, 747 (Tex.2003). The Texas Supreme Court has held that "terms are to be implied in contract, not because they are reasonable, but because they are necessarily involved in the contractual relationship, such that the parties must have intended them and must have failed to express them only because of sheer inadvertence or because they are too obvious to need expression." *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding,* 289 S.W.3d 844, 850 (Tex.2009) (citing 11 Richard A. Lord, *Williston on Contracts* § 31:7 (4th ed.1999)). The rule set up by the majority is not one that is "necessarily involved" in the contractual relationship between a lessor and lessee and we ought not imply it.

**\*444** If such a limitation to the right to accept royalties from multiple pools exists, then, it must exist as a matter of law. The majority, however, cites no law for the proposition that accepting royalties from more than one unit covering some of the same depths and lands (termed "conflicting" units in the majority opinion) serves to terminate an earlier-designated unit.

Instead, it is black-letter law that a lessee cannot unilaterally terminate a unit, once formed. Good-faith pooling can be exercised multiple times. *Expando Prod., Co. v. Marshall,* 407 S.W.2d 254, 259–60 (Tex.Civ.App.-Fort Worth 1966, writ ref'd n.r.e.) (citing *Texaco, Inc. v. Letterman,* 343 S.W.2d 726, 731 (Tex.Civ.App.-Amarillo 1961, writ ref'd n.r.e.). The right to pool leases, however, does not mean the lessee can unilaterally terminate a unit that has a **producing pooled well.** *See Ladd Petroleum*

*Corp. v. Eagle Oil & Gas Co.,* 695 S.W.2d 99, 10607 (Tex.App.-Fort Worth 1985, writ ref'd n.r.e.). When a lease provides that a lessee may dissolve a unit, once formed, when there is no "unitized substance" being produced from the unit, the lessee may not dissolve a unit as long as a well is still producing on it. *See Williamson v. Mobil Producing Tex. & N.M., Inc.,* 737 S.W.2d 917, 921 (Tex.App.-Beaumont 1987, writ denied) ("So, clearly, the lessee, if it is 'after the discovery of the same,' can change the pooling unit only subsequent to the cessation of production.").

Here, no party argues that there was a cessation of production from the BSM A–1 Unit. The only basis for finding that the BSM A–1 Unit was no longer valid is the majority's holding that, by accepting royalty on "conflicting" pooled units, the Hooks accepted those units and thus their interest in the BSM A–1 Unit terminated and they are estopped to deny the validity of the unitization agreements for the DuJay 1 and DuJay A–1 as to their interests. The majority cites three cases in support of this proposition. *See Cambridge Prod., Inc. v. Geodyne Nominee Corp.,* 292 S.W.3d 725, 732 (Tex.App.-Amarillo 2009, pet. denied); *Ladd,* 695 S.W.2d at 107; *Whelan v. Placid Oil Co.,* 274 S.W.2d 125, 128 (Tex.Civ.App.Texarkana 1954, writ ref'd n.r.e.). None, however, actually supports the majority's position. *Cambridge* holds that a top-lessee, the rights of which derive from its underlying lessors, is estopped from taking the position that a unit is terminated when its underlying lessors had taken an inconsistent position by accepting royalties from the unit. *Cambridge,* 292 S.W.3d at 732. *Ladd* holds that "an unpooling could only come about through an agreement of the lessors, or through a cessation of production as provided for in the habendum clauses." *Ladd,* 695 S.W.2d at 107. In *Whelan,* the Texarkana court found that parties that have accepted royalty pursuant to a unitization agreement are estopped from denying the validity of the unitization agreement. *Whelan,* 274 S.W.2d at 128.

All of these cases are distinguishable from the case at bar and none set up the rule that the majority asserts. The Hooks do not deny that they have "consented" to the DuJay 1 Unit. Instead, their position is that each of the units (the BSM A–1 Unit, the DuJay 1 Unit and the DuJay A–1 Unit) is independent of the other, and all could and did exist at the same time. Samson did not exhaust its right to pool by designating the BSM A–1 Unit, so its later DuJay 1 and DuJay A–1 Units were also valid. This position is consistent with the language of the pooling clause itself, which states that "[t]he above right and power to pool may be exercised at any time and from time to time."

The majority's ruling creates a new limitation on pooling, one found neither in the **\*445** language of the Hardin County Leases nor in case law, and one which has serious ramifications for the oil and gas industry. I believe that this limitation is legally unsupported, unnecessary, and detrimental to the legitimate interests of both lessors and lessees.

For the reasons set forth above, I dissent to the portion of the majority's opinion sustaining Samson's sixth issue.

**All Citations**

389 S.W.3d 409, 177 Oil & Gas Rep. 542

457 S.W.3d 52
Supreme Court of Texas.

Charles G. Hooks III, et al., Petitioners,

v.

Samson Lone Star, Limited Partnership, n/k/a Samson Lone Star LLC, Respondent

No. 12–0920  |  Argued September 17, 2014  |  OPINION
DELIVERED: January 30, 2015  |  Rehearing Denied May 1, 2015

**Synopsis**

**Background:** Lessors of land for gas wells brought action against lessee to recover for breach of contract, fraud, fraudulent concealment, statutory fraud, negligent misrepresentation, violation of Texas Natural Resources Code for failure to properly pay royalties, statutory negligence, and common law negligence per se. They also sought injunctive relief and declaratory judgment. The 60th District Court, Jefferson County, Gary Sanderson, J., entered summary judgment on some claims and entered judgment on jury verdict in favor of lessors on remaining claims. Cross appeals were taken. The Houston Court of Appeals, First District, Evelyn V. Keyes, J., 389 S.W.3d 409, affirmed in part and reversed in part. Petition for review was granted.

**Holdings:** The Supreme Court, Devine, J., held that:

[1] as a matter of first impression, reasonableness of diligence in discovering alleged fraud was question of fact;

[2] lessee breached most favored nations clause by increasing state's 25% royalty;

[3] lessee was not required to pay royalty on volume of condensate in addition to royalty on gas volume in reservoir;

[4] lessors ratified amendment altering boundaries of gas pool and changing name and, therefore, were not entitled to receive royalties from old unit; and

[5] four-year statute of limitations did not bar claim for recurring royalties owed within four years before filing of suit.

Affirmed in part, reversed in part, and remanded.

West Headnotes (23)

**[1]**    **Limitation of Actions** 🔑 Causes of action in general

　　　**Limitation of Actions** 🔑 Concealment of Cause of Action

　　241　Limitation of Actions
　　241II　Computation of Period of Limitation
　　241II(A)　Accrual of Right of Action or Defense
　　241k43　Causes of action in general
　　241　Limitation of Actions
　　241II　Computation of Period of Limitation
　　241II(F)　Ignorance, Mistake, Trust, Fraud, and Concealment or Discovery of Cause of Action

241k104   Concealment of Cause of Action

241k104(1)   In general

Generally, causes of action accrue, and statutes of limitation begin to run, when facts come into existence that authorize a claimant to seek a judicial remedy, but a person cannot be permitted to avoid liability for his actions by deceitfully concealing wrongdoing until limitations period has run.

Cases that cite this headnote

**[2]     Limitation of Actions**  🔑  Discovery of Fraud

241   Limitation of Actions

241II   Computation of Period of Limitation

241II(F)   Ignorance, Mistake, Trust, Fraud, and Concealment or Discovery of Cause of Action

241k98   Fraud as Ground for Relief

241k100   Discovery of Fraud

241k100(1)   In general

Because fraud vitiates whatever it touches, limitations period applicable to claim of fraud does not start to run until the fraud is discovered or the exercise of reasonable diligence would discover it.

2 Cases that cite this headnote

**[3]     Fraud**  🔑  Elements of Actual Fraud

184   Fraud

184I   Deception Constituting Fraud, and Liability Therefor

184k2   Elements of Actual Fraud

184k3   In general

Fraudulent inducement is a subspecies of fraud; with a fraudulent inducement claim, the elements of fraud must be established as they relate to an agreement between the parties.

1 Cases that cite this headnote

**[4]     Limitation of Actions**  🔑  Discovery of Fraud

241   Limitation of Actions

241II   Computation of Period of Limitation

241II(F)   Ignorance, Mistake, Trust, Fraud, and Concealment or Discovery of Cause of Action

241k98   Fraud as Ground for Relief

241k100   Discovery of Fraud

241k100(1)   In general

Limitations period applicable to claim of fraudulent inducement does not start to run until the fraud with respect to the contract is discovered or the exercise of reasonable diligence would discover it.

2 Cases that cite this headnote

**[5]     Limitation of Actions**  🔑  Fraud and concealment of cause of action

241   Limitation of Actions

241V   Pleading, Evidence, Trial, and Review

241k199   Questions for Jury

241k199(2)   Fraud and concealment of cause of action

Although date a cause of action accrues is normally a question of law, reasonable diligence in discovering alleged fraud is an issue of fact with regard to statute of limitations.

1 Cases that cite this headnote

**[6]    Limitation of Actions**  🔑  Concealment of Cause of Action

241  Limitation of Actions

241II  Computation of Period of Limitation

241II(F)  Ignorance, Mistake, Trust, Fraud, and Concealment or Discovery of Cause of Action

241k104  Concealment of Cause of Action

241k104(1)  In general

Although fraudulent concealment allows the statute of limitations to be tolled for causes of action besides fraud itself, the standard of reasonable diligence remains the same; fraudulent concealment only tolls the running of limitations until the fraud is discovered or could have been discovered with reasonable diligence.

2 Cases that cite this headnote

**[7]    Limitation of Actions**  🔑  Fraud and concealment of cause of action

241  Limitation of Actions

241V  Pleading, Evidence, Trial, and Review

241k199  Questions for Jury

241k199(2)  Fraud and concealment of cause of action

Reasonableness of lessors' diligence in discovering lessee's underlying fraud that bottom hole for another gas well was not within protected zone for lease that prohibited pooling was question of fact, not law, with regard to running of statute of limitations applicable to lessors' claims of fraud and fraudulent inducement by misrepresenting bottom-hole location, thus depriving lessors of royalties, and fraudulently inducing lessors to amend lease and pool, even though correct public Railroad Commission filing existed; more recent filings contained false information, fraudulent information itself tainted the public record, and lessors were not required as matter of law to double-check the more recent filings against earlier filings.

Cases that cite this headnote

**[8]    Mines and Minerals**  🔑  Community leases, unitization, or pooling arrangements

260  Mines and Minerals

260II  Title, Conveyances, and Contracts

260II(C)  Leases, Licenses, and Contracts

260II(C)3  Construction and Operation of Oil and Gas Leases

260k79  Rent or Royalties

260k79.1  In General

260k79.1(5)  Community leases, unitization, or pooling arrangements

Lessee breached most favored nations clause of lease by failing to increase lessors' 25% royalty after granting to state a royalty of 0.7969% on gas production from pooled unit and thus increasing state's 25% royalty on production from its tract to 28.28896%; production anywhere on pooled unit was production on every tract in the unit, and royalty imposed by the pooling agreement was "payable under" the lease.

Cases that cite this headnote

**[9]    Mines and Minerals**  🔑  Place or portion developed; pooled or unitized tracts

260  Mines and Minerals

260II  Title, Conveyances, and Contracts

260II(C)  Leases, Licenses, and Contracts

260II(C)3   Construction and Operation of Oil and Gas Leases

260k78   Testing or Working

260k78.1   Construction, Breach, and Penalties

260k78.1(7)   Place or portion developed; pooled or unitized tracts

Production anywhere on a pooled unit of oil and gas is production on every tract in the unit.

Cases that cite this headnote

---

**[10]**   **Mines and Minerals**   ⚷ Community leases, unitization, or pooling arrangements

260   Mines and Minerals

260II   Title, Conveyances, and Contracts

260II(C)   Leases, Licenses, and Contracts

260II(C)3   Construction and Operation of Oil and Gas Leases

260k79   Rent or Royalties

260k79.1   In General

260k79.1(5)   Community leases, unitization, or pooling arrangements

Oil and gas well lessor receives royalties under a pooling agreement, even if no production occurs directly on that lessor's tract, because production elsewhere on the pooled unit is attributed to the lessor's tract, and lessor receives royalties on production attributed to the lessor's tract because of the underlying lease.

Cases that cite this headnote

---

**[11]**   **Mines and Minerals**   ⚷ Community leases, unitization, or pooling arrangements

**Mines and Minerals**   ⚷ Amount and time of payment

260   Mines and Minerals

260II   Title, Conveyances, and Contracts

260II(C)   Leases, Licenses, and Contracts

260II(C)3   Construction and Operation of Oil and Gas Leases

260k79   Rent or Royalties

260k79.1   In General

260k79.1(5)   Community leases, unitization, or pooling arrangements

260   Mines and Minerals

260II   Title, Conveyances, and Contracts

260II(C)   Leases, Licenses, and Contracts

260II(C)3   Construction and Operation of Oil and Gas Leases

260k79   Rent or Royalties

260k79.3   Amount and time of payment

Oil and gas well lessor's royalty on production from pooled unit as a whole reflects lessor's royalty on production from its individual tracts in proportion to the size of the tracts relative to the overall unit.

Cases that cite this headnote

---

**[12]**   **Mines and Minerals**   ⚷ Community leases, unitization, or pooling arrangements

260   Mines and Minerals

260II   Title, Conveyances, and Contracts

260II(C)   Leases, Licenses, and Contracts

260II(C)3   Construction and Operation of Oil and Gas Leases

260k79   Rent or Royalties

260k79.1   In General

260k79.1(5)   Community leases, unitization, or pooling arrangements

Pooling effects a cross-conveyance among owners of minerals under the various tracts of royalty or minerals in a pool so that they all own undivided interests under the unitized tract in the proportion their contribution bears to the unitized tract.

Cases that cite this headnote

**[13]     Mines and Minerals** 🔑 Amount and time of payment

260   Mines and Minerals
260II   Title, Conveyances, and Contracts
260II(C)   Leases, Licenses, and Contracts
260II(C)3   Construction and Operation of Oil and Gas Leases
260k79   Rent or Royalties
260k79.3   Amount and time of payment

Lease provision basing royalty calculations on gas formation production as reported on Railroad Commission forms did not require lessee to pay royalty on volume of condensate in addition to royalty on gas volume in reservoir, but simply required lessee to convert volume of condensate to equivalent volume in gas, ensuring that the total volume for royalties related to the volume that lessee reported to Railroad Commission; the clause did not require payment of royalties on everything as gas, and royalties based on condensate as condensate were without reference to formation production.

Cases that cite this headnote

**[14]     Contracts** 🔑 Language of contract

95   Contracts
95II   Construction and Operation
95II(A)   General Rules of Construction
95k147   Intention of Parties
95k147(2)   Language of contract

In construing contracts, courts must ascertain and give effect to the parties' intentions as expressed in the document.

Cases that cite this headnote

**[15]     Contracts** 🔑 Construction as a whole

95   Contracts
95II   Construction and Operation
95II(A)   General Rules of Construction
95k143.5   Construction as a whole

Courts attempt to harmonize all contractual provisions by analyzing the provisions with reference to whole agreement.

Cases that cite this headnote

**[16]     Contracts** 🔑 Subject, object, or purpose as affecting construction

95   Contracts
95II   Construction and Operation
95II(A)   General Rules of Construction
95k143   Application to Contracts in General
95k143(4)   Subject, object, or purpose as affecting construction

Courts construe contracts from a utilitarian standpoint bearing in mind the particular business activity sought to be served.

Cases that cite this headnote

**[17]    Contracts**  ⚷  Reasonableness of construction

95   Contracts

95II   Construction and Operation

95II(A)   General Rules of Construction

95k151   Language of Instrument

95k154   Reasonableness of construction

When possible and proper, courts avoid contract construction which is unreasonable, inequitable, and oppressive.

Cases that cite this headnote

**[18]    Contracts**  ⚷  Questions for Jury

95   Contracts

95II   Construction and Operation

95II(A)   General Rules of Construction

95k176   Questions for Jury

95k176(1)   In general

If, through use of relevant rules of construction, contract can be given a definite meaning, courts construe it as a matter of law.

Cases that cite this headnote

**[19]    Mines and Minerals**  ⚷  Community leases, unitization, or pooling arrangements

260   Mines and Minerals

260II   Title, Conveyances, and Contracts

260II(C)   Leases, Licenses, and Contracts

260II(C)3   Construction and Operation of Oil and Gas Leases

260k79   Rent or Royalties

260k79.1   In General

260k79.1(5)   Community leases, unitization, or pooling arrangements

Lessors ratified amendment altering boundaries of gas pool and changing name and, therefore, were not entitled to receive royalties from old unit after accepting royalties from new unit without ever receiving royalties on the earlier designation; lessors had full knowledge that something had changed and consented by their actions.

Cases that cite this headnote

**[20]    Appeal and Error**  ⚷  Estoppel to Allege Error

30   Appeal and Error

30XVI   Review

30XVI(C)   Parties Entitled to Allege Error

30k881   Estoppel to Allege Error

30k881.1   In general

Lessors did not waive claims for breach of offset provisions of gas lease by filing a proposed judgment with trial court on claims won by lessors in suit against lessee; lessors specifically reserved the right to challenge prior orders of the court.

Cases that cite this headnote

**[21]**   **Contracts** 🔑 Failure to make payments

95   Contracts
95V   Performance or Breach
95k312   Acts or Omissions Constituting Breach in General
95k312(3)   Failure to make payments

If terms of an agreement call for periodic payments during course of the contract, a cause of action for such payments may arise at the end of each period.

Cases that cite this headnote

**[22]**   **Mines and Minerals** 🔑 Actions

260   Mines and Minerals
260II   Title, Conveyances, and Contracts
260II(C)   Leases, Licenses, and Contracts
260II(C)3   Construction and Operation of Oil and Gas Leases
260k79   Rent or Royalties
260k79.7   Actions

If lessee breached gas well lease by drilling gas wells within 1,320 feet of pooled units, its failure to perform obligations under offset provision requiring lessee to drill offset well or release acreage within ninety days of production from infringing well resulted in implied election of third alternative imposing monthly obligation to pay compensatory royalties, and, thus, four-year statute of limitations did not bar claim for recurring royalties owed within four years before filing of suit.

Cases that cite this headnote

**[23]**   **Interest** 🔑 Judgments founded on contract fixing rate

219   Interest
219II   Rate
219k38   On Judgments
219k38(2)   Judgments founded on contract fixing rate

Gas well leases imposing maximum interest rate allowed by law for past-due royalties entitled lessors to post-judgment interest of 18% for any overdue royalties, but statutory rate of 5% applied to any other recoveries. Tex. Fin. Code Ann. §§ 304.002, 304.003(c).

Cases that cite this headnote

**\*54** ON PETITION FOR REVIEW FROM THE COURT OF APPEALS FOR THE FIRST DISTRICT OF TEXAS

**Attorneys and Law Firms**

Dale Wainwright, Bracewell & Giuliani, LLP, Jason Derrick Price, Patton G. Lochridge, McGinnis Lochridge & Kilgore LLP, Marla Diane Broaddus, Shannon H. Ratliff, Ratliff Law Firm, P.L.L.C., Austin, TX, David M. Gunn, Erin Hilary Huber, Beck Redden L.L.P., Paul F. Simpson, McGinnis Lochridge, Houston, TX, for Petitioner.

Cynthia Keely Timms, Michael V. Powell, Locke Lord LLP, Dallas, TX, J. Matthew Marchak, M. C. Carrington, Mehaffy & Weber P.C. Beaumont, TX, Dick Watt, Watt Beckworth Thompson Henneman & Sullivan LLP, Houston, TX, for Respondent.

**Opinion**

JUSTICE DEVINE delivered the opinion of the Court.

In this oil and gas appeal, we consider whether a mineral owner's claims of fraud **\*55** and breach of contract in the leasing and pooling of his mineral interests are, as a matter of law, barred by limitations. A jury determined that the mineral owner, in the exercise of reasonable diligence, discovered the fraud less than four years before filing suit, and the trial court accordingly concluded that the claims were not barred by limitations. The jury also found fraud and damages in the mineral owner's favor, and the trial court rendered judgment on the jury's verdict. The court of appeals, however, reversed most aspects of the mineral owner's judgment, concluding that the fraud should have been discovered, as a matter of law, more than four years before the mineral owner filed suit because the relevant information was available in the Texas Railroad Commission's public records. 389 S.W.3d 409, 429–30, 439–40 (Tex.App.–Houston [1st Dist.] 2012).

While we agree that public records may under certain circumstances establish a lack of diligence in the discovery of fraud as a matter of law, here the records themselves were tainted by fraud and thus provide no conclusive proof on the subject. Because we conclude that the mineral owner's diligence in discovering the underlying fraud was in this instance a question of fact for the jury, we reverse the court of appeals' judgment on this and other issues in part, affirm its judgment on other issues in part, and remand the cause to the court of appeals for review of a factual sufficiency of the evidence complaint and other issues not considered because of the court's ruling on limitations.

## I. Background and Procedural History

Charles G. Hooks III ("Hooks") [1] sued Samson Lone Star Limited Partnership, now known as Samson Lone Star, LLC ("Samson"), in 2006, [2] alleging, among other things, breach of contract and failure to pay royalties under Texas Natural Resources Code section 91.404. Later amendments to Hooks' petition included allegations of fraud, fraudulent inducement, and statutory fraud. These claims centered on three oil and gas leases that Hooks, the lessor, executed with Samson, the lessee, in 1999. Two leases were in Hardin County, Texas (the "Hardin County Leases"), and one was in Jefferson County, Texas (the "Jefferson County Lease").

[1] The plaintiffs consist of multiple parties. We refer to them collectively as "Hooks." Specifically, the parties are Charles G. Hooks III, acting individually and as independent executor of the estate of Charles G. Hooks, Jr., as Trustee of the Scott Ira McKeever Trust and the David Wayne McKeever Trust, and on behalf of Chas. G. Hooks & Son, a General Partnership; McKeever Partnership, Ltd.; and Charles G. Hooks III and Sue Ann Hooks, as co-trustees under the will of Charles G. Hooks, Sr.

[2] Hooks joined a preexisting lawsuit brought by various lessors against Samson. Hooks' suit was later severed from the other claims.

This appeal from a final judgment involves seven claims raised by Hooks. First, Hooks alleges that Samson fraudulently induced Hooks to amend the Jefferson County Lease to allow for pooling. Second, Hooks asserts that Samson breached the most-favored-nations clause in all three leases, failing to pay Hooks the same higher royalty that it paid to a nearby lessor. Third, Hooks contends that Samson breached the formation-production clause in each lease by calculating gas royalties based on proceeds instead of the volume of gas leaving the reservoir. Fourth, Hooks claims that Samson wrongly "unpooled" a unit into which the two Hardin County Leases were pooled, and seeks damages for royalties allegedly owed from this unit. Fifth, Hooks alleges that **\*56** Samson breached certain offset provisions in the two Hardin County Leases. Sixth, pursuant to a pretrial stipulation, Hooks contends that Samson must reimburse Hooks for attorney's fees. And seventh, Hooks asserts that the proper post-judgment interest rate is 18%, rather than 5% as decided by the court of appeals.

Hooks prevailed on the majority of his claims in the trial court. The trial court granted summary judgment for Hooks on the most-favored-nations clause claims and "unpooling" claims, but granted summary judgment for Samson regarding Hooks' allegations

that Samson breached the offset provisions of the Hardin County Leases. The jury returned a verdict for Hooks on the fraud and formation-production claims. The trial court's final judgment awarded Hooks more than $21 million in damages, ordered Samson to pay the stipulated attorney's fees, and applied a post-judgment interest rate of 18%. The court of appeals, however, reversed, holding that Hooks take nothing except for $52,257.22, a stipulated amount to reimburse Hooks for payment of ad valorem taxes. *Id.* at 440–41.

## II. Fraud and Limitations

Hooks' fraud claims relate to the Jefferson County Lease. This lease, which prohibited pooling, contained "offset obligations" providing that if a gas well were completed within 1,320 feet of Hooks' lease line but was not unitized with Hooks' acreage, then Samson would either drill an offset well, pay Hooks compensatory royalties, or release the offset acreage. In 2000, Samson drilled a well that bottomed about 1,186 feet from Hooks' lease, within the 1,320–foot protected zone. But, instead of complying with the original offset obligations, Samson asked Hooks to amend the Jefferson County Lease in 2001 to pool into a unit associated with the new well. In connection with this request, Samson provided Hooks with a plat that incorrectly placed the well's bottom hole outside of the protected zone. A plat with the same false information had already been filed with the Railroad Commission. Older Railroad Commission records, however, contained a directional survey and an attached plat [3] that correctly placed the bottom hole within the 1,320–foot boundary. [4] Other preliminary Railroad Commission filings demonstrated that Samson originally intended the well to bottom within 1,320 feet of Hooks' lease.

[3]    The parties dispute whether, based on the record in this case, the plat was attached to the directional survey in the Railroad Commission filing. This does not affect our holding, and we assume without deciding that it was attached.

[4]    Although the plat correctly placed the bottom hole within the protected zone, some data on the plat does not completely correspond to data on a later correct plat.

Hooks brought his fraud claims in 2007, alleging that Samson deprived Hooks of compensatory royalties by misrepresenting the well's bottom-hole location and fraudulently inducing Hooks to amend the lease and pool. A jury found that Samson committed fraud and statutory fraud, awarding more than $20 million in damages on these claims, and the trial court rendered judgment on the jury's verdict. The court of appeals, however, reversed, holding that the four-year statute of limitations for fraud barred the claims. *Id.* at 428–29 (citing TEX. CIV. PRAC. & REM. CODEE § 16.004(a)(4)).

Hooks argues that the court of appeals erred because the statute of limitations did not begin to run until Hooks "knew or should have known of facts that in the exercise of reasonable diligence would have led to the discovery of the wrongful **\*57** act." *Exxon Corp. v. Emerald Oil & Gas Co.,* 348 S.W.3d 194, 216 (Tex.2011) (quoting *Little v. Smith,* 943 S.W.2d 414, 420 (Tex.1997)). The jury found that, in the exercise of reasonable diligence, Hooks should have discovered Samson's fraud by 2007. Samson responds that, as a matter of law, reasonable diligence would have discovered the true location of the well's bottom hole in 2000 or 2001. Samson points to this Court's decisions in *BP America Production Co. v. Marshall,* 342 S.W.3d 59 (Tex.2011), and *Shell Oil Co. v. Ross,* 356 S.W.3d 924 (Tex.2011), where reasonable diligence required sophisticated lessors to acquaint themselves with "readily accessible and publicly available information" from Railroad Commission records. *Ross,* 356 S.W.3d at 929; *see Marshall,* 342 S.W.3d at 68–69. According to Samson, the directional survey and its associated plat, as well as filings showing the original proposed location of the well's bottom hole, should have been discovered by the exercise of reasonable diligence by 2001 at the latest, meaning that Hooks' fraud claims are barred by limitations.

 [1]    [2]   We have long held that "fraud prevents the running of the statute of limitations until it is discovered, or by the exercise of reasonable diligence might have been discovered." *Ruebeck v. Hunt,* 142 Tex. 167,176 S.W.2d 738, 739 (1943). [5] Generally, "[c]auses of action accrue and statutes of limitation begin to run when facts come into existence that authorize a claimant to seek a judicial remedy," *Emerald Oil,* 348 S.W.3d at 202, but "a person cannot be permitted to avoid liability for his actions by deceitfully concealing wrongdoing until limitations has run," *S.V. v. R.V.,* 933 S.W.2d 1, 6 (Tex.1996). Because "fraud vitiates

whatever it touches," *Borderlon v. Peck,* 661 S.W.2d 907, 909 (Tex.1983), limitations does not start to run until the fraud is discovered or the exercise of reasonable diligence would discover it, *Marshall,* 342 S.W.3d at 69.

[5]     *See also Emerald Oil,* 348 S.W.3d at 216; *Marshall,* 342 S.W.3d at 68; *Computer Assocs. Int'l, Inc. v. Altai, Inc.,* 918 S.W.2d 453, 455 (Tex.1996); *Woods v. William M. Mercer, Inc.,* 769 S.W.2d 515, 517 (Tex.1988).

 **[3]     [4]**   The same rule applies to claims of fraudulent inducement. Fraudulent inducement is a subspecies of fraud; "with a fraudulent inducement claim, the elements of fraud must be established as they relate to an agreement between the parties." *Haase v. Glazner,* 62 S.W.3d 795, 798–99 (Tex.2001). Accordingly, the same principle applies: limitations does not start to run until the fraud with respect to the contract is discovered or the exercise of reasonable diligence would discover it.

 **[5]     [6]**   And just when would reasonable diligence discover the wrong? And who decides?[6] Although "the date a cause of action accrues is normally a question of law,"   **\*58**  *Etan Indus., Inc. v. Lehmann,* 359 S.W.3d 620, 623 (Tex.2011) (per curiam), reasonable diligence is an issue of fact, *Estate of Stonecipher v. Estate of Butts,* 591 S.W.2d 806, 809 (Tex.1979).[7] Nevertheless, in some circumstances, we can still determine as a matter of law that reasonable diligence would have uncovered the wrong.[8] A survey of our decisions reveals the reasons for holding, as a matter of law, that the exercise of reasonable diligence would lead to the discovery of the wrong within the statutory period.[9]

[6]     Hooks and amicus Cardwell, Hart & Bennett, LLP cite cases stating that if there is a fraudulent misrepresentation, it is no defense that proper inquiry might have revealed the truth. *See, e.g., Buchanan v. Burnett,* 102 Tex. 492, 119 S.W. 1141, 1142 (1909); *Labbe v. Corbett,* 69 Tex. 503, 6 S.W. 808, 811 (1888); *Mitchell v. Zimmerman,* 4 Tex. 75, 79–80 (1849). These cases, however, stand for the general proposition that one may be liable for fraud even if it could be discovered by due diligence; they do not hold that limitations is extended even if due diligence would reveal the fraud. Also, at least one amicus, Cardwell, Hart & Bennett, LLP, invokes a lessee's implied covenant to act as a reasonably prudent operator. But we held in *HECI Exploration Co. v. Neel* that "[i]mplied covenants do not dispense with the need for royalty owners to exercise due diligence in enforcing their contractual rights, express or implied, within the statutory limitations period." 982 S.W.2d 881, 887 (Tex.1998).

[7]     *See also Shah v. Moss,* 67 S.W.3d 836, 846 (Tex.2001) ("To avoid summary judgment on limitations grounds, Moss must have raised a fact issue to support his fraudulent-concealment assertion."); *Hurlbut v. Gulf Atl. Life Ins. Co.,* 749 S.W.2d 762, 766 (Tex.1987) ("[W]e agree that whether the plaintiffs knew or should have known of the fraud ... raises a fact issue...."); *Borderlon,* 661 S.W.2d at 909 ("A fact issue exists whether, in the exercise of reasonable diligence, Borderlon knew, or should have known ..., that the presence of the foreign object in her abdomen gave rise to a cause of action against Dr. Peck."); *Cherry v. Victoria Equip. & Supply, Inc.,* 645 S.W.2d 781, 782 (Tex.1983) ("The ultimate duty to weigh the evidence, determine credibility and decide if fraudulent concealment actually existed rests upon the trier of fact."); *Ruebeck,* 176 S.W.2d at 740 ("What will constitute reasonable diligence to discover fraud and when the fraud might have been discovered by the exercise of such diligence are necessarily questions which must be determined from all the facts and circumstances in evidence in each particular case. When, under the facts in evidence, reasonable minds might differ on such issues, the findings of the jury thereon are binding on the appellate court.").

[8]     *See, e.g., Etan Indus.,* 359 S.W.3d at 623 ("On these facts, we hold as a matter of law that the estoppel effect of the alleged fraudulent concealment ended in December 2002 at the latest. By that date, the Lehmanns were apprised of facts, conditions, and circumstances sufficient to cause a reasonable person to make inquiry that would lead to the discovery of the concealed cause of action."); *Ross,* 356 S.W.3d at 929 ("Because the Rosses could have discovered Shell's alleged fraud through the use of reasonable diligence, we hold that, as a matter of law, the doctrine of fraudulent concealment cannot apply to toll the statute of limitations."); *Marshall,* 342 S.W.3d at 69 ("[A]s a matter of law, the Marshalls would have been able to discover BP's fraud through the use of reasonable diligence."); *Kerlin v. Sauceda,* 263 S.W.3d 920, 926 (Tex.2008) ("As a matter of law, the Ballis could have discovered the existence of any claims before limitations expired through the exercise of reasonable diligence.").

[9]     Hooks denies relying on the discovery rule or fraudulent concealment. Although fraudulent concealment allows the statute of limitations to be tolled for causes of action besides fraud itself, the standard of reasonable diligence remains the same: "Fraudulent concealment only tolls the running of limitations until the fraud is discovered or could have been discovered with reasonable

diligence." *Marshall,* 342 S.W.3d at 67. Consequently, cases discussing fraudulent concealment are relevant to the meaning of reasonable diligence.

In *Shell Oil Co. v. Ross,* we considered untimely claims made by Ross—an attorney who "understood the oil and gas industry"— and his family that Shell had underpaid gas royalties. 356 S.W.3d at 926. Despite Shell's allegedly fraudulent representations, the Rosses had a duty to "make themselves aware of relevant information available in the public record." *Id.* at 928. We held that "[d]iligence is required when claimants have been 'put on notice of the alleged harm of injury-causing actions.' " *Id.* (quoting *Emerald Oil,* 348 S.W.3d at 207).[10] Discrepancies in royalties paid to the Rosses on different wells put them on notice. *Id.* at 929. A publicly available price index illuminated the underpayments, **\*59** as did General Land Office records demonstrating that Shell paid higher royalties to the State even though it owed the Rosses the same royalty. *Id.* Had the Rosses exercised reasonable diligence, this "[r]eadily accessible and publicly available information" would have revealed the underpayments. *Id.* Accordingly, as a matter of law, they did not exercise reasonable diligence.

[10]    Samson and Hooks dispute whether parties must be put on notice of potential harm before they have a duty to exercise reasonable diligence, as well as whether Hooks was on notice. We need not reach these questions here. Instead, we decide the case by assuming, without deciding, that Hooks should exercise reasonable diligence.

In *BP America Production Co. v. Marshall,* we held that the statute of limitations was not tolled when BP fraudulently represented that it was maintaining continuous operations on a lease. 342 S.W.3d at 67–69. This case also involved a sophisticated plaintiff who "understood the oil and gas industry." *Id.* at 69. The public record contained two public filings with the Railroad Commission: a well log and a plugging report that contained "highly technical information." *Id.* at 66. Had the Marshalls read these two documents together, they would have discovered that BP was not conducting good-faith continuous operations. *Id.* at 69. "[A]s a matter of law, the Marshalls would have been able to discover BP's fraud th[r]ough the use of reasonable diligence." *Id.*

We have reached similar conclusions in other cases. For example, if the plaintiff has "actual knowledge ... of injury-causing conduct," then this "starts the clock on the limitations period" "[i]rrespective of the potential effect of fraudulent concealment." *Emerald Oil,* 348 S.W.3d at 209. The availability of court records may indicate under some circumstances that reasonable diligence would have found the information. *See Kerlin,* 263 S.W.3d at 926. Land title records and probate proceedings create constructive notice, "an irrebuttable presumption of actual notice," which prevents limitations from being delayed. *Mooney v. Harlin,* 622 S.W.2d 83, 85 (Tex.1981); *Sherman v. Sipper,* 137 Tex. 85, 152 S.W.2d 319, 321 (1941). These cases reveal that when there is actual or constructive notice, or when information is "readily accessible and publicly available," *Ross,* 356 S.W.3d at 929, then, as a matter of law, the accrual of a fraud claim is not delayed.

 [7]   The present case does not fall into any of the categories where we can determine, as a matter of law, that reasonable diligence would have timely uncovered the fraud. Though Samson relies extensively on *Marshall* and *Ross,* Hooks correctly identifies an important distinction: in those cases, the public record itself was not tainted by the fraud. We have not previously considered whether reasonable diligence would uncover a correct public Railroad Commission filing when more recent filings contain false information.

In December 2000, Samson submitted a plat to the Railroad Commission as part of an application to pool. The plat was signed by Glenn Lanoue, Samson's landman, and dated November 16, 2000, certifying that it was "a true and correct plat based on the best of my knowledge." The plat had a label stating "Proposed Well Location," but, unlike some earlier plats in the record, the individual data on this plat were not themselves also marked as "proposed." The plat gave "X" and "Y" coordinates for the well's bottom-hole location, the distance of the well from various survey lines, and the well's surface location along with the bottom hole's location relative to the surface. Trial testimony established that this data is internally consistent, placing the well's bottom hole more than 1,320 feet from Hooks' lease line even though the well actually bottomed within the 1,320–foot protected zone. When Lanoue was asked where he obtained the bottom hole's distance from the survey **\*60** lines, he testified that he created them himself.[11]

11    His deposition testimony was: "I got them from myself."

Samson later provided a plat with the same information to Hooks in connection with Samson's request to amend the lease and allow pooling. Samson argues the plat was ambiguous and indefinite, creating a need for Hooks, an experienced oil and gas lessor, to investigate further. On the plat is the notation "1400' ± scaled," but trial testimony presented different interpretations of what points this distance measured between. Elsewhere, the plat expressly states that the bottom-hole location is "1400' ± scaled' FEL Unit." Testimony indicated that "FEL" means "from the eastern line" of the pooled unit. Another testified that taking the notation literally would be unreasonable because if the well truly bottomed about 1,400 feet from the eastern line of the unit, as opposed to Hooks' lease line, it would be very close to Hooks' lease, perhaps even within it.

Months earlier, a directional survey performed by an independent surveyor and an accompanying plat were filed with the Railroad Commission. Some information on the directional survey clearly contradicts the Lanoue plat discussed above, and Samson urges that the information on the survey could have easily been used to estimate the bottom hole's true location. Hooks argues that it would take an expert to interpret the survey and pinpoint its location.

We cannot say that, as a matter of law, Hooks should have discovered the accurate information when the more recent filing falsely conveyed that the well had been completed outside the protected zone. Although reasonable diligence should examine readily available information in the public record, it may stop at more recent filings with the Railroad Commission, without needing to double-check more recent filings against earlier filings. This accords with our prior decisions. We have held that "fraud vitiates whatever it touches," *Borderlon,* 661 S.W.2d at 909, in this case, the public record. We have held that not all Railroad Commission records create constructive notice, *HECI Exploration Co.,* 982 S.W.2d at 886, meaning that, in some circumstances, Railroad Commission filings may exist that one is not charged with discovering. We have held that fraudulent concealment is "an equitable doctrine that ... is fact-specific." *Marshall,* 342 S.W.3d at 67. And we have held that "a person cannot be permitted to avoid liability for his actions by deceitfully concealing wrongdoing until limitations has run." *S.V.,* 933 S.W.2d at 6. Though reasonable diligence should lead to information in the public record, here, the fraudulent information itself taints the public record. To require, as a matter of law, that Hooks double-check the more recent filings against earlier filings is a higher burden than reasonable diligence requires.

Samson argues that the directional survey is the "gold standard," and that the fraudulent plat was filed to show unit lines for pooling purposes, not to provide the exact location of the well's bottom hole. Samson observes that, in some situations, Texas law mandates directional surveys performed by independent surveyors, *see* 16 TEX. ADMIN. CODE §§ 3.11(c)(2)(A); 3.12 (Tex.R.R. Comm'n), and asserts that Hooks should have known this and looked for the survey to establish the bottom hole's true location. Samson also argues that because Lanoue told Hooks the well was about 1,500 feet from the lease line, but then sent Hooks a plat indicating the bottom hole was about 1,400 feet away, very close to the protected zone, these **\*61** inconsistencies should have caused Hooks to inquire further. None of these arguments avail. Had Hooks gone to the Railroad Commission, the more recent filing would have been a plat with the same inaccurate information, placing the well's bottom hole beyond the protected zone. Hooks is not required, as a matter of law, to double-check it against the earlier directional survey. To the extent some information on the Lanoue plat is unclear, a careful reader could have examined other information on the plat (e.g., the "X" and "Y" coordinates, distances from lease lines, and location of the bottom hole relative to the surface) to resolve any ambiguity, determining that the plat placed the bottom hole outside the protected zone. Indeed, Hooks presented testimony that this plat clearly placed the bottom hole outside of the protected zone. Thus, though Samson's arguments regarding potential ambiguities on the plat, and the availability and superiority of the directional survey, may be appropriate for the factfinder to consider when determining whether reasonable diligence would have uncovered the fraud, they do not establish that, as a matter of law, Hooks did not exercise reasonable diligence.

Amicus Texas Oil and Gas Association suggests that holding for Hooks will encourage litigants to guise their breach-of-contract claims as fraud claims to avoid the statute of limitations. We disagree. To establish fraudulent inducement, "the elements of fraud must be established as they relate to an agreement between the parties." *Haase,* 62 S.W.3d at 798–99. Many breach-of-contract cases do not implicate the elements of fraud. Only when fraud is established with regard to the contract may fraudulent inducement be established, and, in any case, the suit is based on the fraud itself rather than a breach of contract. Moreover,

because fraudulent concealment may toll the statute of limitations for contract claims, no incentive will exist to recast them as fraud claims.

We hold that when the defendant's fraudulent misrepresentations extend to the Railroad Commission record itself, earlier inconsistent filings cannot be used to establish, as a matter of law, that reasonable diligence was not exercised. Under these circumstances, reasonable diligence remains a fact question. The factfinder, no doubt, may consider the failure to examine older records when determining whether reasonable diligence was exercised, but their availability is not enough to establish that reasonable diligence was not exercised as a matter of law.

Because the court of appeals mistakenly concluded that the date by which Hooks reasonably should have discovered Samson's fraud was a question of law, it did not reach Samson's other arguments concerning Hooks' fraudulent inducement claims. *See* 389 S.W.3d at 428–30. These include the factual and legal sufficiency of the evidence with regard to common-law fraud, statutory fraud, and damages for fraud, as well as the factual sufficiency of the evidence regarding when Hooks, by the exercise of reasonable diligence, would have discovered the fraud. We remand these issues for the court of appeals' consideration.

### III. Breach of Most–Favored–Nations Clause Claims

 **[8]**   When an oil and gas lease contains a most-favored-nations clause, it typically provides that a lessee who pays higher royalties on nearby leases must pay matching royalties to the lessor under the subject lease. Here, all three leases contain an identical most-favored-nations clause, providing that

> **\*62**  If Lessee shall enter into an oil and gas lease(s) part of which is located within three (3) miles of any exterior boundary of the subject lands covered by the subject Lease, hereinafter referred to as "Third Party Lease", Lessee shall notify Lessor of such fact. If the reserved royalty or the amount per acre payable for delay rentals, shut-in rentals or minimum royalty, at any time payable under such Third Party Lease, is higher than the like royalty and amounts payable as provided in the subject Lease, the royalty or amount payable per acre in the subject lease, which is less than that provided in the Third Party Lease shall be immediately increased so that it will equal the royalty or other amounts payable under the Third Party Lease. The subject Lease and the Third Party Lease must be calculated in substantially the same manner, such that the comparison of the subject Lease and the Third Party Lease is based on the same effective net royalty or other payments, and that same shall include or deduct the same types of charges, taxes and other burdens from such interests.

The trial court determined on summary judgment that Samson breached the clause by paying a higher royalty to the State of Texas.

Samson leased a qualifying oil and gas interest from the State at the same 25% royalty Samson paid Hooks. In 2003, to induce the State to consent to a Pooling Agreement, Samson increased the State's royalty. This Pooling Agreement allocates production among different interest owners based on their individual shares in their own tracts and the proportion that their tracts play in the overall unit. This general allocation is made "provided that the state [']s unit royalty interest shall be 0.7969%." Considering the size of the State's tract relative to the size of the entire unit, this is equivalent to a royalty of 28.28896% on the production allocated to the State's tract. In other words, the State's royalty of 0.7969% on production from the *unit* equates to a 28.28896% royalty on production allocated to the State's *tract*.

Samson argues that the most-favored-nations clause does not apply because the clause regards the "reserved royalty ... payable under" another lease, whereas Samson paid the State higher royalties under the Pooling Agreement. If the clause were to apply to more than just leases, then it would have said so, Samson argues. Samson also asserts that the Pooling Agreement increased the State's allocation of production from the unit without raising the royalty.

[9]   [10]   [11]   [12]   We disagree. To resolve this dispute, we apply the " 'primary legal consequence' of pooling to this case —that production anywhere on a pooled unit is treated as production on every tract in the unit." *See Key Operating & Equip., Inc. v. Hegar,* 435 S.W.3d 794, 798–99 (Tex.2014) (quoting *See Pipe Line Co. v. Tichacek,* 997 S.W.2d 166, 170 (Tex.1999)). The reason a lessor receives royalties under a pooling agreement, even if no production occurs directly on that lessor's tract, is because production elsewhere on the pooled unit is attributed to the lessor's tract. And the reason the lessor receives royalties on production attributed to the lessor's tract is because of the underlying lease. It follows that a lessor's royalty on production from the unit as a whole reflects the lessor's royalty on production from its individual tracts in proportion to the size of the tracts relative to the overall unit. This accords with the nature of pooling, which "effects a cross-conveyance among the owners of minerals under the various tracts of royalty or minerals in a **\*63** pool so that they all own undivided interests under the unitized tract in the proportion their contribution bears to the unitized tract." *Montgomery v. Rittersbacher,* 424 S.W.2d 210, 213 (Tex.1968). In other words, the royalty owed on production from the whole unit is necessarily tied to the royalty owed on production from the lessor's individual tracts. To increase one is to increase the other.

Thus, by definition, Samson's grant of a royalty to the State of 0.7969% on production from the unit means that Samson increased the State's 25% royalty on production from its tract to 28.28896%. For purposes of the most-favored-nations clause, the royalty imposed by the Pooling Agreement is "payable under" the lease, and the Pooling Agreement itself states that it was entered into by the State "as Lessor" and Samson "as Lessee."

The court of appeals here defined a most-favored-nations clause as "a vendor protection clause" that "enables the vendor to receive the benefit of increases in the *market price* of his product over the term of a long range contract with a purchaser." 389 S.W.3d at 435 (quoting *Lone Star Gas Co. v. Howard Corp.,* 556 S.W.2d 372, 374 (Tex.Civ.App.–Texarkana 1977), *writ ref'd n.r.e.,* 568 S.W.2d 129 (Tex.1978) (per curiam)) (emphasis added). Though this may be the purpose of such clauses, unless they expressly so provide, we are not authorized to examine whether increased prices were caused by market forces or, as seems to be the case here, other considerations. The reason for giving the State a higher royalty—inducing it to pool—is irrelevant in determining whether the most-favored-nations clause applies.

For all these reasons, we conclude that the court of appeals erred in holding that Samson did not breach the most-favored-nations clause.

## IV. Breach of Formation–Production Clause Claims

[13]   Article III of each lease specifies a 25% royalty on "gas, including casinghead gas or other gaseous substances produced from said land," as well as a 25% royalty on "all other liquid hydrocarbons that may be produced from said land." At the end of Article III, each lease also states that

> For the purposes of calculating all royalties payable under Article III. herein, it is expressly provided that all such calculations shall be based on formation production as reported on Texas Railroad Commission forms P–1 and P–2.

Hooks claims that Samson has paid gas royalties on proceeds from gas sales rather than on the total amount of formation production. Samson disputes Hooks' interpretation of the formation-production clause. The trial court awarded damages for breach of the clause, but the court of appeals reversed. 389 S.W.3d at 437.

[14]   [15]   [16]   [17]   [18]   "In construing contracts, we must ascertain and give effect to the parties' intentions as expressed in the document." *Lopez v. Muñoz, Hockema & Reed, L.L.P.,* 22 S.W.3d 857, 861 (Tex.2000). We attempt to harmonize all contractual provisions by "analyzing the provisions with reference to the whole agreement." *Frost Nat'l Bank v. L & F Distribs., Ltd.,* 165 S.W.3d 310, 312 (Tex.2005) (per curiam). We "construe contracts from a utilitarian standpoint bearing in mind the particular business activity sought to be served," and, when possible and proper, we avoid a "construction which is unreasonable, inequitable, and oppressive." *Reilly v. Rangers Mgmt., Inc.,* 727 S.W.2d 527, 530 (Tex.1987). If, through the use of relevant

rules of construction, the contract can be given a definite meaning, we construe it **\*64** as a matter of law. *Frost Nat'l Bank, 165 S.W.3d at 312*.

The parties do not dispute the meaning of formation production; rather, they dispute what it means to calculate all royalties based on formation production. As used on the old Railroad Commission forms P–1 and P–2, [12] formation production describes the total volume of gas removed from the underground reservoir. Not all gas, however, that leaves the reservoir as gas continues to be a gas at the surface; instead, some condenses. "Condensate is hydrocarbons that exist in the form of gas when contained in the natural gas reservoir underground, which condense into a liquid form when released from the reservoir's higher pressure and temperature." *Bowden v. Phillips Petroleum Co.,* 247 S.W.3d 690, 704 n.7 (Tex.2008). When reporting the total volume of gas removed from the reservoir to the Railroad Commission, Samson would convert the volume of condensate at the surface to its equivalent volume as a gas.

[12]     These forms, referred to by the leases, are no longer used by the Railroad Commission. Instead, Form PR has replaced them. According to the instructions accompanying Form PR, "[f]or gas well gas, you no longer need to convert the condensate production to a gas equivalent volume; the RRC will automatically convert the volume." TEX. R.R. COMM'N, INSTRUCTIONS FORM P R: MONTHLY PRODUCTION REPORT, *available at* http:// www.rrc.texas.gov/media/2646/formpr–instructions–final–02–2005.pdf. This opinion need not—and does not—interpret "formation production" as used by the new form.

Hooks argues that because all royalties must be based on formation production, and formation production is the volume of all production while it existed in the reservoir as gas, then the 25% royalty paid on gas should be for the volume of gas removed from the reservoir instead of the volume of gas at the surface. Notably, however, Hooks contends that Samson must still pay a 25% royalty on the volume of condensate taken from the wellhead. In other words, Hooks asserts that the formation-production clause requires that a 25% royalty be paid on the liquid condensate, which must then be converted to its equivalent in gas volume so that another 25% royalty may be paid on it again. Samson responds that Hooks' interpretation unreasonably imposes a double royalty by requiring Samson to pay royalties on condensate twice: first as condensate, and then again as a gas as part of formation production. Samson submits that the formation-production clause means Samson must pay for produced minerals, either as gas or as condensate, but not that Samson must pay royalties on condensate twice.

The formation-production clause provides that *all* royalty calculations be based on formation production. Hooks' approach, however, causes only gas royalties (for gas as gas and for condensate as gas) to be based on formation production. For royalties on condensate as condensate, Hooks' approach bases them solely on the amount of condensate without reference to formation production. We disagree with that interpretation.

The formation-production clause simply requires Samson to convert the volume of condensate to its equivalent volume in gas, ensuring that the total volume that Samson pays royalties on relates to the volume that Samson reports to the Railroad Commission. The conversion ensures that Samson pays royalties on an appropriate volume of production, not that Samson pays royalties on some production twice. In other words, the clause does not require that royalties be paid on everything as gas. Otherwise, the instruction that all royalties be based on formation production would be ignored, because royalties would be paid on condensate without reference to formation **\*65** production. This interpretation of the clause, unlike Hooks', allows royalties on condensate (as well as on gas) to be based on formation production, as the leases require.

Hooks also argues that Samson failed to pay royalties on gas that was not ultimately sold, such as lost or consumed gas. Hooks points to the testimony of a Samson employee that Samson pays royalties based on dollars received rather than on formation production. But Hooks presented no evidence of the royalties that should have been paid on the unsold gas; Hooks merely aggregates this amount (if any) with the royalties that Hooks claims are owed on condensate when converted back to gas. Absent specific evidence of damages for lost and used gas—as opposed to a combined amount for lost and used gas and condensate as part of formation production—Hooks cannot prevail, and thus we need not determine whether Samson breached the contract by failing to pay royalties on lost and used gas. In sum, we agree with the court of appeals' decision with regard to the formation-production claims.

## V. "Unpooling" Claims

 [19]   The two Hardin County Leases authorized Samson to pool. Samson pooled both of Hooks' Hardin County Leases into the "Blackstone Minerals 'A' No. 1" unit, effective as of the date of first production in June 2001. Because the owner of 87.5% of the mineral interest in the tract where the well in this unit was located refused to pool, Samson decided to "amend" the unit designation. A letter from Samson dated October 24, 2001, notified Hooks of an "Amendment and Name Change of Black Stone Minerals 'A' No. 1 Unit Designation, Hardin County, Texas":

> Reference is made to Samson Lone Star Limited Partnership's letter dated March 20, 2001, in which approval to pool on 640–acre plus 10% tolerance was received. Please note that the Unit Designation for the Black Stone Minerals "A" No. 1 is being amended and will now be called the Joyce Du Jay No. 1 Unit.

> No additional action is needed on your part, this letter is meant for informational purposes only. Please update your records with the new name and call the undersigned should you have any questions.

The amended unit was effective in January 2002, when production began.

As filed in the Hardin County records, the amendment did not merely change the name of the existing unit but also significantly altered its boundaries. Whereas the original unit extended from a depth of 6,000 feet to a depth of 13,800 feet, the new Joyce Du Jay No. 1 Unit, beginning at 12,400 feet below surface, extends down without limit. Samson has paid Hooks royalties on production from the Joyce Du Jay No. 1 Unit, but not from the original Blackstone Minerals A–1 Unit. Accordingly, Hooks seeks royalties on the original unit, claiming that Samson did not have the authority to "unpool" the Blackstone Minerals A–1 Unit. The trial court agreed, granting summary judgment in Hooks' favor. Samson responds—and the court of appeals held—that Hooks ratified the new unit by accepting royalties on it, and therefore cannot recover from the old unit. 389 S.W.3d at 434. Samson also asserts that if Hooks is entitled to royalties from the original unit, then these should be offset by the royalties Hooks has already received on the Joyce Du Jay No. 1 Unit.

Notably, Hooks does not question the validity of the Joyce Du Jay No. 1 Unit; rather, Hooks alleges that he should receive royalties from both the original unit  **\*66**  and the Joyce Du Jay No. 1 Unit. Hooks notes that the Hardin County Leases allowed unlimited pooling. Although Samson claimed it was "amending" the original unit, Hooks suggests that the change effectively added another unit without eliminating the original one.

Factually, Hooks' position is problematic. Samson's letter to Hooks made clear that it purported to "amend" the unit designation, not merely create an additional unit. The letter stated that it concerned an "amendment *and* name change," (emphasis added), so Hooks should have been aware that the pooled area could change. The original designation and the amended designation, as well as their differences, were a matter of public record. Though Hooks did not know exactly how Samson amended the unit designation, Hooks was nevertheless aware that Samson amended it, and Hooks regularly accepted royalty checks for the Joyce Du Jay No. 1 Unit without ever receiving royalties on the earlier designation. Under these circumstances, Hooks cannot claim additional royalties from the older unit because Hooks ratified the amendment, having full knowledge that something had changed and by his actions consenting to it, failing even to challenge the new unit. *See Fortune Prod. Co. v. Conoco, Inc., 52 S.W.3d 671, 677 (Tex.2000).* Because Hooks does not deny the validity of the new unit, one that existed only after Hooks was notified that the old unit was being amended, Hooks cannot later assert that he should also receive royalties from the old unit. *See Ohrt v. Union Gas Corp., 398 S.W.3d 315, 329 (Tex.App.–Corpus Christi 2012, pet. denied)* ("Prolonged silence or inaction in not asserting a known right is conduct that may amount to waiver."); *see also Bob Montgomery Chevrolet, Inc. v. Dent Zone Cos., 409 S.W.3d 181, 195 (Tex.App.–Dallas 2013, no pet.)* ("Any act inconsistent with an intent to avoid a contract has the effect of ratifying the contract."). Because of the undisputed contents of the notice letter, Hooks' acceptance of royalties for the new unit, and Hooks' refusal to challenge the new unit, we decide the question of ratification as a matter of law. [13]

13    *See, e.g., Thomson Oil Royalty, LLC v. Graham,* 351 S.W.3d 162, 166 (Tex.App.–Tyler 2011, no pet.); *Barker v. Roelke,* 105 S.W.3d 75, 85 (Tex.App.–Eastland 2003, pet. denied); *Old Republic Ins. Co. v. Fuller,* 919 S.W.2d 726, 728 (Tex.App.–Texarkana 1996, writ denied).

We base our holding solely on the facts that Hooks received notice of an amendment to the unit designation, accepted royalties from the amended unit, and does not challenge the amended unit. We need not decide other issues raised by the parties, such as whether Samson had authority to amend the unit or whether pooled units may overlap. *See* 389 S.W.3d at 431–33. We affirm the judgment of the court of appeals with regard to Hooks' "unpooling" claims.

## VI. Breach of Hardin County Offset Provision Claims

Like the Jefferson County Lease, the two Hardin County Leases also contain offset provisions requiring that if a well is completed within 1,320 feet of Hooks' lease line but is not unitized with Hooks' acreage, then within ninety days of production from the infringing well, Samson must either drill an offset well, pay Hooks compensatory royalties, or release the offset acreage. Under these offset provisions, if Samson elects to pay compensatory royalties, then it has a recurring monthly obligation to pay them. The first compensatory royalty would be due "following the expiration of ninety (90) days after the end **\*67** of said calendar month in which production [is] first marketed."

The Hardin County Leases allow pooling and also contain what the parties have termed an "entire-acreage clause":

> Operations for drilling on or production of gas from any part of the pooled unit which includes all or a portion of the Leased Premises ... shall be considered as operations for drilling on or production of gas from the Leased Premises, ... and the entire acreage constituting such unit or units shall be treated for all purposes, except the payment of royalties on production from the pooled unit, as if the same were included in this Lease.

Samson pooled the Hardin County Leases and drilled additional gas wells within 1,320 feet of the pooled units but more than 1,320 feet from Hooks' individual tracts. Hooks argues that the entire-acreage clause extended the 1,320–foot protected zone around the units themselves, and that Samson breached by disregarding the offset provisions. In the trial court, Samson moved for summary judgment on this claim on several grounds, including limitations, which the trial court granted. The court of appeals affirmed because of limitations. 389 S.W.3d at 440.

 [20]   Before analyzing the issue of limitations, we first consider Samson's argument that Hooks waived his claims for breach of the offset provisions by filing a proposed judgment with the trial court. In Hooks' motion for judgment, he averred that he moved for judgment "without waiving any rights to contest or appeal prior orders of the Court." And, the statement "APPROVED AS TO FORM" was above Hooks' attorney's signature on the proposed judgment. Samson asserts that these reservations did not preserve Hooks' right to appeal, invoking *Litton Industrial Products, Inc. v. Gammage,* where we "disapprove[d] a practice by which a party, by motion, induces the trial court on the one hand to render a judgment, but reserves in a brief the right for the movant to attack the judgment if the court grants the motion." 668 S.W.2d 319, 322 (Tex.1984). Importantly, *Litton Industrial Products* applies only to arguments inconsistent with the specifics of the requested judgment. *See id.*

In contrast, when the argument asserted on appeal is not inconsistent with the judgment, the argument is not waived. *See Diamond Shamrock Ref. Co. v. Hall,* 168 S.W.3d 164, 170 (Tex.2005). This is because "[t]here must be a method by which a party who desires to initiate the appellate process may move the trial court to render judgment without being bound by its terms." *First Nat'l Bank v. Fojtik,* 775 S.W.2d 632, 633 (Tex.1989) (per curiam). Here, Hooks specifically reserved the right to challenge prior orders of the court, and by moving for judgment on the claims that Hooks won, Hooks did not waive his right to appeal on claims that he lost.

Regarding limitations, Samson argues, and the court of appeals held, that the four-year statute of limitations bars Hooks' claims for breach of the offset provisions because the offset provisions were first breached in 2001, at least five years before Hooks filed suit. 389 S.W.3d at 440; see TEX. CIV. PRAC. & REM. CODEE § 16.004. Hooks responds that compensatory damages under the offset provisions are owed monthly, Samson's breach is recurring, and Hooks can recover damages for royalties that should have been paid during the four years preceding the filing of suit. See, e.g., Lyle v. Jane Guinn Revocable Trust, 365 S.W.3d 341, 355 (Tex.App.–Houston [1st Dist.] 2010, pet. denied). Samson denies that the breach, if any, has been recurring. Specifically, Samson argues that the offset provisions authorized **\*68** Samson to elect to release the offset acreage or drill an offset well or pay compensatory royalties. Samson contends that it is not bound by the recurring provision when it could have opted for a non-recurring one, and damages for breach of a non-recurring provision are barred by limitations.

 **[21]**   It is true that, "if the terms of an agreement call for periodic payments during the course of the contract, a cause of action for such payments may arise at the end of each period." Intermedics, Inc. v. Grady, 683 S.W.2d 842, 845 (Tex.App.–Houston [1st Dist.] 1984, writ ref'd n.r.e.). [14] The question remains whether, because the contract gave Samson alternatives that were not recurring, Samson may prevent Hooks from suing based on the one recurring obligation. Samson cites a Fifth Circuit case holding that when a party refuses to make an election under an alternative contract, the choice does not devolve to the other party. See Liberty Bank v. Talman Home Mortg. Corp., 877 F.2d 400, 407 (5th Cir.1989). The Fifth Circuit held that when the "breaching party had the option of choosing between two alternatives at the time of breach, 'the measure of damages is the loss caused by reason of the promisor failing to perform the promise with the lesser value.' " Id. (quoting Stewart v. Cran–Vela Rental Co., 510 F.2d 982, 986 (5th Cir.1975)). Although Samson has not presented evidence of alternative measures of damages, it presumably argues that limitations reduces the alternative damages to zero. Hooks responds by citing a decision from 1849, Hemming v. Zimmerschitte, where this Court observed that there "does not appear on the record, as presented, a manifestation of willingness on the part of the obligor to discharge his obligation; and the right of election, if applicable at all, is lost and cannot avail the defendant." 4 Tex. 159, 164 (1849). We have not addressed the issue since then.

14    See, e.g., Barnes v. LPP Mortg., Ltd., 358 S.W.3d 301, 307 (Tex.App.–Dallas 2011, pet. denied); Lyle, 365 S.W.3d at 355; Headington Oil Co., L.P. v. White, 287 S.W.3d 204, 214 (Tex.App.–Houston [14th Dist.] 2009, no pet.); F.D. Stella Prods. Co. v. Scott, 875 S.W.2d 462, 465–66 (Tex.App.–Austin 1994, no writ); Dvorken v. Lone Star Indus., Inc., 740 S.W.2d 565, 567 (Tex.App.–Fort Worth 1987, no writ).

 **[22]**   We need not reach the general issue of the measure of damages for breach of an alternative contract. The Hardin County Leases required Samson to begin drilling an offset well or release the acreage within ninety days of production from the infringing well. But Samson must pay compensatory royalties slightly later—"on or before the first day of the calendar month next following the expiration of ninety (90) days after the end of said calendar month in which production [is] first marketed." Assuming that Samson breached, then by waiting without performing the first two alternatives, Samson impliedly elected to perform the later one, the only choice remaining after the first ninety days had passed. If Samson breached the offset provisions, then Samson's failure to timely elect an alternative creates an implied election of the recurring compensatory royalty payments. Accordingly, if Samson did indeed breach, then Hooks is entitled to damages for royalties owed within four years of filing suit. This accords with the nature of damages: providing "just compensation for the loss or damage actually sustained." Stewart v. Basey, 150 Tex. 666, 245 S.W.2d 484, 486 (1952). When the law would allow compensation under a recurring alternative (i.e., compensatory royalties) but not under a non-recurring alternative, it would not be just to allow the obligor's silent, continuous breach to constitute an election of the non-recurring alternative.

 **\*69**   The court of appeals held for Samson on limitations and did not reach the merits of Hooks' claim for breach of the offset provisions and the proper construction of the entire-acreage clause. See 389 S.W.3d at 440. Because limitations does not apply to the compensatory royalties that may have been owed within the four years preceding suit, we remand for the court of appeals to consider the merits of Hooks' claims.

## VII. Attorney's Fees Claims

The parties stipulated that if Hooks "prevail[ed] on any of [his] claims" (with exceptions not applicable here), Samson would reimburse Hooks for a stipulated amount of attorney's fees. Because Hooks prevailed on several claims in the trial court, the trial court granted Hooks these attorney's fees. The court of appeals, however, held that Hooks take nothing except for $52,257.22, a stipulated amount to reimburse Hooks for ad valorem taxes that the leases required Samson to pay. *Id.* at 438. It also held that reimbursement for the ad valorem taxes did not constitute "prevail[ing] on [a] claim[ ]" as contemplated by the stipulation. *Id.* Accordingly, the court of appeals did not require Samson to pay attorney's fees. *Id.*

We need not decide whether the ad valorem taxes trigger Samson's obligation to pay attorney's fees under the stipulation. Rather, under our decision today, Hooks prevails on another claim such that he is entitled to the stipulated amount of fees. [15] We reverse the court of appeals on this point.

[15]     At the least, Hooks prevails on his claims under the most-favored-nations clause. Other claims, such as fraud and breach of the Hardin County offset provisions, are remanded to the court of appeals for further consideration.

## VIII. Interest Rate Claims

 **[23]**  Hooks seeks, and the trial court granted, a post-judgment interest rate of 18%. Each lease provides that "past due royalties ... shall be subject to a Late Charge based on the amount due and calculated at the maximum rate allowed by law." Because the court of appeals reversed all of Hooks' damages except for compensation for ad valorem taxes, it reduced the interest rate to 5%. *Id.* at 439.

The Texas Finance Code provides for a maximum post-judgment interest rate of 18% on contract claims:

> A money judgment of a court of this state on a contract that provides for interest or time price differential earns post-judgment interest at a rate equal to the lesser of: (1) the rate specified in the contract, which may be a variable rate; or (2) 18 percent a year.

TEX. FIN. CODE § 304.002. But, if the contract does not specify the interest rate, then the rate is determined under section 304.003 of the Finance Code. Under section 304.003(c), the post-judgment interest rate is "the prime rate as published by the Board of Governors of the Federal Reserve System on the date of computation," not to exceed 15% a year or fall below 5% a year. *Id.* § 304.003(c). "On the 15th day of each month, the consumer credit commissioner shall determine the post-judgment interest rate to be applied to a money judgment rendered during the succeeding calendar month." *Id.* § 304.003(b). Here, the trial court's final judgment was rendered in December 2008, and the judgment interest rate according to the consumer credit commissioner was five percent. [16]

[16]     *See* OFFICE OF THE CONSUMER CREDIT COMM'R, JUDGMENT RATE SUMMARY , *available at* http:// www.occc.state.tx.us/pages/int_ rates/Judgment% 20Rate% 20Summaries/ Thru% 202014% 20Judgment% 20Rate% 20Summary.pdf.

The leases only impose "the maximum [interest] rate allowed by law" for past-due royalties. Accordingly, to the extent **\*70** Hooks recovers for past due royalties, he is entitled to an 18% interest rate. For other recoveries, the statutory rate of 5% applies because Hooks has not directed us to any portion of the leases providing otherwise. We affirm in part and reverse in part the court of appeals' judgment regarding post-judgment interest rates.

### IX. Conclusion

In summary, we reverse the court of appeals regarding limitations for fraud, the most-favored-nations clause, limitations for breach of the offset provisions in the Hardin County Leases, and attorney's fees. We affirm in part and reverse in part regarding the applicable post-judgment interest rate. And we affirm regarding the formation-production and "unpooling" claims. We remand to the court of appeals for further action consistent with this opinion.

**All Citations**

457 S.W.3d 52, 58 Tex. Sup. Ct. J. 252

---

**End of Document**    © 2015 Thomson Reuters. No claim to original U.S. Government Works.

# HYPERLINKED MATERIALS



SAMSON (Helen Cook)
Two West Second Street
Tulsa, Oklahoma 73103
Return to:

## SECOND AMENDMENT TO DESIGNATION OF GAS UNIT
### SAMSON LONE STAR LIMITED PARTNERSHIP -
### BLACK STONE MINERALS NO. 1 GAS UNIT
#### 704.00 ACRE GAS UNIT

DES        2003004468
10 PGS

STATE OF TEXAS                                §
                                             §   KNOW ALL MEN BY THESE PRESENTS:
COUNTIES OF HARDIN & JEFFERSON §

WHEREAS, Samson Lone Star Limited Partnership, a Texas limited partnership, on February 28, 2001, previously executed a Designation of Gas Unit - Samson Lone Star Limited Partnership - Black Stone Minerals No. 1 Gas Unit covering 704 acres (hereinafter referred to as the "Designation"), which is recorded in Volume 1258, Page 696, Official Public Records, Hardin County, Texas, and under Document No. 2001008270, Official Public Records of Real Property, Jefferson County, Texas; and

WHEREAS, Samson Lone Star Limited Partnership on June _6_, 2001, previously executed an Amendment to the Designation, which is recorded in Volume 1271, Page 42, Official Public Records, Hardin County, Texas, and under Document No. 2001023987, Official Public Records of Real Property, Jefferson County, Texas; and

WHEREAS, in the Designation, as amended, Samson Lone Star Limited Partnership reserved the right to amend the Designation at any time to include any outstanding leases and to change the boundaries to the unit; and

WHEREAS, Samson Lone Star Limited Partnership desires to revise and amend the Designation in accordance with the foregoing.

NOW THEREFORE, the Designation is hereby amended in its entirety as follows:

SAMSON LONE STAR LIMITED PARTNERSHIP, a Texas limited partnership, whose address is Two West Second Street, Tulsa, Oklahoma 74103, (hereinafter referred to as "Lessee") is the owner of certain valid and subsisting oil, gas and mineral leases as listed on Exhibit "A" attached hereto and made a part hereof (hereinafter referred to as the "Exhibit 'A' leases") covering and affecting certain lands in Hardin and Jefferson Counties, Texas; and

WHEREAS, pursuant to the options, powers and rights granted under the Exhibit "A" leases, together with all amendments thereto, if any, Lessee has determined that in its judgment, in order to properly explore, develop and operate the premises covered by the Exhibit "A" leases and in order to promote the conservation of gas, in, under and that may be produced from the lands covered by the Exhibit "A" leases, Lessee desires to unitize and pool the Exhibit "A" leases INSOFAR AND ONLY INSOFAR as said leases cover the Pooled Mineral as defined below and the lands shown on Exhibit "B" attached hereto and further described on Exhibit "C" hereto, and made a part hereof for all purposes, to form a single gas operating production unit to be known as the SAMSON LONE STAR LIMITED PARTNERSHIP; ET AL BLACK STONE MINERALS NO. 1 GAS UNIT.

NOW, THEREFORE, in consideration of the premises, Lessee, as owner of the Exhibit "A" leases, does pursuant to the terms of the Exhibit "A" leases, and all amendments thereto, DESIGNATE, POOL, CONSOLIDATE, COMBINE and UNITIZE the Exhibit "A" leases INSOFAR AND ONLY INSOFAR as said leases cover the Pooled Mineral and the lands shown on Exhibit "B" and described by field notes on Exhibit "C" attached hereto, and Lessee does further POOL, CONSOLIDATE, COMBINE and UNITIZE the minerals, royalties, working interests, overriding royalties, production payments and other interests pertaining to the Exhibit "A" leases insofar as the Exhibit "A" leases and other interests under the lands shown on Exhibit "B" and further described by field notes on Exhibit "C" cover and include the Pooled Mineral as hereinafter defined to form a single gas operating production unit known as the SAMSON LONE STAR LIMITED PARTNERSHIP, ET AL - BLACK STONE MINERALS NO. 1 GAS UNIT, containing a total of 704.00 acres as shown on Exhibit "B" and described on Exhibit "C".

"Pooled Mineral" as used herein shall mean gas and all other hydrocarbons produced from any gas well, and all other products from a gas well or wells in said unit, provided such production occurs below a depth of 12,000 feet subsurface. A "gas well" as used herein means a well so recognized and classified by the Railroad Commission of the State of Texas, and this unit includes all production of the Pooled Mineral from any gas well located thereon. However, this unit shall not apply to or cover production from an oil well as recognized and classified by the Railroad Commission of the State of Texas.

Subject to the provisions hereof, production from the Pooled Mineral shall be allocated to the separate tracts covered by each of the Exhibit "A" leases within the unit in proportion that the number of surface acres in each separate tract within the unit bears to the total number of surface acres within the unit.

E.R.\SAMSON\BLACK STONE SECOND AMEND TO DESIG.WPD

PLAINTIFF'S
EXHIBIT
19

SAMSON-13926

The undersigned reserves the right to amend this Designation of Gas Unit from time to time and at any time, in order to correct any error herein or to include in this unit, as herein described, any outstanding leases or any unleased tract or any undivided interest located within the boundaries thereof, or to change the boundaries or the depth thereof, by appropriate instrument correcting same or committing any such outstanding interest to this unit. As to any outstanding interest in this unit not committed hereto, the undersigned parties do not intend that this Designation of Gas Unit shall in any way pool, unitize or affect such outstanding interests or the rights of the owners thereof, unless and until such outstanding interests have been committed by appropriate instrument, and, as to any outstanding working interest, such instrument should be executed by the then owner or owners of the working interest in the lands and/or leases pooled herein.

The undersigned further reserve the right (insofar as such right may be permitted under the terms of the Exhibit "A" leases) to dissolve this unit at any time by instrument filed for record in the Office of the County Clerk of Hardin and Jefferson Counties, Texas, after any failure to establish unit production or the cessation of production and/or operations on said unit, as the case may be.

This Second Amendment to Designation of Gas Unit is executed this 16th day of January, 2003., but effective as of the date of first production of the Black Stone Minerals No. 1 Well (API No. 42-199-32802) located in the Walker Pettit Survey, A-43, Hardin County, Texas.

SAMSON LONE STAR LIMITED PARTNERSHIP,
a Texas limited partnership

By:     Samson Resources Company
        General Partner

By: _____
        Phillip R. Schaucker
        Vice President - Gulf Coast Division


STATE OF OKLAHOMA     §
                      §
COUNTY OF TULSA       §

This instrument was acknowledged before me this 16th day of January, 2003 by Phillip R. Schaucker, VP-Gulf Coast Division of Samson Resources Company, General Partner of Samson Lone Star Limited Partnership, a Texas limited partnership, on behalf of said limited partnership.

[SEAL: Notary Public Oklahoma OFFICIAL SEAL JUDY McGREW TULSA COUNTY COMMISSION #00014958]

_____
Notary Public in and for
the State of Oklahoma

My Commission Expires: 9-23-03

-2-

SAMSON-13927

EXHIBIT "A"
ATTACHED TO AND MADE A PART OF
SECOND AMENDMENT TO DESIGNATION OF GAS UNIT
SAMSON LONE STAR LIMITED PARTNERSHIP -
BLACK STONE MINERALS NO: 1 GAS UNIT
704.00 ACRE GAS UNIT

### Oil, Gas and Mineral Leases

1. Oil and Gas Lease dated effective June 15, 1999, from Black Stone Minerals Company, L.P., as Lessor, to Samson Lone Star Limited Partnership, as Lessee, a memorandum of which is recorded in Volume 1191, Page 847, Official Public Records, Hardin County, Texas.

2. Oil, Gas & Liquid Hydrocarbon Lease dated effective June 30, 1999, from FirnBank, a Nebraska General Partnership, for the benefit of Hosford/Hamilton Trusts, as Lessor, to Samson Lone Star Limited Partnership, as Lessee, a memorandum of which is recorded in Volume 1194, Page 818, Official Public Records, Hardin County, Texas.

3. Oil, Gas and Mineral Lease dated March 14, 1977, from Joyce Du Jay Lee and husband, Harold Lee, as Lessor, to Texaco Inc., as Lessee, recorded in Volume 645, Page 760, Deed Records, Hardin County, Texas.

4. Oil, Gas and Mineral Lease dated March 14, 1977, from Joyce Du Jay Lee, Guardian of the Person and Estate of Nita Du Jay Dickinson, a Person Mentally Incompetent, as Lessor, to Texaco Inc., as Lessee, recorded in Volume 645, Page 762, Deed Records, Hardin County, Texas.

5. Oil, Gas and Mineral Lease dated effective July 6, 1999, from the State of Texas, as Lessor, to Samson Lone Star Limited Partnership, as Lessee, recorded in Volume 1204, Page 687, Official Public Records, Hardin County, Texas, and under Clerk's File No. 1999041071, Official Public Records of Real Property, Jefferson County, Texas.

6. Oil, Gas & Liquid Hydrocarbon Lease and Financing Statement dated April 5, 1999, from Joe A. Bordages, et al, as Lessors, to Samson Lone Star Limited Partnership, as Lessee, a memorandum of which is recorded in counterparts under Clerk's File Nos. 1999019008, 1999019262, 1999031331, 1999024687, 1999019261 and 1999044286, Official Public Records of Real Property, Jefferson County, Texas.

7. Oil, Gas & Liquid Hydrocarbon Lease and Financing Statement dated April 5, 1999, from Donald Wyatt Heisig, et al, as Lessors, to Samson Lone Star Limited Partnership, as Lessee, a memorandum of which is recorded in counterparts under Clerk's File Nos. 1999018838, 1999020387, 1999020388, 1999020389, 1999020390 and 1999020391, Official Public Records of Real Property, Jefferson County, Texas.

8. Oil, Gas & Liquid Hydrocarbon Lease and Financing Statement dated April 19, 1999, from Charles G. Hooks, III, et al, as Lessors, to Samson Lone Star Limited Partnership, as Lessee, a memorandum of which is recorded under Clerk's File No. 1999016773, Official Public Records of Real Property, Jefferson County, Texas.

9. Oil, Gas & Liquid Hydrocarbon Lease and Financing Statement dated November 10, 1998, from Louis M. Broussard, et al, as Lessors, to Samson Lone Star Limited Partnership, as Lessee, a memorandum of which is recorded in counterparts under Clerk's File Nos. 99-9902783 and 99-9902784, Official Public Records of Real Property, Jefferson County, Texas.

10. Oil and Gas Lease dated March 2, 1977, from PICA Investment Venture, as Lessor, to Dallas E. Gordon, Jr., as Lessee, recorded in Volume 2014, Page 274, Deed Records, Jefferson County, Texas, as amended by (i) Amendment dated March 2, 1977, from PICA Investment Venture, as Lessor, to Dallas E. Gordon, Jr., as Lessee, recorded in Volume 2166, Page 282, Deed Records, Jefferson County, Texas, and (ii) Amendment dated November 6, 2001, from PICA Investment Venture, as Lessor, to Samson Lone Star Limited Partnership, as Lessee, recorded under Clerk's File No. 2001044163, Official Public Records of Real Property, Jefferson County, Texas.

11. Oil, Gas and Mineral Lease dated April 13, 1977, from Gertrude Day Baker, as Lessor, to Texaco Inc., as Lessee, recorded in Volume 2001, Page 428, Deed Records, Jefferson County, Texas.

12. Oil, Gas and Mineral Lease dated April 22, 1977, from Mary Day, as Lessor, to Texaco Inc., as Lessee, recorded in Volume 2001, Page 426, Deed Records, Jefferson County, Texas.

SAMSON-13928

13. Oil, Gas and Mineral Lease dated August 4, 1980, from Julia Day, as Lessor, to Texaco Inc., as Lessee, recorded in Volume 2278, Page 138, Deed Records, Jefferson County, Texas, as ratified by (i) Ratification of Oil, Gas and Mineral Leases dated effective February 28, 2001, from Carl Joseph Baker, Jr., as Lessor, to Samson Lone Star Limited Partnership, as Lessee, recorded under Clerk's File No. 2001026735, Official Public Records of Real Property, Jefferson County, Texas, and (ii) Ratification of Oil, Gas and Mineral Leases dated effective February 28, 2001, from George Robert Baker, as Lessor, to Samson Lone Star Limited Partnership, as Lessee, recorded under Clerk's File No. 2001031560, Official Public Records of Real Property, Jefferson County, Texas.

14. Oil, Gas and Mineral Lease dated August 4, 1980, from Gesiena C. Day, as Lessor, to Texaco Inc., as Lessee, recorded in Volume 2284, Page 100, Deed Records, Jefferson County, Texas.

15. Oil, Gas and Mineral Lease dated August 4, 1980, from Gertrude Day Baker, as Lessor, to Texaco Inc., as Lessee, recorded in Volume 2284, Page 94, Deed Records, Jefferson County, Texas, as ratified by (i) Ratification of Oil, Gas and Mineral Leases dated effective February 28, 2001, from Carl Joseph Baker, Jr., as Lessor, to Samson Lone Star Limited Partnership, as Lessee, recorded under Clerk's File No. 2001026735, Official Public Records of Real Property, Jefferson County, Texas, and (ii) Ratification of Oil, Gas and Mineral Leases dated effective February 28, 2001, from George Robert Baker, as Lessor, to Samson Lone Star Limited Partnership, as Lessee, recorded under Clerk's File No. 2001031560, Official Public Records of Real Property, Jefferson County, Texas.

16. Oil, Gas and Mineral Lease dated August 4, 1980, from Elizabeth L. Day Schoonover, as Lessor, to Texaco Inc., as Lessee, recorded in Volume 2284, Page 98, Deed Records, Jefferson County, Texas, as ratified by (i) Ratification of Oil, Gas and Mineral Leases dated effective February 28, 2001, from Carl Joseph Baker, Jr., as Lessor, to Samson Lone Star Limited Partnership, as Lessee, recorded under Clerk's File No. 2001026735, Official Public Records of Real Property, Jefferson County, Texas, and (ii) Ratification of Oil, Gas and Mineral Leases dated effective February 28, 2001, from George Robert Baker, as Lessor, to Samson Lone Star Limited Partnership, as Lessee, recorded under Clerk's File No. 2001031560, Official Public Records of Real Property, Jefferson County, Texas.

17. Oil, Gas and Mineral Lease dated May 31, 1977, from Gesiena C. Day, as Lessor, to Texaco Inc., as Lessee, recorded in Volume 2009, Page 278, Deed Records, Jefferson County, Texas.

18. Oil, Gas and Mineral Lease dated April 27, 1977, from Julia Day, as Lessor, to Texaco Inc., as Lessee, recorded in Volume 2005, Page 102, Deed Records, Jefferson County, Texas.

19. Oil, Gas and Mineral Lease dated August 5, 1980, from Gesiena C. Day, as Lessor, to Texaco Inc., as Lessee, recorded in Volume 2284, Page 102, Deed Records, Jefferson County, Texas.

20. Oil, Gas and Mineral Lease dated August 5, 1980, from Elizabeth L. Day Schoonover, as Lessor, to Texaco Inc., as Lessee, recorded in Volume 2292, Page 282, Deed Records, Jefferson County, Texas, as ratified by (i) Ratification of Oil, Gas and Mineral Leases dated effective February 28, 2001, from Carl Joseph Baker, Jr., as Lessor, to Samson Lone Star Limited Partnership, as Lessee, recorded under Clerk's File No. 2001026735, Official Public Records of Real Property, Jefferson County, Texas, and (ii) Ratification of Oil, Gas and Mineral Leases dated effective February 28, 2001, from George Robert Baker, as Lessor, to Samson Lone Star Limited Partnership, as Lessee, recorded under Clerk's File No. 2001031560, Official Public Records of Real Property, Jefferson County, Texas.

21. Oil, Gas and Mineral Lease dated August 5, 1980, from Gertrude Day Baker, as Lessor, to Texaco Inc., as Lessee, recorded in Volume 2284, Page 96, Deed Records, Jefferson County, Texas, as ratified by (i) Ratification of Oil, Gas and Mineral Leases dated effective February 28, 2001, from Carl Joseph Baker, Jr., as Lessor, to Samson Lone Star Limited Partnership, as Lessee, recorded under Clerk's File No. 2001026735, Official Public Records of Real Property, Jefferson County, Texas, and (ii) Ratification of Oil, Gas and Mineral Leases dated effective February 28, 2001, from George Robert Baker, as Lessor, to Samson Lone Star Limited Partnership, as Lessee, recorded under Clerk's File No. 2001031560, Official Public Records of Real Property, Jefferson County, Texas.

22. Oil, Gas and Mineral Lease dated April 13, 1977, from Elizabeth L. Schoonover, as Lessor, to Texaco Inc., as Lessee, recorded in Volume 2002, Page 319, Deed Records, Jefferson County, Texas.

23. Oil, Gas and Mineral Lease dated March 16, 1977, from Mittie J. Robertson and husband, Ivan D. Robertson, as Lessors, to Texaco Inc., as Lessee, recorded in Volume 1992, Page 284, Deed Records, Jefferson County, Texas.

A-2

SAMSON-13929

24. Oil and Gas Lease dated February 12, 1979, from Atlantic Richfield Company, as Lessor, to Texaco Inc., as Lessee, recorded in Volume 2160, Page 486, Deed Records, Jefferson County, Texas.

25. Oil, Gas and Mineral Lease dated October 2, 1979, from William Russell Campbell, as Lessor, to Texaco Inc., as Lessee, recorded in Volume 2189, Page 401, Deed Records, Jefferson County, Texas.

26. Oil and Gas Lease dated March 27, 2000, from PICA Investment Venture, a Texas Joint Venture, as Lessor, to Samson Lone Star Limited Partnership, as Lessee.

27. Memorandum of Oil and Gas Lease dated May 5, 2000, from PICA Investment Venture, a Texas Joint Venture, as Lessor, to Samson Lone Star Limited Partnership, as Lessee, recorded under Clerk's File No. 2000026104, Official Public Records, Jefferson County, Texas.

28. Oil, Gas and Liquid Hydrocarbon Lease dated November 10, 2001, from PICA Investment Venture, a Texas Joint Venture, as Lessor, to Samson Lone Star Limited Partnership, as Lessee.

29. Memorandum of Oil, Gas and Liquid Hydrocarbon Lease dated November 6, 2001, from PICA Investment Venture, a Texas Joint Venture, as Lessor, to Samson Lone Star Limited Partnership, as Lessee, recorded under Clerk's File No. 2002046300, Official Public Records, Jefferson County, Texas.

30. Oil and Gas Lease dated October 25, 2001, from Barbara Gordon McNeil and Melinda Gordon Paret, as Lessors, to Samson Lone Star Limited Partnership, as Lessee, recorded under Clerk's File No. 2001044296, Official Public Records, Jefferson County, Texas.

SAMSON-13930



SAMSON-13931

John T. Jakubik & Associates, Inc.
4309 Greenbriar • Stafford, Texas 77477
Phone: 281/240-0498 • Fax: 281/240-2435

This plot is accompanied by a separate description and tract listing.

Unit Boundary

| Tract | Lessor | Acres | Percent |
|---|---|---|---|
| 1 | Black Stone Minerals Co., L.P., et al | 422.40 | 60.0000 |
| 2 | Joyce Du Jay Lee et al | 15.05 | 2.1378 |
| 3 | State of Texas | 5.55 | 0.7884 |
| 4 | Broussard et al | 50.00 | 7.1023 |
| 5 | PICA Inv. et al | 25.00 | 3.5512 |
| 6 | Joyce Du Jay Lee et al | 140.18 | 19.9180 |
| 7 | Gertrude Day Baker | 1.01 | 0.1434 |
| 8 | Mary Day | 1.01 | 0.1434 |
| 9 | Gasiano C. Day | 1.01 | 0.1434 |
| 10 | Julia Day | 1.01 | 0.1434 |
| 11 | Elizabeth L. Schoonover | 1.01 | 0.1434 |
| 12 | Mittie Robertson et vir, et al | 40.77 | 5.7913 |
| TOTAL | | 704.00 | 100.0000 |

N86°15'06"E – 4277.88'

W. JORDAN
A-684

661.06'
N03°44'54"W
1514.59'
N86°15'06"E

Tracts in the Robert B. Irvine Survey and the William C. Dyches Survey are calculated to the Bank of Pine Island Bayou. The tracts in the David Choat Survey were calculated to the centerline of Pine Island Bayou.

704.00 Acres in Unit

(1)

T. & N. O. RR.
A-475

WALKER PETTITT
A-43

ROBT. B. IRVINE
A-33

WM. C. DYCHES
A-112

S03°30'29"E – 2365.47'
2529'

ACTUAL SURFACE LOCATION
Samson Lone Star L.P.
Black Stone Minerals No. 1

N85°33'51"E – 2408.33'
1600'
(4)
(2)  (3)
S04°51'26"E
1517.30'

5530'

P.O.B.
Fnd. Conc. Mon.
w/ plain brass disc
X=3,902,230.05
Y=218,113.75

S86°05'06"W
2889.74'

S86°04'28"W
1336.68'

S86°06'53"W
949.77'

ACTUAL BHL

148'

Unit Boundary

3054'

S85°08'34"W
1312.65'

S04°51'26"E
1172.77'

DAVID CHOAT
A-12 (H)
A-11 (J)

C. M. VOTAW
A-803

THOS. D YOCUM
A-59 (H)
A-60 (J)

(6)

(5)

(7)  (8)
(9)
S85°33'22"W
711.71'
(10)
S05°06'38"E
526.70'
(11)
S85°33'22"W
418.59'

Bearings and coordinates are based on the Texas State Plane Coordinate System, Central Zone (NAD 27).

I hereby certify that this is a true and correct plot based on a ground survey made under my supervision on May 04, 2001.

BEARINGS

| | |
|---|---|
| A | N33°25'48"E – 94.71' |
| B | N08°00'54"E – 30.19' |
| C | N16°15'20"W – 157.68' |
| D | N13°06'27"E – 125.90' |
| E | N41°07'06"E – 198.56' |
| F | N65°21'35"E – 217.74' |
| G | N83°50'53"E – 325.93' |
| H | N61°55'46"E – 210.53' |
| I | S60°31'11"E – 150.23' |
| J | N84°35'49"E – 88.87' |
| K | N49°56'18"E – 201.08' |
| L | N80°50'13"E – 307.14' |
| M | N04°59'46"W – 526.68' |
| N | S85°33'22"W – 283.76' |
| O | S40°38'55"E – 154.10' |
| P | S20°19'54"E – 134.50' |
| Q | S03°03'49"W – 130.21' |
| R | S15°13'19"W – 811.78' |
| S | S25°10'55"W – 172.99' |

Hardin Co.

Pine Island Bayou

Jefferson Co.

(12)

S85°15'31"W
1694.16'

S05°23'52"E
1532.91'

1" IP   1" IP

Jeffrey L. Fender
R.P.L.S. No. 4348

SAMSON LONE STAR, L.P.
PROPOSED 704.00 ACRE UNIT
BLACK STONE MINERALS NO. 1
WALKER PETTITT LEAGUE, A-43
HARDIN COUNTY, TEXAS

| DATE: 05-08-01 | SCALE: 1" = 1000' | JOB No.: |
|---|---|---|
| CH: | REV. 11-19-01 Surf. Unit Line | DWG. No.: |

HARDIN COUNTY, KOUNTZE, TX
GLENDA ALSTON, COUNTY CLERK

01/23/2003 #2003-10169
11:43:35AM B-1552 P-260

# JOHN T. JAKUBIK & ASSOCIATES, INC.

4309 Greenbriar Dr. • Stafford, Texas 77477 • 281/240-0498 • Fax 281/240-2435

DESCRIPTION OF
704.00 ACRE UNIT
WALKER PETTIT LEAGUE, A-43
ROBERT B. IRVINE SURVEY, A-33
DAVID CHOAT LEAGUE, A-12
HARDIN COUNTY, TEXAS
DAVID CHOAT LEAGUE, A-11
WILLIAM C. DYCHES SURVEY, A-112
JEFFERSON COUNTY, TEXAS

Being a 704.00 acre unit for the Samson Lone Star, L.P. *Blackstone Minerals Well No. 1* in the Walker Pettitt League, A-43, the Robert B. Irvine Survey, A-33 and the David Choat League, A-12, Hardin County, Texas and the David Choat League, A-11 and the William C. Dyches Survey, A-112, Jefferson County, Texas; said 704.00 acre unit being more particularly described as follows:

BEGINNING at a concrete monument with a plain brass disc found on the east line of the T. & N. O. RR. Survey, A-475 for the northwest corner of the Thomas D. Yocum Survey, A-59 and the southwest corner of said Walker Pettitt League and the southwest corner of a called 766 acre tract described in that certain memorandum of Oil and Gas Lease dated June 15, 1999 from Black Stone Minerals Company, L.P. to Samson Lone Star Limited Partnership as recorded in Volume 1191, Page 847 of the Official Public Records of Hardin County, Texas; said concrete monument having a Texas State Plane Coordinate of X=3,902,230.05 and Y=218,113.75, Central Zone (NAD 27);

THENCE, N 03° 43' 40" W, along the common line between said T. & N. O. RR. Survey and said Walker Pettitt League and along the west line of said called 766 acre tract, a distance of 2516.56 feet to a concrete monument stamped "H 735" found on the west line of said Walker Pettitt League and said called 766 acre tract for the northeast corner of said T. & N. O. RR Survey and the southeast corner of the W. Jordan Survey, A-684;

THENCE, N 86° 15' 06" E, a distance of 1514.59 feet to a point for corner;

THENCE, N 03° 44' 54" W, parallel with the common line between said Walker Pettitt League and said W. Jordan Survey and the west line of said called 766 acre tract, a distance of 661.06 feet to a point for corner;

THENCE, N 86° 15' 06" E, across said called 766 acre tract, a distance of 4277.88 feet to a point for corner;

THENCE, S 03° 30' 29" E, continuing across said called 766 acre tract, a distance of 2365.47 feet to a point for corner;

THENCE, N 85° 33' 51" E, across said called 766 acre tract and said Walker Pettitt League, at 1348.20 feet cross the common line between said Walker Pettitt League and said Robert B. Irvine Survey and the common line between said called 766 acre tract and a called 223.86 acre tract described as Tract No. 1 in that certain Deed of Gift dated March 28, 1973 from Eva Du Jay to Joyce Du Jay Lee and recorded in Volume 591, Page 102 of the Deed Records of Hardin County, Texas, continuing across said called 223.86 acre tract and said Robert B. Irvine Survey, for a total distance of 2408.33 feet to a point on the northwest bank of Pine Island Bayou;

THENCE, Northeasterly with the meander of the northwest bank of Pine Island Bayou as follows:

N 33°25'48" E, a distance of 94.71 feet;

SAMSON-13932

HARDIN COUNTY, KOUNTZE, TX
GLENDA ALSTON, COUNTY CLERK

01/23/2003 #2003-10169
11:43:35AM B-1352 P-261

HARDIN COUNTY, KOUNTZE, TX
GLENDA ALSTON, COUNTY CLERK

01/23/2003 #2003-10169
11:43:35AM B-1352 P-262

704.00 Acre Unit
Hardin & Jefferson Counties Texas

Page 2

N 08°00'54" E, a distance of 30.19 feet;
N 16°15'20" W, a distance of 157.68 feet;
N 13°06'27" E, a distance of 125.90 feet;
N 41°07'06" E, a distance of 198.56 feet;
N 85°21'35" E, a distance of 217.74 feet;
N 83°50'53" E, a distance of 325.93 feet;
N 61°55'46" E, a distance of 210.53 feet;
S 60°31'11" E, a distance of 150.23 feet;
N 84°35'49" E, a distance of 88.87 feet;
N 49°56'18" E, a distance of 201.08 feet;
N 80°50'13" E, a distance of 307.14 feet to a point on said bank;

THENCE, S 04° 51' 26" E, across said Pine Island Bayou and across said William C. Dyches Survey and across a called 640 acre tract described in that certain Memorandum of Oil, Gas and Liquid Hydrocarbon Lease and Financing Statement dated November 10, 1998 from Louis M. Broussard et al to Samson Lone Star Limited Partnership as recorded under Jefferson County Clerk's File No. 99-9902783, for a distance of 1517.30 feet to a point on the common line between said Dyches Survey and said David Choat Survey and on the common line between said called 640 acre tract and a called 135.14 acre tract described in that certain Lease Amendment between Pica Investment Venture and Lear Petroleum Corporation dated June 19, 1979;

THENCE, S 85° 08' 34" W, along said common Survey line and said common property line, a distance of 1312.65 feet to a point on said common Survey line and said common property line;

THENCE, S 04° 51' 26" E, perpendicular to said common Survey line across said David Choat League and said called 135.14 acre tract, a distance of 1172.77 feet to a point on the south line of said called 135.14 acre tract;

THENCE, S 85° 33' 22" W, along said south line, a distance of 711.71 feet to a point on said south line for the northeast corner of a called 1.00 acre tract described as Lot 1 in that certain Partition Decree in Cause No. 25466 of the District Court of Jefferson County, Texas styled Mrs. C. W. McMurray et al v. Berta Sievert and recorded in Volume 352, Page 170 of said Deed Records;

THENCE, S 05° 06' 38" E, along the east line of Lots 1, 2, 3, 4 and 5 of said Partition Decree, a distance of 526.70 feet to a point for the southeast corner of said Lot 5 and the northeast corner of Lot 6 of said Partition Decree;

THENCE, S 85° 33' 22" W, along the common line between said Lots 5 and 6, a distance of 418.59 feet to a point on the east line of Lot 11 of said Partition Decree for the southwest corner of said Lot 5 and the northwest corner of said Lot 6;

THENCE, N 04° 59' 46" W, along the east line of said Lot 11 and the west line of said Lots 5, 4, 3, 2 and 1, a distance of 526.68 feet to a one inch iron pipe found on the south line of said called 135.14 acre tract for the northwest corner of said Lot 1 and the northeast corner of said Lot 11;

THENCE, S 85° 33' 22" W, along the south line of said called 135.14 acre tract and the north line of said Lot 11, a distance of 283.76 feet to a point in the centerline of Pine Island Bayou;

THENCE, along the centerline of Pine Island Bayou as follows:

SAMSON-13933

704.00 Acre Unit
Hardin & Jefferson Counties Texas

S 40°38'55" E, a distance of 154.10 feet;

S 20°19'54" E, a distance of 134.50 feet;

S 03°03'49" W, a distance of 130.21 feet;

S 15°13'19" W, a distance of 811.78 feet;

S 25°10'55" W, a distance of 172.99 feet to a point in said centerline;

THENCE, S 05° 23' 52" E, along the common line between Lot 10 of said Partition Decree and a called 53.606 acre tract described in that certain Deed dated October 07, 1969 from Gladys Randall Fletcher Briggs to Charles A Howell as recorded in Volume 1614, Page 82 of said Deed Records, a distance of 1532.91 feet to a point in said common line;

THENCE, S 85° 15' 31" W, across said called 53.606 acre tract, a distance of 1694.16 feet to a point on the west line of said called 53.606 acre tract and the common line between said David Choat League and said Thomas D. Yocum Survey;

THENCE, N 04° 44' 29" W, along the common line between said David Choat League and said Thomas D. Yocum Survey, at 757.67 feet cross the centerline of Pine Island Bayou, for a total distance of 4002.13 feet to a ¾ inch iron rod inside a 1-1/2 inch iron pipe found on the south line of said Walker Pettitt League for the northwest corner of said David Choat League and the northeast corner of said Thomas D. Yocum Survey;

THENCE, S 86° 06' 53" W, along the common line between said Walker Pettitt League and said Thomas D. Yocum Survey, a distance of 949.77 feet to a 1 ¼ inch iron pipe found for an angle point on said common line;

THENCE, S 86° 04' 28" W, continuing along said common Survey line, a distance of 1336.68 feet to a 2 inch galvanized iron pipe with cap found for an angle point in said common Survey line;

THENCE, S 86° 05' 06" W, continuing along said common Survey line, a distance of 2889.74 feet to the POINT OF BEGINNING and containing 704.00 acres.

Coordinates and bearings are based on the Texas State Plane Coordinate System, Central Zone (NAD 27).

This description is accompanied by a separate plat dated May 08, 2001 and last revised on October 10, 2001 prepared by John T. Jakubik & Associates, Inc.

File:   5867unit.doc
Date:   05-23-01
Rev.:   06-04-01
        10-15-01
        11-12-01

STATE OF TEXAS          COUNTY OF HARDIN
I hereby certify that this instrument was filed on the date and time stamped hereby by me and was duly recorded in the Official Public Records of Hardin County Texas on

JAN 2 4 2003

COUNTY CLERK
HARDIN CO., TEXAS

Jeffrey L. Fansler
R.P.L.S. No. 4348

SAMSON-13934

FILED AND RECORDED

OFFICIAL PUBLIC RECORDS

*Sandy Walker*

2003 Feb 05 08:28 AM    2003004468

GOODINA $28.00

SANDY WALKER COUNTY CLERK

JEFFERSON COUNTY TEXAS

STATE OF TEXAS          COUNTY OF JEFFERSON

I hereby certify that this instrument was filed on the date and time stamped hereon by me and was duly recorded in the Official Public Records of Real Property of Jefferson County, Texas, on

FEB 0 6 2003



*Sandy Walker*

County Clerk, Jefferson County, Texas

SAMSON-13935

## OIL, GAS AND LIQUID HYDROCARBON LEASE

THIS AGREEMENT, made effective the date hereinafter provided, by and between the undersigned, CHARLES G. HOOKS III and SUE ANN HOOKS as Co-Trustees under the Will of Charles G. Hooks, Sr., Deceased, and CHARLES G. HOOKS III as Independent Executor of the Estate of Charles G. Hooks, Jr., Deceased, doing business jointly as CHAS. G. HOOKS & SON, a Texas general partnership, hereinafter individually and collectively called "Lessor", whose address is 820 Gessner Road, Suite 1300, Houston, Texas 77024-4259, and SAMSON LONE STAR LIMITED PARTNERSHIP, a Texas limited partnership, hereinafter called "Lessee", the address of which is Two West Second Street, Tulsa, Oklahoma 74103-3101,

### WITNESSETH:

### I. GRANTING CLAUSE:

A.    Lessor, in consideration of Ten and No/100 Dollars ($10.00) and other good and valuable considerations, of the royalties herein provided, and of the agreements of Lessee herein contained, hereby GRANTS, LEASES and LETS exclusively unto Lessee for the purpose of investigating, exploring, prospecting, drilling and mining for, and producing oil, gas and other liquid hydrocarbons, including sulphur produced in conjunction therewith, and laying such pipelines, building such tanks and power stations as are necessary to produce, save, take care of, treat, transport, temporarily store current production, and own said products produced from the land covered by this Lease, said land being situated in JEFFERSON COUNTY, TEXAS, and described on Exhibit "A" attached hereto and made a part hereof for all purposes.

B.    For the purpose of calculating any money payments to be made to Lessor by Lessee under the various provisions hereof, but subject to the proportionate reduction of royalties and rentals as hereinafter provided, the lands covered hereby shall be estimated to comprise 640.0 gross acres and 273.6 net mineral acres, whether it actually contains more or less.

C.    If the Lessor does not own the surface of the leased lands Lessor grants only such uses of the surface as Lessor owns by virtue of Lessor's mineral ownership.

D.    This Lease shall not be construed to include and Lessor expressly reserves hereby all of the sulphur, coal, lignite, uranium and other fissionable materials, geothermal energy, including entrained methane, hydrostatic pressure and thermal energy, base and precious metals and any and all other mineral substances, excepting only oil, gas and other liquid hydrocarbons and their respective constituent products expressly covered by this Lease, presently owned by Lessor in, under or upon leased premises, together with the rights of ingress and egress and use of the leased premises by Lessor and their mineral Lessees for purposes of exploration for and production of the minerals reserved herein to Lessor. Further, without limiting the rights granted to Lessee herein to perform seismographic or other geological tests on the leased premises, Lessor expressly reserves the right to perform or to grant the right to others to perform seismographic or other geological tests for minerals over and across the lands covered by this Lease provided said operations do not interfere with Lessee's drilling or production operations. Lessor and Lessee shall each conduct their respective operations on the leased premises so as not unreasonably to interfere with the operations or activities of the other.

### II. TERM:

A.    Subject to the other provisions herein contained, this Lease shall remain in force for a term of three (3) years from the effective date hereof called "primary term", and so long thereafter as oil, gas or other liquid or gaseous hydrocarbons are produced in paying quantities from said land, or actual drilling or reworking operations are conducted or this Lease is otherwise maintained as hereinafter provided, herein called "secondary term".

B.    ANYTHING HEREIN TO THE CONTRARY NOTWITHSTANDING, at any time before the expiration of the primary term of this Lease, Lessee must have commenced actual drilling operations by spudding in a well on the leased premises with a sufficient size drilling rig and related



PLAINTIFF'S
EXHIBIT
25

CGH 0197

equipment to drill the same to the permitted depth filed with the Railroad Commission of the State of Texas, and must prosecute the same with reasonable diligence, or else this Lease shall terminate without further notice.

## III. ROYALTIES:

Lessors reserve for themselves, and their heirs, successors and assigns, the following royalties and Lessee, in consideration of the Lessors' granting of this Lease, covenants and agrees to deliver same to Lessors out of production as follows:

A. On oil, Twenty-Five percent (25%) of that produced and saved from the leased premises, free of expense to Lessor, to be, at Lessor's option (1) delivered into the pipelines, tanks or other receptacles to which Lessee may connect Lessee's wells; (2) delivered at the well or wells in tanks or other receptacles provided by Lessor, at Lessor's own expense (3) purchased by Lessee at the highest market price therefor being paid by a bona fide purchaser of oil in the county or counties where produced on the date of purchase, for oil of like quality and gravity; (4) sold by Lessee (for Lessor's account) to the purchaser of Lessee's oil, if sold by Lessee at the well, for the price received by Lessee or any affiliate of Lessee for Lessee's own oil.

B. (1) On gas, including casinghead gas or other gaseous substances produced from said land, Twenty-Five percent (25%) of the market value at the wells of such gas, or Twenty-Five percent (25%) of the price received therefor by Lessee, which ever is greater. It is expressly agreed that for the purposes hereof, "market value" of said gas, including casinghead gas, shall be defined as set forth in Paragraph III.H. hereof. This royalty provision shall apply to all gas sold at the wells, all gas sold or used off the premises and all gas otherwise sold, except as provided below.

(2) In lieu of the royalty on gas hereinafter provided, in case Lessee shall itself, or through an affiliated company, use gas from the premises in the extraction of gasoline or other products in a plant, Lessor shall be paid a royalty Twenty-Five percent (25%) of the then current market value at the plant of such gasoline or other by-products so extracted. "Market Value" of such gasoline or other products extracted in a plant shall be determined by (1) highest price posted for any product of comparable quality at common delivery point of Mt. Belvieu, Texas, or (2) the weighted average gross selling price for the respective grades of product, F.O.B. at the plant in which said gas is processed, whichever is greater. All royalties due on plant products under the terms of this Subparagraph III.B.(2) shall be based on that percent of total plant production of gasoline or other products representing the highest percent accruing to a third party processing gas through such plant under a processing agreement negotiated at arm's length (or if there is no such third party, the highest percent then being specified in processing agreements or contracts in the industry). In addition to the royalties on the plant products, Lessor shall be paid as royalty the market value (as defined in Paragraph III.H.) at the point of delivery to the pipeline purchaser, if sold, or if used, at the point of use, of Twenty-Five percent (25%) of all residue gas attributable to the leased premises and sold or used. In no event shall the royalties payable under this subparagraph for any twelve (12) month period be less than the royalties which would have been due had the gas not been processed.

(3) Should Lessee enter into a bona fide arm's length contract or arrangement with a non- affiliated company for use of gas from the premises in the manufacture or extraction of gasoline or other products in a plant, Lessor shall have and be entitled to a royalty of Twenty-Five percent (25%) of all such products, proceeds, monies, benefits, and other things of value, of every kind and character, received by Lessee or to which Lessee is entitled under such contract or arrangement attributable to gas produced from the leased premises. All royalties due on plant products under the terms of this Subparagraph III.B.(3) shall be based on that percent of total plant production of gasoline or other products accruing to Lessee attributable to the gas produced from the leased premises. In addition to the royalties on plant products, Lessor shall be paid as royalty the market value (as that term is defined in Paragraph III.H.) at the outlet of such plant or plants of Twenty-Five percent (25%) of all residue gas attributable to the leased premises and sold or used. In no event shall the royalties payable under this subparagraph for any twelve (12) month period be less than the royalties which would have been due had the gas not been processed.

(4) In the event reinjection operations are not conducted or if the gas is not taken to a plant, if the gas from any well shall be sufficiently impregnated with condensate or other liquid

CGH 0198

hydrocarbons that paying quantities of condensate or other liquid hydrocarbons can be separated therefrom and liquefied as a practical lease operation by the installation by Lessee of mechanical traps, conventional separators or other similar devices customarily used in the industry for such purposes on the premises, then in such event Lessee shall install such devices upon said lease.

(5) If, at any time at or before the expiration date of the primary term, there is a well capable of producing gas on said land, but gas is not being produced, and this lease is not being maintained by production, operations or otherwise, Lessee, at Lessee's election, may pay as royalty to the parties entitled to royalty on or before the first day of the month after expiration of ninety (90) days after (a) the expiration of the primary term, or (b) the date this lease ceases to be maintained by production operations or otherwise, a sum equal to one-twelfth (1/12) of Seventy-Five and NO/100 Dollars ($75.00) per net mineral acre for each such net mineral acre in a production unit (as defined herein) around such well or within a pooled unit then subject to this Lease, which payment shall maintain this lease in force and effect for the acreage comprising said unit for a period of one (1) month from the date of payment and relieve Lessee of any further operation during such month, it being understood, however, that such payment shall in no manner affect nor alter the provisions of Article V. relating to the periodic drilling of wells. "Net Mineral Acre" as used herein, shall be equivalent to the full mineral interest on one acre of land and, shall be determined by adding the respective products derived by multiplying the divided or undivided mineral interest of Lessor in the leased premises times the surface acres subject to like undivided mineral interests of Lessor in the leased premises. In like manner, with like effect and upon like payments on or before the expiration of the last preceding month for which such payment has been made, this lease may be maintained in force and effect for successive periods of one (1) month each, until such time as the acreage comprising said unit is maintained by production, operations or otherwise under the terms hereof; provided, however, such payments shall not operate to maintain this Lease in force and effect for any period in excess of two (2) consecutive years for the first such occurrence; nor for any period in excess of twelve (12) months for any succeeding occurrence not to exceed twenty-four (24) months cumulative. Any amounts so paid shall not be treated nor considered as advance royalty payments on any gas produced from such well or wells. Lessee may at any time and from time to time prepay such monthly shut-in royalty for such periods as Lessee may elect. Nothing herein shall relieve Lessee of Lessee's obligation at all times to protect the leased premises from drainage as set forth in Article VI.

C. An equal Twenty-Five percent (25%) part of all other liquid hydrocarbons that may be produced from said land; or at Lessor's election, exercisable from time to time, an equal Twenty-Five percent (25%) part of the full market value in the field of all such other liquid hydrocarbons, provided that when such liquid hydrocarbons are sold, the market value shall not be less than the amount realized by Lessee from the sale thereof in an arms length transaction, and, in any event, without any cost or expense to Lessor and without any deduction of any kind or character.

D. Anything hereinabove to the contrary notwithstanding, it is expressly provided that Lessee, and any subsidiary of Lessee, shall at all times exercise due diligence as the fiduciary agent for Lessor in the marketing of all products produced under the terms of this Lease. In the event Lessor considers that the Lessee is not exercising due diligence as the fiduciary agent for Lessor in the marketing of any products produced under the terms of this Lease, then the provision of Article XI. of this Lease shall apply.

E. For the purposes of this Article III., the following terms shall have the meanings set forth below:

(1) Affiliate - the term "Affiliate" or "Affiliated Company", when used in relation to Lessee, means another corporation or business entities of any type which;

(a) owns more than ten percent (10%) of Lessee's stock or equity;

(b) more than ten percent (10%) of whose stock or equity is owned by Lessee; or

CGH 0199

(c)     more than ten percent (10%) of whose stock or equity is owned by any parent corporation, either directly or indirectly, which parent corporation also owns more than ten percent (10%) of Lessee's stock or equity either directly or indirectly.

(2)     As used herein, the term "Lessee" and "Affiliate of Lessee" shall also mean "Assignee or Assignees of Lessee" and "Affiliate of Assignee or Assignees of Lessees".

F.     Upon request (and from time to time) of any party Lessor, or any of their respective agents, Lessee shall promptly furnish copies of any and all contracts for the sale, transportation or processing of Lessor's royalty share of any gas or oil produced under the terms hereof.

G.     Lessee agrees that all royalties accruing under this Lease shall be without deduction for the cost of producing, gathering, separating, compressing, dehydrating, storing, treating, processing, transporting and otherwise making the oil, gas and other gaseous or liquid hydrocarbons produced hereunder ready for sale or use or for the marketing thereof.

H.     It is expressly agreed that for the purposes of this Lease the term "market value" of gas, including casinghead gas, shall mean the gross amount realized under any contract or contracts for the sale of gas produced hereunder; provided that, "market value" shall be at least as high as the first posting during each month per mmbtu published in "NATURAL GAS WEEK, TEXAS GULF COAST, ONSHORE INTERSTATE SPOT PRICE DELIVERED TO PIPELINE" for gas sold interstate and "NATURAL GAS WEEK, TEXAS GULF COAST, ONSHORE INTRASTATE SPOT PRICE DELIVERED TO PIPELINE" for gas sold intrastate or, in the event NATURAL GAS WEEK ceases publication or ceases to post the Reference Price set forth above, Lessor and Lessee mutually agree to employ a substitute price derived from the publication "INSIDE FERC GAS MARKET REPORT-SPOT INTERSTATE PRICE DELIVERED TO PIPELINE". If Lessee sells Lessor's gas under contracts providing for a term of one (1) year or more, the index for determining the floor value shall be that which references gas contracts having terms of one (1) year or longer. The substitute price shall be the first posting during the month per mmbtu. In the event the latter publication ceases publication or ceases publishing Texas index gas prices, then Lessor and Lessee agree to select a mutually agreeable index to be utilized as a floor for valuing Lessor's royalty. If Lessor and Lessee are unable to locate an acceptable substitute publication or if such substitute publication or appropriate price index is not available, then the parties hereto agree that "market value" shall be as defined under the terms of the oil and gas lease form at that time being used by the General Land Office of the State of Texas for mineral classified lands.

In the event a contract signed by Lessee or an index price used as a floor for valuing Lessor's royalty shall include any deduction for the expense of producing, gathering, dehydrating, compressing, transporting, manufacturing, processing, treating or marketing of gas, then such deductions shall be added to the market value of such gas so that Lessor's royalty shall not be chargeable, directly or indirectly, with any of such expenses or adjustments.

I.     Notwithstanding anything herein to the contrary, in the event this Lease now, or in the future, covers and pertains to separate tracts, then each and every party Lessor to this Lease affirmatively states, as indicated by his signature below, that it is his intent that there be no apportionment of rentals, royalties, shut-in rentals, minimum royalties or any other payment now payable or to be paid to Lessor under the terms of this Lease; further more, this Lease shall not be construed as constituting either a community lease or a pooling or unitization agreement. As used in this Article III., the words "separate tract" mean any tract with mineral or royalty ownership differing now or hereafter either as to parties or to percentage ownership from that applicable to any other part of the leased premises.

J.     In the event this Lease covers and pertains as to separate tracts, either now or in the future, then in order to form the production units defined hereinbelow in Paragraph V.D., and subject to the provisions applicable to such production units, including without limitation those provisions as to size, shape, location, designation, re-designation and form as stated therein, Lessee is hereby given the right and power to pool or combine separate tracts subject to and covered by this Lease with other separate tracts subject to and covered by this Lease. For the purpose of computing the

CGH 0200

royalties to which owners of royalties shall be entitled on production from each production unit, there shall be allocated to the applicable separate tract acreage included in such production unit a pro rata portion of the production produced from such production unit. Such allocation shall be on an acreage basis; that is to say, there shall be allocated to the applicable separate tract acreage within the unit that pro rata portion of the production produced from the production unit which the number of surface acres covered by such separate tract and included in the production unit bears to the total number of surface acres included in the production unit commencing with the date of first production from the production unit.

K.     For the purposes of calculating all royalties payable under Article III. herein, it is expressly provided that all such calculations shall be based on formation production as reported on Texas Railroad Commission forms P-1 and P-2.

IV.     DELAY RENTAL:

A.     If operations for drilling are not commenced on said land on or be fore one (1) year from the date hereof, this Lease shall then terminate as to both parties, unless on or before such anniversary date Lessee shall pay to Lessor the sum of Seventy-Five and NO/100 Dollars ($75.00) per net mineral acre for the number of net mineral acres then covered by this Lease (herein called rentals), which shall cover the privilege of deferring commencement of drilling operations for a period of twelve (12) months. Thereafter, upon the payment in like manner annually of Seventy-Five and NO/100 Dollars ($75.00) per net mineral acre for the number of net mineral acres then covered by this Lease and not surrendered as hereinafter provided, the commencement of drilling operations may be further deferred for successive periods of twelve (12) months each during the primary term. The payment of rental under this Paragraph and of royalty under Article III. on any gas well from which gas is not being sold or used, and of minimum royalties, may be made by check of Lessee delivered to the parties entitled thereto on or before the date of payment. The above provisions are subject to reduction of payments as expressed in Paragraph V.

B.     Lessee may at any time or times execute and deliver to Lessor, or place of record, a release or releases covering any portion or portions of the above described premises or rights therein, and thereby surrender this Lease in whole or in part as to such portion or portions and be relieved of all obligations as to the acreage surrendered, and thereafter the rentals payable hereunder shall be reduced in the proportion that the acreage covered hereby is reduced by said release or releases; provided, however, anything hereinabove to the contrary notwithstanding, that prior to drilling operations on the leased premises if Lessee elects to maintain this Lease as to any portion of the leased premises by payment of rental, such rental shall not be less than Seventy-Five and NO/100 Dollars ($75.00) per year subject to the proportionate reduction under Article XVIII. This provision shall in no way deny the Lessee the right at any time to release all the leased premises and thereafter be relieved of the payment of any rental. Notwithstanding any partial release or releases, Lessee shall retain such easement rights upon such released and surrendered lands as are then being used for Lessee's operations on other lands retained hereunder. For the purpose of release and assignment, the recited acreage of any tract shall be considered correct whether it contains more or less, unless subsequent survey or other accurate determination reveals that such recited acreage is incorrect, in which case, the actual acreage shall prevail.

V.     CONTINUOUS DEVELOPMENT, POOLING, SECONDARY TERM, ANNUAL RENTALS AND MINIMUM ROYALTY:

A.     If during the primary term and prior to discovery and production of oil, gas or other liquid hydrocarbons in paying quantities on said land, Lessee should drill a dry hole or holes thereon, or if after discovery and production of oil, gas or other liquid hydrocarbons, the production thereof in paying quantities should cease from any cause, this Lease shall not terminate if Lessee commences operations for drilling or reworking within sixty (60) days thereafter or if it be within the primary term, commences or resumes the payment of rentals or commences operations for drilling or reworking on or before the rental paying date next ensuing after the expiration of sixty (60) days from the date of completion of a dry hole or cessation of production, however, if during the primary term Lessee is engaged in drilling operations on a rental paying date and for that reason the annual rental is not paid, and if the well is a dry hole, then on or be fore the expiration of sixty (60) days after the cessation of operations on such well Lessee will either commence additional operations for the drilling of another well or pay a proportionate part of the annual delay rental which would have been paid

CGH 0201

except for such drilling operations, based on the number of days then remaining to the next ensuing rental payment date, or to the expiration of the primary term, whichever is applicable, in order to maintain this Lease in force and effect.

B. If at the expiration of the primary term, oil, gas or other liquid hydrocarbons are not being produced in paying quantities on said land, but Lessee is then engaged in drilling or reworking operations thereon or shall have completed a dry hole thereon within sixty (60) days prior to the end of the primary term, the Lease shall remain in force so long as operations on said well or for drilling or reworking of any additional well are prosecuted with no cessation of more than sixty (60) consecutive days, and if they result in the production of oil, gas or other liquid hydrocarbons, so long thereafter as oil, gas or such other liquid hydrocarbons are produced from said land in paying quantities.

C. Notwithstanding the foregoing, it is specifically provided that during the primary term only, and after the discovery and production of oil, gas or other liquid hydrocarbons in paying quantities on the leased premises, Lessee shall either (1) develop the acreage retained hereunder by the drilling of additional wells at sixty (60) day intervals, as hereinafter provided for, (2) release those portions of the land covered hereby not included in a production unit or units, or (3) Lessee may in lieu of such drilling or release, maintain this Lease in force and effect during the primary term as to any land covered hereby which is not included in a production unit (either oil or gas) by the payment of the proportionate part of the delay rentals provided herein as to the acreage not then included in a production unit or units.

D. Subject to the other provisions of this Paragraph V.D. and upon and at any time during the secondary term of this Lease, Lessee shall reasonably develop the acreage retained hereunder but not included in a production unit ("undeveloped acreage"), and in order to reasonably develop such undeveloped acreage, Lessee must drill additional wells on such undeveloped acreage at one hundred and twenty (120) day intervals, as hereinafter provided. It is agreed that in the event that during the secondary term of this Lease, more than one hundred twenty (120) consecutive days elapse between the completion of one well and the commencement of drilling operations on the next well on such undeveloped acreage, Lessee shall upon written demand of Lessor, forthwith execute and deliver to the Lessor, or place of record in the County in which said land is located, a release of all the premises covered by this Lease, SAVE AND EXCEPT that Lessee shall retain, and this Lease shall remain in full force and effect as to, the production units as hereinafter defined.

E. There shall be no pooling or unitization of royalty interests between the land covered by this Lease and any other tract.

ANYTHING HEREIN TO THE CONTRARY NOTWITHSTANDING, as used in this Lease, the term "production unit(s)" is defined as follows:

(1) As to each well situated on the leased premises producing oil in paying quantities or being reworked and classified as an oil well under the Rules and Regulations of the Railroad Commission of Texas, not more than forty (40) acres around each such well, in the shape hereinafter provided

(2) As to each well producing gas in paying quantities (or capable of producing gas in paying quantities with all shut-in gas well rental having been paid thereon) or being reworked and classified as a gas well under the Rules and Regulations of the Railroad Commission of Texas from the surface down to a depth of 9,000 feet, not more than one hundred sixty (160) acres surrounding each such gas well, or such portion of the land covered by this Lease which shall have been included in a gas pooled unit.

(3) As to each well producing gas in paying quantities (or capable of producing gas in paying quantities with all shut-in gas well rental having been paid thereon) or being reworked and classified as a gas well under the Rules and Regulations of the Railroad Commission of Texas, not more than three hundred and twenty (320) acres surrounding each such gas well completed at depths or horizons below 9,000 feet beneath the surface of the leased premises and above 12,000 feet beneath the surface of the leased premises; or such portion of the land covered by this Lease which shall have been included in a gas pooled unit.

CGH 0202

(4.)   As to each well producing gas in paying quantities (or capable of producing gas in paying quantities with all shut-in gas well rental having been paid thereon) or being reworked and classified as a gas well under the Rules and Regulations of the Railroad Commission of Texas, not more than six hundred and forty (640) acres surrounding each such gas well completed at depths or horizons of 12,000 feet beneath the surface of the leased premises and deeper; or such portion of the land covered by this Lease which shall have been included in a gas pooled unit.

Each production unit (except the tracts in pooled gas units, if any) to be centered by said well, to be in as nearly a square form as is reasonably possible, unless otherwise agreed to by Lessor. Should the Railroad Commission of Texas or any governmental authority having and asserting jurisdiction over the subject matter thereof prescribe for the drilling or operation of a well at a regular location, or permit for the obtaining the maximum allowable from any well to be drilled, drilling, or already drilled, larger production units than any of those herein permitted, then any such production unit may be established or enlarged to conform to the size either required of a well or permitted for the obtaining of the maximum allowable.

Each such production unit shall be one contiguous area (except the tracts in pooled gas units). Within thirty (30) days of completion of any well drilled on the leased premises producing in paying quantities, or capable of producing in paying quantities, Lessee shall furnish to Lessor, and shall file of record in the Official Public Records of Real Property of the county in which the land is located, a written designation of the production unit for such well.

Notwithstanding the termination of this Lease as to a portion or portions of the acreage covered hereby and as to depth under the other provisions hereof, this Lease shall nevertheless remain in force and effect as to each production unit or units so long as oil, gas or other liquid hydrocarbons are produced therefrom in paying quantities or, as to gas production units, capable of being produced therefrom in paying quantities with all shut-in gas well rentals having been paid thereon, for that period of time specified above in Subparagraph III.B.(5); and if production in paying quantities from any production unit shall cease, this Lease, insofar as it covers and affects such particular production unit which ceases producing in paying quantities, shall terminate (not withstanding the fact that there may be production in paying quantities from some other lease production unit) unless Lessee shall commence drilling or reworking operations on such particular production unit within sixty (60) days thereafter if during the primary term and one hundred twenty (120) days if after the primary term (sometimes referred to herein as the secondary term) and shall pursue such drilling or reworking operations on the same or successive wells at intervals not to exceed sixty (60) days if during the primary term and one hundred twenty (120) days if after the primary term (sometimes referred to herein as the secondary term) between the date of completion of operations on one well and the date of commencement of operations on another and, if production in paying quantities is restored on such production unit, so long thereafter as production in paying quantities is produced therefrom or, as to gas production units capable of being produced in paying quantities with all shut-in gas well rentals being paid thereon for that period of time specified above in Subparagraph III.B.(5), or additional drilling or reworking operations are had thereon as above provided. It is further expressly provided that production or operations or payment of shut-in gas well rental on any production unit as so designated shall have no effect upon the continuance of this Lease as to any other production unit or units. If any production unit gas well is converted to or reclassified as an oil well; or if any production unit well (either oil or gas) re-completed at a lesser depth; then Lessee shall re-designate the production unit for such well so as to reduce the acreage included in such production unit to comply with the applicable (with regard to type of production and greatest producing depth) acreage provisions stated hereinabove and shall release all lease acreage not included in such re-designated production unit or another production unit in the same manner as provided above in Paragraph V.C. of this Lease.

F.   Any release required hereunder shall be filed for record in the Official Public Records of Real Property in the Office of the County Clerk of the county in which said land is located, and a copy of such instrument furnished to Lessor within a reasonable time; thereafter, Lessee shall lose all rights, except the easement and lease facilities rights as set forth and specified in Article I. hereof, and be relieved of all obligations as to the acreage so released. Effective as of the date that Lessee receives the demand for release specified above in Paragraph V.D., each production unit shall be treated the same as if it were covered by a separate lease.

CGH 0203

G.     ANYTHING HEREIN TO THE CONTRARY NOTWITHSTANDING, it is agreed that in any circumstances where Lessee is required to secure from the United States Army Corps of Engineers or any other State or Federal agency, department, or service having legal jurisdiction over Lessee's operations on the leased premises, permits for the drilling and/or operation of wells under the terms of this Lease, the sixty (60) day or one hundred and twenty day period of time, whichever is applicable, referred to in this Article V. between the completion of one well and the commencement of drilling operations on the next well after the primary term shall be and accordingly is hereby extended by another sixty (60) days after such permit is received by Lessee, but in no event more than three hundred sixty-five (365) days between the completion of one well and the commencement of drilling operations on the next well. In such event, Lessee shall promptly furnish Lessor a true copy of such permit in recordable form.

H.     On each anniversary date of the first sale of oil, gas or other liquid or gaseous hydrocarbons, or either, produced from said land and in the event Lessee is retaining all or any portion of the lands covered hereby by the production of oil, gas or other hydrocarbons, if the rentals and royalties (including shut-in payments) accrued hereunder, during the preceding twelve (12) months shall not have equaled at least the amount of ONE HUNDRED and NO/100 Dollars ($100.00) per acre for each net mineral acre as hereinafter defined of land subject to the terms hereof at the commencement of said twelve (12) months, Lessee covenants and agrees that, within thirty (30) days after the receipt from Lessor or Lessor's Agents of notice to such effect, Lessee will promptly pay to Lessor as an additional royalty the amount of the difference between such accrued royalties and the sum of ONE HUNDRED and NO/100 Dollars ($100.00) per acre for each net mineral acre subject to the terms hereof at the commencement of said twelve (12) months. This additional royalty provision, when applicable, shall be in effect for and during the life of this Lease after the primary term.

I.     Notwithstanding anything herein to the contrary, in the event the Texas Railroad Commission, or any governmental authority having and asserting jurisdiction over the subject matter thereof, prescribes for a drilling or operation of a well at a regular location, or permits for the obtaining of the maximum allowable from any well drilled, drilling or already drilled, smaller productions units than any of those herein permitted for such well under the provisions defining production units in Paragraph V.D. hereof, then any such production unit shall be established or reduced to conform to the minimum size allowed for the obtaining of the maximum allowable.

J.     For the purposes of this Lease, the terms "commencement of a well" and "completion of a well" are defined as follows:

(1)     "Commencement of a Well" shall mean only the actual drilling of a well with rotary equipment and tools of a suitable size necessary to reach an objective depth from which Lessee may, in good faith, anticipate the production of oil or gas.

(2)     "Completion of a well" shall mean the day Lessee releases the drilling rig used to drill such well or a completion rig, if utilized, or the date the latter of such rigs is moved off the location, whichever date occurs first.

## VI.     OFFSET OBLIGATIONS:

A.     Lessee covenants and agrees to operate the leased premises as a reasonable prudent operator would under the same or similar circumstances and to protect each of the leased premises from drainage by reason of any well drilled on adjacent or nearby lands. The above covenant notwithstanding, in the event a well producing from a unit not comprised of acreage from the leased premises which has been classified "oil" by the appropriate governmental body is completed on adjacent or nearby lands not more than six hundred sixty feet (660') from the leased premises, or draining the leased premises, or a well producing from a unit not comprised of acreage from the leased premises which has been classified as "gas" by the appropriate governmental body is completed on adjacent or nearby lands not more than one thousand three hundred and twenty feet (1,320') from the leased premises, or draining the leased premises, Lessee covenants and agrees to, within ninety (90) days from the date production is first sold, removed or otherwise marketed from said adjacent or nearby producing well, either (1) commence with due diligence operations for the actual drilling of an offset well on the leased premises to the base of the formation from which the adjacent or nearby producing well is producing, (2) pay Lessors as compensatory royalty, in addition to any

CGH 0204

royalties currently due, a sum equal to the royalties which would be payable under this Lease on the production from said adjacent or nearby producing well had same been producing on the leased premises, or (3) in lieu of drilling such offset well or paying such compensatory royalty, release by recordable instrument the offset acreage, as hereinafter defined. "Offset Acreage", as used hereinabove, shall be defined as a unit which would surround such a well if same were completed on the leased premises; provided, however, that if any portion of the offset acreage should be included in a producing unit designated by Lessee hereunder, then if Lessee elects to surrender and release such offset acreage, it may retain and except from such release the producing stratum or strata included in such producing unit, but such offset acreage must conform to the depth, size and shape limitations contained in Paragraph V. herein. The provisions hereof shall apply regardless of whether lands upon which offset wells may be located are owned by Lessor or any of them or not, and with regard to wells located within the hereinabove prescribed distances from the leased premises, regardless of whether drainage is actually proved to be taking place or not. Notwithstanding anything herein to the contrary, Lessee shall have no obligations under this Article VI. in the event a producing well on nearby or adjacent land is already offset by a well on the leased premises or on acreage pooled therewith producing from the same producing horizon from which production has been secured from any well on nearby or adjacent lands.

B. If Lessee elects to pay the above authorized compensatory royalty, then such royalty shall be calculated and paid on a calendar month basis. The compensatory royalty for the calendar month in which production is first marketed from the offsetting well shall be paid on or before the first day of the calendar month next following the expiration of ninety (90) days after the end of said calendar month in which production if first marketed, and subsequent payments shall be made on or before the first day of each succeeding calendar month. If Lessee is neither the operator of, nor the owner of an interest in the offsetting well, and if the operator of such well refuses to divulge to Lessee the actual monthly volume and/or sales price of production from such well, then Lessee shall be authorized to pay the compensatory royalty for each month on estimates of volume and sales price based on such information as may be timely available to Lessee from other sources, such as the Texas Railroad Commission and/or the Texas Comptroller's Office, provided that each such payment which is made on an estimated basis shall be properly adjusted within 60 days after the date that Lessee directly obtains, or is furnished by Lessor, the actual volume and sales price for the month covered by the estimated payment.

VII. SURFACE OBLIGATIONS AND ADDITIONAL FEE:

Prior to the commencement of any drilling and/or seismic operations, Lessee shall enter into a written contract with the then owner of the surface estate (the "Surface Owner"), hereinafter referred to as the "Surface Use and Damage Agreement", on whose property any drill site or seismic survey is located or is to be located (regardless of whether said Surface Owner is a Party to this lease), which Agreement shall set forth Lessee's responsibilities and specify the amounts and payees of any permit fees and monetary damages which are to be paid. Such Agreement shall provide for repair, replacement or reimbursement for any damages caused by Lessee's operations hereunder. The "Surface Use and Damage Agreement" shall include but shall not be limited to the following:

A. Lessee shall pay Surface Owner, or those otherwise entitled to receive same, the amount of any and all surface damages caused by any of Lessee's operations to plowed grounds, growing crops (including trees of any type), livestock, wells, fresh water sands, fences, improvements or other property, or surface water drainage on any of the lands covered hereby, or in the vicinity thereof. If Lessee makes any use of the roads on the lands covered hereby, in connection with Lessee's operations hereunder, Lessee agrees to maintain such roads in good condition and repair during the period of Lessee's operations, and when Lessee ceases all operations hereunder Lessee will leave such roads in good condition and repair. Lessee agrees to fence all pits dug on said land in connection with drilling or reworking operations, and, upon completion of any operations on said land, Lessee shall clean out and fill all pits and restore the surface of the land to substantially the same condition it was in before commencement of such operations.

B. After operations on each well are complete, whether resulting in a dry hole or a producing well, in addition to and separate from the surface damage obligations of Lessee above mentioned, the area used by Lessee, including new roadways, storage tank areas and the actual well site and pits, shall be measured, and Lessee shall pay Surface Owner a fee of One Thousand and No/100 Dollars ($1,000.00) per acre, and proportionately per fractional acre, so measured.

CGH 0205

C. In connection with any right given Lessee by this Lease to lay pipelines, build roads, bridges, telephone lines and other structures on or under said land, it is agreed by both parties herein that Lessee will procure written consent from Surface Owner as to the location and placement of such structures before such construction has commenced.

D. If any roads, pipelines or other structures are built upon the above described lands by Lessee, Lessee agrees that:

(1) Lessee shall erect and maintain a good and substantial gate in good working order at each point where any such road or right-of-way enters the herein described land through an existing or hereafter erected fence, and that said gate shall remain locked between sunset and sunrise except during such times as Lessee is engaged in actual drilling or reworking operations on the Leased Premises, and Lessee shall keep said gates closed at all other times. Said gates shall have placed on them, or in the near proximity, a clearly legible and plainly visible sign notifying the public that such road or right-of-way is private and is not to be traveled by said public. Upon abandonment of this Lease, Surface Owner may require Lessee at Lessee's sole expense to repair or replace such fences as have been altered by Lessee during the term of this Lease. Lessee further agrees that all gates and cattle guards installed by Lessee shall become the property of Surface Owner.

(2) The tops of all pipelines placed on the Leased Premises shall be buried at least three feet (3') below the surface of the land and at least two feet (2') below the bottom of all ditches and canals.

(3) All equipment placed on the land and all pits and surface containers will be concentrated in as small areas as are workable, and shall be so constructed and maintained as not to allow flow of any liquids or materials therefrom onto the adjoining land.

(4) All storage tanks and equipment shall be kept painted and neat in appearance, and the adjacent area shall be kept free of weeds and other vegetation.

(5) Before entering upon any land with any equipment, Lessee agrees to consult with Surface Owner as to the route of such entry. Any permanent roads shall provide sufficient culverts so as not to obstruct drainage or irrigation.

(6) All existing and future wells shall be plugged within ninety (90) days or within the period designated by the Texas Railroad Commission after they are determined to be not capable of producing oil or gas in commercial quantities by drilling or reworking operations, such plugging operations to be performed in accordance with the state laws or regulations applicable. At the end of the primary term of this Lease all existing wells not capable of producing oil or gas in commercial quantities shall be so plugged within ninety (90) days thereafter, including any well to be used for disposal of salt water as set forth hereinbelow. Lessee's obligation to plug wells shall not be relieved by Lessee's assignment or transfer of its rights under this Lease, or the designation of a third party as operator of the Lease, unless expressly agreed to in writing by Surface Owner.

(7) No injection or storage of salt water or brine obtained off the Leased Premises is authorized or permitted. Injection of salt water produced on the Leased Premises will be permitted for disposal purposes only, provided, however, such disposal is prohibited above the depth of three thousand feet (3,000') below the surface of the ground. Further, no injection of salt water is authorized or permitted into any fresh water sands or zones. Lessee shall, in disposing of said salt water as provided herein, cement off the zone at which the salt water is to be injected, both above and below the zone, so as to prevent any contamination of fresh water sands or zones and shall, in addition, satisfy all requirements of appropriate governmental agencies concerned with such operations.

E. If at any time Lessee conducts operations for the drilling of a well or wells on any part of the Leased Premises, Lessee will confine Lessee's use of the surface to a maximum of four (4) acres in the form of a square around each such well.

F. It is further agreed that when Lessee procures production of oil or gas on the herein described premises, Lessee will thereafter consult with Surface Owner as to the location of

CGH 0206

subsequent drill sites, to the end that there will be cooperation between Surface Owner and Lessee, to the extent reasonably practical, in the location of such drill sites.

G.    This Lease is not intended to and does not grant Lessee the right or privilege to erect and maintain refining facilities, or any other extraction or treating facilities not directly related to the production, treatment and recovery of oil and gas from this Lease only, and all such facilities shall be only those reasonably necessary for production, treatment and recovery of such substances under this Lease.

H.    Lessee specifically agrees to assess and to compensate Surface Owner for damage to any merchantable timber (i.e., trees in excess of 4 inches in diameter), caused by Lessee's operations on the Leased Premises. Damaged timber assessment will be conducted by a qualified forester mutually agreeable to Surface Owner and Lessee. Surface Owner and Lessee agree to value timber based on timber in place (i.e., value Surface Owner would receive if timber were sold in a competitive bid sale covering the Surface Owner's entire tract of property). In no case shall the Surface Owner be burdened by any cost or expense of assessing timber damage.

I.    Lessee agrees that if any seismic activities are to be conducted on the herein Leased Premises, Lessee will enter into a Geophysical Exploration/Seismic Permit Agreement with the Surface Owner.

J.    In the event of a conflict between the provisions of this Article VII. and provisions contained within any Surface Use and Damage Agreement Lessee enters into with the Surface Owner, then the provisions of said Surface Use and Damage Agreement shall supersede the provisions of this Article VII., insofar and only insofar as they relate to said conflicting language. Except as specifically provided herein, nothing contained within such Surface Use and Damage Agreement shall alter or amend the terms and conditions of this Lease.

## VIII.   GENERAL INDEMNITY AGREEMENT:

Lessee covenants and agrees to fully defend, protect, indemnify, hold harmless and render whole each party comprising Lessor, their representatives, agents and employees, and their respective heirs, successors, legal representatives and assigns, from and against each and every claim, demand or cause of action and any liability, cost, and/or expense (including but not limited to reasonable attorneys' fees and expenses incurred in defense of Lessor, their representatives, agents and/or employees) for damage or loss in connection therewith, which may be made or asserted by Lessee, Lessee's representatives, agents or employees, or which may be made or asserted by any contractor or subcontractors, contractor's or subcontractor's representatives, employees and/or agents, or which may be made or asserted by any other third party (including, but not limited to, Lessor's representatives, employees and/or agents or Lessee' s invitees, licensees or any trespasser), on account of personal injury or death or property damage caused by, arising out of, or in any way incidental to, or in connection with this agreement and of Lessee's operations both on or about the premises, including, but not limited to, those situations where personal injury or death or property damage (or liability therefor) was caused by the sole negligence of Lessee, any contractor or subcontractors and/or third party (and/or any of their respective representatives, employees and agents), by the concurrent negligence or any combination of Lessor, or any one or more of them, Lessee, any contractor or subcontractor and/or any third party (and/or any of their respective representatives, employees and/or agents), or where liability for such personal injury or death or property damage with or without fault is imposed on any theory of strict liability by operation by law.

Lessee must give notice to Lessor of any claim, action, administrative proceeding or other demand by any other governmental agency or other party of any such claims, actions, or demands made as a result of any action by Lessee.

Lessee shall assume, on behalf of Lessor, and conduct with due diligence and in good faith, the defense of all claims arising out of the exercise of the rights herein granted to Lessee or in connection with or growing out of this agreement or the performance by Lessee of the obligations hereunder which may be brought against the Lessor, whether or not the Lessee is joined therein, even if such claims be groundless, false or fraudulent, and shall bear the costs of all judgments and settlements in connection therewith, provided, however, without relieving Lessee of any obligations

CGH 0207

under this agreement, Lessor, at Lessor's election, may defend or participate in the defense of any or all of the claims.

## IX.   ENVIRONMENTAL PROVISIONS AND INDEMNITY:

A.      Lessee covenants and warrants that Lessee and Lessee's use of the leased premises will at all times comply with and conform to all laws, statutes, ordinances, rules and regulations of any governmental, quasi-governmental or regulatory authority ("Laws") which relate to the exploration and production of oil and/or gas from the leased premises, or land pooled therewith, transportation, storage, placement, handling, treatment, discharge, generation, production, disposal or injection (collectively "Treatment") of oil, gas and other liquid hydrocarbon substances produced hereunder ("Products"); of salt water, brine and other exempt waste products produced in association with oil or gas ("Exempt Waste"); or of any other waste (including, without limitation, non-exempt wastes), any of the petroleum product, waste products, radioactive waste, poly-chlorinated biphenyl, asbestos, hazardous materials of any kind, and any other substance which is regulated by any law, statute, ordinance, rule or regulation (collectively "Waste"). Lessee further covenants that it will not engage in or permit any party to engage in any Treatment of any Waste not associated with the exploration, development or production of oil or gas on or which affects the leased premises. Specifically, and without limiting the foregoing, Lessee agrees that (i) no toxic or hazardous wastes shall be generated, treated, stored, disposed of or otherwise deposited or released in or on the leased premises; (ii) Lessee will not engage in and will not permit any other party to engage in any activity not associated with the exploration, development or production of oil or gas with respect to the leased premises which would cause (a) the leased premises or the adjoining property to become a non-exempt or hazardous waste treatment, storage or disposal facility within the meaning of the Resource Conservation and Recovery Act of 1975 ("RCRA"), as now or hereafter amended, or any similar State law or Local ordinance or other environmental law, (b) a release or threatened release of a hazardous substance from or to the leased premises or the adjoining property within the meaning of the Comprehensive Environmental Response, Compensation and Liability Act of 1980 ("CERCLA"), as now or hereafter amended or any similar State law or Local ordinance or any other environmental law, or (c) the discharge of pollutants or effluents into any water source or system, or the discharge into the air of any emissions, which would require a permit under the Federal Water Pollution Control Act or the Clean Air Act or any similar State or Local ordinance or other environmental law; (iii) Lessee shall not permit any substance or conditions in or on the leased premises or the adjoining property which might support a claim or cause of action under RCRA, CERCLA, or any other Federal, State or Local environmental statutes, regulations, ordinances or other environmental regulatory requirements; and (iv) no underground storage tanks will be located in or on the leased premises. In the event either CERCLA or RCRA is amended so as to narrow or broaden the meaning of any term defined thereby, such amendment shall apply to Lessee's covenants contained herein, and provided further, to the extent that the laws of the State of Texas establish a meaning for such terms which is broader than that specified in either CERCLA or RCRA, the broader meaning or definition shall apply.

B.      Immediately upon receipt of any Notice, as hereinafter defined, from any party, Lessee shall deliver to Lessor a true, correct and complete report of any written Notice or a true, correct, and complete report of any non-written Notice. "Notice" shall mean any note, notice, or report of any of the following:

(1)      any suit, proceeding, investigation, order, consent order, injunction, writ, award, or action related to or affecting or indicting the Treatment of any Product, Exempt Waste or Waste in or affecting the leased premises;

(2)      any spill, contamination, discharge, leakage, release or escape of any Product, Exempt Waste or Waste in or affecting the leased premises, whether sudden or gradual, accidental or anticipated, or of any other nature (hereinafter "Spill");

(3)      any dispute relating to Lessee's or any other party's treatment of any Product, Exempt Waste or Waste or any Spill in or affecting the leased premises

(4)      any claims by or against any insurer related to or arising out of any Product, Exempt Waste or Waste or Spill in or affecting the leased premises;

CGH 0208

(5)     any recommendations or requirements of any governmental or regulatory authority, or insurer relating to any treatment of Product, Exempt Waste or Waste or a Spill in or affecting the leased premises;

(6)     any legal requirement or deficiency related to the treatment of Product, Exempt Waste or Waste or any Spill in or affecting the leased premises; or

C.     In the event that (a) Lessee has caused, suffered or permitted, directly or indirectly, any Spill in or affecting the leased premises, or (b) any Spill of any Product, Exempt Taste or Waste has occurred on the leased premises during the term of this.agreement, then Lessee shall immediately take all of the following actions:

(1)     notify Lessor, as provided herein;

(2)     take all steps necessary or desirable, in Lessor's reasonable opinion, to clean up all such Spill and any contamination related to the Spill; and

(3)     fully restore the leased premises to its condition prior to the Spill.

D.     Lessee hereby agrees that it will indemnify, defend, save and hold harmless Lessor and their respective heirs, executors, administrators, successors and assigns (collectively "Indemnified Parties") against and from, and to reimburse the Indemnified Parties with respect to, any and all damages, claims, liabilities, loss, costs and expenses (including, without limitation, response costs, remediation, abatement costs, mitigation costs, harm to the environment, property damage, reasonable attorneys' fees and expenses, court costs, administrative costs and costs of appeals), incurred by or asserted against the Indemnified Parties by reason or arising out of: (a) the breach of any representation or undertaking of Lessee under this Article IX., or (b) arising out of the treatment of any Product, Exempt Waste or Waste by Lessee or any tenant, licensee, concessionaire, manager, or other party occupying or using the leased premises under the authority of Lessee, in or affecting the leased premises, or (c) in the event of any Spill governed by the terms of this Article IX.

E.     Notwithstanding anything in this agreement to the contrary, the representations and undertakings of Lessee in this Article IX. shall survive the expiration or termination of the Lease regardless of the means of such expiration or termination; furthermore, in the event of the assignment, sublease, or other transfer of all or any of Lessee's rights under this Lease, the assignee or sub-lessee must assume all of the Lessee's obligations under this Article IX. and Lessee shall remain liable for every obligation under this Article IX.

X.     CHANGE OF OWNERSHIP:

A.     The rights of either party hereunder may be assigned in whole or in part, and the provisions hereof shall extend to their heirs, successors and assigns; but no change or division of ownership of land, rentals or royalties, however accomplished, shall operate to enlarge the obligations or diminish the rights of Lessee; and no change or division in such ownership shall be binding on Lessee until thirty (30) days after Lessee shall have been furnished by registered or certified United States Mail at Lessee's principal place of business with a certified copy of the recorded instrument or instruments evidencing same. In the event of assignment hereof in whole or in part, liability for breach of any obligation hereunder shall, except as herein expressly provided, rest exclusively upon the owner of this Lease, or a portion thereof, who commits such breach. In the event of the death of any person entitled to rentals and royalties hereunder, Lessee may pay such rentals and royalties to the credit of the deceased, or the estate of the deceased, until such time as Lessee is furnished with proper evidence of the appointment and qualification of an executor or administrator of the estate, or if there be none, until Lessee is furnished with evidence satisfactory to Lessee as to the heirs and devisees of the deceased.

B.     In the event the Lessee herein, or any subsequent assignee of Lessee, at any time during the effectiveness of this Lease transfers and/or assigns this Lease or any interest herein, Lessee shall contemporaneously with each such assignment and/or transfer give written notice thereof by mailing a true and full copy of each and every instrument evidencing any and all such assignments and/or transfers to Lessor.

CGH 0209

## XI. NOTICE OF DEFAULT:

A.      The breach by Lessee of any obligation existing hereunder shall not automatically work a forfeiture or termination of this Lease nor cause an automatic termination or reversion of the estate created hereby nor be grounds for automatic cancellation hereof in whole or in part except as provided with regard to Lessee's obligation to pay Lessor royalty payments in Paragraph XVII.D. of this Lease. In the event Lessor considers that Lessee is in breach of any provision of this Lease (except for those with regard to payment of royalties), Lessor shall notify Lessee in writing of the facts relied upon as constituting a breach hereof and Lessee shall have sixty (60) days after receipt of such notice in which to comply with the obligations imposed by virtue of this instrument or to provide evidence satisfactory to Lessor that Lessee is not in breach of the terms and conditions of this Lease. In the event Lessee fails to comply with such obligations or to provide said evidence within sixty (60) days after receipt of such notice, the Lessor shall have the right to declare this Lease forfeited, canceled and terminated.

## XII. PRODUCING LIMITATION (STRATUM OR STRATA):

A.      At the occurrence of a partial termination of this Lease in accordance with the provisions of Article V. hereof and respectively upon the subsequent partial termination as provided herein, and in no event later than the expiration of the fourth year of the secondary term of this Lease, this Lease will terminate automatically as to all the mineral estate of Lessor covered hereby on or under each production unit, respectively, which is greater than one hundred feet (100') below the deepest total depth drilled or the stratigraphic equivalent thereof, whichever horizontal subsurface depth constitutes the deepest depth, for a well which Lessee has completed as commercial producer of oil and/or gas on the lands described in this Lease or on other lands, if any, pooled or unitized with the leased premises. Upon expiration of the fourth (4th) year of the secondary term of this Lease this Lease will further terminate as to all the mineral estate of Lessor covered on or under each production unit, respectively, which is (1) greater than one hundred feet (100') below the deepest depth from which production in paying quantities is then being had (or at which a well capable of producing gas in paying quantities is completed), and (2) situated between the surface of the land and one hundred feet (100') above the shallowest of the following: (1) the shallowest depth from which production in paying quantities is then being had, (2) the shallowest depth at which a well capable of producing gas in paying quantities is completed, or (3) the top of the shallowest identifiable stratum or horizon determined by the mutual agreement of the parties hereto to be capable if completion were had therein at that time of production in paying quantities, IF AND ONLY IF, Lessee has furnished identification thereof together with the applicable geological/geophysical data used to identify such stratum or horizon on or before the expiration of the fourth (4th) year of the secondary term of this Lease. Such determination is to be based upon (1) the applicable geological/geophysical data acquired by or available to Lessee, copies of which are to be furnished to Lessor for review for such purpose, and (2) any applicable independent geological/geophysical data acquired by Lessor, copies of which are to be furnished to Lessee for review for such purpose. For these purposes, the parties will consider both wells located on the leased premises and those on other lands, if any, pooled or unitized with the leased premises. Furthermore, subsequent to any occurrence of a partial termination of this Lease in accordance with Article V. and respectively upon the subsequent partial terminations as provided therein, and in any event, subsequent to the expiration of the fourth year of the secondary term of this Lease, if any gas well on a production unit is re-completed at a shallower depth and classified as an oil well, then this Lease will further terminate as to all the mineral estate of Lessor covered hereby on or under such production unit which is greater than one hundred feet below the deepest depth from which oil and/or gas is being produced from such oil well. Upon such partial termination Lessor and Lessor's successors, heirs or assigns shall thereafter have the right to reasonable use of the released acreage and depths of the leased premises, but without unreasonable interference with Lessee's rights, for the purposes of investigating, exploring, prospecting and drilling for, producing and owning oil, gas and other liquid hydrocarbons from the horizons (strata) as to which this Lease has terminated.

B.      Upon the occurrence of an event of partial termination of this Lease as to subsurface depths, or at a time thereafter upon request of Lessor, Lessee shall execute and deliver to Lessor recordable instrument(s) setting forth the various producing horizon (stratum) or horizons (strata) stated above, as reflected by reports to the Texas Railroad Commission or other governmental authority having jurisdiction, so that the limit and extent of Lessee's rights under this Lease may be fixed and reflected as a matter of record and, in addition thereto, as requested by Lessor, Lessee shall

Page 14 of 22

CGH 0210

also execute and deliver to Lessor recordable releases or assignments of any and all interests hereunder not maintained in force and effect by Lessee by production, as above provided.

## XIII.   FORCE MAJEURE:

Should Lessee be prevented from complying with any expressed or implied covenant of this Lease, from conducting drilling or reworking operations thereof, or from producing oil or gas therefrom by reason of scarcity of or inability to obtain or to use equipment or material, or by operation of force majeure, any Federal or State law, or other order, rule or regulation of governmental authority, (SAVE AND EXCEPT where Lessee is required to secure from the United States Army Corps of Engineers or other State or Federal agency, department, or service having jurisdiction over Lessee's operations on the leased premises, permits for the drilling and/or operation of wells under the terms of this Lease in which case the provisions of Paragraph V.F. shall apply), then while so prevented, Lessee's obligation to comply with such covenant shall be suspended, and Lessee shall not be liable in damages for failure to comply therewith, and this Lease shall be extended while and so long as Lessee is prevented by any such cause from conducting drilling or reworking operations on or from producing oil or gas from the leased premises and the time while Lessee is so prevented shall not be counted against Lessee, anything in this Lease to the contrary notwithstanding, provided, however, any period this Lease may be so extended shall not cumulatively exceed two (2) years, and provided further that during such period Lessee shall pay monthly to Lessor a sum equal to one-twelfth (1/12th) of Seventy-Five and NO/100 Dollars ($75.00) per acre for each mineral acre then subject to this Lease, the first of such payments to begin on or before the first day of the month after the expiration of thirty (30) days from the date this Lease ceased to be maintained by production, operations or otherwise. Nothing in this paragraph shall relieve the Lessee of Lessee's obligation to protect the leased premises from drainage.

## XIV.   COUNTERPARTS:

A.     This Lease may be executed in any number of counterparts found to be convenient. Each counterpart shall be deemed an original and shall be binding on all parties who execute such counterpart, or another counterpart, irrespective of whether or not such counterpart, or another counterpart, is executed by the other parties below named as parties Lessor .

B.     This Lease will not be recorded. However, Lessor and Lessee agree to execute, and Lessee agrees to record in the Official Public Records of Real Property in the County in which said land is located, a "Memorandum" giving notice of this Lease, and promptly following such recording, Lessee shall furnish copies of such recorded Memorandum to Lessor.

## XV.   INFORMATION:

As to any and all wells drilled on the herein described land, Lessee agrees to furnish Lessor, or Lessor's authorized representatives, access to said well or wells at his or their own risk at all reasonable hours. Lessee further agrees to furnish at no cost to Lessor, as set forth herein, the following information:

A.     A copy of all daily operation reports received by Lessee during drilling, completion or reworking operations shall be sent to Lessor, via facsimile, concurrent with Lessee's receipt of such reports.

B.     A copy of all electric logs, formation surveys or any other test made in such well or wells within thirty (30) days of the completion of such log, survey or test.

C.     A copy of all applications and reports filed by Lessee with the Texas Railroad Commission in connection with Lessee's operations hereunder shall also be mailed to Lessor simultaneously with Lessee's mailing of such applications and reports to the Texas Railroad Commission.

D.     Lessee also agrees to furnish to Lessor any and all title opinions obtained by Lessee, whether rendered by Lessee's attorneys, by outside attorneys retained by Lessee, or by attorneys for purchasers of production under this Lease.

CGH 0211

E.    In addition, Lessee shall furnish to Lessor the following seismic or other geophysical data obtained by Lessee during the term of this Lease on the leased premises: (1) access to for review and duplication of all basic data generated (including tapes); (2) scaled, platted maps for all geophysical surveys performed showing the location of all shot holes and station points used in each survey and (3) final stacked and migrated seismic data at all depths across the leased premises. Lessor agrees to use Lessor's best efforts during the term of this Lease to maintain all such data so provided in confidence until otherwise released from this obligation by Lessee or until Lessee releases such data to the general oil and gas industry, whichever occurs earlier.

All such information shall be provided by Lessee irrespective of the results of Lessee's operations on the herein described land.

## XVI.   ASSIGNMENT:

In the event this Lease is assigned or transferred by Lessee in whole or in part, then, upon termination of this Lease, Lessee shall be responsible for obtaining a proper recordable release or releases of this Lease as to the portion or portions of said land as to which this Lease has been assigned or transferred by Lessee and Lessee shall furnish such release or releases to Lessor, or file same for record in the Official Public Records of Real Property in the County in which said land is located, promptly after termination of this Lease.

## XVII.   TIME, METHOD AND MANNER OF PAYMENT:

ANYTHING HEREIN TO THE CONTRARY NOTWITHSTANDING, and in lieu of the terms and provisions contained in Sections 91.401 through 91.406 of the Texas Natural Resources Code, the parties hereto specifically agree that the following provisions shall apply to this Lease and all royalty payments made hereunder or other rights as provided in the above listed sections, and that such provisions of the Texas Natural Resources Code shall not be applicable; such parties further, by their signatures below, waive any and all rights which might be claimed or asserted under such Sections 91.401 through 91.406 of the Texas Natural Resources Code; thus, it is specifically provided that:

A.    All rentals and royalties which may become due hereunder shall be payable at Houston, Harris County, Texas or at such other place, if any, as may be specified by written directive of a particular royalty owner as to such owner's interest.

B.    Royalties on production shall be paid on a calendar month basis. The royalty for the calendar month in which production is first marketed shall be paid on or before the first day of the calendar month next following the expiration of sixty (60) days from the execution date of the completion report or potential test for the well that is filed with the Railroad Commission of Texas, and the respective royalty payments for each subsequent calendar month of production shall be made on or before the first day of each successive calendar month following the calendar month in which the first payment is due.

C.    All past due royalties (including any compensatory royalties payable under Paragraph VI.B.) shall be subject to a Late Charge based on the amount due and calculated at the maximum rate allowed by law commencing on the day after the last day on which such monthly royalty payment could have been timely made and for every calendar month and/or fraction thereof from the due date until paid, plus attorney's fees, court costs, and other costs in connection with the collection of the unpaid amounts. Any Late Charge that may become applicable shall be due and payable on the last day of each month when this provision becomes applicable.

D.    Notwithstanding anything herein to the contrary, upon the failure of Lessee to pay Lessor the royalty payments as provided herein, the Lessor may, at Lessor's option, elect to terminate said Lease by serving written notice on Lessee at the address shown herein, of Lessor's intention to terminate said Lease within not less than thirty (30) days of receipt, or any time thereafter. Should Lessee pay Lessor all royalty payments past due during said period, with interest as provided herein, this Lease shall not terminate. However, upon the failure of Lessee to pay Lessor said past due royalty payments during said notice period, Lessor may elect to terminate this Lease, and title to said land shall revert to Lessor. Lessor may elect to terminate said Lease, after the expiration of said notice period, by serving notice of termination, filing a copy of said notice with the County Clerk of

Page 16 of 22

CGH 0212

the county in which said land is located. The effective date of said termination shall be the date said termination is filed with the said County Clerk. In the event of the termination of said Lease in this manner, Lessee shall not remove any of Lessee's equipment, fixtures, or personal property located on said land, unless so instructed by Lessor, and if so instructed, such property shall be removed within thirty (30) days of notice to Lessee. In the event Lessor prohibits the removal of such property from the leased premises, then it shall become the property of Lessor, at the option of Lessor.

E.     Neither Lessee nor its purchaser of production shall be authorized to make any deductions or adjustments against present or future royalty payments for royalty amounts previously paid without first giving Lessor or royalty owner thirty (30) days advanced notice of same along with a full explanation of such overpayment. In the event Lessor or royalty owner disputes the legitimacy of such deduction or adjustment, Lessee or purchaser shall not be entitled to make such deductions or adjustments against Lessor's royalty (and Lessor's full royalty payments shall not be interrupted) until such dispute is resolved. If it is agreed between Lessor or royalty owner and Lessee that a royalty owner was overpaid, then the overpaid royalty owner has the option of repaying such overpayment or allowing Lessee or purchaser to recoup such overpayment out of future royalty payments on a schedule and in monthly amounts agreed to by such overpaid royalty owner and Lessee or purchaser. Any overpaid royalty owner shall not be charged interest on the overpaid sums.

F.     Lessor expressly reserves the right and Lessee expressly grants to Lessor and any royalty owner the right to audit production, revenue and the calculation and payment of revenues to Lessor and royalty owners, by such royalty owner giving Lessee notice of the exercise of this right and, within 30 days after receipt of such notice, Lessee shall make available to the requesting royalty owner all books and records (together with copies thereof if requested by royalty owner) along with all other data necessary for royalty owner or his agent to audit such production, revenue and/or royalty payments. Lessor shall select the accounting procedure to be utilized in such audit and such procedure selected shall be binding on Lessee so long as such procedure is accepted under general accounting practice and standards. If it is determined that royalty owner has not been correctly paid all sums owed him, then Lessee shall reimburse the requesting royalty owner for all costs and expenses incurred by Lessor for such audit, together with all unpaid revenues, late charges, and interest thereon.

G.     Without limiting the other provisions of this Article XVII., it is further specifically acknowledged and agreed by the parties hereto that the term "market value" as used herein shall be defined in accordance with the above Paragraph III.H. and not in accordance with the provisions of Subsection 91.402 (i) of the Texas Natural Resources Code.

H.     The provisions of this Article XVII. shall not apply where Lessor has elected to take Lessor's royalty in kind or market separately Lessor's royalty share of production under the terms of this Lease.

I.     Notwithstanding anything herein to the contrary, Lessor's exercise of Lessor's rights under this paragraph shall not be deemed as a waiver of Lessor's right to take all actions necessary to recover unpaid royalties, interest and other damages incurred.

J.     In the event Lessee enters into a gas purchase contract which contains what is commonly referred to as a "take or pay provision" (such provision meaning that the gas purchaser agrees to take delivery of a specified minimum volume or quantity of gas over a specified term at a specified price or to make minimum periodic payments to the producer for gas not taken by the purchaser) and the purchaser under such gas purchase contract makes payments to Lessee by virtue of such purchaser's failure to take delivery of such minimum volume or quantity of gas, then Lessor shall be entitled to Twenty-Five percent (25%) of all such sums paid to Lessee or producer under the "pay" provisions of such gas purchase contract. Such payment shall be due and owing to Lessor within sixty (60) days after the receipt of such payments by Lessee. Any payments made to Lessor under the "pay" obligation of any "take or pay" gas contract shall be applied as a credit toward Lessee's minimum royalty obligation. If the gas purchaser "makes up" such gas within the period called for in the gas contract and Lessee is required to give such purchaser a credit for gas previously paid for but not taken, then Lessor shall not be entitled to royalty on such "make up" gas.

If Lessee is not producing any quantities of gas from leased premises but is receiving payments under the "pay" portion of such "take or pay" gas purchase contract provision, such

CGH 0213

payments shall not relieve Lessee of the duty to make shut-in royalty payments if Lessee desires to continue this Lease, but such "take or pay" payments shall be applied as a credit against any shut-in royalty obligation of the Lessee.

Lessor shall be a third-party beneficiary of any gas purchase contract and/or transportation agreement entered into between Lessee and any purchaser and/or transporter or pipeline company of Lessor's gas, irrespective of any provision of said contracts to the contrary. Further, Lessor shall be entitled to Twenty-Five percent (25%) of the value of any benefits obtained by or granted to Lessee from any gas purchaser and/or transporter for the amendment, modification, extension, alteration, consolidation, transfer, cancellation or settlement of any gas purchase contract and/or transportation agreement.

## XVIII. TITLE:

A. Lessor hereby warrants and agrees to defend the title to only Lessor's interest in said lands, as shown by the Official Public Records of Real Property of the county in which said land is located, against the claims of all persons whomsoever claiming or to claim the same by, through, or under Lessor, but not otherwise, and agrees that Lessee, at Lessee's option, may discharge any tax, mortgage or other lien upon said land, either in whole or in part, and in the event Lessee does so, Lessee shall be subrogated to such lien with the right to enforce same and apply royalties accruing hereunder toward satisfying the same.

B. Without impairment of Lessee's rights under the warranty in event of failure of title, it is agreed that if Lessor owns an interest in all or any part of the land covered by this Lease, or part thereof, less than the entire fee simple estate, then the royalties, rentals and shut-in payments, or any other payments hereunder to be paid or delivered to Lessor shall be paid only in the proportion which Lessor's interest therein, if any, bears to the whole or undivided fee simple estate therein. All outstanding royalties chargeable to Lessor's mineral interest shall be deducted from those royalties herein provided.

## XIX. TAXES:

All State occupation, severance, production and ad valorem taxes of every nature, kind and description levied upon the leasehold and royalty interest created by or reserved in this Lease by whatever taxing authority within the State, shall be borne and paid by Lessee at Lessee's sole cost and expense without deduction from or charge against Lessor's interest or against proceeds payable to Lessor hereunder, but this provision shall not cover any taxes levied or assessed on the surface of said land or any mineral interest, save and except the oil, gas and other liquid hydrocarbons interest, which is the subject matter of this Lease; nor shall this provision apply to any income, estate, gift, inheritance, or Federal windfall profits taxes charged on or assessed against any Lessor of this Lease.

## XX. ATTORNEY'S FEES:

It is further specifically provided that in the event it becomes necessary for Lessor to employ an attorney, or attorneys, as a result of any activity conducted by Lessee on the herein leased premises, or land pooled therewith, or to enforce any of Lessee's obligations hereunder and Lessor is successful in any court action to enforce same, Lessee agrees to pay all reasonable attorney's fees incurred by Lessor in connection therewith.

## XXI. BANKRUPTCY:

Notwithstanding any language contained herein to the contrary, the rights of Lessee, or Lessee's heirs, successors or assigns, in and to the leased premises, the equipment or fixtures thereon or the unsold oil and gas produced therefrom, shall automatically terminate, ipso facto, and be of no further force and effect upon the voluntary or involuntary filing of same for relief under the United States Bankruptcy Code.

## XXII. PARAGRAPH CAPTIONS:

The captions set forth opposite each paragraph number are for convenience only and are not to be used to interpret or have any legal effect on the terms and provisions of this Lease.

CGH 0214

## XXIII. LESSOR FIDUCIARY CAPACITY:

It is expressly agreed and understood that this instrument is executed by Parties identified as fiduciaries, solely in the capacities stated and not otherwise, and that they shall never have any individual, personal or corporate liability or responsibility by reason of the execution of this instrument, except in such fiduciary capacities.

## XXIV. LESSOR'S AGENT:

This paragraph does not apply to Lessor, and accordingly this space is intentionally left blank.

## XXV. SECURITY AGREEMENT:

Lessor hereby retains a security interest in all of its proportionate part of (i) the oil, gas and other hydrocarbons produced and saved from the leased premises or lands pooled or unitized therewith or otherwise subject to this Lease as provided in Articles III. and XVII. herein regarding payment of royalties due under this Lease, and (ii) Lessor's respective royalty part of any and all proceeds of sale of such oil, gas and other hydrocarbons and Lessor's respective royalty part of any and all accounts (including, without limitation, accounts arising from gas imbalances, or from the sale of oil, gas or other liquid hydrocarbons at the well head), contract rights, inventory and general intangibles relating thereto or arising therefrom, and Lessor's respective royalty part of any and all proceeds and products of the foregoing (the "Collateral"), to secure Lessee's payment of royalties due under the terms and provisions of this Lease.

In addition to any other remedies provided in this Lease, Lessor, as Secured Party, may in event of Lessee's default hereunder proceed under V.T.C.A., BUSINESS AND COMMERCE CODE (the "Code") as to the Collateral, in any manner permitted by the Code. In the event of default by Lessee, Lessor shall have the right to take possession and to receive its proportionate part of the Collateral and to hold same as payment for Lessee's obligations or to apply it on the amounts owing to Lessor hereunder. The filing of a suit and rendition of judgment in favor of Lessor for the secured indebtedness shall not be deemed an election of remedies or otherwise affect the security interest as security for payment thereof. In addition, at any time during the term of this Lease, Lessor shall have the right, without prejudice to other rights and remedies, to collect, directly from any purchaser of production, the proceeds from the sale of its proportionate part of the Collateral. All purchasers of the Collateral may rely on a notification from Lessor stating its intent to collect such Collateral directly, and Lessee waives any recourse available against purchasers for releasing such Collateral as provided in this Paragraph.

The above reservation by Lessor of the security interest in the Collateral shall be a first and prior lien against the Collateral, and Lessee hereby agrees to maintain the priority of said security interest against all persons. All parties acquiring an interest in the Lease and/or the personal property covered by this Security Agreement, whether by assignment, merger, mortgage, operation of law, or otherwise, shall be deemed to have take such interest subject to the security interest in the Collateral as reserved herein. The address of Lessor, as Secured Party, is 820 Gessner Road, Suite 1300, Houston, Texas 77024-4259 and the address of Lessee, as Debtor, is set forth on page 1 of this Lease.

The Collateral includes Lessor's royalty part of the oil, gas and other hydrocarbons to be financed at the well head of the wells and accounts from the sale thereof. The parties hereto agree that the provisions of this Article XXV. shall be a part of the Memorandum of this Lease, and when such Memorandum is recorded in the Official Public Records of Real Property in the county where the land covered here is located, this Article and the Memorandum thereof shall be effective as a filed financing statement for the purposes of the Code. In addition, Lessee agrees to execute and acknowledge financing statements and continuation statements thereto prepared and submitted by Lessor in conjunction herewith or at any time following the execution hereof, and Lessor is authorized to file such statements in the appropriate UCC and/or official Public Records of Real Property with the Office of the Secretary of State of Texas and the county in which the leased premises are located, respectively, to perfect the security interest granted hereunder.

CGH 0215

## XXVI. FIELD RULES:

Lessee shall not file any Application for Field Rules pertaining to the land covered by this Lease without first giving Lessor not less than thirty (30) days advance written notice of intention to do so, together with a copy of a draft of the Application which Lessee contemplates filing. Within three days after the date of the filing of the final form of such Application, Lessee shall mail Lessor written notice of the date of filing and a copy of the Application so filed.

## XXVII. DIVISION ORDERS:

Notwithstanding Subsection 91.402 (c) of the Texas Natural Resources Code, the execution of Division Orders shall never be required as prerequisite for payment of royalty, and division orders, if signed for the convenience of the parties, shall not be construed as amending this Lease regardless of terminology contained therein. If requested by Lessee, Lessor will execute and deliver to Lessee or the purchaser of production a written statement of Lessor's interest in such production and Lessor's current address and taxpayer's Federal tax identification number.

## XXVIII. LANGUAGE:

Lessor and Lessee further acknowledge and agree that each and every provision contained herein has been specifically negotiated for valuable consideration and no provision of this Lease agreement shall be construed or interpreted as being "boiler plate" or "surplus" language.

## XXIX. MOST FAVORED NATIONS CLAUSE:

If Lessee shall enter into an oil and gas lease(s) part of which is located within three (3) miles of any exterior boundary of the subject lands covered by the subject Lease, hereinafter referred to as "Third Party Lease", Lessee shall notify Lessor of such fact. If the reserved royalty or the amount per acre payable for delay rentals, shut-in rentals or minimum royalty, at any time payable under such Third Party Lease, is higher than the like royalty and amounts payable as provided in the subject Lease, the royalty or amount payable per acre in the subject lease, which is less than that provided in the Third Party Lease shall be immediately increased so that it will equal the royalty or other amounts payable under the Third Party Lease. The subject Lease and the Third Party Lease must be calculated in substantially the same manner, such that the comparison of the subject Lease and the Third Party Lease is based on the same effective net royalty or other payments, and that same shall include or deduct the same types of charges, taxes and other burdens from such interests.

IN WITNESS WHEREOF, this instrument is executed effective as of the 19th day of April, 1999.

LESSORS:

CHARLES G. HOOKS III as Co-Trustee under the Will of Charles G. Hooks, Sr., Deceased (d/b/a CHAS. G. HOOKS & SON)

SUE ANN HOOKS as Co-Trustee under the Will of Charles G. Hooks, Sr., Deceased (d/b/a CHAS. G. HOOKS & SON)

CHARLES G. HOOKS III as Independent Executor of the Estate of Charles G. Hooks, Jr., Deceased (d/b/a CHAS. G. HOOKS & SON)

CGH 0216

LESSEE:

SAMSON LONE STAR LIMITED PARTNERSHIP, by
Samson Resources Company, its general partner

Thomas E. Dimelow
President

THE STATE OF TEXAS

COUNTY OF HARRIS

This instrument was acknowledged before me on the 21ST day of $APRIL$ , 1999, by
CHARLES G. HOOKS III and by SUE ANN HOOKS as Co-Trustees under the Will of Charles G.
Hooks, Sr., Deceased.



NORMA K. BALDRY
Notary Public, State of Texas
My Commission Expires
DECEMBER 05, 2000

Notary Public in and for the State of Texas

THE STATE OF TEXAS

COUNTY OF HARRIS

This instrument was acknowledged before me on the 21ST day of $APRIL$ , 1999, by
CHARLES G. HOOKS III as Independent Executor of the Estate of Charles G. Hooks, Jr.,
Deceased.

NORMA K. BALDRY
Notary Public, State of Texas
My Commission Expires
DECEMBER 05, 2000

Notary Public in and for the State of Texas

THE STATE OF OKLAHOMA

COUNTY OF TULSA

The above and foregoing instrument was acknowledged before me this 20th day of
April, 1999, by Thomas E. Dimelow, as President of SAMSON RESOURCES
COMPANY, as general partner of SAMSON LONE STAR LIMITED PARTNERSHIP, a
Texas limited partnership, on behalf of said Partnership.

My commission expires: 9/25/01

Notary Public for the State of Oklahoma
Notary's Printed Name
Patricia A. Yelton

CGH 0217

<u>EXHIBIT "A"</u>

ATTACHED TO AND MADE A PART OF THAT CERTAIN OIL, GAS AND LIQUID HYDROCARBON LEASE DATED EFFECTIVE April 19th, 1999, BY AND BETWEEN CHARLES G. HOOKS III, CO-TRUSTEE, ET AL., DOING BUSINESS JOINTLY AS CHAS. G. HOOKS & SON, A TEXAS GENERAL PARTNERSHIP, AS LESSOR, AND SAMSON LONE STAR LIMITED PARTNERSHIP, A TEXAS LIMITED PARTNERSHIP, AS LESSEE, COVERING SIX HUNDRED AND FORTY (640) ACRES OF LAND, MORE OR LESS, IN THE WM. C. DYCHES SURVEY, ABSTRACT 112, JEFFERSON COUNTY, TEXAS.

640.0 acres of land, more or less, situated in the Wm. C. Dyches Survey, A-112, Jefferson County, Texas, more fully and particularly described in that certain deed dated January 2, 1901, from Hugh Jackson, et al to W.P.H. McFaddin, et al, recorded in Volume 46, Page 155, et seq., of the Deed Records of Jefferson County, Texas, reference to which deed and said records is here made for descriptive purposes only.

CGH 0218

## OIL, GAS AND LIQUID HYDROCARBON LEASE

THIS AGREEMENT, made effective the date hereinafter provided, by and between the undersigned, CHARLES G. HOOKS III and SUE ANN HOOKS as Co-Trustees under the Will of Charles G. Hooks, Sr., Deceased, and CHARLES G. HOOKS III as Independent Executor of the Estate of Charles G. Hooks, Jr., Deceased, doing business jointly as CHAS. G. HOOKS & SON, a Texas general partnership, hereinafter individually and collectively called "Lessor", whose address is 820 Gessner Road, Suite 1300, Houston, Texas 77024-4259, and SAMSON LONE STAR LIMITED PARTNERSHIP, a Texas limited partnership, hereinafter called "Lessee", the address of which is Two West Second Street, Tulsa, Oklahoma 74103-3101,

### WITNESSETH:

### I.    GRANTING CLAUSE:

A.    Lessor, in consideration of Ten and No/100 Dollars ($10.00) and other good and valuable considerations, of the royalties herein provided, and of the agreements of Lessee herein contained, hereby GRANTS, LEASES and LETS exclusively unto Lessee for the purpose of investigating, exploring, prospecting, drilling and mining for, and producing oil, gas and other liquid hydrocarbons, including sulphur produced in conjunction therewith, and laying such pipelines, building such tanks and power stations as are necessary to produce, save, take care of, treat, transport, temporarily store current production, and own said products produced from the land covered by this Lease, said land being situated in HARDIN COUNTY, TEXAS, and described on Exhibit "A" attached hereto and made a part hereof for all purposes.

B.    For the purpose of calculating any money payments to be made to Lessor by Lessee under the various provisions hereof, but subject to the proportionate reduction of royalties and rentals as hereinafter provided, the lands covered hereby shall be estimated to comprise 95.0 gross acres and 31.667 net mineral acres, whether it actually contains more or less.

C.    If the Lessor does not own the surface of the leased lands Lessor grants only such uses of the surface as Lessor owns by virtue of Lessor's mineral ownership.

D.    This Lease shall not be construed to include and Lessor expressly reserves hereby all of the sulphur, coal, lignite, uranium and other fissionable materials, geothermal energy, including entrained methane, hydrostatic pressure and thermal energy, base and precious metals and any and all other mineral substances, excepting only oil, gas and other liquid hydrocarbons and their respective constituent products expressly covered by this Lease, presently owned by Lessor in, under or upon leased premises, together with the rights of ingress and egress and use of the leased premises by Lessor and their mineral Lessees for purposes of exploration for and production of the minerals reserved herein to Lessor. Further, without limiting the rights granted to Lessee herein to perform seismographic or other geological tests on the leased premises, Lessor expressly reserves the right to perform or to grant the right to others to perform seismographic or other geological tests for minerals over and across the lands covered by this Lease provided said operations do not interfere with Lessee's drilling or production operations. Lessor and Lessee shall each conduct their respective operations on the leased premises so as not unreasonably to interfere with the operations or activities of the other.

### II.    TERM:

A.    Subject to the other provisions herein contained, this Lease shall remain in force for a term of three (3) years from the effective date hereof called "primary term", and so long thereafter as oil, gas or other liquid or gaseous hydrocarbons are produced in paying quantities from said land, or actual drilling or reworking operations are conducted or this Lease is otherwise maintained as hereinafter provided, herein called "secondary term".

B.    ANYTHING HEREIN TO THE CONTRARY NOTWITHSTANDING, at any time before the expiration of the primary term of this Lease, Lessee must have commenced actual drilling operations by spudding in a well on the leased premises with a sufficient size drilling rig and related

Page 1 of 21

24054-01

SAM.4616

PLAINTIFF'S EXHIBIT 26

Samson / Klorer
Deposition Exh. 26

equipment to drill the same to the permitted depth filed with the Railroad Commission of the State of Texas, and must prosecute the same with reasonable diligence, or else this Lease shall terminate without further notice.

## III.   ROYALTIES:

Lessors reserve for themselves, and their heirs, successors and assigns, the following royalties and Lessee, in consideration of the Lessors' granting of this Lease, covenants and agrees to deliver same to Lessors out of production as follows:

A.   On oil, Twenty-Five percent (25%) of that produced and saved from the leased premises, free of expense to Lessor, to be, at Lessor's option (1) delivered into the pipelines, tanks or other receptacles to which Lessee may connect Lessee's wells; (2) delivered at the well or wells in tanks or other receptacles provided by Lessor, at Lessor's own expense (3) purchased by Lessee at the highest market price therefor being paid by a bona fide purchaser of oil in the county or counties where produced on the date of purchase, for oil of like quality and gravity; (4) sold by Lessee (for Lessor's account) to the purchaser of Lessee's oil, if sold by Lessee at the well, for the price received by Lessee or any affiliate of Lessee for Lessee's own oil.

B.   (1)   On gas, including casinghead gas or other gaseous substances produced from said land, Twenty-Five percent (25%) of the market value at the wells of such gas, or Twenty-Five percent (25%) of the price received therefor by Lessee, which ever is greater. It is expressly agreed that for the purposes hereof, "market value" of said gas, including casinghead gas, shall be defined as set forth in Paragraph III.H. hereof. This royalty provision shall apply to all gas sold at the wells, all gas sold or used off the premises and all gas otherwise sold, except as provided below.

(2)   In lieu of the royalty on gas hereinafter provided, in case Lessee shall itself, or through an affiliated company, use gas from the premises in the extraction of gasoline or other products in a plant, Lessor shall be paid a royalty Twenty-Five percent (25%) of the then current market value at the plant of such gasoline or other by-products so extracted. "Market Value" of such gasoline or other products extracted in a plant shall be determined by (1) highest price posted for any product of comparable quality at common delivery point of Mt. Belvieu, Texas, or (2) the weighted average gross selling price for the respective grades of product, F.O.B. at the plant in which said gas is processed, whichever is greater. All royalties due on plant products under the terms of this Subparagraph III.B.(2) shall be based on that percent of total plant production of gasoline or other products representing the highest percent accruing to a third party processing gas through such plant under a processing agreement negotiated at arm's length (or if there is no such third party, the highest percent then being specified in processing agreements or contracts in the industry). In addition to the royalties on the plant products, Lessor shall be paid as royalty the market value (as defined in Paragraph III.H.) at the point of delivery to the pipeline purchaser, if sold, or if used, at the point of use, of Twenty-Five percent (25%) of all residue gas attributable to the leased premises and sold or used. In no event shall the royalties payable under this subparagraph for any twelve (12) month period be less than the royalties which would have been due had the gas not been processed.

(3)   Should Lessee enter into a bona fide arm's length contract or arrangement with a non- affiliated company for use of gas from the premises in the manufacture or extraction of gasoline or other products in a plant, Lessor shall have and be entitled to a royalty of Twenty-Five percent (25%) of all such products, proceeds, monies, benefits, and other things of value, of every kind and character, received by Lessee or to which Lessee is entitled under such contract or arrangement attributable to gas produced from the leased premises. All royalties due on plant products under the terms of this Subparagraph III.B.(3) shall be based on that percent of total plant production of gasoline or other products accruing to Lessee attributable to the gas produced from the leased premises. In addition to the royalties on plant products, Lessor shall be paid as royalty the market value (as that term is defined in Paragraph III.H.) at the outlet of such plant or plants of Twenty-Five percent (25%) of all residue gas attributable to the leased premises and sold or used. In no event shall the royalties payable under this subparagraph for any twelve (12) month period be less than the royalties which would have been due had the gas not been processed.

(4)   In the event reinjection operations are not conducted or if the gas is not taken to a plant, if the gas from any well shall be sufficiently impregnated with condensate or other liquid

SAM.4617

hydrocarbons that paying quantities of condensate or other liquid hydrocarbons can be separated therefrom and liquefied as a practical lease operation by the installation by Lessee of mechanical traps, conventional separators or other similar devices customarily used in the industry for such purposes on the premises, then in such event Lessee shall install such devices upon said lease.

(5)     If, at any time at or before the expiration date of the primary term, there is a well capable of producing gas on said land, but gas is not being produced, and this lease is not being maintained by production, operations or otherwise, Lessee, at Lessee's election, may pay as royalty to the parties entitled to royalty on or before the first day of the month after expiration of ninety (90) days after (a) the expiration of the primary term, or (b) the date this lease ceases to be maintained by production operations or otherwise, a sum equal to one-twelfth (1/12) of <u>Seventy-Five and NO/100 Dollars ($75.00)</u> per net mineral acre for each such net mineral acre in a production unit (as defined herein) around such well or within a pooled unit then subject to this Lease, which payment shall maintain this lease in force and effect for the acreage comprising said unit for a period of one (1) month from the date of payment and relieve Lessee of any further operation during such month, it being understood, however, that such payment shall in no manner affect nor alter the provisions of Article V. relating to the periodic drilling of wells. "Net Mineral Acre" as used herein, shall be equivalent to the full mineral interest on one acre of land and, shall be determined by adding the respective products derived by multiplying the divided or undivided mineral interest of Lessor in the leased premises times the surface acres subject to like undivided mineral interests of Lessor in the leased premises. In like manner, with like effect and upon like payments on or before the expiration of the last preceding month for which such payment has been made, this lease may be maintained in force and effect for successive periods of one (1) month each, until such time as the acreage comprising said unit is maintained by production, operations or otherwise under the terms hereof; provided, however, such payments shall not operate to maintain this Lease in force and effect for any period in excess of two (2) consecutive years for the first such occurrence; nor for any period in excess of twelve (12) months for any succeeding occurrence not to exceed twenty-four (24) months cumulative. Any amounts so paid shall not be treated nor considered as advance royalty payments on any gas produced from such well or wells. Lessee may at any time and from time to time prepay such monthly shut-in royalty for such periods as Lessee may elect. Nothing herein shall relieve Lessee of Lessee's obligation at all times to protect the leased premises from drainage as set forth in Article VI.

C.     An equal <u>Twenty-Five</u> percent <u>(25%)</u> part of all other liquid hydrocarbons that may be produced from said land; or at Lessor's election, exercisable from time to time, an equal <u>Twenty-Five</u> percent <u>(25%)</u> part of the full market value in the field of all such other liquid hydrocarbons, provided that when such liquid hydrocarbons are sold, the market value shall not be less than the amount realized by Lessee from the sale thereof in an arms length transaction, and, in any event, without any cost or expense to Lessor and without any deduction of any kind or character.

D.     Anything hereinabove to the contrary notwithstanding, it is expressly provided that Lessee, and any subsidiary of Lessee, shall at all times exercise due diligence as the fiduciary agent for Lessor in the marketing of all products produced under the terms of this Lease. In the event Lessor considers that the Lessee is not exercising due diligence as the fiduciary agent for Lessor in the marketing of any products produced under the terms of this Lease, then the provision of Article XI. of this Lease shall apply.

E.     For the purposes of this Article III., the following terms shall have the meanings set forth below:

(1)     Affiliate - the term "Affiliate" or "Affiliated Company", when used in relation to Lessee, means another corporation or business entities of any type which;

(a)     owns more than ten percent (10%) of Lessee's stock or equity;

(b)     more than ten percent (10%) of whose stock or equity is owned by Lessee; or

(c)     more than ten percent (10%) of whose stock or equity is owned by any parent corporation, either directly or indirectly, which parent

SAM.4618

corporation also owns more than ten percent (10%) of Lessee's stock or equity either directly or indirectly.

(2)    As used herein, the term "Lessee" and "Affiliate of Lessee" shall also mean "Assignee or Assignees of Lessee" and "Affiliate of Assignee or Assignees of Lessees"

F.    Upon request (and from time to time) of any party Lessor, or any of their respective agents, Lessee shall promptly furnish copies of any and all contracts for the sale, transportation or processing of Lessor's royalty share of any gas or oil produced under the terms hereof.

G.    Lessee agrees that all royalties accruing under this Lease shall be without deduction for the cost of producing, gathering, separating, compressing, dehydrating, storing, treating, processing, transporting and otherwise making the oil, gas and other gaseous or liquid hydrocarbons produced hereunder ready for sale or use or for the marketing thereof.

H.    It is expressly agreed that for the purposes of this Lease the term "market value" of gas, including casinghead gas, shall mean the gross amount realized under any contract or contracts for the sale of gas produced hereunder; provided that, "market value" shall be at least as high as the first posting during each month per mmbtu published in "NATURAL GAS WEEK, TEXAS GULF COAST, ONSHORE INTERSTATE SPOT PRICE DELIVERED TO PIPELINE" for gas sold interstate and "NATURAL GAS WEEK, TEXAS GULF COAST, ONSHORE INTRASTATE SPOT PRICE DELIVERED TO PIPELINE" for gas sold intrastate or, in the event NATURAL GAS WEEK ceases publication or ceases to post the Reference Price set forth above, Lessor and Lessee mutually agree to employ a substitute price derived from the publication "INSIDE FERC GAS MARKET REPORT-SPOT INTERSTATE PRICE DELIVERED TO PIPELINE". If Lessee sells Lessor's gas under contracts providing for a term of one (1) year or more, the index for determining the floor value shall be that which references gas contracts having terms of one (1) year or longer. The substitute price shall be the first posting during the month per mmbtu. In the event the latter publication ceases publication or ceases publishing Texas index gas prices, then Lessor and Lessee agree to select a mutually agreeable index to be utilized as a floor for valuing Lessor's royalty. If Lessor and Lessee are unable to locate an acceptable substitute publication or if such substitute publication or appropriate price index is not available, then the parties hereto agree that "market value" shall be as defined under the terms of the oil and gas lease form at that time being used by the General Land Office of the State of Texas for mineral classified lands.

In the event a contract signed by Lessee or an index price used as a floor for valuing Lessor's royalty shall include any deduction for the expense of producing, gathering, dehydrating, compressing, transporting, manufacturing, processing, treating or marketing of gas, then such deductions shall be added to the market value of such gas so that Lessor's royalty shall not be chargeable, directly or indirectly, with any of such expenses or adjustments.

I.    Notwithstanding anything herein to the contrary, in the event this Lease now, or in the future, covers and pertains to separate tracts, then each and every party Lessor to this Lease affirmatively states, as indicated by his signature below, that it is his intent that there be no apportionment of rentals, royalties, shut-in rentals, minimum royalties or any other payment now payable or to be paid to Lessor under the terms of this Lease; further more, this Lease shall not be construed as constituting either a community lease or a pooling or unitization agreement. As used in this Article III., the words "separate tract" mean any tract with mineral or royalty ownership differing now or hereafter either as to parties or to percentage ownership from that applicable to any other part of the leased premises.

J.    In the event this Lease covers and pertains as to separate tracts, either now or in the future, then in order to form the production units defined hereinbelow in Paragraph V.D., and subject to the provisions applicable to such production units, including without limitation those provisions as to size, shape, location, designation, re-designation and form as stated therein, Lessee is hereby given the right and power to pool or combine separate tracts subject to and covered by this Lease with other separate tracts subject to and covered by this Lease. For the purpose of computing the royalties to which owners of royalties shall be entitled on production from each production unit, there shall be allocated to the applicable separate tract acreage included in such production unit a pro rata portion of the production produced from such production unit. Such allocation shall be on an acreage

SAM.4619

basis; that is to say, there shall be allocated to the applicable separate tract acreage within the unit that pro rata portion of the production produced from the production unit which the number of surface acres covered by such separate tract and included in the production unit bears to the total number of surface acres included in the production unit commencing with the date of first production from the production unit.

K. For the purposes of calculating all royalties payable under Article III. herein, it is expressly provided that all such calculations shall be based on formation production as reported on Texas Railroad Commission forms P-1 and P-2.

## IV. DELAY RENTAL:

A. If operations for drilling are not commenced on said land on or be fore one (1) year from the date hereof, this Lease shall then terminate as to both parties, unless on or before such anniversary date Lessee shall pay to Lessor the sum of Seventy-Five and NO/100 Dollars ($75.00) per net mineral acre for the number of net mineral acres then covered by this Lease (herein called rentals), which shall cover the privilege of deferring commencement of drilling operations for a period of twelve (12) months. Thereafter, upon the payment in like manner annually of Seventy-Five and NO/100 Dollars ($75.00) per net mineral acre for the number of net mineral acres then covered by this Lease and not surrendered as hereinafter provided, the commencement of drilling operations may be further deferred for successive periods of twelve (12) months each during the primary term. The payment of rental under this Paragraph and of royalty under Article III. on any gas well from which gas is not being sold or used, and of minimum royalties, may be made by check of Lessee delivered to the parties entitled thereto on or before the date of payment. The above provisions are subject to reduction of payments as expressed in Paragraph V.

B. Lessee may at any time or times execute and deliver to Lessor, or place of record, a release or releases covering any portion or portions of the above described premises or rights therein, and thereby surrender this Lease in whole or in part as to such portion or portions and be relieved of all obligations as to the acreage surrendered, and thereafter the rentals payable hereunder shall be reduced in the proportion that the acreage covered hereby is reduced by said release or releases; provided, however, anything hereinabove to the contrary notwithstanding, that prior to drilling operations on the leased premises if Lessee elects to maintain this Lease as to any portion of the leased premises by payment of rental, such rental shall not be less than Seventy-Five and NO/100 Dollars ($75.00) per year subject to the proportionate reduction under Article XVIII. This provision shall in no way deny the Lessee the right at any time to release all the leased premises and thereafter be relieved of the payment of any rental. Notwithstanding any partial release or releases, Lessee shall retain such easement rights upon such released and surrendered lands as are then being used for Lessee's operations on other lands retained hereunder. For the purpose of release and assignment, the recited acreage of any tract shall be considered correct whether it contains more or less, unless subsequent survey or other accurate determination reveals that such recited acreage is incorrect, in which case, the actual acreage shall prevail.

## V. CONTINUOUS DEVELOPMENT, POOLING, SECONDARY TERM, ANNUAL RENTALS AND MINIMUM ROYALTY:

A. If during the primary term and prior to discovery and production of oil, gas or other liquid hydrocarbons in paying quantities on said land, Lessee should drill a dry hole or holes thereon, or if after discovery and production of oil, gas or other liquid hydrocarbons, the production thereof in paying quantities should cease from any cause, this Lease shall not terminate if Lessee commences operations for drilling or reworking within sixty (60) days thereafter or if it be within the primary term, commences or resumes the payment of rentals or commences operations for drilling or reworking on or before the rental paying date next ensuing after the expiration of sixty (60) days from the date of completion of a dry hole or cessation of production, however, if during the primary term Lessee is engaged in drilling operations on a rental paying date and for that reason the annual rental is not paid, and if the well is a dry hole, then on or be fore the expiration of sixty (60) days after the cessation of operations on such well Lessee will either commence additional operations for the drilling of another well or pay a proportionate part of the annual delay rental which would have been paid except for such drilling operations, based on the number of days then remaining to the next ensuing rental payment date, or to the expiration of the primary term, whichever is applicable, in order to maintain this Lease in force and effect.

Page 5 of 21

SAM.4620

B.     If at the expiration of the primary term, oil, gas or other liquid hydrocarbons are not being produced in paying quantities on said land, but Lessee is then engaged in drilling or reworking operations thereon or shall have completed a dry hole thereon within sixty (60) days prior to the end of the primary term, the Lease shall remain in force so long as operations on said well or for drilling or reworking of any additional well are prosecuted with no cessation of more than sixty (60) consecutive days, and if they result in the production of oil, gas or other liquid hydrocarbons, so long thereafter as oil, gas or such other liquid hydrocarbons are produced from said land in paying quantities.

C.     Notwithstanding the foregoing, it is specifically provided that during the primary term only, and after the discovery and production of oil, gas or other liquid hydrocarbons in paying quantities on the leased premises, Lessee shall either (1) develop the acreage retained hereunder by the drilling of additional wells at sixty (60) day intervals, as hereinafter provided for, (2) release those portions of the land covered hereby not included in a production unit or units, or (3) Lessee may in lieu of such drilling or release, maintain this Lease in force and effect during the primary term as to any land covered hereby which is not included in a production unit (either oil or gas) by the payment of the proportionate part of the delay rentals provided herein as to the acreage not then included in a production unit or units.

D.     Subject to the other provisions of this Paragraph V.D. and upon and at any time during the secondary term of this Lease, Lessee shall reasonably develop the acreage retained hereunder but not included in a production unit ("undeveloped acreage"), and in order to reasonably develop such undeveloped acreage, Lessee must drill additional wells on such undeveloped acreage at one hundred and twenty (120) day intervals, as hereinafter provided. It is agreed that in the event that during the secondary term of this Lease, more than one hundred twenty (120) consecutive days elapse between the completion of one well and the commencement of drilling operations on the next well on such undeveloped acreage, Lessee shall upon written demand of Lessor, forthwith execute and deliver to the Lessor, or place of record in the County in which said land is located, a release of all the premises covered by this Lease, SAVE AND EXCEPT that Lessee shall retain, and this Lease shall remain in full force and effect as to, the production units as hereinafter defined.

E.     Lessee, at its option, is hereby given the right and power in its discretion to pool or combine, as to any one or more formations, the land covered by this Lease or any portion of said land, insofar only as gas or gas condensate rights are concerned (it being understood that there shall be no pooling for oil hereunder), with other land, lease or leases in the immediate vicinity thereof, except to the extent and in the manner hereinafter stipulated. With respect to any such unit so formed, Lessee shall execute in writing an instrument or instruments identifying and describing the pooled acreage, and file same for recording in the office of the County Clerk in Hardin County, Texas; and the pooled unit shall become effective on the date such instrument or instruments are so filed for record. Notwithstanding anything hereof to the contrary, pooled units created hereunder and comprising all or part of the herein leased premises shall not exceed the maximum acreage figures permitted for production units of oil or gas wells completed at certain depths under Article V. hereof unless the Railroad Commission of Texas or any governmental authority having and asserting jurisdiction over the subject matter thereof prescribes for the drilling or operation of a well at a regular location, or permits for the obtaining of the maximum allowable from any well to be drilled, drilling, or already drilled, larger pooled units than any of those herein permitted, then any such pooled unit may be established or enlarged to conform to the size either required of a well or permitted for the obtaining of the maximum allowable. For any well drilled on and completed at depths beneath the surface of a tract covered by this lease there shall be no pooling with other lands, unless such tract is insufficient, due to either its lack of size or prior unitization hereunder, to comprise the maximum acreage figures permitted hereunder in which case all of said tract (95 acres more or less) or the then un-unitized portion of same shall be so pooled; and Lessee may include in such pooled unit such other acreage as may be available to comprise the maximum acreage figures permitted under the terms of this lease. For a well drilled on or completed at depths beneath the surface of lands other than the herein leased premises, not less than all (100%) of the lands (95 acres more or less) or the then un-unitized portion of same shall be so pooled; and Lessee may include in such pooled unit such other acreage as may be available to comprise the maximum acreage figures permitted under the terms of this lease.

Operations for drilling on or production of gas from any part of the pooled unit which includes all or a portion of the Leased Premises, regardless of whether such operations for drilling were commenced

SAM.4621

or such production was secured before or after the date of this lease or the date of the instrument designating the pooled unit, shall be considered as operations for drilling on or production of gas from the Leased Premises, whether or not the well or wells be located on the Leased Premises, and the entire acreage constituting such unit or units shall be treated for all purposes, except the payment of royalties on production from the pooled unit, as if the same were included in this Lease. The above right and power to pool may be exercised at any time and from time to time and before or after a well has been drilled, or while a well is being drilled. Lessee may vacate any unit formed by it hereunder by instrument in writing filed for record in said county at any time when there is no unitized substance being produced from such unit. The pooling for gas hereunder by Lessee shall also pool and unitize all liquid gas, and the royalty interest payable to Lessor thereon shall be computed the same as on gas. For the purpose of computing the royalties to which owners of royalties shall be entitled on production from each production unit, there shall be allocated to the applicable separate tract acreage included in such production unit a pro rata portion of the production produced from such production unit. Such allocation shall be on an acreage basis; that is to say, there shall be allocated to the applicable separate tract acreage within the unit that pro rata portion of the production produced from the production unit which the number of surface acres covered by such separate tract and included in the production unit bears to the total number of surface acres included in the production unit, commencing with the date of first production from the production unit.

Pooled units subject to this Article V. shall conform in size with the acreage set forth hereunder.

ANYTHING HEREIN TO THE CONTRARY NOTWITHSTANDING, as used in this Lease, the term "production unit(s)" is defined as follows:

(1) As to each well situated on the leased premises producing oil in paying quantities or being reworked and classified as an oil well under the Rules and Regulations of the Railroad Commission of Texas, not more than forty (40) acres around each such well, in the shape hereinafter provided

(2) As to each well producing gas in paying quantities (or capable of producing gas in paying quantities with all shut-in gas well rental having been paid thereon) or being reworked and classified as a gas well under the Rules and Regulations of the Railroad Commission of Texas from the surface down to a depth of 9,000 feet, not more than one hundred sixty (160) acres surrounding each such gas well, or such portion of the land covered by this Lease which shall have been included in a gas pooled unit.

(3) As to each well producing gas in paying quantities (or capable of producing gas in paying quantities with all shut-in gas well rental having been paid thereon) or being reworked and classified as a gas well under the Rules and Regulations of the Railroad Commission of Texas, not more than three hundred and twenty (320) acres surrounding each such gas well completed at depths or horizons below 9,000 feet beneath the surface of the leased premises and above 12,000 feet beneath the surface of the leased premises; or such portion of the land covered by this Lease which shall have been included in a gas pooled unit.

(4.) As to each well producing gas in paying quantities (or capable of producing gas in paying quantities with all shut-in gas well rental having been paid thereon) or being reworked and classified as a gas well under the Rules and Regulations of the Railroad Commission of Texas, not more than six hundred and forty (640) acres surrounding each such gas well completed at depths or horizons of 12,000 feet beneath the surface of the leased premises and deeper; or such portion of the land covered by this Lease which shall have been included in a gas pooled unit.

Each production unit (except the tracts in pooled gas units, if any) to be centered by said well, to be in as nearly a square form as is reasonably possible, unless otherwise agreed to by Lessor. Should the Railroad Commission of Texas or any governmental authority having and asserting jurisdiction over the subject matter thereof prescribe for the drilling or operation of a well at a regular location, or permit for the obtaining the maximum allowable from any well to be drilled, drilling, or already drilled, larger production units than any of those herein permitted, then any such production unit may be established or enlarged to conform to the size either required of a well or permitted for the obtaining of the maximum allowable.

SAM.4622

Each such production unit shall be one contiguous area (except the tracts in pooled gas units). Within thirty (30) days of completion of any well drilled on the leased premises producing in paying quantities, or capable of producing in paying quantities, Lessee shall furnish to Lessor, and shall file of record in the Official Public Records of Real Property of the county in which the land is located, a written designation of the production unit for such well.

Notwithstanding the termination of this Lease as to a portion or portions of the acreage covered hereby and as to depth under the other provisions hereof, this Lease shall nevertheless remain in force and effect as to each production unit or units so long as oil, gas or other liquid hydrocarbons are produced therefrom in paying quantities or, as to gas production units, capable of being produced therefrom in paying quantities with all shut-in gas well rentals having been paid thereon, for that period of time specified above in Subparagraph III.B.(5); and if production in paying quantities from any production unit shall cease, this Lease, insofar as it covers and affects such particular production unit which ceases producing in paying quantities, shall terminate (not withstanding the fact that there may be production in paying quantities from some other lease production unit) unless Lessee shall commence drilling or reworking operations on such particular production unit within sixty (60) days thereafter if during the primary term and one hundred twenty (120) days if after the primary term (sometimes referred to herein as the secondary term) and shall pursue such drilling or reworking operations on the same or successive wells at intervals not to exceed sixty (60) days if during the primary term and one hundred twenty (120) days if after the primary term (sometimes referred to herein as the secondary term) between the date of completion of operations on one well and the date of commencement of operations on another and, if production in paying quantities is restored on such production unit, so long thereafter as production in paying quantities is produced therefrom or, as to gas production units capable of being produced in paying quantities with all shut-in gas well rentals being paid thereon for that period of time specified above in Subparagraph III.B.(5), or additional drilling or reworking operations are had thereon as above provided. It is further expressly provided that production or operations or payment of shut-in gas well rental on any production unit as so designated shall have no effect upon the continuance of this Lease as to any other production unit or units. If any production unit gas well is converted to or reclassified as an oil well; or if any production unit well (either oil or gas) re-completed at a lesser depth; then Lessee shall re-designate the production unit for such well so as to reduce the acreage included in such production unit to comply with the applicable (with regard to type of production and greatest producing depth) acreage provisions stated hereinabove and shall release all lease acreage not included in such re-designated production unit or another production unit in the same manner as provided above in Paragraph V.C. of this Lease.

F.      Any release required hereunder shall be filed for record in the Official Public Records of Real Property in the Office of the County Clerk of the county in which said land is located, and a copy of such instrument furnished to Lessor within a reasonable time; thereafter, Lessee shall lose all rights, except the easement and lease facilities rights as set forth and specified in Article I. hereof, and be relieved of all obligations as to the acreage so released. Effective as of the date that Lessee receives the demand for release specified above in Paragraph V.D., each production unit shall be treated the same as if it were covered by a separate lease.

G.      ANYTHING HEREIN TO THE CONTRARY NOTWITHSTANDING, it is agreed that in any circumstances where Lessee is required to secure from the United States Army Corps of Engineers or any other State or Federal agency, department, or service having legal jurisdiction over Lessee's operations on the leased premises, permits for the drilling and/or operation of wells under the terms of this Lease, the sixty (60) day or one hundred and twenty day period of time, whichever is applicable, referred to in this Article V. between the completion of one well and the commencement of drilling operations on the next well after the primary term shall be and accordingly is hereby extended by another sixty (60) days after such permit is received by Lessee, but in no event more than three hundred sixty-five (365) days between the completion of one well and the commencement of drilling operations on the next well. In such event, Lessee shall promptly furnish Lessor a true copy of such permit in recordable form.

H.      On each anniversary date of the first sale of oil, gas or other liquid or gaseous hydrocarbons, or either, produced from said land and in the event Lessee is retaining all or any portion of the lands covered hereby by the production of oil, gas or other hydrocarbons, if the rentals and royalties (including shut-in payments) accrued hereunder, during the preceding twelve (12) months shall not have equaled at least the amount of ONE HUNDRED and NO/100 Dollars

SAM.4623

($100.00) per acre for each net mineral acre as hereinafter defined of land subject to the terms hereof at the commencement of said twelve (12) months, Lessee covenants and agrees that, within thirty (30) days after the receipt from Lessor or Lessor's Agents of notice to such effect, Lessee will promptly pay to Lessor as an additional royalty the amount of the difference between such accrued royalties and the sum of ONE HUNDRED and NO/100 Dollars ($100.00) per acre for each net mineral acre subject to the terms hereof at the commencement of said twelve (12) months. This additional royalty provision, when applicable, shall be in effect for and during the life of this Lease after the primary term.

      I.      Notwithstanding anything herein to the contrary, in the event the Texas Railroad Commission, or any governmental authority having and asserting jurisdiction over the subject matter thereof, prescribes for a drilling or operation of a well at a regular location, or permits for the obtaining of the maximum allowable from any well drilled, drilling or already drilled, smaller productions units than any of those herein permitted for such well under the provisions defining production units in Paragraph V.D. hereof, then any such production unit shall be established or reduced to conform to the minimum size allowed for the obtaining of the maximum allowable.

      J.      For the purposes of this Lease, the terms "commencement of a well" and "completion of a well" are defined as follows:

      (1)      "Commencement of a Well" shall mean only the actual drilling of a well with rotary equipment and tools of a suitable size necessary to reach an objective depth from which Lessee may, in good faith, anticipate the production of oil or gas.

      (2)      "Completion of a well" shall mean the day Lessee releases the drilling rig used to drill such well or a completion rig, if utilized, or the date the latter of such rigs is moved off the location, whichever date occurs first.

## VI.    OFFSET OBLIGATIONS:

      A.      Lessee covenants and agrees to operate the leased premises as a reasonable prudent operator would under the same or similar circumstances and to protect each of the leased premises from drainage by reason of any well drilled on adjacent or nearby lands. The above covenant notwithstanding, in the event a well producing from a unit not comprised of acreage from the leased premises which has been classified "oil" by the appropriate governmental body is completed on adjacent or nearby lands not more than six hundred sixty feet (660') from the leased premises, or draining the leased premises, or a well producing from a unit not comprised of acreage from the leased premises which has been classified as "gas" by the appropriate governmental body is completed on adjacent or nearby lands not more than one thousand three hundred and twenty feet (1,320') from the leased premises, or draining the leased premises, Lessee covenants and agrees to, within ninety (90) days from the date production is first sold, removed or otherwise marketed from said adjacent or nearby producing well, either (1) commence with due diligence operations for the actual drilling of an offset well on the leased premises to the base of the formation from which the adjacent or nearby producing well is producing, (2) pay Lessors as compensatory royalty, in addition to any royalties currently due, a sum equal to the royalties which would be payable under this Lease on the production from said adjacent or nearby producing well had same been producing on the leased premises, or (3) in lieu of drilling such offset well or paying such compensatory royalty, release by recordable instrument the offset acreage, as hereinafter defined. "Offset Acreage", as used hereinabove, shall be defined as a unit which would surround such a well if same were completed on the leased premises; provided, however, that if any portion of the offset acreage should be included in a producing unit designated by Lessee hereunder, then if Lessee elects to surrender and release such offset acreage, it may retain and except from such release the producing stratum or strata included in such producing unit, but such offset acreage must conform to the depth, size and shape limitations contained in Paragraph V. herein. The provisions hereof shall apply regardless of whether lands upon which offset wells may be located are owned by Lessor or any of them or not, and with regard to wells located within the hereinabove prescribed distances from the leased premises, regardless of whether drainage is actually proved to be taking place or not. Notwithstanding anything herein to the contrary, Lessee shall have no obligations under this Article VI. in the event a producing well on nearby or adjacent land is already offset by a well on the leased premises or on acreage pooled therewith producing from the same producing horizon from which production has been secured from any well on nearby or adjacent lands.

SAM.4624

B.     If Lessee elects to pay the above authorized compensatory royalty, then such royalty shall be calculated and paid on a calendar month basis. The compensatory royalty for the calendar month in which production is first marketed from the offsetting well shall be paid on or before the first day of the calendar month next following the expiration of ninety (90) days after the end of said calendar month in which production if first marketed, and subsequent payments shall be made on or before the first day of each succeeding calendar month. If Lessee is neither the operator of, nor the owner of an interest in the offsetting well, and if the operator of such well refuses to divulge to Lessee the actual monthly volume and/or sales price of production from such well, then Lessee shall be authorized to pay the compensatory royalty for each month on estimates of volume and sales price based on such information as may be timely available to Lessee from other sources, such as the Texas Railroad Commission and/or the Texas Comptroller's Office, provided that each such payment which is made on an estimated basis shall be properly adjusted within 60 days after the date that Lessee directly obtains, or is furnished by Lessor, the actual volume and sales price for the month covered by the estimated payment.

## VII.     SURFACE OBLIGATIONS AND ADDITIONAL FEE:

Lessor owns no surface in the acreage described herein and this space is intentionally left blank.

## VIII.    GENERAL INDEMNITY AGREEMENT: .

Lessee covenants and agrees to fully defend, protect, indemnify, hold harmless and render whole each party comprising Lessor, their representatives, agents and employees, and their respective heirs, successors, legal representatives and assigns, from and against each and every claim, demand or cause of action and any liability, cost, and/or expense (including but not limited to reasonable attorneys' fees and expenses incurred in defense of Lessor, their representatives, agents and/or employees) for damage or loss in connection therewith, which may be made or asserted by Lessee, Lessee's representatives, agents or employees, or which may be made or asserted by any contractor or subcontractors, contractor's or subcontractor's representatives, employees and/or agents, or which may be made or asserted by any other third party (including, but not limited to, Lessor's representatives, employees and/or agents or Lessee's invitees, licensees or any trespasser), on account of personal injury or death or property damage caused by, arising out of, or in any way incidental to, or in connection with this agreement and of Lessee's operations both on or about the premises, including, but not limited to, those situations where personal injury or death or property damage (or liability therefor) was caused by the sole negligence of Lessee, any contractor or subcontractors and/or third party (and/or any of their respective representatives, employees and agents), by the concurrent negligence or any combination of Lessor, or any one or more of them, Lessee, any contractor or subcontractor and/or any third party (and/or any of their respective representatives, employees and/or agents), or where liability for such personal injury or death or property damage with or without fault is imposed on any theory of strict liability by operation by law.

Lessee must give notice to Lessor of any claim, action, administrative proceeding or other demand by any other governmental agency or other party of any such claims, actions, or demands made as a result of any action by Lessee.

Lessee shall assume, on behalf of Lessor, and conduct with due diligence and in good faith, the defense of all claims arising out of the exercise of the rights herein granted to Lessee or in connection with or growing out of this agreement or the performance by Lessee of the obligations hereunder which may be brought against the Lessor, whether or not the Lessee is joined therein, even if such claims be groundless, false or fraudulent, and shall bear the costs of all judgments and settlements in connection therewith, provided, however, without relieving Lessee of any obligations under this agreement, Lessor, at Lessor's election, may defend or participate in the defense of any or all of the claims.

SAM.4625

## IX.   ENVIRONMENTAL PROVISIONS AND INDEMNITY:

A.    Lessee covenants and warrants that Lessee and Lessee's use of the leased premises will at all times comply with and conform to all laws, statutes, ordinances, rules and regulations of any governmental, quasi-governmental or regulatory authority ("Laws") which relate to the exploration and production of oil and/or gas from the leased premises, or land pooled therewith, transportation, storage, placement, handling, treatment, discharge, generation, production, disposal or injection (collectively "Treatment") of oil, gas and other liquid hydrocarbon substances produced hereunder ("Products"); of salt water, brine and other exempt waste products produced in association with oil or gas ("Exempt Waste"); or of any other waste (including, without limitation, non-exempt wastes), any of the petroleum product, waste products, radioactive waste, poly-chlorinated biphenyl, asbestos, hazardous materials of any kind, and any other substance which is regulated by any law, statute, ordinance, rule or regulation (collectively "Waste").  Lessee further covenants that it will not engage in or permit any party to engage in any Treatment of any Waste not associated with the exploration, development or production of oil or gas on or which affects the leased premises. Specifically, and without limiting the foregoing, Lessee agrees that (i) no toxic or hazardous wastes shall be generated, treated, stored, disposed of or otherwise deposited or released in or on the leased premises; (ii) Lessee will not engage in and will not permit any other party to engage in any activity not associated with the exploration, development or production of oil or gas with respect to the leased premises which would cause (a) the leased premises or the adjoining property to become a non-exempt or hazardous waste treatment, storage or disposal facility within the meaning of the Resource Conservation and Recovery Act of 1975 ("RCRA"), as now or hereafter amended, or any similar State law or Local ordinance or other environmental law, (b) a release or threatened release of a hazardous substance from or to the leased premises or the adjoining property within the meaning of the Comprehensive Environmental Response, Compensation and Liability Act of 1980 ("CERCLA"), as now or hereafter amended or any similar State law or Local ordinance or any other environmental law, or (c) the discharge of pollutants or effluents into any water source or system, or the discharge into the air of any emissions, which would require a permit under the Federal Water Pollution Control Act or the Clean Air Act or any similar State or Local ordinance or other environmental law; (iii) Lessee shall not permit any substance or conditions in or on the leased premises or the adjoining property which might support a claim or cause of action under RCRA, CERCLA, or any other Federal, State or Local environmental statutes, regulations, ordinances or other environmental regulatory requirements; and (iv) no underground storage tanks will be located in or on the leased premises.  In the event either CERCLA or RCRA is amended so as to narrow or broaden the meaning of any term defined thereby, such amendment shall apply to Lessee's covenants contained herein, and provided further, to the extent that the laws of the State of Texas establish a meaning for such terms which is broader than that specified in either CERCLA or RCRA, the broader meaning or definition shall apply.

B.    Immediately upon receipt of any Notice, as hereinafter defined, from any party, Lessee shall deliver to Lessor a true, correct and complete report of any written Notice or a true, correct, and complete report of any non-written Notice.  "Notice" shall mean any note, notice, or report of any of the following:

(1)    any suit, proceeding, investigation, order, consent order, injunction, writ, award, or action related to or affecting or indicting the Treatment of any Product, Exempt Waste or Waste in or affecting the leased premises;

(2)    any spill, contamination, discharge, leakage, release or escape of any Product, Exempt Waste or Waste in or affecting the leased premises, whether sudden or gradual, accidental or anticipated, or of any other nature (hereinafter "Spill");

(3)    any dispute relating to Lessee's or any other party's treatment of any Product, Exempt Waste or Waste or any Spill in or affecting the leased premises

(4)    any claims by or against any insurer related to or arising out of any Product, Exempt Waste or Waste or Spill in or affecting the leased premises;

(5)    any recommendations or requirements of any governmental or regulatory authority, or insurer relating to any treatment of Product, Exempt Waste or Waste or a Spill in or affecting the leased premises;

SAM.4626

(6)     any legal requirement or deficiency related to the treatment of Product, Exempt Waste or Waste or any Spill in or affecting the leased premises; or

C.     In the event that (a) Lessee has caused, suffered or permitted, directly or indirectly, any Spill in or affecting the leased premises, or (b) any Spill of any Product, Exempt Taste or Waste has occurred on the leased premises during the term of this agreement, then Lessee shall immediately take all of the following actions:

(1)     notify Lessor, as provided herein;

(2)     take all steps necessary or desirable, in Lessor's reasonable opinion, to clean up all such Spill and any contamination related to the Spill; and

(3)     fully restore the leased premises to its condition prior to the Spill.

D.     Lessee hereby agrees that it will indemnify, defend, save and hold harmless Lessor and their respective heirs, executors, administrators, successors and assigns (collectively "Indemnified Parties") against and from, and to reimburse the Indemnified Parties with respect to, any and all damages, claims, liabilities, loss, costs and expenses (including, without limitation, response costs, remediation, abatement costs, mitigation costs, harm to the environment, property damage, reasonable attorneys' fees and expenses, court costs, administrative costs and costs of appeals), incurred by or asserted against the Indemnified Parties by reason or arising out of: (a) the breach of any representation or undertaking of Lessee under this Article IX., or (b) arising out of the treatment of any Product, Exempt Waste or Waste by Lessee or any tenant, licensee, concessionaire, manager, or other party occupying or using the leased premises under the authority of Lessee, in or affecting the leased premises, or (c) in the event of any Spill governed by the terms of this Article IX.

E.     Notwithstanding anything in this agreement to the contrary, the representations and undertakings of Lessee in this Article IX. shall survive the expiration or termination of the Lease regardless of the means of such expiration or termination; furthermore, in the event of the assignment, sublease, or other transfer of all or any of Lessee's rights under this Lease, the assignee or sub-lessee must assume all of the Lessee's obligations under this Article IX. and Lessee shall remain liable for every obligation under this Article IX.

X.     CHANGE OF OWNERSHIP:

A.     The rights of either party hereunder may be assigned in whole or in part, and the provisions hereof shall extend to their heirs, successors and assigns; but no change or division of ownership of land, rentals or royalties, however accomplished, shall operate to enlarge the obligations or diminish the rights of Lessee; and no change or division in such ownership shall be binding on Lessee until thirty (30) days after Lessee shall have been furnished by registered or certified United States Mail at Lessee's principal place of business with a certified copy of the recorded instrument or instruments evidencing same. In the event of assignment hereof in whole or in part, liability for breach of any obligation hereunder shall, except as herein expressly provided, rest exclusively upon the owner of this Lease, or a portion thereof, who commits such breach. In the event of the death of any person entitled to rentals and royalties hereunder, Lessee may pay such rentals and royalties to the credit of the deceased, or the estate of the deceased, until such time as Lessee is furnished with proper evidence of the appointment and qualification of an executor or administrator of the estate, or if there be none, until Lessee is furnished with evidence satisfactory to Lessee as to the heirs and devisees of the deceased.

B.     In the event the Lessee herein, or any subsequent assignee of Lessee, at any time during the effectiveness of this Lease transfers and/or assigns this Lease or any interest herein, Lessee shall contemporaneously with each such assignment and/or transfer give written notice thereof by mailing a true and full copy of each and every instrument evidencing any and all such assignments and/or transfers to Lessor.

SAM.4627

## XI.  NOTICE OF DEFAULT: .

A.  The breach by Lessee of any obligation existing hereunder shall not automatically work a forfeiture or termination of this Lease nor cause an automatic termination or reversion of the estate created hereby nor be grounds for automatic cancellation hereof in whole or in part except as provided with regard to Lessee's obligation to pay Lessor royalty payments in Paragraph XVII.D. of this Lease. In the event Lessor considers that Lessee is in breach of any provision of this Lease (except for those with regard to payment of royalties), Lessor shall notify Lessee in writing of the facts relied upon as constituting a breach hereof and Lessee shall have sixty (60) days after receipt of such notice in which to comply with the obligations imposed by virtue of this instrument or to provide evidence satisfactory to Lessor that Lessee is not in breach of the terms and conditions of this Lease. In the event Lessee fails to comply with such obligations or to provide said evidence within sixty (60) days after receipt of such notice, the Lessor shall have the right to declare this Lease forfeited, canceled and terminated.

## XII.  PRODUCING LIMITATION (STRATUM OR STRATA):

. A.  At the occurrence of a partial termination of this Lease in accordance with the provisions of Article V. hereof and respectively upon the subsequent partial termination as provided herein, and in no event later than the expiration of the fourth year of the secondary term of this Lease, this Lease will terminate automatically as to all the mineral estate of Lessor covered hereby on or under each production unit, respectively, which is greater than one hundred feet (100') below the deepest total depth drilled or the stratigraphic equivalent thereof, whichever horizontal subsurface depth constitutes the deepest depth, for a well which Lessee has completed as commercial producer of oil and/or gas on the lands described in this Lease or on other lands, if any, pooled or unitized with the leased premises. Upon expiration of the fourth (4th) year of the secondary term of this Lease this Lease will further terminate as to all the mineral estate of Lessor covered on or under each production unit, respectively, which is (1) greater than one hundred feet (100') below the deepest depth from which production in paying quantities is then being had (or at which a well capable of producing gas in paying quantities is completed), and (2) situated between the surface of the land and one hundred feet (100') above the shallowest of the following: (1) the shallowest depth from which production in paying quantities is then being had, (2) the shallowest depth at which a well capable of producing gas in paying quantities is completed, or (3) the top of the shallowest identifiable stratum or horizon determined by the mutual agreement of the parties hereto to be capable if completion were had therein at that time of production in paying quantities, IF AND ONLY IF, Lessee has furnished identification thereof together with the applicable geological/geophysical data used to identify such stratum or horizon on or before the expiration of the fourth (4th) year of the secondary term of this Lease. Such determination is to be based upon (1) the applicable geological/geophysical data acquired by or available to Lessee, copies of which are to be furnished to Lessor for review for such purpose, and (2) any applicable independent geological/geophysical data acquired by Lessor, copies of which are to be furnished to Lessee for review for such purpose. For these purposes, the parties will consider both wells located on the leased premises and those on other lands, if any, pooled or unitized with the leased premises. Furthermore, subsequent to any occurrence of a partial termination of this Lease in accordance with Article V. and respectively upon the subsequent partial terminations as provided therein, and in any event, subsequent to the expiration of the fourth year of the secondary term of this Lease, if any gas well on a production unit is re-completed at a shallower depth and classified as an oil well, then this Lease will further terminate as to all the mineral estate of Lessor covered hereby on or under such production unit which is greater than one hundred feet below the deepest depth from which oil and/or gas is being produced from such oil well. Upon such partial termination Lessor and Lessor's successors, heirs or assigns shall thereafter have the right to reasonable use of the released acreage and depths of the leased premises, but without unreasonable interference with Lessee's rights, for the purposes of investigating, exploring, prospecting and drilling for, producing and owning oil, gas and other liquid hydrocarbons from the horizons (strata) as to which this Lease has terminated.

B.  Upon the occurrence of an event of partial termination of this Lease as to subsurface depths, or at a time thereafter upon request of Lessor, Lessee shall execute and deliver to Lessor recordable instrument(s) setting forth the various producing horizon (stratum) or horizons (strata) stated above, as reflected by reports to the Texas Railroad Commission or other governmental authority having jurisdiction, so that the limit and extent of Lessee's rights under this Lease may be fixed and reflected as a matter of record and, in addition thereto, as requested by Lessor, Lessee shall

SAM.4628

also execute and deliver to Lessor recordable releases or assignments of any and all interests hereunder not maintained in force and effect by Lessee by production, as above provided.

## XIII. FORCE MAJEURE:

Should Lessee be prevented from complying with any expressed or implied covenant of this Lease, from conducting drilling or reworking operations thereof, or from producing oil or gas therefrom by reason of scarcity of or inability to obtain or to use equipment or material, or by operation of force majeure, any Federal or State law, or other order, rule or regulation of governmental authority, (SAVE AND EXCEPT where Lessee is required to secure from the United States Army Corps of Engineers or other State or Federal agency, department, or service having jurisdiction over Lessee's operations on the leased premises, permits for the drilling and/or operation of wells under the terms of this Lease in which case the provisions of Paragraph V.F. shall apply), then while so prevented, Lessee's obligation to comply with such covenant shall be suspended, and Lessee shall not be liable in damages for failure to comply therewith, and this Lease shall be extended while and so long as Lessee is prevented by any such cause from conducting drilling or reworking operations on or from producing oil or gas from the leased premises and the time while Lessee is so prevented shall not be counted against Lessee, anything in this Lease to the contrary notwithstanding, provided, however, any period this Lease may be so extended shall not cumulatively exceed two (2) years, and provided further that during such period Lessee shall pay monthly to Lessor a sum equal to one-twelfth (1/12th) of Seventy-Five and NO/100 Dollars ($75.00) per acre for each mineral acre then subject to this Lease, the first of such payments to begin on or before the first day of the month after the expiration of thirty (30) days from the date this Lease ceased to be maintained by production, operations or otherwise. Nothing in this paragraph shall relieve the Lessee of Lessee's obligation to protect the leased premises from drainage.

## XIV. COUNTERPARTS:

A. This Lease may be executed in any number of counterparts found to be convenient. Each counterpart shall be deemed an original and shall be binding on all parties who execute such counterpart, or another counterpart, irrespective of whether or not such counterpart, or another counterpart, is executed by the other parties below named as parties Lessor .

B. This Lease will not be recorded. However, Lessor and Lessee agree to execute, and Lessee agrees to record in the Official Public Records of Real Property in the County in which said land is located, a "Memorandum" giving notice of this Lease, and promptly following such recording, Lessee shall furnish copies of such recorded Memorandum to Lessor.

## XV. INFORMATION:

As to any and all wells drilled on the herein described land, Lessee agrees to furnish Lessor, or Lessor's authorized representatives, access to said well or wells at his or their own risk at all reasonable hours. Lessee further agrees to furnish at no cost to Lessor, as set forth herein, the following information:

A. A copy of all daily operation reports received by Lessee during drilling, completion or reworking operations shall be sent to Lessor, via facsimile, concurrent with Lessee's receipt of such reports.

B. A copy of all electric logs, formation surveys or any other test made in such well or wells within thirty (30) days of the completion of such log, survey or test.

C. A copy of all applications and reports filed by Lessee with the Texas Railroad Commission in connection with Lessee's operations hereunder shall also be mailed to Lessor simultaneously with Lessee's mailing of such applications and reports to the Texas Railroad Commission.

D. Lessee also agrees to furnish to Lessor any and all title opinions obtained by Lessee, whether rendered by Lessee's attorneys, by outside attorneys retained by Lessee, or by attorneys for purchasers of production under this Lease.

SAM.4629

E. In addition, Lessee shall furnish to Lessor the following seismic or other geophysical data obtained by Lessee during the term of this Lease on the leased premises: (1) access to for review and duplication of all basic data generated (including tapes); (2) scaled, platted maps for all geophysical surveys performed showing the location of all shot holes and station points used in each survey and (3) final stacked and migrated seismic data at all depths across the leased premises. Lessor agrees to use Lessor's best efforts during the term of this Lease to maintain all such data so provided in confidence until otherwise released from this obligation by Lessee or until Lessee releases such data to the general oil and gas industry, whichever occurs earlier.

All such information shall be provided by Lessee irrespective of the results of Lessee's operations on the herein described land.

## XVI. ASSIGNMENT:

In the event this Lease is assigned or transferred by Lessee in whole or in part, then, upon termination of this Lease, Lessee shall be responsible for obtaining a proper recordable release or releases of this Lease as to the portion or portions of said land as to which this Lease has been assigned or transferred by Lessee and Lessee shall furnish such release or releases to Lessor, or file same for record in the Official Public Records of Real Property in the County in which said land is located, promptly after termination of this Lease.

## XVII. TIME, METHOD AND MANNER OF PAYMENT:

ANYTHING HEREIN TO THE CONTRARY NOTWITHSTANDING, and in lieu of the terms and provisions contained in Sections 91.401 through 91.406 of the Texas Natural Resources Code, the parties hereto specifically agree that the following provisions shall apply to this Lease and all royalty payments made hereunder or other rights as provided in the above listed sections, and that such provisions of the Texas Natural Resources Code shall not be applicable; such parties further, by their signatures below, waive any and all rights which might be claimed or asserted under such Sections 91.401 through 91.406 of the Texas Natural Resources Code; thus, it is specifically provided that:

A. All rentals and royalties which may become due hereunder shall be payable at Houston, Harris County, Texas or at such other place, if any, as may be specified by written directive of a particular royalty owner as to such owner's interest.

B. Royalties on production shall be paid on a calendar month basis. The royalty for the calendar month in which production is first marketed shall be paid on or before the first day of the calendar month next following the expiration of sixty (60) days from the execution date of the completion report or potential test for the well that is filed with the Railroad Commission of Texas, and the respective royalty payments for each subsequent calendar month of production shall be made an or before the first day of each successive calendar month following the calendar month in which the first payment is due.

C. All past due royalties (including any compensatory royalties payable under Paragraph VI.B.) shall be subject to a Late Charge based on the amount due and calculated at the maximum rate allowed by law commencing on the day after the last day on which such monthly royalty payment could have been timely made and for every calendar month and/or fraction thereof from the due date until paid, plus attorney's fees, court costs, and other costs in connection with the collection of the unpaid amounts. Any Late Charge that may become applicable shall be due and payable on the last day of each month when this provision becomes applicable.

D. Notwithstanding anything herein to the contrary, upon the failure of Lessee to pay Lessor the royalty payments as provided herein, the Lessor may, at Lessor's option, elect to terminate said Lease by serving written notice on Lessee at the address shown herein, of Lessor's intention to terminate said Lease within not less than thirty (30) lays of receipt, or any time thereafter. Should Lessee pay Lessor all royalty payments past due during said period, with interest as provided herein, this Lease shall not terminate. However, upon the failure of Lessee to pay Lessor said past due royalty payments during said notice period, Lessor may elect to terminate this Lease, and title to said land shall revert to Lessor. Lessor may elect to terminate said Lease, after the expiration of said notice period, by serving notice of termination, filing a copy of said notice with the County Clerk of

SAM.4630

the county in which said land is located. The effective date of said termination shall be the date said termination is filed with the said County Clerk. In the event of the termination of said Lease in this manner, Lessee shall not remove any of Lessee's equipment, fixtures, or personal property located on said land, unless so instructed by Lessor, and if so instructed, such property shall be removed within thirty (30) days of notice to Lessee. In the event Lessor prohibits the removal of such property from the leased premises, then it shall become the property of Lessor, at the option of Lessor.

E.    Neither Lessee nor its purchaser of production shall be authorized to make any deductions or adjustments against present or future royalty payments for royalty amounts previously paid without first giving Lessor or royalty owner thirty (30) days advanced notice of same along with a full explanation of such overpayment. In the event Lessor or royalty owner disputes the legitimacy of such deduction or adjustment, Lessee or purchaser shall not be entitled to make such deductions or adjustments against Lessor's royalty (and Lessor's full royalty payments shall not be interrupted) until such dispute is resolved. If it is agreed between Lessor or royalty owner and Lessee that a royalty owner was overpaid, then the overpaid royalty owner has the option of repaying such overpayment or allowing Lessee or purchaser to recoup such overpayment out of future royalty payments on a schedule and in monthly amounts agreed to by such overpaid royalty owner and Lessee or purchaser. Any overpaid royalty owner shall not be charged interest on the overpaid sums.

F.    Lessor expressly reserves the right and Lessee expressly grants to Lessor and any royalty owner the right to audit production, revenue and the calculation and payment of revenues to Lessor and royalty owners, by such royalty owner giving Lessee notice of the exercise of this right and, within 30 days after receipt of such notice, Lessee shall make available to the requesting royalty owner all books and records (together with copies thereof if requested by royalty owner) along with all other data necessary for royalty owner or his agent to audit such production, revenue and/or royalty payments. Lessor shall select the accounting procedure to be utilized in such audit and such procedure selected shall be binding on Lessee so long as such procedure is accepted under general accounting practice and standards. If it is determined that royalty owner has not been correctly paid all sums owed him, then Lessee shall reimburse the requesting royalty owner for all costs and expenses incurred by Lessor for such audit, together with all unpaid revenues, late charges, and interest thereon.

G.    Without limiting the other provisions of this Article XVII., it is further specifically acknowledged and agreed by the parties hereto that the term "market value" as used herein shall be defined in accordance with the above Paragraph III.H. and not in accordance with the provisions of Subsection 91.402 (i) of the Texas Natural Resources Code.

H.    The provisions of this Article XVII. shall not apply where Lessor has elected to take Lessor's royalty in kind or market separately Lessor's royalty share of production under the terms of this Lease.

I.    Notwithstanding anything herein to the contrary, Lessor's exercise of Lessor's rights under this paragraph shall not be deemed as a waiver of Lessor's right to take all actions necessary to recover unpaid royalties, interest and other damages incurred.

J.    In the event Lessee enters into a gas purchase contract which contains what is commonly referred to as a "take or pay provision" (such provision meaning that the gas purchaser agrees to take delivery of a specified minimum volume or quantity of gas over a specified term at a specified price or to make minimum periodic payments to the producer for gas not taken by the purchaser) and the purchaser under such gas purchase contract makes payments to Lessee by virtue of such purchaser's failure to take delivery of such minimum volume or quantity of gas, then Lessor shall be entitled to Twenty-Five percent (25%) of all such sums paid to Lessee or producer under the "pay" provisions of such gas purchase contract. Such payment shall be due and owing to Lessor within sixty (60) days after the receipt of such payments by Lessee. Any payments made to Lessor under the "pay" obligation of any "take or pay" gas contract shall be applied as a credit toward Lessee's minimum royalty obligation. If the gas purchaser "makes up" such gas within the period called for in the gas contract and Lessee is required to give such purchaser a credit for gas previously paid for but not taken, then Lessor shall not be entitled to royalty on such "make up" gas.

If Lessee is not producing any quantities of gas from leased premises but is receiving payments under the "pay" portion of such "take or pay" gas purchase contract provision, such

SAM.4631

payments shall not relieve Lessee of the duty to make shut-in royalty payments if Lessee desires to continue this Lease, but such "take or pay" payments shall be applied as a credit against any shut-in royalty obligation of the Lessee.

Lessor shall be a third-party beneficiary of any gas purchase contract and/or transportation agreement entered into between Lessee and any purchaser and/or transporter or pipeline company of Lessor's gas, irrespective of any provision of said contracts to the contrary. Further, Lessor shall be entitled to Twenty-Five percent (25%) of the value of any benefits obtained by or granted to Lessee from any gas purchaser and/or transporter for the amendment, modification, extension, alteration, consolidation, transfer, cancellation or settlement of any gas purchase contract and/or transportation agreement.

XVIII. TITLE:

A. Lessor hereby warrants and agrees to defend the title to only Lessor's interest in said lands, as shown by the Official Public Records of Real Property of the county in which said land is located, against the claims of all persons whomsoever claiming or to claim the same by, through, or under Lessor, but not otherwise, and agrees that Lessee, at Lessee's option, may discharge any tax, mortgage or other lien upon said land, either in whole or in part, and in the event Lessee does so, Lessee shall be subrogated to such lien with the right to enforce same and apply royalties accruing hereunder toward satisfying the same.

B. Without impairment of Lessee's rights under the warranty in event of failure of title, it is agreed that if Lessor owns an interest in all or any part of the land covered by this Lease, or part thereof, less than the entire fee simple estate, then the royalties, rentals and shut-in payments, or any other payments hereunder to be paid or delivered to Lessor shall be paid only in the proportion which Lessor's interest therein, if any, bears to the whole or undivided fee simple estate therein. All outstanding royalties chargeable to Lessor's mineral interest shall be deducted from those royalties herein provided.

XIX. TAXES:

All State occupation, severance, production and ad valorem taxes of every nature, kind and description levied upon the leasehold and royalty interest created by or reserved in this Lease by whatever taxing authority within the State, shall be borne and paid by Lessee at Lessee's sole cost and expense without deduction from or charge against Lessor's interest or against proceeds payable to Lessor hereunder, but this provision shall not cover any taxes levied or assessed on the surface of said land or any mineral interest, save and except the oil, gas and other liquid hydrocarbons interest, which is the subject matter of this Lease; nor shall this provision apply to any income, estate, gift, inheritance, or Federal windfall profits taxes charged on or assessed against any Lessor of this Lease.

XX. ATTORNEY'S FEES:

It is further specifically provided that in the event it becomes necessary for Lessor to employ an attorney, or attorneys, as a result of any activity conducted by Lessee on the herein leased premises, or land pooled therewith, or to enforce any of Lessee's obligations hereunder and Lessor is successful in any court action to enforce same, Lessee agrees to pay all reasonable attorney's fees incurred by Lessor in connection therewith.

XXI. BANKRUPTCY:

Notwithstanding any language contained herein to the contrary, the rights of Lessee, or Lessee's heirs, successors or assigns, in and to the leased premises, the equipment or fixtures thereon or the unsold oil and gas produced therefrom, shall automatically terminate, ipso facto, and be of no further force and effect upon the voluntary or involuntary filing of same for relief under the United States Bankruptcy Code.

XXII. PARAGRAPH CAPTIONS:

The captions set forth opposite each paragraph number are for convenience only and are not to be used to interpret or have any legal effect on the terms and provisions of this Lease.

SAM.4632

## XXIII. LESSOR FIDUCIARY CAPACITY:

It is expressly agreed and understood that this instrument is executed by Parties identified as fiduciaries, solely in the capacities stated and not otherwise, and that they shall never have any individual, personal or corporate liability or responsibility by reason of the execution of this instrument, except in such fiduciary capacities.

## XXIV. LESSOR'S AGENT:

This paragraph does not apply to Lessor, and accordingly this space is intentionally left blank.

## XXV. SECURITY AGREEMENT:

Lessor hereby retains a security interest in all of its proportionate part of (i) the oil, gas and other hydrocarbons produced and saved from the leased premises or lands pooled or unitized therewith or otherwise subject to this Lease as provided in Articles III. and XVII. herein regarding payment of royalties due under this Lease, and (ii) Lessor's respective royalty part of any and all proceeds of sale of such oil, gas and other hydrocarbons and Lessor's respective royalty part of any and all accounts (including, without limitation, accounts arising from gas imbalances, or from the sale of oil, gas or other liquid hydrocarbons at the well head), contract rights, inventory and general intangibles relating thereto or arising therefrom, and Lessor's respective royalty part of any and all proceeds and products of the foregoing (the "Collateral"), to secure Lessee's payment of royalties due under the terms and provisions of this Lease.

In addition to any other remedies provided in this Lease, Lessor, as Secured Party, may in event of Lessee's default hereunder proceed under V.T.C.A., BUSINESS AND COMMERCE CODE (the "Code") as to the Collateral, in any manner permitted by the Code. In the event of default by Lessee, Lessor shall have the right to take possession and to receive its proportionate part of the Collateral and to hold same as payment for Lessee's obligations or to apply it on the amounts owing to Lessor hereunder. The filing of a suit and rendition of judgment in favor of Lessor for the secured indebtedness shall not be deemed an election of remedies or otherwise affect the security interest as security for payment thereof. In addition, at any time during the term of this Lease, Lessor shall have the right, without prejudice to other rights and remedies, to collect, directly from any purchaser of production, the proceeds from the sale of its proportionate part of the Collateral. All purchasers of the Collateral may rely on a notification from Lessor stating its intent to collect such Collateral directly, and Lessee waives any recourse available against purchasers for releasing such Collateral as provided in this Paragraph.

The above reservation by Lessor of the security interest in the Collateral shall be a first and prior lien against the Collateral, and Lessee hereby agrees to maintain the priority of said security interest against all persons. All parties acquiring an interest in the Lease and/or the personal property covered by this Security Agreement, whether by assignment, merger, mortgage, operation of law, or otherwise, shall be deemed to have take such interest subject to the security interest in the Collateral as reserved herein. The address of Lessor, as Secured Party, is 820 Gessner Road, Suite 1300, Houston, Texas 77024-4259 and the address of Lessee, as Debtor, is set forth on page 1 of this Lease.

The Collateral includes Lessor's royalty part of the oil, gas and other hydrocarbons to be financed at the well head of the wells and accounts from the sale thereof. The parties hereto agree that the provisions of this Article XXV. shall be a part of the Memorandum of this Lease, and when such Memorandum is recorded in the Official Public Records of Real Property in the county where the land covered here is located, this Article and the Memorandum thereof shall be effective as a filed financing statement for the purposes of the Code. In addition, Lessee agrees to execute and acknowledge financing statements and continuation statements thereto prepared and submitted by Lessor in conjunction herewith or at any time following the execution hereof, and Lessor is authorized to file such statements in the appropriate UCC and/or official Public Records of Real Property with the Office of the Secretary of State of Texas and the county in which the leased premises are located, respectively, to perfect the security interest granted hereunder.

SAM.4633

## XXVI. FIELD RULES:

Lessee shall not file any Application for Field Rules pertaining to the land covered by this Lease without first giving Lessor not less than thirty (30) days advance written notice of intention to do so, together with a copy of a draft of the Application which Lessee contemplates filing. Within three days after the date of the filing of the final form of such Application, Lessee shall mail Lessor written notice of the date of filing and a copy of the Application so filed.

## XXVII. DIVISION ORDERS:

Notwithstanding Subsection 91.402 (c) of the Texas Natural Resources Code, the execution of Division Orders shall never be required as prerequisite for payment of royalty, and division orders, if signed for the convenience of the parties, shall not be construed as amending this Lease regardless of terminology contained therein. If requested by Lessee, Lessor will execute and deliver to Lessee or the purchaser of production a written statement of Lessor's interest in such production and Lessor's current address and taxpayer's Federal tax identification number.

## XXVIII. LANGUAGE:

Lessor and Lessee further acknowledge and agree that each and every provision contained herein has been specifically negotiated for valuable consideration and no provision of this Lease agreement shall be construed or interpreted as being "boiler plate" or "surplus" language.

## XXIX. MOST FAVORED NATIONS CLAUSE:

If Lessee shall enter into an oil and gas lease(s) part of which is located within three (3) miles of any exterior boundary of the subject lands covered by the subject Lease, hereinafter referred to as "Third Party Lease", Lessee shall notify Lessor of such fact. If the reserved royalty or the amount per acre payable for delay rentals, shut-in rentals or minimum royalty, at any time payable under such Third Party Lease, is higher than the like royalty and amounts payable as provided in the subject Lease, the royalty or amount payable per acre in the subject lease, which is less than that provided in the Third Party Lease shall be immediately increased so that it will equal the royalty or other amounts payable under the Third Party Lease. The subject Lease and the Third Party Lease must be calculated in substantially the same manner, such that the comparison of the subject Lease and the Third Party Lease is based on the same effective net royalty or other payments, and that same shall include or deduct the same types of charges, taxes and other burdens from such interests.

IN WITNESS WHEREOF, this instrument is executed effective as of the 24th day of March, 1999.

LESSORS:

CHARLES G. HOOKS III as Co-Trustee under the Will of Charles G. Hooks, Sr., Deceased (d/b/a CHAS. G. HOOKS & SON)

SUE ANN HOOKS as Co-Trustee under the Will of Charles G. Hooks, Sr., Deceased (d/b/a CHAS. G. HOOKS & SON)

CHARLES G. HOOKS III as Independent Executor of the Estate of Charles G. Hooks, Jr., Deceased (d/b/a CHAS. G. HOOKS & SON)

SAM.4634

LESSEE:

SAMSON LONE STAR LIMITED PARTNERSHIP

STEVEN E. AREA, Senior Vice President-Land
On behalf of said Partnership

THE STATE OF TEXAS

COUNTY OF HARRIS

This instrument was acknowledged before me on the /st day of April, 1999, by CHARLES G. HOOKS III and by SUE ANN HOOKS as Co-Trustees under the Will of Charles G. Hooks, Sr., Deceased.



NORMA K. BALDRY
Notary Public, State of Texas
My Commission Expires
DECEMBER 05, 2000

Notary Public in and for the State of Texas

THE STATE OF TEXAS

COUNTY OF HARRIS

This instrument was acknowledged before me on the /st day of April, 1999, by CHARLES G. HOOKS III as Independent Executor of the Estate of Charles G. Hooks, Jr., Deceased.



NORMA K. BALDRY
Notary Public, State of Texas
My Commission Expires
DECEMBER 05, 2000

Notary Public in and for the State of Texas

THE STATE OF OKLAHOMA

COUNTY OF TULSA

The above and foregoing instrument was acknowledged before me on this the 31st day of March, 1999, by STEVEN E. AREA, as Senior Vice President – Land of SAMSON LONE STAR LIMITED PARTNERSHIP, a Texas limited partnership, on behalf of said partnership.

My commission expires
9|25|01

Notary Public in and for the State of Oklahoma

SAM.4635

EXHIBIT "A"

ATTACHED TO AND MADE A PART OF THAT CERTAIN OIL, GAS AND LIQUID
HYDROCARBON LEASE DATED EFFECTIVE MARCH 2꓿, 1999, BY AND BETWEEN
CHARLES G. HOOKS III, CO-TRUSTEE, ET AL., DOING BUSINESS JOINTLY AS CHAS. G.
HOOKS & SON, A TEXAS GENERAL PARTNERSHIP, AS LESSOR, AND SAMSON LONE
STAR LIMITED PARTNERSHIP, A TEXAS LIMITED PARTNERSHIP, AS LESSEE,
COVERING NINETY-FIVE (95) ACRES OF LAND, MORE OR LESS, IN THE ROBERT B.
IRVINE SURVEY, ABSTRACT 33, HARDIN COUNTY, TEXAS.

Ninety-five (95) acres of land, more or less, in the Robert B. Irvine Survey, Abstract 33, Hardin
County, Texas, more fully and particularly described in that certain deed dated January 3, 1925, from
M. J. Jorgensen to Chas. G. Hooks, recorded in Volume 98, Page 346, et seq., of the Deed Records
of Hardin County, Texas, reference to which deed and said records is here made for all purposes.

                    SAM.4636

## OIL, GAS AND LIQUID HYDROCARBON LEASE

THIS AGREEMENT, made effective the date hereinafter provided, by and between the undersigned, CHARLES G. HOOKS III and SUE ANN HOOKS as Co-Trustees under the Will of Charles G. Hooks, Sr., Deceased, and CHARLES G. HOOKS III as Independent Executor of the Estate of Charles G. Hooks, Jr., Deceased, doing business jointly as CHAS. G. HOOKS & SON, a Texas general partnership, hereinafter individually and collectively called "Lessor", whose address is 820 Gessner Road, Suite 1300, Houston, Texas 77024-4259, and SAMSON LONE STAR LIMITED PARTNERSHIP, a Texas limited partnership, hereinafter called "Lessee", the address of which is Two West Second Street, Tulsa, Oklahoma 74103-3101,

## WITNESSETH:

### I.   GRANTING CLAUSE:

A.   Lessor, in consideration of Ten and No/100 Dollars ($10.00) and other good and valuable considerations, of the royalties herein provided, and of the agreements of Lessee herein contained, hereby GRANTS, LEASES and LETS exclusively unto Lessee for the purpose of investigating, exploring, prospecting, drilling and mining for, and producing oil, gas and other liquid hydrocarbons, including sulphur produced in conjunction therewith, and laying such pipelines, building such tanks and power stations as are necessary to produce, save, take care of, treat, transport, temporarily store current production, and own said products produced from the land covered by this Lease, said land being situated in HARDIN COUNTY, TEXAS, and described on Exhibit "A" attached hereto and made a part hereof for all purposes.

B.   For the purpose of calculating any money payments to be made to Lessor by Lessee under the various provisions hereof, but subject to the proportionate reduction of royalties and rentals as hereinafter provided, the lands covered hereby shall be estimated to comprise 10.0 gross acres and 10.0 net mineral acres, whether it actually contains more or less.

C.   If the Lessor does not own the surface of the leased lands Lessor grants only such uses of the surface as Lessor owns by virtue of Lessor's mineral ownership.

D.   This Lease shall not be construed to include and Lessor expressly reserves hereby all of the sulphur, coal, lignite, uranium and other fissionable materials, geothermal energy, including entrained methane, hydrostatic pressure and thermal energy, base and precious metals and any and all other mineral substances, excepting only oil, gas and other liquid hydrocarbons and their respective constituent products expressly covered by this Lease, presently owned by Lessor in, under or upon leased premises, together with the rights of ingress and egress and use of the leased premises by Lessor and their mineral Lessees for purposes of exploration for and production of the minerals reserved herein to Lessor. Further, without limiting the rights granted to Lessee herein to perform seismographic or other geological tests on the leased premises, Lessor expressly reserves the right to perform or to grant the right to others to perform seismographic or other geological tests for minerals over and across the lands covered by this Lease provided said operations do not interfere with Lessee's drilling or production operations. Lessor and Lessee shall each conduct their respective operations on the leased premises so as not unreasonably to interfere with the operations or activities of the other.

### II.   TERM:

A.   Subject to the other provisions herein contained, this Lease shall remain in force for a term of three (3) years from the effective date hereof called "primary term", and so long thereafter as oil, gas or other liquid or gaseous hydrocarbons are produced in paying quantities from said land, or actual drilling or reworking operations are conducted or this Lease is otherwise maintained as hereinafter provided, herein called "secondary term".

B.   ANYTHING HEREIN TO THE CONTRARY NOTWITHSTANDING, at any time before the expiration of the primary term of this Lease, Lessee must have commenced actual drilling operations by spudding in a well on the leased premises with a sufficient size drilling rig and related

24053

SAM.4204

PLAINTIFF'S
EXHIBIT
27

Samson / Klorer
Deposition Exh.  27

equipment to drill the same to the permitted depth filed with the Railroad Commission of the State of Texas, and must prosecute the same with reasonable diligence, or else this Lease shall terminate without further notice.

## III. ROYALTIES:

Lessors reserve for themselves, and their heirs, successors and assigns, the following royalties and Lessee, in consideration of the Lessors' granting of this Lease, covenants and agrees to deliver same to Lessors out of production as follows:

A.   On oil, Twenty-Five percent (25%) of that produced and saved from the leased premises, free of expense to Lessor, to be, at Lessor's option (1) delivered into the pipelines, tanks or other receptacles to which Lessee may connect Lessee's wells; (2) delivered at the well or wells in tanks or other receptacles provided by Lessor, at Lessor's own expense (3) purchased by Lessee at the highest market price therefor being paid by a bona fide purchaser of oil in the county or counties where produced on the date of purchase, for oil of like quality and gravity; (4) sold by Lessee (for Lessor's account) to the purchaser of Lessee's oil, if sold by Lessee at the well, for the price received by Lessee or any affiliate of Lessee for Lessee's own oil.

B.   (1)   On gas, including casinghead gas or other gaseous substances produced from said land, Twenty-Five percent (25%) of the market value at the wells of such gas, or Twenty-Five percent (25%) of the price received therefor by Lessee, which ever is greater. It is expressly agreed that for the purposes hereof, "market value" of said gas, including casinghead gas, shall be defined as set forth in Paragraph III.H. hereof. This royalty provision shall apply to all gas sold at the wells, all gas sold or used off the premises and all gas otherwise sold, except as provided below.

(2)   In lieu of the royalty on gas hereinafter provided, in case Lessee shall itself, or through an affiliated company, use gas from the premises in the extraction of gasoline or other products in a plant, Lessor shall be paid a royalty Twenty-Five percent (25%) of the then current market value at the plant of such gasoline or other by-products so extracted. "Market Value" of such gasoline or other products extracted in a plant shall be determined by (1) highest price posted for any product of comparable quality at common delivery point of Mt. Belvieu, Texas, or (2) the weighted average gross selling price for the respective grades of product, F.O.B. at the plant in which said gas is processed, whichever is greater. All royalties due on plant products under the terms of this Subparagraph III.B.(2) shall be based on that percent of total plant production of gasoline or other products representing the highest percent accruing to a third party processing gas through such plant under a processing agreement negotiated at arm's length (or if there is no such third party, the highest percent then being specified in processing agreements or contracts in the industry). In addition to the royalties on the plant products, Lessor shall be paid as royalty the market value (as defined in Paragraph III.H.) at the point of delivery to the pipeline purchaser, if sold, or if used, at the point of use, of Twenty-Five percent (25%) of all residue gas attributable to the leased premises and sold or used. In no event shall the royalties payable under this subparagraph for any twelve (12) month period be less than the royalties which would have been due had the gas not been processed.

(3)   Should Lessee enter into a bona fide arm's length contract or arrangement with a non- affiliated company for use of gas from the premises in the manufacture or extraction of gasoline or other products in a plant, Lessor shall have and be entitled to a royalty of Twenty-Five percent (25%) of all such products, proceeds, monies, benefits, and other things of value, of every kind and character, received by Lessee or to which Lessee is entitled under such contract or arrangement attributable to gas produced from the leased premises. All royalties due on plant products under the terms of this Subparagraph III.B.(3) shall be based on that percent of total plant production of gasoline or other products accruing to Lessee attributable to the gas produced from the leased premises. In addition to the royalties on plant products, Lessor shall be paid as royalty the market value (as that term is defined in Paragraph III.H.) at the outlet of such plant or plants of Twenty-Five percent (25%) of all residue gas attributable to the leased premises and sold or used. In no event shall the royalties payable under this subparagraph for any twelve (12) month period be less than the royalties which would have been due had the gas not been processed.

(4)   In the event reinjection operations are not conducted or if the gas is not taken to a plant, if the gas from any well shall be sufficiently impregnated with condensate or other liquid

SAM.4205

hydrocarbons that paying quantities of condensate or other liquid hydrocarbons can be separated therefrom and liquefied as a practical lease operation by the installation by Lessee of mechanical traps, conventional separators or other similar devices customarily used in the industry for such purposes on the premises, then in such event Lessee shall install such devices upon said lease.

(5)     If, at any time at or before the expiration date of the primary term, there is a well capable of producing gas on said land, but gas is not being produced, and this lease is not being maintained by production, operations or otherwise, Lessee, at Lessee's election, may pay as royalty to the parties entitled to royalty on or before the first day of the month after expiration of ninety (90) days after (a) the expiration of the primary term, or (b) the date this lease ceases to be maintained by production operations or otherwise, a sum equal to one-twelfth (1/12) of Seventy-Five and NO/100 Dollars ($75.00) per net mineral acre for each such net mineral acre in a production unit (as defined herein) around such well or within a pooled unit then subject to this Lease, which payment shall maintain this lease in force and effect for the acreage comprising said unit for a period of one (1) month from the date of payment and relieve Lessee of any further operation during such month, it being understood, however, that such payment shall in no manner affect nor alter the provisions of Article V. relating to the periodic drilling of wells. "Net Mineral Acre" as used herein, shall be equivalent to the full mineral interest on one acre of land and, shall be determined by adding the respective products derived by multiplying the divided or undivided mineral interest of Lessor in the leased premises times the surface acres subject to like undivided mineral interests of Lessor in the leased premises. In like manner, with like effect and upon like payments on or before the expiration of the last preceding month for which such payment has been made, this lease may be maintained in force and effect for successive periods of one (1) month each, until such time as the. acreage comprising said unit is maintained by production, operations or otherwise under the terms hereof; provided, however, such payments shall not operate to maintain this Lease in force and effect for any period in excess of two (2) consecutive years for the first such occurrence; nor for any period in excess of twelve (12) months for any succeeding occurrence not to exceed twenty-four (24) months cumulative. Any amounts so paid shall not be treated nor considered as advance royalty payments on any gas produced from such well or wells. Lessee may at any time and from time to time prepay such monthly shut-in royalty for such periods as Lessee may elect. Nothing herein shall relieve Lessee of Lessee's obligation at all times to protect the leased premises from drainage as set forth in Article VI.

C.     An equal Twenty-Five percent (25%) part of all other liquid hydrocarbons that may be produced from said land; or at Lessor's election, exercisable from time to time, an equal Twenty-Five percent (25%) part of the full market value in the field of all such other liquid hydrocarbons, provided that when such liquid hydrocarbons are sold, the market value shall not be less than the amount realized by Lessee from the sale thereof in an arms length transaction, and, in any event, without any cost or expense to Lessor and without any deduction of any kind or character.

D.     Anything hereinabove to the contrary notwithstanding, it is expressly provided that Lessee, and any subsidiary of Lessee, shall at all times exercise due diligence as the fiduciary agent for Lessor in the marketing of all products produced under the terms of this Lease. In the event Lessor considers that the Lessee is not exercising due diligence as the fiduciary agent for Lessor in the marketing of any products produced under the terms of this Lease, then the provision of Article XI. of this Lease shall apply.

E.     For the purposes of this Article III., the following terms shall have the meanings set forth below:

(1)     Affiliate - the term "Affiliate" or "Affiliated Company", when used in relation to Lessee, means another corporation or business entities of any type which;

(a)     owns more than ten percent (10%) of Lessee's stock or equity;

(b)     more than ten percent (10%) of whose stock or equity is owned by Lessee; or

(c)     more than ten percent (10%) of whose stock or equity is owned by any parent corporation, either directly or indirectly, which parent

Page 3 of 21

SAM.4206

corporation also owns more than ten percent (10%) of Lessee's stock or equity either directly or indirectly.

(2)     As used herein, the term "Lessee" and "Affiliate of Lessee" shall also mean "Assignee or Assignees of Lessee" and "Affiliate of Assignee or Assignees of Lessees"

F.     Upon request (and from time to time) of any party Lessor, or any of their respective agents, Lessee shall promptly furnish copies of any and all contracts for the sale, transportation or processing of Lessor's royalty share of any gas or oil produced under the terms hereof.

G.     Lessee agrees that all royalties accruing under this Lease shall be without deduction for the cost of producing, gathering, separating, compressing, dehydrating, storing, treating, processing, transporting and otherwise making the oil, gas and other gaseous or liquid hydrocarbons produced hereunder ready for sale or use or for the marketing thereof.

H.     It is expressly agreed that for the purposes of this Lease the term "market value" of gas, including casinghead gas, shall mean the gross amount realized under any contract or contracts for the sale of gas produced hereunder; provided that, "market value" shall be at least as high as the first posting during each month per mmbtu published in "NATURAL GAS WEEK, TEXAS GULF COAST, ONSHORE INTERSTATE SPOT PRICE DELIVERED TO PIPELINE" for gas sold interstate and "NATURAL GAS WEEK, TEXAS GULF COAST, ONSHORE INTRASTATE SPOT PRICE DELIVERED TO PIPELINE" for gas sold intrastate or, in the event NATURAL GAS WEEK ceases publication or ceases to post the Reference Price set forth above, Lessor and Lessee mutually agree to employ a substitute price derived from the publication "INSIDE FERC GAS MARKET REPORT-SPOT INTERSTATE PRICE DELIVERED TO PIPELINE". If Lessee sells Lessor's gas under contracts providing for a term of one (1) year or more, the index for determining the floor value shall be that which references gas contracts having terms of one (1) year or longer. The substitute price shall be the first posting during the month per mmbtu. In the event the latter publication ceases publication or ceases publishing Texas index gas prices, then Lessor and Lessee agree to select a mutually agreeable index to be utilized as a floor for valuing Lessor's royalty. If Lessor and Lessee are unable to locate an acceptable substitute publication or if such substitute publication or appropriate price index is not available, then the parties hereto agree that "market value" shall be as defined under the terms of the oil and gas lease form at that time being used by the General Land Office of the State of Texas for mineral classified lands.

In the event a contract signed by Lessee or an index price used as a floor for valuing Lessor's royalty shall include any deduction for the expense of producing, gathering, dehydrating, compressing, transporting, manufacturing, processing, treating or marketing of gas, then such deductions shall be added to the market value of such gas so that Lessor's royalty shall not be chargeable, directly or indirectly, with any of such expenses or adjustments.


I.     Notwithstanding anything herein to the contrary, in the event this Lease now, or in the future, covers and pertains to separate tracts, then each and every party Lessor to this Lease affirmatively states, as indicated by his signature below, that it is his intent that there be no apportionment of rentals, royalties, shut-in rentals, minimum royalties or any other payment now payable or to be paid to Lessor under the terms of this Lease; further more, this Lease shall not be construed as constituting either a community lease or a pooling or unitization agreement. As used in this Article III., the words "separate tract" mean any tract with mineral or royalty ownership differing now or hereafter either as to parties or to percentage ownership from that applicable to any other part of the leased premises.

J.     In the event this Lease covers and pertains as to separate tracts, either now or in the future, then in order to form the production units defined hereinbelow in Paragraph V.D., and subject to the provisions applicable to such production units, including without limitation those provisions as to size, shape, location, designation, re-designation and form as stated therein, Lessee is hereby given the right and power to pool or combine separate tracts subject to and covered by this Lease with other separate tracts subject to and covered by this Lease. For the purpose of computing the royalties to which owners of royalties shall be entitled on production from each production unit, there shall be allocated to the applicable separate tract acreage included in such production unit a pro rata portion of the production produced from such production unit. Such allocation shall be on an acreage

Page 4 of 21

basis; that is to say, there shall be allocated to the applicable separate tract acreage within the unit that pro rata portion of the production produced from the production unit which the number of surface acres covered by such separate tract and included in the production unit bears to the total number of surface acres included in the production unit commencing with the date of first production from the production unit.

K.     For the purposes of calculating all royalties payable under Article III. herein, it is expressly provided that all such calculations shall be based on formation production as reported on Texas Railroad Commission forms P-1 and P-2.

## IV.    DELAY RENTAL:

A.     If operations for drilling are not commenced on said land on or be fore one (1) year from the date hereof, this Lease shall then terminate as to both parties, unless on or before such anniversary date Lessee shall pay to Lessor the sum of Seventy-Five and NO/100 Dollars ($75.00) per net mineral acre for the number of net mineral acres then covered by this Lease (herein called rentals), which shall cover the privilege of deferring commencement of drilling operations for a period of twelve (12) months. Thereafter, upon the payment in like manner annually of Seventy-Five and NO/100 Dollars ($75.00) per net mineral acre for the number of net mineral acres then covered by this Lease and not surrendered as hereinafter provided, the commencement of drilling operations may be further deferred for successive periods of twelve (12) months each during the primary term. The payment of rental under this Paragraph and of royalty under Article III. on any gas well from which gas is not being sold or used, and of minimum royalties, may be made by check of Lessee delivered to the parties entitled thereto on or before the date of payment. The above provisions are subject to reduction of payments as expressed in Paragraph V.

B.     Lessee may at any time or times execute and deliver to Lessor, or place of record, a release or releases covering any portion or portions of the above described premises or rights therein, and thereby surrender this Lease in whole or in part as to such portion or portions and be relieved of all obligations as to the acreage surrendered, and thereafter the rentals payable hereunder shall be reduced in the proportion that the acreage covered hereby is reduced by said release or releases; provided, however, anything hereinabove to the contrary notwithstanding, that prior to drilling operations on the leased premises if Lessee elects to maintain this Lease as to any portion of the leased premises by payment of rental, such rental shall not be less than Seventy-Five and NO/100 Dollars ($75.00) per year subject to the proportionate reduction under Article XVIII. This provision shall in no way deny the Lessee the right at any time to release all the leased premises and thereafter be relieved of the payment of any rental. Notwithstanding any partial release or releases, Lessee shall retain such easement rights upon such released and surrendered lands as are then being used for Lessee's operations on other lands retained hereunder. For the purpose of release and assignment, the recited acreage of any tract shall be considered correct whether it contains more or less, unless subsequent survey or other accurate determination reveals that such recited acreage is incorrect, in which case, the actual acreage shall prevail.

## V.    CONTINUOUS DEVELOPMENT, POOLING, SECONDARY TERM, ANNUAL RENTALS AND MINIMUM ROYALTY:

A.     If during the primary term and prior to discovery and production of oil, gas or other liquid hydrocarbons in paying quantities on said land, Lessee should drill a dry hole or holes thereon, or if after discovery and production of oil, gas or other liquid hydrocarbons, the production thereof in paying quantities should cease from any cause, this Lease shall not terminate if Lessee commences operations for drilling or reworking within sixty (60) days thereafter or if it be within the primary term, commences or resumes the payment of rentals or commences operations for drilling or reworking on or before the rental paying date next ensuing after the expiration of sixty (60) days from the date of completion of a dry hole or cessation of production, however, if during the primary term Lessee is engaged in drilling operations on a rental paying date and for that reason the annual rental is not paid, and if the well is a dry hole, then on or be fore the expiration of sixty (60) days after the cessation of operations on such well Lessee will either commence additional operations for the drilling of another well or pay a proportionate part of the annual delay rental which would have been paid except for such drilling operations, based on the number of days then remaining to the next ensuing rental payment date, or to the expiration of the primary term, whichever is applicable, in order to maintain this Lease in force and effect.

SAM.4208

B.    If at the expiration of the primary term, oil, gas or other liquid hydrocarbons are not being produced in paying quantities on said land, but Lessee is then engaged in drilling or reworking operations thereon or shall have completed a dry hole thereon within sixty (60) days prior to the end of the primary term, the Lease shall remain in force so long as operations on said well or for drilling or reworking of any additional well are prosecuted with no cessation of more than sixty (60) consecutive days, and if they result in the production of oil, gas or other liquid hydrocarbons, so long thereafter as oil, gas or such other liquid hydrocarbons are produced from said land in paying quantities.

C.    Notwithstanding the foregoing, it is specifically provided that during the primary term only, and after the discovery and production of oil, gas or other liquid hydrocarbons in paying quantities on the leased premises, Lessee shall either (1) develop the acreage retained hereunder by the drilling of additional wells at sixty (60) day intervals, as hereinafter provided for, (2) release those portions of the land covered hereby not included in a production unit or units, or (3) Lessee may in lieu of such drilling or release, maintain this Lease in force and effect during the primary term as to any land covered hereby which is not included in a production unit (either oil or gas) by the payment of the proportionate part of the delay rentals provided herein as to the acreage not then included in a production unit or units.

D.    Subject to the other provisions of this Paragraph V.D. and upon and at any time during the secondary term of this Lease, Lessee shall reasonably develop the acreage retained hereunder but not included in a production unit ("undeveloped acreage"), and in order to reasonably develop such undeveloped acreage, Lessee must drill additional wells on such undeveloped acreage at one hundred and twenty (120) day intervals, as hereinafter provided. It is agreed that in the event that during the secondary term of this Lease, more than one hundred twenty (120) consecutive days elapse between the completion of one well and the commencement of drilling operations on the next well on such undeveloped acreage, Lessee shall upon written demand of Lessor, forthwith execute and deliver to the Lessor, or place of record in the County in which said land is located, a release of all the premises covered by this Lease, SAVE AND EXCEPT that Lessee shall retain, and this Lease shall remain in full force and effect as to, the production units as hereinafter defined.

E.    Lessee, at its option, is hereby given the right and power in its discretion to pool or combine, as to any one or more formations, the land covered by this Lease or any portion of said land, with other land, lease or leases in the immediate vicinity thereof, except to the extent and in the manner hereinafter stipulated. With respect to any such unit so formed, Lessee shall execute in writing an instrument or instruments identifying and describing the pooled acreage, and file same for recording in the office of the County Clerk in Hardin County, Texas; and the pooled unit shall become effective on the date such instrument or instruments are so filed for record. Notwithstanding anything hereof to the contrary, pooled units created hereunder and comprising all or part of the herein leased premises shall not exceed the maximum acreage figures permitted for production units of oil or gas wells completed at certain depths under Article V. hereof unless the Railroad Commission of Texas or any governmental authority having and asserting jurisdiction over the subject matter thereof prescribes for the drilling or operation of a well at a regular location, or permits for the obtaining of the maximum allowable from any well to be drilled, drilling, or already drilled, larger pooled units than any of those herein permitted, then any such pooled unit may be established or enlarged to conform to the size either required of a well or permitted for the obtaining of the maximum allowable. For any well drilled on and completed at depths beneath the surface of a tract covered by this lease there shall be no pooling with other lands, unless such tract is insufficient, due to either its lack of size or prior unitization hereunder, to comprise the maximum acreage figures permitted hereunder in which case all of said tract (10 acres more or less) or the then un-unitized portion of same shall be so pooled; and Lessee may include in such pooled unit such other acreage as may be available to comprise the maximum acreage figures permitted under the terms of this lease. For a well drilled on or completed at depths beneath the surface of lands other than the herein leased premises, not less than all (100%) of the lands (10 acres more or less) or the then un-unitized portion of same shall be so pooled; and Lessee may include in such pooled unit such other acreage as may be available to comprise the maximum acreage figures permitted under the terms of this lease.

Operations for drilling on or production from any part of the pooled unit which includes all or a portion of the Leased Premises, regardless of whether such operations for drilling were commenced

SAM.4209

or such production was secured before or after the date of this lease or the date of the instrument designating the pooled unit, shall be considered as operations for drilling on or production from the Leased Premises, whether or not the well or wells be located on the Leased Premises, and the entire acreage constituting such unit or units shall be treated for all purposes, except the payment of royalties on production from the pooled unit, as if the same were included in this Lease. The above right and power to pool may be exercised at any time and from time to time and before or after a well has been drilled, or while a well is being drilled. Lessee may vacate any unit formed by it hereunder by instrument in writing filed for record in said county at any time when there is no unitized substance being produced from such unit. The pooling for gas hereunder by Lessee shall also pool and unitize all liquid gas, and the royalty interest payable to Lessor thereon shall be computed the same as on gas. For the purpose of computing the royalties to which owners of royalties shall be entitled on production from each production unit, there shall be allocated to the applicable separate tract acreage included in such production unit a pro rata portion of the production produced from such production unit. Such allocation shall be on an acreage basis; that is to say, there shall be allocated to the applicable separate tract acreage within the unit that pro rata portion of the production produced from the production unit which the number of surface acres covered by such separate tract and included in the production unit bears to the total number of surface acres included in the production unit, commencing with the date of first production from the production unit.

Pooled units subject to this Article V. shall conform in size with the acreage set forth hereunder.

ANYTHING HEREIN TO THE CONTRARY NOTWITHSTANDING, as used in this Lease, the term "production unit(s)" is defined as follows:

(1)     As to each well situated on the leased premises producing oil in paying quantities or being reworked and classified as an oil well under the Rules and Regulations of the Railroad Commission of Texas, not more than forty (40) acres around each such well, in the shape hereinafter provided

(2)     As to each well producing gas in paying quantities (or capable of producing gas in paying quantities with all shut-in gas well rental having been paid thereon) or being reworked and classified as a gas well under the Rules and Regulations of the Railroad Commission of Texas from the surface down to a depth of 9,000 feet, not more than one hundred sixty (160) acres surrounding each such gas well, or such portion of the land covered by this Lease which shall have been included in a gas pooled unit.

(3) As to each well producing gas in paying quantities (or capable of producing gas in paying quantities with all shut-in gas well rental having been paid thereon) or being reworked and classified as a gas well under the Rules and Regulations of the Railroad Commission of Texas, not more than three hundred and twenty (320) acres surrounding each such gas well completed at depths or horizons below 9,000 feet beneath the surface of the leased premises and above 12,000 feet beneath the surface of the leased premises; or such portion of the land covered by this Lease which shall have been included in a gas pooled unit.

(4.) As to each well producing gas in paying quantities (or capable of producing gas in paying quantities with all shut-in gas well rental having been paid thereon) or being reworked and classified as a gas well under the Rules and Regulations of the Railroad Commission of Texas, not more than six hundred and forty (640) acres surrounding each such gas well completed at depths or horizons of 12,000 feet beneath the surface of the leased premises and deeper; or such portion of the land covered by this Lease which shall have been included in a gas pooled unit.

Each production unit (except the tracts in pooled gas units, if any) to be centered by said well, to be in as nearly a square form as is reasonably possible, unless otherwise agreed to by Lessor. Should the Railroad Commission of Texas or any governmental authority having and asserting jurisdiction over the subject matter thereof prescribe for the drilling or operation of a well at a regular location, or permit for the obtaining the maximum allowable from any well to be drilled, drilling, or already drilled, larger production units than any of those herein permitted, then any such production unit may be established or enlarged to conform to the size either required of a well or permitted for the obtaining of the maximum allowable.

SAM.4210

Each such production unit shall be one contiguous area (except the tracts in pooled gas units). Within thirty (30) days of completion of any well drilled on the leased premises producing in paying quantities, or capable of producing in paying quantities, Lessee shall furnish to Lessor, and shall file of record in the Official Public Records of Real Property of the county in which the land is located, a written designation of the production unit for such well.

Notwithstanding the termination of this Lease as to a portion or portions of the acreage covered hereby and as to depth under the other provisions hereof, this Lease shall nevertheless remain in force and effect as to each production unit or units so long as oil, gas or other liquid hydrocarbons are produced therefrom in paying quantities or, as to gas production units, capable of being produced therefrom in paying quantities with all shut-in gas well rentals having been paid thereon, for that period of time specified above in Subparagraph III.B.(5); and if production in paying quantities from any production unit shall cease, this Lease, insofar as it covers and affects such particular production unit which ceases producing in paying quantities, shall terminate (not withstanding the fact that there may be production in paying quantities from some other lease production unit) unless Lessee shall commence drilling or reworking operations on such particular production unit within sixty (60) days thereafter if during the primary term and one hundred twenty (120) days if after the primary term (sometimes referred to herein as the secondary term) and shall pursue such drilling or reworking operations on the same or successive wells at intervals not to exceed sixty (60) days if during the primary term and one hundred twenty (120) days if after the primary term (sometimes referred to herein as the secondary term) between the date of completion of operations on one well and the date of commencement of operations on another and, if production in paying quantities is restored on such production unit, so long thereafter as production in paying quantities is produced therefrom or, as to gas production units capable of being produced in paying quantities with all shut-in gas well rentals being paid thereon for that period of time specified above in Subparagraph III.B.(5), or additional drilling or reworking operations are had thereon as above provided. It is further expressly provided that production or operations or payment of shut-in gas well rental on any production unit as so designated shall have no effect upon the continuance of this Lease as to any other production unit or units. If any production unit gas well is converted to or reclassified as an oil well; or if any production unit well (either oil or gas) re-completed at a lesser depth; then Lessee shall re-designate the production unit for such well so as to reduce the acreage included in such production unit to comply with the applicable (with regard to type of production and greatest producing depth) acreage provisions stated hereinabove and shall release all lease acreage not included in such re-designated production unit or another production unit in the same manner as provided above in Paragraph V.C. of this Lease.

F.    Any release required hereunder shall be filed for record in the Official Public Records of Real Property in the Office of the County Clerk of the county in which said land is located, and a copy of such instrument furnished to Lessor within a reasonable time; thereafter, Lessee shall lose all rights, except the easement and lease facilities rights as set forth and specified in Article I. hereof, and be relieved of all obligations as to the acreage so released. Effective as of the date that Lessee receives the demand for release specified above in Paragraph V.D., each production unit shall be treated the same as if it were covered by a separate lease.

G.    ANYTHING HEREIN TO THE CONTRARY NOTWITHSTANDING, it is agreed that in any circumstances where Lessee is required to secure from the United States Army Corps of Engineers or any other State or Federal agency, department, or service having legal jurisdiction over Lessee's operations on the leased premises, permits for the drilling and/or operation of wells under the terms of this Lease, the sixty (60) day or one hundred and twenty day period of time, whichever is applicable, referred to in this Article V. between the completion of one well and the commencement of drilling operations on the next well after the primary term shall be and accordingly is hereby extended by another sixty (60) days after such permit is received by Lessee, but in no event more than three hundred sixty-five (365) days between the completion of one well and the commencement of drilling operations on the next well. In such event, Lessee shall promptly furnish Lessor a true copy of such permit in recordable form.

H.    On each anniversary date of the first sale of oil, gas or other liquid or gaseous hydrocarbons, or either, produced from said land and in the event Lessee is retaining all or any portion of the lands covered hereby by the production of oil, gas or other hydrocarbons, if the rentals and royalties (including shut-in payments) accrued hereunder, during the preceding twelve (12) months shall not have equaled at least the amount of ONE HUNDRED and NO/100 Dollars

SAM.4211

($100.00) per acre for each net mineral acre as hereinafter defined of land subject to the terms hereof at the commencement of said twelve (12) months, Lessee covenants and agrees that, within thirty (30) days after the receipt from Lessor or Lessor's Agents of notice to such effect, Lessee will promptly pay to Lessor as an additional royalty the amount of the difference between such accrued royalties and the sum of ONE HUNDRED and NO/100 Dollars ($100.00) per acre for each net mineral acre subject to the terms hereof at the commencement of said twelve (12) months. This additional royalty provision, when applicable, shall be in effect for and during the life of this Lease after the primary term.

I.     Notwithstanding anything herein to the contrary, in the event the Texas Railroad Commission, or any governmental authority having and asserting jurisdiction over the subject matter thereof, prescribes for a drilling or operation of a well at a regular location, or permits for the obtaining of the maximum allowable from any well drilled, drilling or already drilled, smaller productions units than any of those herein permitted for such well under the provisions defining production units in Paragraph V.D. hereof, then any such production unit shall be established or reduced to conform to the minimum size allowed for the obtaining of the maximum allowable.

J.     For the purposes of this Lease, the terms "commencement of a well" and "completion of a well" are defined as follows:

(1)     "Commencement of a Well" shall mean only the actual drilling of a well with rotary equipment and tools of a suitable size necessary to reach an objective depth from which Lessee may, in good faith, anticipate the production of oil or gas.

(2)     "Completion of a well" shall mean the day Lessee releases the drilling rig used to drill such well or a completion rig, if utilized, or the date the latter of such rigs is moved off the location, whichever date occurs first.

## VI.     OFFSET OBLIGATIONS:

A.     Lessee covenants and agrees to operate the leased premises as a reasonable prudent operator would under the same or similar circumstances and to protect each of the leased premises from drainage by reason of any well drilled on adjacent or nearby lands. The above covenant notwithstanding, in the event a well producing from a unit not comprised of acreage from the leased premises which has been classified "oil" by the appropriate governmental body is completed on adjacent or nearby lands not more than six hundred sixty feet (660') from the leased premises, or draining the leased premises, or a well producing from a unit not comprised of acreage from the leased premises which has been classified as "gas" by the appropriate governmental body is completed on adjacent or nearby lands not more than one thousand three hundred and twenty feet (1,320') from the leased premises, or draining the leased premises, Lessee covenants and agrees to, within ninety (90) days from the date production is first sold, removed or otherwise marketed from said adjacent or nearby producing well, either (1) commence with due diligence operations for the actual drilling of an offset well on the leased premises to the base of the formation from which the adjacent or nearby producing well is producing, (2) pay Lessors as compensatory royalty, in addition to any royalties currently due, a sum equal to the royalties which would be payable under this Lease on the production from said adjacent or nearby producing well had same been producing on the leased premises, or (3) in lieu of drilling such offset well or paying such compensatory royalty, release by recordable instrument the offset acreage, as hereinafter defined. "Offset Acreage", as used hereinabove, shall be defined as a unit which would surround such a well if same were completed on the leased premises; provided, however, that if any portion of the offset acreage should be included in a producing unit designated by Lessee hereunder, then if Lessee elects to surrender and release such offset acreage, it may retain and except from such release the producing stratum or strata included in such producing unit, but such offset acreage must conform to the depth, size and shape limitations contained in Paragraph V. herein. The provisions hereof shall apply regardless of whether lands upon which offset wells may be located are owned by Lessor or any of them or not, and with regard to wells located within the hereinabove prescribed distances from the leased premises, regardless of whether drainage is actually proved to be taking place or not. Notwithstanding anything herein to the contrary, Lessee shall have no obligations under this Article VI. in the event a producing well on nearby or adjacent land is already offset by a well on the leased premises or on acreage pooled therewith producing from the same producing horizon from which production has been secured from any well on nearby or adjacent lands.

SAM.4212

10

B.    If Lessee elects to pay the above authorized compensatory royalty, then such royalty shall be calculated and paid on a calendar month basis. The compensatory royalty for the calendar month in which production is first marketed from the offsetting well shall be paid on or before the first day of the calendar month next following the expiration of ninety (90) days after the end of said calendar month in which production if first marketed, and subsequent payments shall be made on or before the first day of each succeeding calendar month. If Lessee is neither the operator of, nor the owner of an interest in the offsetting well, and if the operator of such well refuses to divulge to Lessee the actual monthly volume and/or sales price of production from such well, then Lessee shall be authorized to pay the compensatory royalty for each month on estimates of volume and sales price based on such information as may be timely available to Lessee from other sources, such as the Texas Railroad Commission and/or the Texas Comptroller's Office, provided that each such payment which is made on an estimated basis shall be properly adjusted within 60 days after the date that Lessee directly obtains, or is furnished by Lessor, the actual volume and sales price for the month covered by the estimated payment.

## VII    SURFACE OBLIGATIONS AND ADDITIONAL FEE:

Lessor owns no surface in the acreage described herein and this space is intentionally left blank.

## VIII   GENERAL INDEMNITY AGREEMENT:

Lessee covenants and agrees to fully defend, protect, indemnify, hold harmless and render whole each party comprising Lessor, their representatives, agents and employees, and their respective heirs, successors, legal representatives and assigns, from and against each and every claim, demand or cause of action and any liability, cost, and/or expense (including but not limited to reasonable attorneys' fees and expenses incurred in defense of Lessor, their representatives, agents and/or employees) for damage or loss in connection therewith, which may be made or asserted by Lessee, Lessee's representatives, agents or employees, or which may be made or asserted by any contractor or subcontractors, contractor's or subcontractor's representatives, employees and/or agents, or which may be made or asserted by any other third party (including, but not limited to, Lessor's representatives, employees and/or agents or Lessee's invitees, licensees or any trespasser), on account of personal injury or death or property damage caused by, arising out of, or in any way incidental to, or in connection with this agreement and of Lessee's operations both on or about the premises, including, but not limited to, those situations where personal injury or death or property damage (or liability therefor) was caused by the sole negligence of Lessee, any contractor or subcontractors and/or third party (and/or any of their respective representatives, employees and agents), by the concurrent negligence or any combination of Lessor, or any one or more of them, Lessee, any contractor or subcontractor and/or any third party (and/or any of their respective representatives, employees and/or agents), or where liability for such personal injury or death or property damage with or without fault is imposed on any theory of strict liability by operation by law.

Lessee must give notice to Lessor of any claim, action, administrative proceeding or other demand by any other governmental agency or other party of any such claims, actions, or demands made as a result of any action by Lessee.

Lessee shall assume, on behalf of Lessor, and conduct with due diligence and in good faith, the defense of all claims arising out of the exercise of the rights herein granted to Lessee or in connection with or growing out of this agreement or the performance by Lessee of the obligations hereunder which may be brought against the Lessor, whether or not the Lessee is joined therein, even if such claims be groundless, false or fraudulent, and shall bear the costs of all judgments and settlements in connection therewith, provided, however, without relieving Lessee of any obligations under this agreement, Lessor, at Lessor's election, may defend or participate in the defense of any or all of the claims.

SAM.4213

## IX. ENVIRONMENTAL PROVISIONS AND INDEMNITY:

A.　Lessee covenants and warrants that Lessee and Lessee's use of the leased premises will at all times comply with and conform to all laws, statutes, ordinances, rules and regulations of any governmental, quasi-governmental or regulatory authority ("Laws") which relate to the exploration and production of oil and/or gas from the leased premises, or land pooled therewith, transportation, storage, placement, handling, treatment, discharge, generation, production, disposal or injection (collectively "Treatment") of oil, gas and other liquid hydrocarbon substances produced hereunder ("Products"); of salt water, brine and other exempt waste products produced in association with oil or gas ("Exempt Waste"); or of any other waste (including, without limitation, non-exempt wastes), any of the petroleum product, waste products, radioactive waste, poly-chlorinated biphenyl, asbestos, hazardous materials of any kind, and any other substance which is regulated by any law, statute, ordinance, rule or regulation (collectively "Waste"). Lessee further covenants that it will not engage in or permit any party to engage in any Treatment of any Waste not associated with the exploration, development or production of oil or gas on or which affects the leased premises. Specifically, and without limiting the foregoing, Lessee agrees that (i) no toxic or hazardous wastes shall be generated, treated, stored, disposed of or otherwise deposited or released in or on the leased premises; (ii) Lessee will not engage in and will not permit any other party to engage in any activity not associated with the exploration, development or production of oil or gas with respect to the leased premises which would cause (a) the leased premises or the adjoining property to become a non-exempt or hazardous waste treatment, storage or disposal facility within the meaning of the Resource Conservation and Recovery Act of 1975 ("RCRA"), as now or hereafter amended, or any similar State law or Local ordinance or other environmental law, (b) a release or threatened release of a hazardous substance from or to the leased premises or the adjoining property within the meaning of the Comprehensive Environmental Response, Compensation and Liability Act of 1980 ("CERCLA"), as now or hereafter amended or any similar State law or Local ordinance or any other environmental law, or (c) the discharge of pollutants or effluents into any water source or system, or the discharge into the air of any emissions, which would require a permit under the Federal Water Pollution Control Act or the Clean Air Act or any similar State or Local ordinance or other environmental law; (iii) Lessee shall not permit any substance or conditions in or on the leased premises or the adjoining property which might support a claim or cause of action under RCRA, CERCLA, or any other Federal, State or Local environmental statutes, regulations, ordinances or other environmental regulatory requirements; and (iv) no underground storage tanks will be located in or on the leased premises. In the event either CERCLA or RCRA is amended so as to narrow or broaden the meaning of any term defined thereby, such amendment shall apply to Lessee's covenants contained herein, and provided further, to the extent that the laws of the State of Texas establish a meaning for such terms which is broader than that specified in either CERCLA or RCRA, the broader meaning or definition shall apply.

B.　Immediately upon receipt of any Notice, as hereinafter defined, from any party, Lessee shall deliver to Lessor a true, correct and complete report of any written Notice or a true, correct, and complete report of any non-written Notice. "Notice" shall mean any note, notice, or report of any of the following:

(1)　any suit, proceeding, investigation, order, consent order, injunction, writ, award, or action related to or affecting or indicting the Treatment of any Product, Exempt Waste or Waste in or affecting the leased premises;

(2)　any spill, contamination, discharge, leakage, release or escape of any Product, Exempt Waste or Waste in or affecting the leased premises, whether sudden or gradual, accidental or anticipated, or of any other nature (hereinafter "Spill");

(3)　any dispute relating to Lessee's or any other party's treatment of any Product, Exempt Waste or Waste or any Spill in or affecting the leased premises

(4)　any claims by or against any insurer related to or arising out of any Product, Exempt Waste or Waste or Spill in or affecting the leased premises;

(5)　any recommendations or requirements of any governmental or regulatory authority, or insurer relating to any treatment of Product, Exempt Waste or Waste or a Spill in or affecting the leased premises;

SAM.4214

(6)   any legal requirement or deficiency related to the treatment of Product, Exempt Waste or Waste or any Spill in or affecting the leased premises; or

C.   In the event that (a) Lessee has caused, suffered or permitted, directly or indirectly, any Spill in or affecting the leased premises, or (b) any Spill of any Product, Exempt Taste or Waste has occurred on the leased premises during the term of this agreement, then Lessee shall immediately take all of the following actions:

(1)   notify Lessor, as provided herein;

(2)   take all steps necessary or desirable, in Lessor's reasonable opinion, to clean up all such Spill and any contamination related to the Spill; and

(3)   fully restore the leased premises to its condition prior to the Spill.

D.   Lessee hereby agrees that it will indemnify, defend, save and hold harmless Lessor and their respective heirs, executors, administrators, successors and assigns (collectively "Indemnified Parties") against and from, and to reimburse the Indemnified Parties with respect to, any and all damages, claims, liabilities, loss, costs and expenses (including, without limitation, response costs, remediation, abatement costs, mitigation costs, harm to the environment, property damage, reasonable attorneys' fees and expenses, court costs, administrative costs and costs of appeals), incurred by or asserted against the Indemnified Parties by reason or arising out of: (a) the breach of any representation or undertaking of Lessee under this Article IX., or (b) arising out of the treatment of any Product, Exempt Waste or Waste by Lessee or any tenant, licensee, concessionaire, manager, or other party occupying or using the leased premises under the authority of Lessee, in or affecting the leased premises, or (c) in the event of any Spill governed by the terms of this Article IX.

E.   Notwithstanding anything in this agreement to the contrary, the representations and undertakings of Lessee in this Article IX. shall survive the expiration or termination of the Lease regardless of the means of such expiration or termination; furthermore, in the event of the assignment, sublease, or other transfer of all or any of Lessee's rights under this Lease, the assignee or sub-lessee must assume all of the Lessee's obligations under this Article IX. and Lessee shall remain liable for every obligation under this Article IX.

X.   CHANGE OF OWNERSHIP:

A.   The rights of either party hereunder may be assigned in whole or in part, and the provisions hereof shall extend to their heirs, successors and assigns; but no change or division of ownership of land, rentals or royalties, however accomplished, shall operate to enlarge the obligations or diminish the rights of Lessee; and no change or division in such ownership shall be binding on Lessee until thirty (30) days after Lessee shall have been furnished by registered or certified United States Mail at Lessee's principal place of business with a certified copy of the recorded instrument or instruments evidencing same. In the event of assignment hereof in whole or in part, liability for breach of any obligation hereunder shall, except as herein expressly provided, rest exclusively upon the owner of this Lease, or a portion thereof, who commits such breach. In the event of the death of any person entitled to rentals and royalties hereunder, Lessee may pay such rentals and royalties to the credit of the deceased, or the estate of the deceased, until such time as Lessee is furnished with proper evidence of the appointment and qualification of an executor or administrator of the estate, or if there be none, until Lessee is furnished with evidence satisfactory to Lessee as to the heirs and devisees of the deceased.

B.   In the event the Lessee herein, or any subsequent assignee of Lessee, at any time during the effectiveness of this Lease transfers and/or assigns this Lease or any interest herein, Lessee shall contemporaneously with each such assignment and/or transfer give written notice thereof by mailing a true and full copy of each and every instrument evidencing any and all such assignments and/or transfers to Lessor.

SAM.4215

## XI. NOTICE OF DEFAULT:

A.    The breach by Lessee of any obligation existing hereunder shall not automatically work a forfeiture or termination of this Lease nor cause an automatic termination or reversion of the estate created hereby nor be grounds for automatic cancellation hereof in whole or in part except as provided with regard to Lessee's obligation to pay Lessor royalty payments in Paragraph XVII.D. of this Lease. In the event Lessor considers that Lessee is in breach of any provision of this Lease (except for those with regard to payment of royalties), Lessor shall notify Lessee in writing of the facts relied upon as constituting a breach hereof and Lessee shall have sixty (60) days after receipt of such notice in which to comply with the obligations imposed by virtue of this instrument or to provide evidence satisfactory to Lessor that Lessee is not in breach of the terms and conditions of this Lease. In the event Lessee fails to comply with such obligations or to provide said evidence within sixty (60) days after receipt of such notice, the Lessor shall have the right to declare this Lease forfeited, canceled and terminated.

## XII. PRODUCING LIMITATION (STRATUM OR STRATA):

A.    At the occurrence of a partial termination of this Lease in accordance with the provisions of Article V. hereof and respectively upon the subsequent partial termination as provided herein, and in no event later than the expiration of the fourth year of the secondary term of this Lease, this Lease will terminate automatically as to all the mineral estate of Lessor covered hereby on or under each production unit, respectively, which is greater than one hundred feet (100') below the deepest total depth drilled or the stratigraphic equivalent thereof, whichever horizontal subsurface depth constitutes the deepest depth, for a well which Lessee has completed as commercial producer of oil and/or gas on the lands described in this Lease or on other lands, if any, pooled or unitized with the leased premises. Upon expiration of the fourth (4th) year of the secondary term of this Lease this Lease will further terminate as to all the mineral estate of Lessor covered on or under each production unit, respectively, which is (1) greater than one hundred feet (100') below the deepest depth from which production in paying quantities is then being had (or at which a well capable of producing gas in paying quantities is completed), and (2) situated between the surface of the land and one hundred feet (100') above the shallowest of the following: (1) the shallowest depth from which production in paying quantities is then being had, (2) the shallowest depth at which a well capable of producing gas in paying quantities is completed, or (3) the top of the shallowest identifiable stratum or horizon determined by the mutual agreement of the parties hereto to be capable if completion were had therein at that time of production in paying quantities, IF AND ONLY IF, Lessee has furnished identification thereof together with the applicable geological/geophysical data used to identify such stratum or horizon on or before the expiration of the fourth (4th) year of the secondary term of this Lease. Such determination is to be based upon (1) the applicable geological/geophysical data acquired by or available to Lessee, copies of which are to be furnished to Lessor for review for such purpose, and (2) any applicable independent geological/geophysical data acquired by Lessor, copies of which are to be furnished to Lessee for review for such purpose. For these purposes, the parties will consider both wells located on the leased premises and those on other lands, if any, pooled or unitized with the leased premises. Furthermore, subsequent to any occurrence of a partial termination of this Lease in accordance with Article V. and respectively upon the subsequent partial terminations as provided therein, and in any event, subsequent to the expiration of the fourth year of the secondary term of this Lease, if any gas well on a production unit is re-completed at a shallower depth and classified as an oil well, then this Lease will further terminate as to all the mineral estate of Lessor covered hereby on or under such production unit which is greater than one hundred feet below the deepest depth from which oil and/or gas is being produced from such oil well. Upon such partial termination Lessor and Lessor's successors, heirs or assigns shall thereafter have the right to reasonable use of the released acreage and depths of the leased premises, but without unreasonable interference with Lessee's rights, for the purposes of investigating, exploring, prospecting and drilling for, producing and owning oil, gas and other liquid hydrocarbons from the horizons (strata) as to which this Lease has terminated. .

B.    Upon the occurrence of an event of partial termination of this Lease as to subsurface depths, or at a time thereafter upon request of Lessor, Lessee shall execute and deliver to Lessor recordable instrument(s) setting forth the various producing horizon (stratum) or horizons (strata) stated above, as reflected by reports to the Texas Railroad Commission or other governmental authority having jurisdiction, so that the limit and extent of Lessee's rights under this Lease may be fixed and reflected as a matter of record and, in addition thereto, as requested by Lessor, Lessee shall

SAM.4216

also execute and deliver to Lessor recordable releases or assignments of any and all interests hereunder not maintained in force and effect by Lessee by production, as above provided.

## XIII. FORCE MAJEURE:

Should Lessee be prevented from complying with any expressed or implied covenant of this Lease, from conducting drilling or reworking operations thereof, or from producing oil or gas therefrom by reason of scarcity of or inability to obtain or to use equipment or material, or by operation of force majeure, any Federal or State law, or other order, rule or regulation of governmental authority, (SAVE AND EXCEPT where Lessee is required to secure from the United States Army Corps of Engineers or other State or Federal agency, department, or service having jurisdiction over Lessee's operations on the leased premises, permits for the drilling and/or operation of wells under the terms of this Lease in which case the provisions of Paragraph V.F. shall apply), then while so prevented, Lessee's obligation to comply with such covenant shall be suspended, and Lessee shall not be liable in damages for failure to comply therewith, and this Lease shall be extended while and so long as Lessee is prevented by any such cause from conducting drilling or reworking operations on or from producing oil or gas from the leased premises and the time while Lessee is so prevented shall not be counted against Lessee, anything in this Lease to the contrary notwithstanding, provided, however, any period this Lease may be so extended shall not cumulatively exceed two (2) years, and provided further that during such period Lessee shall pay monthly to Lessor a sum equal to one-twelfth (1/12th) of Seventy-Five and NO/100 Dollars ($75.00) per acre for each mineral acre then subject to this Lease, the first of such payments to begin on or before the first day of the month after the expiration of thirty (30) days from the date this Lease ceased to be maintained by production, operations or otherwise. Nothing in this paragraph shall relieve the Lessee of Lessee's obligation to protect the leased premises from drainage.

## XIV. COUNTERPARTS:

A.     This Lease may be executed in any number of counterparts found to be convenient. Each counterpart shall be deemed an original and shall be binding on all parties who execute such counterpart, or another counterpart, irrespective of whether or not such counterpart, or another counterpart, is executed by the other parties below named as parties Lessor .

B.     This Lease will not be recorded. However, Lessor and Lessee agree to execute, and Lessee agrees to record in the Official Public Records of Real Property in the County in which said land is located, a "Memorandum" giving notice of this Lease, and promptly following such recording, Lessee shall furnish copies of such recorded Memorandum to Lessor.

## XV. INFORMATION:

As to any and all wells drilled on the herein described land, Lessee agrees to furnish Lessor, or Lessor's authorized representatives, access to said well or wells at his or their own risk at all reasonable hours. Lessee further agrees to furnish at no cost to Lessor, as set forth herein, the following information:

A.     A copy of all daily operation reports received by Lessee during drilling, completion or reworking operations shall be sent to Lessor, via facsimile, concurrent with Lessee's receipt of such reports.

B.     A copy of all electric logs, formation surveys or any other test made in such well or wells within thirty (30) days of the completion of such log, survey or test.

C.     A copy of all applications and reports filed by Lessee with the Texas Railroad Commission in connection with Lessee's operations hereunder shall also be mailed to Lessor simultaneously with Lessee's mailing of such applications and reports to the Texas Railroad Commission.

D.     Lessee also agrees to furnish to Lessor any and all title opinions obtained by Lessee, whether rendered by Lessee's attorneys, by outside attorneys retained by Lessee, or by attorneys for purchasers of production under this Lease.

SAM.4217

E.   In addition, Lessee shall furnish to Lessor the following seismic or other geophysical data obtained by Lessee during the term of this Lease on the leased premises: (1) access to for review and duplication of all basic data generated (including tapes); (2) scaled, platted maps for all geophysical surveys performed showing the location of all shot holes and station points used in each survey and (3) final stacked and migrated seismic data at all depths across the leased premises. Lessor agrees to use Lessor's best efforts during the term of this Lease to maintain all such data so provided in confidence until otherwise released from this obligation by Lessee or until Lessee releases such data to the general oil and gas industry, whichever occurs earlier.

All such information shall be provided by Lessee irrespective of the results of Lessee's operations on the herein described land.

## XVI.  ASSIGNMENT:

In the event this Lease is assigned or transferred by Lessee in whole or in part, then, upon termination of this Lease, Lessee shall be responsible for obtaining a proper recordable release or releases of this Lease as to the portion or portions of said land as to which this Lease has been assigned or transferred by Lessee and Lessee shall furnish such release or releases to Lessor, or file same for record in the Official Public Records of Real Property in the County in which said land is located, promptly after termination of this Lease.

## XVII.  TIME, METHOD AND MANNER OF PAYMENT:

ANYTHING HEREIN TO THE CONTRARY NOTWITHSTANDING, and in lieu of the terms and provisions contained in Sections 91.401 through 91.406 of the Texas Natural Resources Code, the parties hereto specifically agree that the following provisions shall apply to this Lease and all royalty payments made hereunder or other rights as provided in the above listed sections, and that such provisions of the Texas Natural Resources Code shall not be applicable; such parties further, by their signatures below, waive any and all rights which might be claimed or asserted under such Sections 91.401 through 91.406 of the Texas Natural Resources Code; thus, it is specifically provided that:

A.   All rentals and royalties which may become due hereunder shall be payable at Houston, Harris County, Texas or at such other place, if any, as may be specified by written directive of a particular royalty owner as to such owner's interest.

B.   Royalties on production shall be paid on a calendar month basis.  The royalty for the calendar month in which production is first marketed shall be paid on or before the first day of the calendar month next following the expiration of sixty (60) days from the execution date of the completion report or potential test for the well that is filed with the Railroad Commission of Texas, and the respective royalty payments for each subsequent calendar month of production shall be made on or before the first day of each successive calendar month following the calendar month in which the first payment is due.

C.   All past due royalties (including any compensatory royalties payable under Paragraph VI.B.) shall be subject to a Late Charge based on the amount due and calculated at the maximum rate allowed by law commencing on the day after the last day on which such monthly royalty payment could have been timely made and for every calendar month and/or fraction thereof from the due date until paid, plus attorney's fees, court costs, and other costs in connection with the collection of the unpaid amounts.  Any Late Charge that may become applicable shall be due and payable on the last day of each month when this provision becomes applicable.

D.   Notwithstanding anything herein to the contrary, upon the failure of Lessee to pay Lessor the royalty payments as provided herein, the Lessor may, at Lessor's option, elect to terminate said Lease by serving written notice on Lessee at the address shown herein, of Lessor's intention to terminate said Lease within not less than thirty (30) days of receipt, or any time thereafter.  Should Lessee pay Lessor all royalty payments past due during said period, with interest as provided herein, this Lease shall not terminate.  However, upon the failure of Lessee to pay Lessor said past due royalty payments during said notice period, Lessor may elect to terminate this Lease, and title to said land shall revert to Lessor.  Lessor may elect to terminate said Lease, after the expiration of said notice period, by serving notice of termination, filing a copy of said notice with the County Clerk of

SAM.4218

the county in which said land is located. The effective date of said termination shall be the date said termination is filed with the said County Clerk. In the event of the termination of said Lease in this manner, Lessee shall not remove any of Lessee's equipment, fixtures, or personal property located on said land, unless so instructed by Lessor, and if so instructed, such property shall be removed within thirty (30) days of notice to Lessee. In the event Lessor prohibits the removal of such property from the leased premises, then it shall become the property of Lessor, at the option of Lessor.

E.      Neither Lessee nor its purchaser of production shall be authorized to make any deductions or adjustments against present or future royalty payments for royalty amounts previously paid without first giving Lessor or royalty owner thirty (30) days advanced notice of same along with a full explanation of such overpayment. In the event Lessor or royalty owner disputes the legitimacy of such deduction or adjustment, Lessee or purchaser shall not be entitled to make such deductions or adjustments against Lessor's royalty (and Lessor's full royalty payments shall not be interrupted) until such dispute is resolved. If it is agreed between Lessor or royalty owner and Lessee that a royalty owner was overpaid, then the overpaid royalty owner has the option of repaying such overpayment or allowing Lessee or purchaser to recoup such overpayment out of future royalty payments on a schedule and in monthly amounts agreed to by such overpaid royalty owner and Lessee. or purchaser. Any overpaid royalty owner shall not be charged interest on the overpaid sums.

F.      Lessor expressly reserves the right and Lessee expressly grants to Lessor and any royalty owner the right to audit production, revenue and the calculation and payment of revenues to Lessor and royalty owners, by such royalty owner giving Lessee notice of the exercise of this right and, within 30 days after receipt of such notice, Lessee shall make available to the requesting royalty owner all books and records (together with copies thereof if requested by royalty owner) along with all other data necessary for royalty owner or his agent to audit such production, revenue and/or royalty payments. Lessor shall select the accounting procedure to be utilized in such audit and such procedure selected shall be binding on Lessee so long as such procedure is accepted under general accounting practice and standards. If it is determined that royalty owner has not been correctly paid all sums owed him, then Lessee shall reimburse the requesting royalty owner for all costs and expenses incurred by Lessor for such audit, together with all unpaid revenues, late charges, and interest thereon.

G.      Without limiting the other provisions of this Article XVII., it is further specifically acknowledged and agreed by the parties hereto that the term "market value" as used herein shall be defined in accordance with the above Paragraph III.H. and not in accordance with the provisions of Subsection 91.402 (i) of the Texas Natural Resources Code.

H.      The provisions of this Article XVII. shall not apply where Lessor has elected to take Lessor's royalty in kind or market separately Lessor's royalty share of production under the terms of this Lease.

I.      Notwithstanding anything herein to the contrary, Lessor's exercise of Lessor's rights under this paragraph shall not be deemed as a waiver of Lessor's right to take all actions necessary to recover unpaid royalties, interest and other damages incurred.

J.      In the event Lessee enters into a gas purchase contract which contains what is commonly referred to as a "take or pay provision" (such provision meaning that the gas purchaser agrees to take delivery of a specified minimum volume or quantity of gas over a specified term at a specified price or to make minimum periodic payments to the producer for gas not taken by the purchaser) and the purchaser under such gas purchase contract makes payments to Lessee by virtue of such purchaser's failure to take delivery of such minimum volume or quantity of gas, then Lessor shall be entitled to Twenty-Five percent (25%) of all such sums paid to Lessee or producer under the "pay" provisions of such gas purchase contract. Such payment shall be due and owing to Lessor within sixty (60) days after the receipt of such payments by Lessee. Any payments made to Lessor under the "pay" obligation of any "take or pay" gas contract shall be applied as a credit toward Lessee's minimum royalty obligation. If the gas purchaser "makes up" such gas within the period called for in the gas contract and Lessee is required to give such purchaser a credit for gas previously paid for but not taken, then Lessor shall not be entitled to royalty on such "make up" gas.

If Lessee is not producing any quantities of gas from leased premises but is receiving payments under the "pay" portion of such "take or pay" gas purchase contract provision, such

SAM.4219

payments shall not relieve Lessee of the duty to make shut-in royalty payments if Lessee desires to continue this Lease, but such "take or pay" payments shall be applied as a credit against any shut-in royalty obligation of the Lessee.

Lessor shall be a third-party beneficiary of any gas purchase contract and/or transportation agreement entered into between Lessee and any purchaser and/or transporter or pipeline company of Lessor's gas, irrespective of any provision of said contracts to the contrary. Further, Lessor shall be entitled to Twenty-Five percent (25%) of the value of any benefits obtained by or granted to Lessee from any gas purchaser and/or transporter for the amendment, modification, extension, alteration, consolidation, transfer, cancellation or settlement of any gas purchase contract and/or transportation agreement.

XVIII. TITLE:

A.     Lessor hereby warrants and agrees to defend the title to only Lessor's interest in said lands, as shown by the Official Public Records of Real Property of the county in which said land is located, against the claims of all persons whomsoever claiming or to claim the same by, through, or under Lessor, but not otherwise, and agrees that Lessee, at Lessee's option, may discharge any tax, mortgage or other lien upon said land, either in whole or in part, and in the event Lessee does so, Lessee shall be subrogated to such lien with the right to enforce same and apply royalties accruing hereunder toward satisfying the same.

B.     Without impairment of Lessee's rights under the warranty in event of failure of title, it is agreed that if Lessor owns an interest in all or any part of the land covered by this Lease, or part thereof, less than the entire fee simple estate, then the royalties, rentals and shut-in payments, or any other payments hereunder to be paid or delivered to Lessor shall be paid only in the proportion which Lessor's interest therein, if any, bears to the whole or undivided fee simple estate therein. All outstanding royalties chargeable to Lessor's mineral interest shall be deducted from those royalties herein provided.

XIX.  TAXES:

All State occupation, severance, production and ad valorem taxes of every nature, kind and description levied upon the leasehold and royalty interest created by or reserved in this Lease by whatever taxing authority within the State, shall be borne and paid by Lessee at Lessee's sole cost and expense without deduction from or charge against Lessor's interest or against proceeds payable to Lessor hereunder, but this provision shall not cover any taxes levied or assessed on the surface of said land or any mineral interest, save and except the oil, gas and other liquid hydrocarbons interest, which is the subject matter of this Lease; nor shall this provision apply to any income, estate, gift, inheritance, or Federal windfall profits taxes charged on or assessed against any Lessor of this Lease.

XX.   ATTORNEY'S FEES:

It is further specifically provided that in the event it becomes necessary for Lessor to employ an attorney, or attorneys, as a result of any activity conducted by Lessee on the herein leased premises, or land pooled therewith, or to enforce any of Lessee's obligations hereunder and Lessor is successful in any court action to enforce same, Lessee agrees to pay all reasonable attorney's fees incurred by Lessor in connection therewith.

XXI.  BANKRUPTCY:

Notwithstanding any language contained herein to the contrary, the rights of Lessee, or Lessee's heirs, successors or assigns, in and to the leased premises, the equipment or fixtures thereon or the unsold oil and gas produced therefrom, shall automatically terminate, ipso facto, and be of no further force and effect upon the voluntary or involuntary filing of same for relief under the United States Bankruptcy Code.

XXII. PARAGRAPH CAPTIONS:

The captions set forth opposite each paragraph number are for convenience only and are not to be used to interpret or have any legal effect on the terms and provisions of this Lease.

SAM.4220

## XXIII. LESSOR FIDUCIARY CAPACITY:

It is expressly agreed and understood that this instrument is executed by Parties identified as fiduciaries, solely in the capacities stated and not otherwise, and that they shall never have any individual, personal or corporate liability or responsibility by reason of the execution of this instrument, except in such fiduciary capacities.

## XXIV. LESSOR'S AGENT:

This paragraph does not apply to Lessor, and accordingly this space is intentionally left blank.

## XXV. SECURITY AGREEMENT:

Lessor hereby retains a security interest in all of its proportionate part of (i) the oil, gas and other hydrocarbons produced and saved from the leased premises or lands pooled or unitized therewith or otherwise subject to this Lease as provided in Articles III. and XVII. herein regarding payment of royalties due under this Lease, and (ii) Lessor's respective royalty part of any and all proceeds of sale of such oil, gas and other hydrocarbons and Lessor's respective royalty part of any and all accounts (including, without limitation, accounts arising from gas imbalances, or from the sale of oil, gas or other liquid hydrocarbons at the well head), contract rights, inventory and general intangibles relating thereto or arising therefrom, and Lessor's respective royalty part of any and all proceeds and products of the foregoing (the "Collateral"), to secure Lessee's payment of royalties due under the terms and provisions of this Lease.

In addition to any other remedies provided in this Lease, Lessor, as Secured Party, may in event of Lessee's default hereunder proceed under V.T.C.A., BUSINESS AND COMMERCE CODE (the "Code") as to the Collateral, in any manner permitted by the Code. In the event of default by Lessee, Lessor shall have the right to take possession and to receive its proportionate part of the Collateral and to hold same as payment for Lessee's obligations or to apply it on the amounts owing to Lessor hereunder. The filing of a suit and rendition of judgment in favor of Lessor for the secured indebtedness shall not be deemed an election of remedies or otherwise affect the security interest as security for payment thereof. In addition, at any time during the term of this Lease, Lessor shall have the right, without prejudice to other rights and remedies, to collect, directly from any purchaser of production, the proceeds from the sale of its proportionate part of the Collateral. All purchasers of the Collateral may rely on a notification from Lessor stating its intent to collect such Collateral directly, and Lessee waives any recourse available against purchasers for releasing such Collateral as provided in this Paragraph.

The above reservation by Lessor of the security interest in the Collateral shall be a first and prior lien against the Collateral, and Lessee hereby agrees to maintain the priority of said security interest against all persons. All parties acquiring an interest in the Lease and/or the personal property covered by this Security Agreement, whether by assignment, merger, mortgage, operation of law, or otherwise, shall be deemed to have take such interest subject to the security interest in the Collateral as reserved herein. The address of Lessor, as Secured Party, is 820 Gessner Road, Suite 1300, Houston, Texas 77024-4259 and the address of Lessee, as Debtor, is set forth on page 1 of this Lease.

The Collateral includes Lessor's royalty part of the oil, gas and other hydrocarbons to be financed at the well head of the wells and accounts from the sale thereof. The parties hereto agree that the provisions of this Article XXV. shall be a part of the Memorandum of this Lease, and when such Memorandum is recorded in the Official Public Records of Real Property in the county where the land covered here is located, this Article and the Memorandum thereof shall be effective as a filed financing statement for the purposes of the Code. In addition, Lessee agrees to execute and acknowledge financing statements and continuation statements thereto prepared and submitted by Lessor in conjunction herewith or at any time following the execution hereof, and Lessor is authorized to file such statements in the appropriate UCC and/or official Public Records of Real Property with the Office of the Secretary of State of Texas and the county in which the leased premises are located, respectively, to perfect the security interest granted hereunder.

SAM.4221

## XXVI. FIELD RULES:

Lessee shall not file any Application for Field Rules pertaining to the land covered by this Lease without first giving Lessor not less than thirty (30) days advance written notice of intention to do so, together with a copy of a draft of the Application which Lessee contemplates filing. Within three days after the date of the filing of the final form of such Application, Lessee shall mail Lessor written notice of the date of filing and a copy of the Application so filed.

## XXVII. DIVISION ORDERS:

Notwithstanding Subsection 91.402 (c) of the Texas Natural Resources Code, the execution of Division Orders shall never be required as prerequisite for payment of royalty, and division orders, if signed for the convenience of the parties, shall not be construed as amending this Lease regardless of terminology contained therein. If requested by Lessee, Lessor will execute and deliver to Lessee or the purchaser of production a written statement of Lessor's interest in such production and Lessor's current address and taxpayer's Federal tax identification number.

## XXVIII. LANGUAGE:

Lessor and Lessee further acknowledge and agree that each and every provision contained herein has been specifically negotiated for valuable consideration and no provision of this Lease agreement shall be construed or interpreted as being "boiler plate" or "surplus" language.

## XXIX. MOST FAVORED NATIONS CLAUSE:

If Lessee shall enter into an oil and gas lease(s) part of which is located within three (3) miles of any exterior boundary of the subject lands covered by the subject Lease, hereinafter referred to as "Third Party Lease", Lessee shall notify Lessor of such fact. If the reserved royalty or the amount per acre payable for delay rentals, shut-in rentals or minimum royalty, at any time payable under such Third Party Lease, is higher than the like royalty and amounts payable as provided in the subject Lease, the royalty or amount payable per acre in the subject lease, which is less than that provided in the Third Party Lease shall be immediately increased so that it will equal the royalty or other amounts payable under the Third Party Lease. The subject Lease and the Third Party Lease must be calculated in substantially the same manner, such that the comparison of the subject Lease and the Third Party Lease is based on the same effective net royalty or other payments, and that same shall include or deduct the same types of charges, taxes and other burdens from such interests.

IN WITNESS WHEREOF, this instrument is executed effective as of the 24th day of March, 1999.

LESSORS:

CHARLES G. HOOKS III as Co-Trustee under the Will of Charles G. Hooks, Sr., Deceased (d/b/a CHAS. G. HOOKS & SON)

SUE ANN HOOKS as Co-Trustee under the Will of Charles G. Hooks, Sr., Deceased (d/b/a CHAS. G. HOOKS & SON)

CHARLES G. HOOKS III as Independent Executor of the Estate of Charles G. Hooks, Jr., Deceased (d/b/a CHAS. G. HOOKS & SON)

SAM.4222

20

LESSEE:

SAMSON LONE STAR LIMITED PARTNERSHIP

STEVEN E. AREA, Senior Vice President-Land
On behalf of said Partnership

THE STATE OF TEXAS

COUNTY OF HARRIS

This instrument was acknowledged before me on the 2nd day of April, 1999, by CHARLES G. HOOKS III and by SUE ANN HOOKS as Co-Trustees under the Will of Charles G. Hooks, Sr., Deceased.



NORMA K. BALDRY
Notary Public, State of Texas
My Commission Expires
DECEMBER 05, 2000

Notary Public in and for the State of Texas

THE STATE OF TEXAS

COUNTY OF HARRIS

This instrument was acknowledged before me on the 2nd day of April, 1999, by CHARLES G. HOOKS III as Independent Executor of the Estate of Charles G. Hooks, Jr., Deceased.



NORMA K. BALDRY
Notary Public, State of Texas
My Commission Expires
DECEMBER 05, 2000

Notary Public in and for the State of Texas

THE STATE OF OKLAHOMA

COUNTY OF TULSA

The above and foregoing instrument was acknowledged before me on this the 31st day of March, 1999, by STEVEN E. AREA, as Senior Vice President – Land of SAMSON LONE STAR LIMITED PARTNERSHIP, a Texas limited partnership, on behalf of said partnership.

My commission expires
9|25|01

Notary Public in and for the State of Oklahoma

SAM.4223

21

EXHIBIT "A"

ATTACHED TO AND MADE A PART OF THAT CERTAIN OIL, GAS AND LIQUID HYDROCARBON LEASE DATED EFFECTIVE MARCH 24, 1999, BY AND BETWEEN CHARLES G. HOOKS III, CO-TRUSTEE, ET AL., DOING BUSINESS JOINTLY AS CHAS. G. HOOKS & SON, A TEXAS GENERAL PARTNERSHIP, AS LESSOR, AND SAMSON LONE STAR LIMITED PARTNERSHIP, A TEXAS LIMITED PARTNERSHIP, AS LESSEE, COVERING TEN (10.0) ACRES OF LAND, MORE OR LESS, IN THE ROBERT B. IRVINE SURVEY, ABSTRACT 33, HARDIN COUNTY, TEXAS.

Ten (10.0) acres of land, more or less, in the Robert B. Irvine Survey, Abstract 33, Hardin County, Texas, more fully and particularly described in that certain deed dated March 25, 1922, from N.E. Laidacker to Chas. G. Hooks, recorded in Volume 93, Page 533, et seq., of the Deed Records of Hardin County, Texas, and being the same tract of land more fully and particularly described in that certain Special Warranty Deed dated March 23, 1995, from Charles G. Hooks III, Co-Trustee, et al., to William H. Munro and wife, Kelly B. Munro, recorded in Volume 1043, Page 405, et seq., of the Official Public Records (Deed Records) of Hardin County, Texas, reference to which deeds and said records is here made for all purposes.

SAM.4224



# POLLARD, GORE & HARRISON
## PETROLEUM & ENVIRONMENTAL ENGINEERS

REGISTERED IN
COLORADO, LOUISIANA
OKLAHOMA & TEXAS

323 CONGRESS AVENUE, SUITE 200
AUSTIN, TEXAS 78701
TELEPHONE (512) 480-8800
FACSIMILE (512) 480-8813

OFFICES IN
AUSTIN, DALLAS
DENVER, HOUSTON
& MIDLAND

RECEIVED

December 7, 2000

DEC 7 2000

Ms. Jackie Kelm
Railroad Commission of Texas
1701 N. Congress Avenue
Austin, Texas 78701

**Via Hand Delivery**

Re:  Samson Lone Star Ltd. Partnership's Black Stone Minerals #1 Lease

Dear Ms. Kelm:

Enclosed is a revised P-12 and plat for the above referenced well in the Constitution (Yegua) Field in Hardin County. Please note this is a different 704 acres than the 704 acres previously filed for this pooled unit. A portion of the original 704 acres will be put in a separate 308.41 acre unit for the operator's Black Stone Minerals "A" well. Please contact the undersigned if you require additional information to support this request.

Sincerely,

James M. Clark

James M. Clark
For Samson Lone Star LP

Enclosures

PLAINTIFF'S
EXHIBIT
56

SAMSON-14637

Form P - 12
(1 / 16 / 74)
EAQ0697

## RAILROAD COMMISSION OF TEXAS
## OIL AND GAS DIVISION

### CERTIFICATE OF POOLING AUTHORITY

I, ___Glenn H. Lanoue___ , being of lawful age, being familiar with the matter, and having full knowledge of the facts set out, do state:

(1) That the acreage claimed for the purpose of establishing a pooled drilling or proration unit under applicable orders of the Railroad Commission of Texas, for the

NAME OF OPERATOR:_Samson Lone Star Limited Partnership_____

NAME OF POOLED UNIT:___Black Stone Minerals_____ WELL NO._1_____

FIELD:___Constitution (Yegua)_____ · ___Hardin_____ COUNTY,

TEXAS, contains___704.00___ acres; that with respect to such pooled unit, as it is hereafter described, parties now owning a mineral interest or mineral interests (including royalty interests, working interests, or other mineral interests) therein either (1) acquired such interest as they now have subject to the provisions of an instrument or instruments now in effect and which permit the pooling of said interests or (2) have, by virtue of the execution of an instrument or instruments the provisions of which are now in effect, pooled such of said interests as they now own therein, in such manner that all of such pooled unit shall be considered by the Commission as one base tract as if all rights with respect thereto has been acquired under a single contract.

(2) That the pooled unit described in the preceding paragraph is made up of and contains the hereafter described individual tracts of land no part of which is embraced within any other pooled unit in the same field and which, by virtue of the pooling agreements referred to in the preceding paragraph, are now contained within the pooled unit herein described.

(3) That where a non-pooled undivided interest exists in any of the individual tracts pooled, that certain non-pooled interest is noted in the margin of this instrument beside the tract description to identify the existence of the non-pooled interests in that tract:

(OVER)

SAMSON-14638

## DESCRIPTION OF INDIVIDUAL TRACTS OR LEASES CONTAINED WITHIN POOLED UNIT REFERRED TO IN PARAGRAPH (1) ABOVE

| NAME OF HOLDER OF LEASE | LEASE NAME | NO. OF ACRES | MARGIN |
|---|---|---|---|
| 1)Samson Lone Star Limited Ptsp. | Black Stone Minerals | 422.400 | |
| 2)Samson Lone Star Limited Ptsp. | Joyce Du Jay Lee, et al | 10.000 | |
| 3)Samson Lone Star Limited Ptsp. | State of Texas | 5.000 | |
| 4)Samson Lone Star Limited Ptsp. | Broussard, et al | 50.000 | |
| 5)Samson Lone Star Limited Ptsp. | Pica Investment, et al | 25.000 | |
| 6)Samson Lone Star Limited Ptsp. | Joyce Du Jay Lee, et al | 144.400 | |
| 7)Samson Lone Star Limited Ptsp. | Charles A. Howell | 13.401 | |
| 8)Samson Lone Star Limited Ptsp. | Gertrude Day Baker | 1.000 | |
| 9)Samson Lone Star Limited Ptsp. | Mary Day | 1.000 | |
| 10)Samson Lone Star Limited Ptsp | Gesiena C. Day | 1.000 | |
| 11)Samson Lone Star Limited Ptsp | Julia Day | 1.000 | |
| 12)Samson Lone Star Limited Ptsp | Elizabeth L. Schoonover | 1.000 | |
| 13)Samson Lone Star Limited Ptsp | Vastar, et al | 28.799 | |
| TOTAL | | 704.000 | |

CERTIFICATE:

I declare under penalties prescribed in Sec. 91.143, Texas Natural Resources Code, that I am authorized to make this report, that this report was prepared by me or under my supervision and direction, and that data and facts stated thereto are true, correct, and complete, to the best of my knowledge.

_____     Senior Landman        12/4/00
Representative of Operator                Title                Date

Telephone    918    591-1846
             A / C         Number

## INSTRUCTIONS

Where two or more tracts are pooled to form either a drilling unit or a proration unit as permitted by Commission regulation, the operator thereof must furnish a certificate of pooling authority at the time action by the Commission is sought either for a permit to drill on a pooled drilling unit or for establishment of an allowable for a well on a pooled proration unit.

SAMSON-14639



SAMSON-14640



PLAINTIFF'S
EXHIBIT
57

SAMSON-14633

 **Samson**

Samson Plaza
Two West Second Street
Tulsa. Oklahoma 74103-3103
USA
918/583-1791
Fax 918/591-1796

**RECEIVED**

MAR 0 9 2001

SAMSON SOUTHERN LAND DEPT.

February 15, 2001

**VIA FEDERAL EXPRESS**

Donald Wyatt Heisig
59857 Cascadel Drive N.
North Fork, CA 93643

Sharon Carlisi
41-675 Navarre Ct.
Palm Desert, CA 92260

Mary Patricia Carlisi
4511 Park Serena
Calabasas, CA 91302

Shannon Grace Carlisi
625 Fairhill Court
Oceanside, CA 92057

Wayne Charles Carlisi
3860 Broadlawn Drive
Hollywood, CA 90068

Stephanie Rae Carlisi
4511 Park Serena
Calabasas, CA 91302

Barry Hathorne Carlisi
19 Maverick Lane
Bell Canyon, CA 91607

Donald Thomas Carlisi
15 Morgan Lane
Bell Canyon, CA 91607

RE:  Black Stone Minerals No. 1 Well
     Hardin County, Texas

Dear Ladies and Gentlemen:

Samson Lone Star Limited Partnership ("Samson") hereby requests the above parties agree to amend Paragraph V.E. of the Oil, Gas and Liquid Hydrocarbon Lease dated April 5, 1999, to allow Samson to pool your lease with other tracts and to grant 640 acre pooling plus a 10% tolerance for the Black Stone Minerals No. 1 Well.

Please be advised that Jimmy Broussard has already given approval for the 640 acre pooling plus a 10% tolerance and we would like to have your approval as well.



**PLAINTIFF'S EXHIBIT 63**

SAMSON-13656

Please indicate your approval for the 640 acre pooling and 10% tolerance by signing in the space provided below and returning same to Samson. Should you have any questions, please call me at (918) 591-1846.

Sincerely,

SAMSON LONE STAR LIMITED PARTNERSHIP

Glenn W. Lanoue, CPL
Senior Landman

ACCEPTED AND AGREED TO THIS _____ DAY OF _____, 2001.

_____
DONALD WYATT HEISIG

ACCEPTED AND AGREED TO THIS _____ DAY OF _____, 2001.

_____
MARY PATRICIA CARLISI

ACCEPTED AND AGREED TO THIS _____ DAY OF _____, 2001.

_____
WAYNE CHARLES CARLISI

ACCEPTED AND AGREED TO THIS _____ DAY OF _____, 2001.

_____
BARRY HATHORNE CARLISI

Please indicate your approval for the 640 acre pooling and 10% tolerance by signing in the space provided below and returning same to Samson. Should you have any questions, please call me at (918) 591-1846.

Sincerely,

SAMSON LONE STAR LIMITED PARTNERSHIP

Glenn W. Lanoue, CPL
Senior Landman

---

ACCEPTED AND AGREED TO THIS _14th_ DAY OF _March_ , 2001.

JOE A. BORDAGES

ACCEPTED AND AGREED TO THIS _____ DAY OF _____, 2001.

_____
SCOTT ALAN BORDAGES

ACCEPTED AND AGREED TO THIS _____ DAY OF _____, 2001.

_____
JOANNA M. PASTORE

ACCEPTED AND AGREED TO THIS _____ DAY OF _____, 2001.

_____
STEPHANIE BORDAGES KNOBEL

SAMSON-13658

Please indicate your approval for the 640 acre pooling and 10% tolerance by signing in the space provided below and returning same to Samson. Should you have any questions, please call me at (918) 591-1846.

Sincerely,

SAMSON LONE STAR LIMITED PARTNERSHIP

Glenn W. Lanoue, CPL
Senior Landman

ACCEPTED AND AGREED TO THIS _____ DAY OF _____, 2001.

_____
**JOE A. BORDAGES**

ACCEPTED AND AGREED TO THIS _____ DAY OF _____, 2001.

_____
**SCOTT ALAN BORDAGES**

ACCEPTED AND AGREED TO THIS _____ DAY OF _____, 2001.

_____
**JOANNA M. PASTORE**

ACCEPTED AND AGREED TO THIS _____ DAY OF _____, 2001.

_____
**STEPHANIE BORDAGES KNOBEL**

SAMSON-13659

Please indicate your approval for the 640 acre pooling and 10% tolerance by signing in the space provided below and returning same to Samson. Should you have any questions, please call me at (918) 591-1846.

Sincerely,

SAMSON LONE STAR LIMITED PARTNERSHIP

Glenn W. Lanoue, CPL
Senior Landman


ACCEPTED AND AGREED TO THIS _____ DAY OF _____, 2001.


_____
JOE A. BORDAGES


ACCEPTED AND AGREED TO THIS _____ DAY OF _____, 2001.


_____
SCOTT ALAN BORDAGES


ACCEPTED AND AGREED TO THIS _____ DAY OF _____, 2001.


_____
JOANNA M. PASTORE


ACCEPTED AND AGREED TO THIS __17__ DAY OF _Feb._____, 2001.


_____
STEPHANIE BORDAGES KNOBEL


SAMSON-13660

ACCEPTED AND AGREED TO THIS _____ DAY OF _____, 2001.


_____
**ALLISON BORDAGES KOSKELLA**

ACCEPTED AND AGREED TO THIS _____ DAY OF _____, 2001.


_____
**JOSEPH A. BORDAGES III**

ACCEPTED AND AGREED TO THIS _____20_____ DAY OF ___FEBRUARY___, 2001.


**KATHERINE BORDAGES BROWNLEE**

SAMSON-13661

ACCEPTED AND AGREED TO THIS _____ DAY OF _____, 2001.

_____
ALLISON BORDAGES KOSKELLA

ACCEPTED AND AGREED TO THIS _____ DAY OF _____, 2001.

_____
JOSEPH A. BORDAGES III

ACCEPTED AND AGREED TO THIS _____20_____ DAY OF _FEBRUARY_, 2001.

_____
KATHERINE BORDAGES BROWNLEE

SAMSON-13662

ACCEPTED AND AGREED TO THIS ___3___ DAY OF _march___, 2001.

_____
SHARON CARLISI

ACCEPTED AND AGREED TO THIS _____ DAY OF _____, 2001.

_____
SHANNON GRACE CARLISI

ACCEPTED AND AGREED TO THIS _____ DAY OF _____, 2001.

_____
STEPHANIE RAE CARLISI

ACCEPTED AND AGREED TO THIS _____ DAY OF _____, 2001.

_____
DONALD THOMAS CARLISI

SAMSON-13663

ACCEPTED AND AGREED TO THIS _____ DAY OF _____, 2001.


_____
SHARON CARLISI

ACCEPTED AND AGREED TO THIS _____ DAY OF _____, 2001.

_____
SHANNON GRACE CARLISI

ACCEPTED AND AGREED TO THIS _____ DAY OF _____, 2001.


_____
STEPHANIE RAE CARLISI

ACCEPTED AND AGREED TO THIS _____ DAY OF _____, 2001.


_____
DONALD THOMAS CARLISI

SAMSON-13664

ACCEPTED AND AGREED TO THIS _____ DAY OF _____, 2001.


_____
SHARON CARLISI

ACCEPTED AND AGREED TO THIS _____ DAY OF _____, 2001.

_____
SHANNON GRACE CARLISI

ACCEPTED AND AGREED TO THIS _____ DAY OF _____, 2001.


_____
STEPHANIE RAE CARLISI

ACCEPTED AND AGREED TO THIS _____ DAY OF _____, 2001.


_____
DONALD THOMAS CARLISI

SAMSON-13665

RECEIVED

FEB 2 6 2001

SAMSON SOUTHERN LAND DEPT.

ACCEPTED AND AGREED TO THIS _____ DAY OF _____, 2001.

_____
SHARON CARLISI

ACCEPTED AND AGREED TO THIS _____ DAY OF _____, 2001.

_____
SHANNON GRACE CARLISI

ACCEPTED AND AGREED TO THIS _21ST_ DAY OF _February_, 2001.

_____
STEPHANIE RAE CARLISI

ACCEPTED AND AGREED TO THIS _____ DAY OF _____, 2001.

_____
DONALD THOMAS CARLISI

SAMSON-13666

**Samson**

Samson Plaza
Two West Second Street
Tulsa, Oklahoma 74103-3103
USA
918/583-1791
Fax 918/591-1796

RECEIVED

JUN 0 1 2001

SAMSON SOUTHERN LAND DEPT.

February 15, 2001

**VIA FEDERAL EXPRESS**

Charles G. Hooks III and Sue Ann Hooks, as Co-Trustees
under the Will of Charles G. Hooks, Sr., Deceased
and Charles G. Hooks III as Independent Executor of the
Estate of Charles G. Hooks, Jr., Deceased, doing business
jointly as Chas. G. Hooks & Son
820 Gessner Road, Suite 1300
Houston, Texas 77024-4259

RE:    Black Stone Minerals No. 1 Well
       Hardin County, Texas

Dear Ladies and Gentlemen:

Samson Lone Star Limited Partnership ("Samson") hereby requests the above parties agree
to amend Paragraph V.E. of the Oil, Gas and Liquid Hydrocarbon Lease dated April 19,
1999, to allow Samson to pool your lease with other tracts and to grant 640 acre pooling
plus a 10% tolerance for the Black Stone Minerals No. 1 Well, as per a photocopy of a plat of
the proposed Black Stone Minerals No. 1 Unit attached hereto and made a part hereof.
Please be advised that Jimmy Broussard has already given approval for the 640 acre
pooling plus a 10% tolerance and we would like to have your approval as well.

Please indicate your approval for the 640 acre pooling and 10% tolerance by signing in the
space provided below and returning same to Samson. Should you have any questions,
please call me at (918) 591-1846.

Sincerely,

SAMSON LONE STAR LIMITED PARTNERSHIP

Glenn W. Lanoue, CPL
Senior Landman

PLAINTIFF'S
EXHIBIT
65

SAMSON-13667

**ACCEPTED AND AGREED TO THIS ___25th___ DAY OF _____May_____, 2001.

CHARLES G. HOOKS III  as Co-Trustee
Under the Will of Charles G. Hooks, Sr.,
Deceased (d/b/a CHAS. G. HOOKS & SON)


**ACCEPTED AND AGREED TO THIS ___25th___ DAY OF _____May_____, 2001.

SUE ANN HOOKS  as Co-Trustee
Under the Will of Charles G. Hooks, Sr.,
Deceased (d/b/a CHAS. G. HOOKS & SON)


**ACCEPTED AND AGREED TO THIS ___25th___ DAY OF _____May_____, 2001.

CHARLES G. HOOKS III  as Independent
Executor of the Estate of Charles G. Hooks, Jr.,
Deceased (d/b/a CHAS. G. HOOKS & SON)


**Lessors' acceptance and agreement expressed hereinabove is
conditioned upon the subsequent execution by Lessors and Lessee
of a formal lease amendment document to be prepared by Lessors
and submitted to Lessee.

SAMSON-13668



4308 Greenbriar • Stafford, Texas 77477
Phone 281/240-0486 • Fax 281/240-24

WALKER PETTITT
A-43

A-33

SURFACE LOCATION
Samson Lone Star L.P.
*Black Stone Minerals No. 1*
X=3,907,706.37
Y= 219,122.73
Elev. = 27'

F.M. 105

① Unit Boundary

704.00 Acres In Unit

5740'± Scaled

S72°45'47"E 219.85'

④
③
② WM. C. DYCHES A-112
1400'± Scaled

BHL
X=3,908,584.91
Y= 218,850.16

⑤
⑥
⑦
⑬

D. CHOAT
A-12 (H)
A-11 (J)

HARDIN CO.
JEFFERSON CO.

THOS. D. YOCUM
A-59 (H)
A-60 (J)

| Tract | Lessor | Acres | Percent |
|---|---|---|---|
| 1 | Black Stone Minerals Co., L.P., et al | 422.40 | 60.00 |
| 2 | Joyce Du Jay Lee et al | 10.00 | 1.42 |
| 3 | State of Texas | 5.00 | .71 |
| 4 | Broussard et al | 50.00 | 7.10 |
| 5 | PICA Inv. et al | 25.00 | 3.55 |
| 6 | Joyce Du Jay Lee et al | 144.40 | 20.51 |
| 7 | Charles A. Howell | 13.401 | 1.90 |
| 8 | Gertrude Day Baker | 1.00 | .15 |
| 9 | Mary Day | 1.00 | .14 |
| 10 | Cessena C. Day | 1.00 | .14 |
| 11 | Julia Day | 1.00 | .14 |
| 12 | Elizabeth L. Schoonover | 1.00 | .15 |
| 13 | Vostor et al | 28.799 | 4.09 |
| Total | | 704.00 | 100.00 |

All coordinates and bearings shown are based on the Texas State Plane Coordinate System, Central Zone (NAD 27).

The unit boundaries and acreages of tracts in the unit were scaled from maps or obtained from record information furnished to us.

The Well Location is approximately 7.4 miles east of Sour Lake, Texas.

The Surface Location is:
630' FSL x 1600' FEL Survey
2410'± Scaled FWL x 3834' FNL Unit

The Bottom Hole Location is:
290' FSL x 740' FEL Survey
500' Scaled FNL x 1400'± Scaled FEL Unit

I hereby certify that this is a true and correct plat based on the best of my knowledge
December 26, 2000

Glenn Lanoue          C.P.L.

**SAMSON LONE STAR L.P.**
PROPOSED WELL LOCATION
BLACK STONE MINERALS NO. 1
WALKER PETTITT LEAGUE, A-43
HARDIN COUNTY, TEXAS

TOTAL P.07

SAMSON-13669

2/20/01

1) 13,700' deep gas well w/ good deal of condensate — located about 1500' west of Pike Island Bayou on Blackstone lease — well drilled by Samson — want to include 50 ac. out of our 640 ac. in 70± ac. gas unit — haven't decided about remaining 570 ac. —

2) Drilling another well north (?) of Blackstone No. 1 — If good, will probably include 95 ac. and 10 ac. in producing unit — will probably pay delay rental ($2375.03 on 95 ac. and $750.00 on 10 ac. — both due on March 24) — This well will probably determine whether Samson will pay $20,570.00 ± delay rental due on 570 ac. remaining on April 19 —

PLAINTIFF'S EXHIBIT
160

CGH 0424

Summary of Lost Compensatory Royalty with Incremental Formation Production - Charles G. Hooks, III, et al.
Lost Royalty (Oct-00 to Mar-04) Less Actual Payments and Late Charges
Samson Lone Star, LLC
Black Stone Minerals No. 1 Gas Unit, Well No. 1 (RRC ID 179535) and Joyce Du Jay No. 1 Gas Unit, Well No. 1 (RRC ID 187477)
Constitution (Yegua) Field - Hardin County, Texas

PLAINTIFF'S EXHIBIT
608

| Production Month | Plaintiffs' Total Net Value Black Stone GU No. 1 $ | Plaintiffs' Total Net Value Du Jay GU No. 1 $ | Plaintiffs' Total Net Value Black Stone GU No. 1 Incremental Formation $ | Plaintiffs' Total Net Value Du Jay GU No. 1 Incremental Formation $ | Plaintiffs' Total Net Value $ | Actual Royalty Paid Black Stone GU No.'s 1, 2 & 3 $ | Amount Due Plaintiffs $ | Royalty Due Date | Months in Overdue Period | Late Charge to 1-Aug-08 $ | Lost Royalty Plus Late Charge $ |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Oct-00 | 34,451.97 | 0.00 | 5,392.67 | 0.00 | 39,844.64 | 2,447.72 | 37,396.92 | 1-Feb-01 | 90 | 105,419.99 | 142,816.91 |
| Nov-00 | 137,703.63 | 0.00 | 19,603.77 | 0.00 | 157,307.40 | 9,779.21 | 147,528.19 | 1-Mar-01 | 89 | 407,548.22 | 555,076.41 |
| Dec-00 | 177,403.88 | 0.00 | 33,439.85 | 0.00 | 210,843.73 | 12,599.38 | 198,244.35 | 1-Apr-01 | 88 | 536,629.07 | 734,873.42 |
| Jan-01 | 233,265.08 | 0.00 | 48,417.93 | 0.00 | 281,683.01 | 16,569.93 | 265,113.08 | 1-May-01 | 87 | 703,113.12 | 968,226.20 |
| Feb-01 | 125,793.78 | 0.00 | 15,408.04 | 0.00 | 141,201.82 | 8,933.09 | 132,268.73 | 1-Jun-01 | 86 | 343,654.41 | 475,923.14 |
| Mar-01 | 127,013.46 | 0.00 | 14,364.90 | 0.00 | 141,378.36 | 9,017.62 | 132,360.74 | 1-Jul-01 | 85 | 336,855.22 | 469,215.96 |
| Apr-01 | 156,883.46 | 0.00 | 26,360.09 | 0.00 | 183,243.55 | 11,139.97 | 172,103.58 | 1-Aug-01 | 84 | 428,983.58 | 601,087.16 |
| May-01 | 154,257.46 | 0.00 | 24,084.04 | 0.00 | 178,341.50 | 10,957.49 | 167,384.01 | 1-Sep-01 | 83 | 408,580.17 | 575,964.18 |
| Jun-01 | 129,982.34 | 0.00 | 17,263.90 | 0.00 | 147,246.24 | 9,229.95 | 138,016.29 | 1-Oct-01 | 82 | 329,875.92 | 467,892.21 |
| Jul-01 | 116,705.34 | 0.00 | 14,597.19 | 0.00 | 131,302.53 | 8,289.99 | 123,012.54 | 1-Nov-01 | 81 | 287,852.14 | 410,864.68 |
| Aug-01 | 113,012.96 | 0.00 | 13,275.49 | 0.00 | 126,288.45 | 8,028.67 | 118,259.78 | 1-Dec-01 | 80 | 270,893.28 | 389,153.06 |
| Sep-01 | 97,516.53 | 0.00 | 9,711.54 | 0.00 | 107,228.07 | 6,927.28 | 100,300.79 | 1-Jan-02 | 79 | 224,877.61 | 325,178.40 |
| Oct-01 | 82,891.13 | 0.00 | 8,296.98 | 0.00 | 91,188.11 | 5,884.46 | 85,303.65 | 1-Feb-02 | 78 | 187,166.49 | 272,470.14 |
| Nov-01 | 90,941.66 | 0.00 | 12,559.53 | 0.00 | 103,501.19 | 5,710.63 | 97,790.56 | 1-Mar-02 | 77 | 209,948.19 | 307,738.75 |
| Dec-01 | 80,267.22 | 0.00 | 9,663.11 | 0.00 | 89,930.33 | 5,038.92 | 84,891.41 | 1-Apr-02 | 76 | 178,306.82 | 263,198.23 |
| Jan-02 | 55,474.94 | 67,938.86 | 7,239.80 | 8,957.88 | 139,611.48 | 3,482.05 | 136,129.43 | 1-May-02 | 75 | 279,690.40 | 415,819.83 |
| Feb-02 | 46,688.55 | 85,321.63 | 5,121.39 | 9,254.81 | 146,386.38 | 3,123.43 | 143,262.95 | 1-Jun-02 | 74 | 287,879.73 | 431,142.68 |
| Mar-02 | 62,400.13 | 127,550.15 | 6,847.20 | 13,925.90 | 210,723.38 | 8,418.43 | 202,304.95 | 1-Jul-02 | 73 | 397,524.24 | 599,829.19 |
| Apr-02 | 75,237.62 | 165,323.79 | 9,722.99 | 21,205.83 | 271,490.23 | 10,307.45 | 261,182.78 | 1-Aug-02 | 72 | 501,773.38 | 762,956.16 |
| May-02 | 72,629.78 | 155,841.42 | 9,024.84 | 19,074.58 | 256,570.62 | 9,612.89 | 246,957.73 | 1-Sep-02 | 71 | 463,783.69 | 710,741.42 |
| Jun-02 | 62,507.44 | 139,620.07 | 8,076.43 | 17,849.05 | 228,052.99 | 9,941.98 | 218,111.01 | 1-Oct-02 | 70 | 400,333.23 | 618,444.24 |
| Jul-02 | 62,714.04 | 140,893.64 | 7,540.27 | 17,184.35 | 228,332.30 | 12,082.83 | 216,249.47 | 1-Nov-02 | 69 | 387,854.89 | 604,104.36 |
| Aug-02 | 54,991.98 | 134,102.17 | 6,157.70 | 15,039.51 | 210,291.36 | 10,310.09 | 199,981.27 | 1-Dec-02 | 68 | 350,420.97 | 550,402.24 |
| Sep-02 | 51,706.11 | 133,267.85 | 6,044.92 | 15,609.58 | 206,628.46 | 9,876.88 | 196,751.58 | 1-Jan-03 | 67 | 336,759.03 | 533,510.61 |
| Oct-02 | 51,711.23 | 128,749.14 | 6,413.20 | 16,202.91 | 203,076.48 | 9,508.09 | 193,568.39 | 1-Feb-03 | 66 | 323,553.86 | 517,122.25 |
| Nov-02 | 36,805.32 | 120,146.49 | 5,273.55 | 17,220.92 | 179,446.28 | 7,953.90 | 171,492.38 | 1-Mar-03 | 65 | 279,882.70 | 451,375.08 |
| Dec-02 | 41,345.11 | 130,873.64 | 5,442.88 | 17,440.05 | 195,101.68 | 8,447.52 | 186,654.16 | 1-Apr-03 | 64 | 297,367.03 | 484,021.19 |
| Jan-03 | 46,789.91 | 139,668.25 | 6,357.02 | 19,300.87 | 212,116.05 | 9,547.49 | 202,568.56 | 1-May-03 | 63 | 314,958.07 | 517,526.63 |
| Feb-03 | 32,751.56 | 135,801.11 | 4,564.41 | 18,880.79 | 191,997.87 | 8,500.95 | 183,496.92 | 1-Jun-03 | 62 | 278,376.96 | 461,873.88 |
| Mar-03 | 47,802.56 | 166,721.94 | 8,696.10 | 30,090.65 | 253,311.25 | 11,713.27 | 241,597.98 | 1-Jul-03 | 61 | 357,533.14 | 599,131.12 |
| Apr-03 | 17,681.53 | 111,825.28 | 2,529.22 | 16,778.63 | 148,814.66 | 5,725.15 | 143,089.51 | 1-Aug-03 | 60 | 206,509.61 | 349,599.12 |
| May-03 | 129,164.99 | 110,820.99 | 19,313.47 | 16,854.02 | 276,153.47 | 12,537.89 | 263,615.58 | 1-Sep-03 | 59 | 370,936.93 | 634,552.51 |
| Jun-03 | 152,609.88 | 118,011.82 | 23,759.21 | 19,080.91 | 313,461.82 | 14,009.78 | 299,452.04 | 1-Oct-03 | 58 | 410,710.44 | 710,162.48 |
| Jul-03 | 129,851.34 | 112,563.68 | 19,075.92 | 17,036.74 | 278,527.68 | 12,110.33 | 266,417.35 | 1-Nov-03 | 57 | 356,064.81 | 622,482.16 |
| Aug-03 | 101,134.84 | 104,150.65 | 13,337.37 | 14,401.15 | 233,024.01 | 9,603.87 | 223,420.14 | 1-Dec-03 | 56 | 290,884.79 | 514,304.93 |
| Sep-03 | 75,354.42 | 89,693.17 | 9,874.47 | 13,396.08 | 188,318.14 | 7,586.46 | 180,731.68 | 1-Jan-04 | 55 | 229,157.65 | 409,889.33 |
| Oct-03 | 61,268.15 | 65,073.94 | 7,848.20 | 9,024.57 | 143,214.86 | 6,574.46 | 136,640.40 | 1-Feb-04 | 54 | 168,672.68 | 305,313.08 |
| Nov-03 | 41,104.82 | 80,968.99 | 5,994.52 | 11,331.43 | 139,399.76 | 5,093.23 | 134,306.53 | 1-Mar-04 | 53 | 161,356.73 | 295,663.26 |
| Dec-03 | 49,333.15 | 86,086.48 | 7,504.23 | 12,751.37 | 155,675.23 | 5,781.55 | 149,893.68 | 1-Apr-04 | 52 | 175,206.73 | 325,100.41 |

Summary of Lost Compensatory Royalty with Incremental Formation Production - Charles G. Hooks, III, et al.
Lost Royalty (Oct-00 to Mar-04) Less Actual Payments and Late Charges
Samson Lone Star, LLC
Black Stone Minerals No. 1 Gas Unit, Well No. 1 (RRC ID 179535) and Joyce Du Jay No. 1 Gas Unit, Well No. 1 (RRC ID 187477)
Constitution (Yegua) Field - Hardin County, Texas

| Production Month | Plaintiffs' Total Net Value Black Stone GU No. 1 $ | Plaintiffs' Total Net Value Du Jay GU No. 1 $ | Plaintiffs' Total Net Value Black Stone GU No. 1 Incremental Formation $ | Plaintiffs' Total Net Value Du Jay GU No. 1 Incremental Formation $ | Plaintiffs' Total Net Value $ | Actual Royalty Paid Black Stone GU No.'s 1, 2 & 3 $ | Amount Due Plaintiffs $ | Royalty Due Date | Months in Overdue Period | Late Charge to 1-Aug-08 $ | Lost Royalty Plus Late Charge $ |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Jan-04 | 53,471.96 | 94,166.11 | 8,656.64 | 15,102.40 | 171,397.11 | 6,412.60 | 164,984.51 | 1-May-04 | 51 | 187,557.87 | 352,542.38 |
| Feb-04 | 44,850.78 | 80,941.52 | 6,509.95 | 11,990.76 | 144,293.01 | 5,391.53 | 138,901.48 | 1-Jun-04 | 50 | 153,519.81 | 292,421.29 |
| Mar-04 | 37,728.11 | 85,892.44 | 5,003.71 | 11,564.28 | 140,188.54 | 4,886.15 | 135,302.39 | 1-Jul-04 | 49 | 145,332.42 | 280,634.81 |
| Apr-04 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 4,447.63 | -4,447.63 | 1-Aug-04 | 48 | -4,641.01 | -9,088.64 |
| May-04 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 4,632.08 | -4,632.08 | 1-Sep-04 | 47 | -4,693.59 | -9,325.67 |
| Jun-04 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 4,364.55 | -4,364.55 | 1-Oct-04 | 46 | -4,292.65 | -8,657.20 |
| Jul-04 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 4,557.84 | -4,557.84 | 1-Nov-04 | 45 | -4,349.15 | -8,906.99 |
| Aug-04 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 4,651.02 | -4,651.02 | 1-Dec-04 | 44 | -4,303.74 | -8,954.76 |
| Sep-04 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 3,159.47 | -3,159.47 | 1-Jan-05 | 43 | -2,833.66 | -5,993.13 |
| Oct-04 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 4,333.79 | -4,333.79 | 1-Feb-05 | 42 | -3,765.40 | -8,099.19 |
| Nov-04 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 4,033.46 | -4,033.46 | 1-Mar-05 | 41 | -3,393.06 | -7,426.52 |
| Dec-04 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 3,902.84 | -3,902.84 | 1-Apr-05 | 40 | -3,176.98 | -7,079.82 |
| Jan-05 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 3,314.02 | -3,314.02 | 1-May-05 | 39 | -2,608.83 | -5,922.85 |
| Feb-05 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 3,451.20 | -3,451.20 | 1-Jun-05 | 38 | -2,625.67 | -6,076.87 |
| Mar-05 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 4,185.65 | -4,185.65 | 1-Jul-05 | 37 | -3,075.52 | -7,261.17 |
| Apr-05 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 3,750.55 | -3,750.55 | 1-Aug-05 | 36 | -2,659.66 | -6,410.21 |
| May-05 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 3,262.78 | -3,262.78 | 1-Sep-05 | 35 | -2,231.35 | -5,494.13 |
| Jun-05 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 3,318.21 | -3,318.21 | 1-Oct-05 | 34 | -2,186.69 | -5,504.90 |
| Jul-05 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 3,315.23 | -3,315.23 | 1-Nov-05 | 33 | -2,103.44 | -5,418.67 |
| Aug-05 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 3,593.90 | -3,593.90 | 1-Dec-05 | 32 | -2,193.44 | -5,787.34 |
| Sep-05 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 2,964.83 | -2,964.83 | 1-Jan-06 | 31 | -1,738.95 | -4,703.78 |
| Oct-05 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 3,058.91 | -3,058.91 | 1-Feb-06 | 30 | -1,722.41 | -4,781.32 |
| Nov-05 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 2,781.31 | -2,781.31 | 1-Mar-06 | 29 | -1,501.85 | -4,283.16 |
| Dec-05 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 1,808.12 | -1,808.12 | 1-Apr-06 | 28 | -935.20 | -2,743.32 |
| Jan-06 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 1,967.64 | -1,967.64 | 1-May-06 | 27 | -973.59 | -2,941.23 |
| Feb-06 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 2,889.02 | -2,889.02 | 1-Jun-06 | 26 | -1,365.67 | -4,254.69 |
| Mar-06 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 3,622.87 | -3,622.87 | 1-Jul-06 | 25 | -1,633.72 | -5,256.59 |
| Apr-06 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 3,414.12 | -3,414.12 | 1-Aug-06 | 24 | -1,466.37 | -4,880.49 |
| May-06 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 3,331.61 | -3,331.61 | 1-Sep-06 | 23 | -1,360.55 | -4,692.16 |
| Jun-06 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 2,704.48 | -2,704.48 | 1-Oct-06 | 22 | -1,048.16 | -3,752.64 |
| Jul-06 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 2,842.23 | -2,842.23 | 1-Nov-06 | 21 | -1,043.26 | -3,885.49 |
| Aug-06 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 2,852.92 | -2,852.92 | 1-Dec-06 | 20 | -989.55 | -3,842.47 |
| Sep-06 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 2,437.63 | -2,437.63 | 1-Jan-07 | 19 | -796.98 | -3,234.61 |
| Oct-06 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 1,962.66 | -1,962.66 | 1-Feb-07 | 18 | -603.21 | -2,565.87 |
| Nov-06 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 2,209.17 | -2,209.17 | 1-Mar-07 | 17 | -636.29 | -2,845.46 |
| Dec-06 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 2,307.45 | -2,307.45 | 1-Apr-07 | 16 | -620.67 | -2,928.12 |
| Jan-07 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 1,801.36 | -1,801.36 | 1-May-07 | 15 | -450.76 | -2,252.12 |
| Feb-07 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 1,701.03 | -1,701.03 | 1-Jun-07 | 14 | -394.22 | -2,095.25 |
| Mar-07 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 2,016.09 | -2,016.09 | 1-Jul-07 | 13 | -430.54 | -2,446.63 |

Summary of Lost Compensatory Royalty with Incremental Formation Production - Charles G. Hooks, III, et al.
Lost Royalty (Oct-00 to Mar-04) Less Actual Payments and Late Charges
Samson Lone Star, LLC
Black Stone Minerals No. 1 Gas Unit, Well No. 1 (RRC ID 179535) and Joyce Du Jay No. 1 Gas Unit, Well No. 1 (RRC ID 187477)
Constitution (Yegua) Field - Hardin County, Texas

| Production Month | Plaintiffs' Total Net Value Black Stone GU No. 1 $ | Plaintiffs' Total Net Value Du Jay GU No. 1 $ | Plaintiffs' Total Net Value Black Stone GU No. 1 Incremental Formation $ | Plaintiffs' Total Net Value Du Jay GU No. 1 Incremental Formation $ | Plaintiffs' Total Net Value $ | Actual Royalty Paid Black Stone GU No.'s 1, 2 & 3 $ | Amount Due Plaintiffs $ | Royalty Due Date | Months in Overdue Period | Late Charge to 1-Aug-08 $ | Lost Royalty Plus Late Charge $ |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Apr-07 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 2,074.02 | -2,074.02 | 1-Aug-07 | 12 | -405.72 | -2,479.74 |
| May-07 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 2,138.60 | -2,138.60 | 1-Sep-07 | 11 | -380.56 | -2,519.16 |
| Jun-07 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 2,073.89 | -2,073.89 | 1-Oct-07 | 10 | -332.94 | -2,406.83 |
| Jul-07 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 1,306.27 | -1,306.27 | 1-Nov-07 | 9 | -187.31 | -1,493.58 |
| Aug-07 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 1,616.40 | -1,616.40 | 1-Dec-07 | 8 | -204.46 | -1,820.86 |
| Sep-07 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 1,396.02 | -1,396.02 | 1-Jan-08 | 7 | -153.35 | -1,549.37 |
| Oct-07 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 2,977.66 | -2,977.66 | 1-Feb-08 | 6 | -278.24 | -3,255.90 |
| Nov-07 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 3,172.19 | -3,172.19 | 1-Mar-08 | 5 | -245.16 | -3,417.35 |
| Dec-07 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 2,888.86 | -2,888.86 | 1-Apr-08 | 4 | -177.27 | -3,066.13 |
| Jan-08 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 3,034.48 | -3,034.48 | 1-May-08 | 3 | -138.61 | -3,173.09 |
| Feb-08 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 2,531.90 | -2,531.90 | 1-Jun-08 | 2 | -76.53 | -2,608.43 |
| Mar-08 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 3,201.90 | -3,201.90 | 1-Jul-08 | 1 | -48.03 | -3,249.93 |
| Apr-08 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 3,427.16 | -3,427.16 | 1-Aug-08 | 0 | 0.00 | -3,427.16 |
| May-08 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 4,446.43 | -4,446.43 | 1-Sep-08 | 0 | 0.00 | -4,446.43 |
| Totals: | 3,553,200.15 | 3,112,015.22 | 504,368.64 | 426,550.02 | 7,596,134.03 | 510,328.01 | 7,085,806.02 | | | 12,995,832.05 | 20,081,638.07 |



DEFENDANT'S EXHIBIT 5

PENGAD-Bayonne, N. J.

# Schlumberger

## DIPMETER COMPUTED RESULT

# DIRECTIONAL SURVEY

Using the following logs:

DIRECTIONAL FROM GPIT
TIED_IN TO SPERRY-SUN @ 12745 FT

| | | | | |
|---|---|---|---|---|
| Company: | SAMSON LONESTAR L.P. | | | |
| Well: | BLACKSTONE MINERALS #1 | | | |
| Field: | WILDCAT | | | |
| County: | HARDIN | | | |
| State: | TEXAS | | | |
| Date Logged: | 21-JUL-00 | Date Processed: | 03-AUG-00 | |
| Location: | 630 FT FSL & 1600 FT FEL OF WALKER PETTIT SURVEY A-43. | | | |
| Elevations: | KB: 63.0 | DF: 62.0 | GL: 27.0 | |
| Permanent Datum: | GROUND LEVEL | Job Reference: | 66743 | |

FOLD HERE

The well name, location and borehole reference data were furnished by the customer.

All interpretations are opinions based on inferences from electrical or other measurements and we cannot, and do not guarantee the accuracy or correctness of any interpretations, and we shall not, except in the case of gross or willful negligence on our part, be liable or responsible for any loss, costs, damages or expenses incurred or sustained by anyone resulting from any interpretations made by any of our officers, agents or employees. These interpretations are also subject to Clause 4 of our General Terms and Conditions as set out in our current Price Schedule.



N
△

L

1500    2000    2500

-2000

SOUTH

REF 66743

PROJECTION O





REF 66743

PROJECTION ON VERTICAL PLANE     WEST     EAST     SCAL



# EXACT RADIUS OF CURVATURE METHOD

## TIED_IN TO SPERRY SURVEY @ 12745 FT

**TIE-IN LOCATION**

| | |
|---|---|
| MEASURED DEPTH | 12745.00 |
| TRUE VERTICAL DEPTH | 12394.60 |
| DISTANCE SOUTH | 374.38 |
| DISTANCE EAST | 1257.03 |

**BOTTOM HOLE LOCATION**

| | |
|---|---|
| COURSE LENGTH | 1335.69 |
| COURSE AZIMUTH | 106.45 |
| MEASURED DEPTH | 13793.00 |
| TRUE VERTICAL DEPTH | 12442.40 |
| DISTANCE SOUTH | 378.17 |
| DISTANCE EAST | 1281.04 |

```
SPERRY SURVEY @ 12745 FT
**********************************************************************
           *        * TRUE   *    COORDINATES     *        *  DOG-LEG  *
DEVIATION * AZIMUTH * VERTICAL ********************* COURSE * SEVERITY  *
DEGREES   * DEGREES * DEPTH  * + NORTH * + EAST  * LENGTH *           *
           *        * FT     * - SOUTH * - WEST  *   FT   * DEG/100FT *
**********************************************************************
   3.0   *    144  * 12394.6 *  -374.4 * 1257.0 * 1311.6 *    24.3   *
   3.1   *    138  * 12395.6 *  -374.4 * 1257.1 * 1311.6 *    24.3   *
   2.8   *    160  * 12449.5 *  -376.8 * 1258.8 * 1314.0 *     6.3   *
   2.5   *    154  * 12549.4 *  -380.7 * 1261.1 * 1317.3 *     4.0   *
   2.1   *    144  * 12649.4 *  -383.6 * 1263.0 * 1320.0 *     0.0   *
   1.5   *    129  * 12749.4 *  -385.9 * 1265.0 * 1322.6 *     5.6   *
   0.9   *    114  * 12849.4 *  -387.0 * 1267.1 * 1324.9 *     0.0   *
   1.3   *     65  * 12949.4 *  -386.6 * 1269.2 * 1326.8 *     6.3   *
   1.4   *     60  * 13049.4 *  -385.4 * 1271.5 * 1328.6 *     0.0   *
   1.7   *     72  * 13149.4 *  -384.1 * 1273.9 * 1330.6 *     0.0   *
```

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 1.? | * | 65 | * 12949.4 | * -386.6 * | 1269.2 * | 1326.8 * | 6.3 | * |
| 1.4 | * | 60 | * 13049.4 | *-385.4 * | 1271.5 * | 1328.6 * | 0.0 | * |
| 1.? | * | 72 | * 13149.4 | * -384.1 * | 1273.9 * | 1330.6 * | 0.0 | * |
| 1.5 | * | 52 | * 13249.4 | * -382.3 * | 1276.4 * | 1332.4 * | 4.8 | * |
| 1.8 | * | 45 | * 13349.4 | * -380.1 * | 1278.8 * | 1334.1 * | 0.0 | * |
| 1.? | * | 50 | * 13442.4 | * -378.2 * | 1281.0 * | 1335.7 * | 0.0 | * |

```
BOTTOM HOLE LOCATION                                        *
                                                           *
COURSE LENGTH          1335.7  FT                          *
                                                           *
COURSE AZIMUTH          100.4  DEGREES                     *
                                                           *
MEASURED DEPTH        13793.0  FT                          *
                                                           *
TRUE VERTICAL DEPTH   13442.4  FT                          *
                                                           *
DISTANCE SOUTH          378.2  FT                          *
                                                           *
DISTANCE EAST          1281.0  FT                          *
                                                           *
                                                           *
EXACT RADIUS OF CURVATURE METHOD                           *
```



CAUSE NO. B173008-B

| | | |
|---|---|---|
| CHARLES G. HOOKS III, et al., | § | IN THE DISTRICT COURT OF |
| Plaintiffs, | § | |
| | § | |
| vs. | § | JEFFERSON COUNTY, TEXAS |
| | § | |
| SAMSON LONE STAR, L.P., | § | |
| Defendant. | § | 60TH JUDICIAL DISTRICT |

## PLAINTIFFS' MOTION FOR JUDGMENT

TO THE HONORABLE JUDGE OF THIS COURT:

Plaintiffs Charles G. Hooks III, et al., without waiving any rights to contest or appeal prior orders of the Court, move that the Court enter judgment in favor of Plaintiffs against Defendant Samson Lone Star Limited Partnership, n/k/a Samson Lone Star, L.L.C. ("Samson"), as follows:

Plaintiffs submit herewith a proposed Final Judgment for entry by the Court, pursuant to the verdict of the jury, certain Orders on Motions for Partial Summary Judgment, and Stipulations of the parties entered of record, and request entry of that proposed Final Judgment.

## Background

On November 3, 2008, this cause proceeded to trial and was subsequently submitted to a jury on November 12, 2008. On November 13, 2008, the jury's verdict was read in open court with all of the jury questions answered. Attached to this Motion as Exhibit A and incorporated herein by reference as if fully set out is a true and correct copy of the Charge of the Court and the jury verdict form with the jury's answers to the questions submitted, as follows:

> ➤ In response to Question No. 1, the jury found by a vote of eleven (11) to one that Samson committed fraud against the Hooks;

> ➤ In response to Question No. 2, the jury found by a vote of eleven (11) to one that Samson committed statutory fraud against the Hooks;

> ➤ In response to Question No. 3, the jury found by a vote of eleven (11) to one that the sum of money if paid now in cash that would fairly and reasonable compensate the Hooks for their damages proximately caused by such fraud is $20,081,638.07;

> The jury did not answer Questions Nos. 4, 5, 6, or 7;

> In response to Question No. 8, the jury found by a vote of eleven (11) to one that Samson's failure to pay royalty based on formation production resulted in underpayment of royalty under the three Hooks oil and gas leases entered as Exhibits 25, 26, and 27; and

> In response to Question No. 9, the jury found by a unanimous vote that the Hooks, in the exercise of reasonable diligence, should have discovered the fraud of Samson by April 2007.

In addition, before trial, the Court had entered Orders on motions for partial summary judgment with regard to certain claims at issue in this case. The following Orders on motions for partial summary judgment, attached to this Motion and incorporated herein by reference, adjudicated liability – but not damages – as to some of Plaintiffs' claims, as indicated:

> Exhibit B: Order on Plaintiffs' First Amended Motion for Partial Summary Judgment (Tract 4/14 Leases), recommended by Special Master W. Frank Newton on July 29, 2008, and adopted by the Court on July 30, 2008, held that the royalty rate under the Hooks oil and gas leases at issue in this case (admitted as Exhibits 25, 26, and 27 at trial) has been equal to 28.28896% since November 2001 and

> Exhibit C: Order Granting Plaintiffs' First Amended Motion for Partial Summary Judgment (Unpooling), recommended by Special Master W. Frank Newton on July 29, 2008, and adopted by the Court on July 30, 2008, held that Defendant Samson pay Plaintiffs royalty on production from Samson's Black Stone Minerals A-1 well based on the royalty revenue interest Plaintiffs are due pursuant to the Black Stone Minerals "A" No. 1 Gas Unit as described in Samson's Designation of Gas Unit for the Black Stone Minerals "A" No. 1 Gas Unit filed of record at Volume 1259, Page 237 of the Official Public Records of Hardin County, Texas.

Damages related to the foregoing Orders were left to be determined at trial.

Plaintiffs and Defendant Samson thereafter entered into certain stipulations entered into the Court's record. Accordingly, the following stipulations are attached to this Motion and incorporated herein by reference:

> Exhibit D: Stipulation (regarding damages) signed by counsel for the parties and filed November 7, 2008; and

> Exhibit E: Stipulation Regarding Attorneys' Fees signed by counsel for the parties and filed October 31, 2008.

-2-

**Damages**

As noted above, the jury found that the damages to the Hooks proximately caused by Samson's fraud equals $20,081,638.07. In addition, in Exhibit D, the parties stipulated amounts of damages for the claims adjudicated by the Orders on partial summary judgment listed above for production through May 2008, with various alternatives depending on (among other things) whether Plaintiffs prevailed in their claims that Samson had underpaid royalty by not paying it based on "formation production" as specified in Plaintiffs' leases. Because the jury found that Samson's failure to pay on "formation production" resulted in underpayment of royalty, Plaintiffs prevailed on that claim. In addition, Samson stipulated its liability for and the amount of reimbursement it owes Plaintiffs for ad valorem taxes paid through November 2007.

Therefore, the actual damages to be awarded Plaintiffs, based on the jury's verdict, the Court's Orders identified above, and the parties' Stipulations, are as follows:

| | |
|---|---|
| Damages proximately caused by fraud: | $20,081,638.07 |
| Damages for breach of Most Favored Nations Clause : | $    848,854.01 |
| Damages for "Unpooling" claim related to Black Stone Minerals A-1 well: | $    766,626.85 |
| Damages Related to Ad Valorem Taxes: | $      52,257.22 |
| Total Damages: | $21,749,376.15 |

The proposed Final Judgment submitted with this Motion includes the foregoing amounts for actual damages.

**Attorneys' Fees**

Plaintiffs are entitled to recover attorneys' fees pursuant to statute, the leases at issue, and the parties' Stipulations. In Exhibit E, the parties stipulated as to the amounts of reasonable and necessary attorneys' fees incurred in the prosecution of Plaintiffs' claims in this case for which attorneys' fees are recoverable (net of segregation of fees for claims for which attorneys' fees are not recoverable), and that all such fees are owed Plaintiffs if they prevailed on any claim other

- 3 -

than certain claims specified in the Stipulation. At least because Plaintiffs prevailed on various other contract claims in this case, and Samson stipulated liability for ad valorem taxes in Exhibit D, Plaintiffs are entitled to recover fees pursuant to the Stipulation Regarding Attorneys' Fees. The proposed Final Judgment submitted herewith includes such amounts for attorneys' fees.

**Costs and Witness Fees**

In addition, Plaintiffs are entitled to recover various other costs incurred in connection with this case. As the successful party, Plaintiffs are entitled to recover from Samson all taxable costs of court. TEX. R. CIV P. 131. In addition, Plaintiffs' leases provide for recovery of "court costs, and other costs" incurred in collecting unpaid amounts. *Trial Exhibits 25, 26, and 27, Article XVII.C ("Time, Method and Manner of Payment")*. Plaintiffs are also entitled to recover other costs based on the jury's finding that Samson committed statutory fraud as defined in Section 27.01 of the Texas Business and Commerce Code. Pursuant to that Section, a person who violates its provisions is liable to the person defrauded for "reasonable and necessary attorney's fees, expert witness fees, costs for copies of depositions, and costs of court." TEX. BUS. & COM. CODE § 27.01 (e).

Therefore, in addition to the usual taxable costs of court, Plaintiffs are entitled to recover at least expert witness fees and costs for copies of depositions. Plaintiffs entered evidence at trial of the fees invoiced as of the time of trial for the expert witnesses Plaintiffs called to testify – Nedra Foster and Charles Graham (Exhibits 553 and 554, respectively) – and those witnesses then estimated their additional fees through trial. In addition, evidence of such witness fees can be submitted post-verdict by affidavit. *Durish v. Panan Int'l, N.V.*, 808 S.W.2d 175, 179-80. Before the hearing on this Motion, Plaintiffs will submit affidavit proof with supporting detail of the additional expert witness fees invoiced post-trial, and of the costs of copies of depositions incurred by Plaintiffs. Plaintiffs anticipate those total amounts will be as follows: fees for Nedra

Foster, $47,351.79 ($40,926.94 in Exhibit 553, plus an additional $6,424.85 in post-trial billings; fees for Charles E. Graham, $58,689.07 ($50,244.99 in Exhibit 554 plus an additional $8,444.08 in post-trial billings); and $5,493.51 for costs for copies of depositions. The proposed Final Judgment submitted with this Motion includes such amounts for costs and expert witness fees.

**Postjudgment Interest**

The judgment to be entered is based on contract, i.e., Plaintiffs' oil and gas leases with Samson. Plaintiffs' damages for both fraud and breach of contract (other than unpaid taxes) are measured on the basis of unpaid royalty and include Late Charges computed in accordance with those leases.

The leases specify that all royalty payments, including (unpaid) compensatory royalties – by which the damages awarded to Plaintiffs' for Samson's fraud were measured – shall be subject to Late Charges based on the amount due, calculated at the maximum rate allowed by law commencing on the day after the last day on which such monthly royalty payment could have been timely paid and for every calendar month or fraction thereof from the due date until paid. *See Trial Exhibits 25, 26, and 27, Article XVII ("Time, Method and Manner of Payment")*. Therefore, per the Texas Finance Code, the judgment is "on a contract that provides for interest or time price differential" and thus should earn postjudgment interest at a rate equal to the lesser of the rate specified in the leases or eighteen (18) percent per year. TEXAS FIN. CODE §304.002.

The Court has previously determined that, under this provision, Late Charges are to be computed each month based on the amount due, including any previously accrued Late Charges, calculated at eighteen percent (18%) per annum. *See* Exhibit F to this Motion: the "Order Granting Plaintiffs' First Amended Motion for Partial Summary Judgment (Accrued Unpaid Royalties)" recommended by Special Master W. Frank Newton on July 29, 2008, and adopted by the Court on July 30, 2008, in the *Bordages* case from which this case was severed in 2007 (*Joe*

-5-

*A. Bordages, Jr., et al. v. Samson Lone Star, L.P.*, No. B173008-A in the 60th Judicial District Court, Jefferson County, Texas). (Plaintiffs incorporate herein by reference that Order and the bases for computing Late Charges as stated in the *Bordages* Plaintiffs' First Amended Motion for Partial Summary Judgment (Accrued Unpaid Royalties), and request that the Court take judicial notice of same.) For the foregoing reasons, the proposed Final Judgment submitted herewith includes postjudgment interest at eighteen percent (18%) per annum, compounded annually.

**Declaratory Judgment and Injunctive Relief**

Moreover, pursuant to the Orders cited above and attached to this Motion, the jury's finding as to payment of royalty on formation production, the parties' stipulations as to damages with regard to ad valorem taxes, and the terms of Plaintiffs' oil and gas leases, Plaintiffs are entitled to declaratory judgment and permanent injunctive relief as follows:

> ➤ Defendant Samson shall pay Plaintiffs royalty on production from Samson's Black Stone Minerals A-1 well, commencing with production after May 2008, based on the royalty revenue interest Plaintiffs are due pursuant to the Black Stone Minerals "A" No. 1 Gas Unit as described in Samson's Designation of Gas Unit for the Black Stone Minerals "A" No. 1 Gas Unit filed of record at Volume 1259, Page 237 of the Official Public Records of Hardin County, Texas;

> ➤ Any royalty owed on production after May 2008 under Plaintiffs' oil and gas leases at issue in this case (admitted as Exhibits 25, 26, and 27 at trial) shall be based on a royalty rate of 28.28896%;

> ➤ Any royalty owed on gas production after May 2008 under the oil and gas leases at issue in this case (admitted as Exhibits 25, 26, and 27 at trial) shall be based on formation production gas volumes as reported on Texas Railroad Commission records;

> ➤ Defendant Samson shall be liable for all ad valorem taxes levied upon Plaintiffs' interest in the oil and gas leases at issue (admitted as Exhibits 25, 26, and 27 at trial) after November 2007, as long as those leases remain in effect;

> ➤ Defendant Samson shall provide Plaintiffs with all notices and information required by the oil and gas leases at issue in this case (admitted as Exhibits 25, 26, and 27 at trial) while those leases are in effect, including the following:

>> • Copies of all electric logs, formation surveys, or any other test made in a well or wells on the land described in the leases or units into which they were pooled;

-6-

- Copies of written designations of production units;

- Copies of all applications and reports filed with the Texas Railroad Commission in connection with Samson's operations under Plaintiffs' Leases;

- Advanced notice of any deductions or adjustments against present or future royalty payments for royalty payments previously paid, with full explanation of such overpayment;

- Title opinions;

- Daily operation reports during drilling, completion, or reworking operations;

- Seismic or other geophysical data obtained by Samson on the leased premises or units into which the leased premises are pooled, including basic data, scaled and platted maps, and final stacked and migrated seismic data at all depths across such acreage; and

- Notice of any oil and gas lease Samson enters into covering any land within three miles of the exterior boundary of the leased premises or units into which the leased premises are pooled.

The proposed Final Judgment submitted herewith includes declaratory and injunctive relief as described above.

## Conclusion

For the foregoing reasons, and without waiving any rights to contest or appeal prior orders of the Court, Plaintiffs respectfully request the Court enter judgment as set out above and submitted herewith, and grant Plaintiffs such other and further relief to which they are entitled.

Respectfully submitted,

McGINNIS, LOCHRIDGE & KILGORE, L.L.P.

By: _____
Paul F. Simpson
State Bar No. 18403800
3200 One Houston Center
1221 McKinney Street
Houston, Texas 77010
713-615-8500 Telephone
713-615-8585 Facsimile

-7-

Patton G. Lochridge
State Bar No. 12458500
Don H. Magee
State Bar No. 12811800
J. Derrick Price
State Bar No. 24041726
600 Congress Avenue, Suite 2100
Austin, Texas 78701
(512) 495-6000 Telephone
(512) 495-6093 Facsimile

RIENSTRA, DOWELL & FLATTEN
Gerald R. Flatten
State Bar No. 07112500
595 Orleans, Suite 1007
Beaumont, Texas 77701
(409) 833-6317 Telephone
(409) 833-9560 FAX

MOORE LANDREY, L.L.P.
Jon B. Burmeister
State Bar No. 03425500
390 Park Street, Suite 500
Beaumont, Texas 77701
(409) 835-3891 Telephone
(409) 835-2707

**ATTORNEYS FOR PLAINTIFFS,**
**CHARLES G. HOOKS III, ET AL.**

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the foregoing Motion and the proposed Final Judgment referenced therein are being served on the following by telephonic document transfer (fax) on November 21, 2008:

M. C. Carrington
Mehaffy Weber
P.O. Box 16
Beaumont, TX 77704

Dick Watt
1800 Penzoil Place, South Tower
711 Louisiana Street
Houston, Texas 77002

Paul F. Simpson

- 8 -

where it was.  It was drilled.  It was -- they were just simply reporting inaccurately, and now this is correct. The bottom one is the correct placement of the bottom hole.

Q.  Did Samson eventually file a second amendment to the designation of the Black Stone 1 unit?

A.  Yes.

Q.  Is that Exhibit 19?

A.  Yes, that's right.

MR. SIMPSON:  Plaintiffs offer Exhibit 19.          16:30:22

MR. CARRINGTON:  No objection.

THE COURT:  It's admitted.

(Plaintiff's Exhibit No. 19 received)

Q.  (BY MR. SIMPSON)  Now, before we get into this, I'm going to want to look at one other letter in a second; but I want to make clear that on this second amendment, the designation, was there a plat attached?

A.  Yes.

Q.  Is this it right here (indicating)?

A.  Yes, it is.                                      16:31:09

Q.  This was -- how does this plat compare with the corrected one that Samson got from the surveyors in November, 2001?

A.  This is a correct plat that shows the correct bottom hole, and it -- it is signed and sealed by the

surveyor.

Q. Okay. You've seen the records from Samson's files indicating when Samson got this designation with the correct plat?

A. November 21st of --

Q. I'm sorry.

A. -- 2000 -- I'm sorry.

Q. I asked you a bad question.

Have you seen from Samson's files what Samson -- when Samson got the second amended designation in its -- with the new plat?

16:31:55

A. Yes.

Q. And what is Exhibit 71?

A. This is a letter from Williams & Lindahl, Attorneys At Law. It's signed by Eric Lindahl, addressed to Samson Lone Star Limited Partnership, attention to Mr. Glenn Lanoue, and it's dated November 21, 2001.

MR. SIMPSON: Okay. Your Honor, we offer Exhibit 71.

16:32:27

MR. CARRINGTON: No objection.

THE COURT: It's admitted.

(Plaintiff's Exhibit No. 71 received)

THE COURT: We're going to stop here. Ladies and gentlemen, you're excused. Please be back in

P R O C E E D I N G S

THE COURT: Bring them in.

(Jury enters courtroom).

THE COURT: Good morning, ladies and gentlemen. Y'all have a seat.

MS. SAMUELS: May I proceed?

THE COURT: Yeah.

NEDRA FOSTER,

having been previously duly sworn, testified further as follows:

DIRECT EXAMINATION (CONTINUED)

BY MR. SIMPSON:

Q. Good morning, Ms. Foster.

A. Good morning.

Q. I'd just like to recap where we were at the end of the day yesterday.

MR. SIMPSON: Would you put Exhibit 19 up, please.

THE TECHNICIAN: (Complying)

Q. (BY MR. SIMPSON) And do you remember we were looking at this Exhibit 19? You may have it there.

A. Yes.

Q. And do you remember what Exhibit 19 was?

A. It's the -- a second amendment to the designation of the gas unit on the Black Stone Minerals

09:22:10

No. 1.

Q. And there's a plat attached to this second amended designation?

A. That's correct.

Q. And which plat was this?

A. This is one that is signed and sealed by Jeffrey Fansler out of the John Jakubik & Associates survey office. This one actually shows the correct bottom hole as drilled with the 356 feet off the east line of the Walker Pettitt and 148 feet off of the south line. The -- from the surface down to the bottom hole, the distance is 1327.47; and the bearing is south 73 degrees 09 minutes, 14 seconds east.

Q. And then I think we had just taken a look -- or just seen Exhibit 71 at the end of the day yesterday. Do you recall that exhibit?

A. I don't remember the numbers. So...

Q. It's --

A. Oh. Okay, yes.

Q. What -- what is Exhibit 71?

A. That's a letter from Eric Lindahl of Williams & Lindahl. It's addressed to Samson Lone Star to attention of Glenn Lanoue, and it's dated November 21st, 2001. What he's telling Mr. Lanoue is that he's enclosing the second amendment for this designation we

09:23:01

09:23:41

the -- in apparently Mr. Lanoue's grand plan. They screwed up and told the truth at the Railroad Commission, right?

A. Well, I don't know about that.

Q. Okay.

A. Their proposed plat showed the initial unit line was over here to the bayou, and they did show the distance as being 1,080 feet to the bayou to the unit line.

Q. Okay. So, if they were really -- if they were really going to try to pull off a real good fraud, they would have not disclosed 1,080 feet to the Railroad Commission right off the bat, correct?

A. I think the plat speaks for itself.

Q. It sure does.

A. That was their proposal.

Q. It does. Okay.

Now, we know that this plat and this 740 feet from the section line there, we know that was -- that was changed and put in at the request of Mr. Lanoue in August, correct?

A. That's correct.

Q. Excuse me. August of 2000, six months before this plat was sent to Mr. Hooks, right?

A. That's correct.

Q. Okay. And, again, we don't know why he made the mistake or how he made the error in his calculations; but, nonetheless, that was what went forward from August on through, correct, was the 740 feet?

A. Up until October of '01.

Q. All right. Now, do you have any reason -- strike that.

Okay. So, six months after Mr. -- Mr. Lanoue messes up with his scaling and has an erroneous number there, this plat goes to Mr. Hooks; and Mr. Hooks is concerned about 1320 feet, right?

A. Among other things, I'm sure.

Q. So, he gets this -- and Mr. Lanoue -- you understand that Mr. Lanoue, according to Mr. Hooks, told him on the 20th, which is the day before he got this, that that well's about 1500 feet from your property.

You understand that?

A. Yes.

Q. All right. Which is outside of 1320, correct?

A. True.

Q. But Mr. Hooks is concerned about 1320?

A. Yes.

Q. So, he has been told the well is going to be about 180 feet away from his protective zone, right?

doesn't it?

A. Yes, plus or minus.

Q. All right. Two things come to mind right there. 1400 feet is not 1500 feet, is it?

A. Well, he says plus or minus. So, he's been given those two numbers.

Q. Okay. All right. But the numbers are obviously different, aren't they?

A. Yes.

Q. Okay. If I'm Mr. Hooks and I'm worried about 1320 and I'm told 1500 one day and I'm told 1400 plus or minus the next day, we're getting closer to that 1320, aren't we?                                        10:20:31

A. That's true.

Q. I'm concerned. Wouldn't you be?

A. I as a surveyor might be. I don't know about Mr. Hooks as a landowner being given a plat.

Q. Okay. So, now we're within 80 feet of this protective zone, aren't we, at 1400?

A. By perpendicular measure, yes.                    10:21:04

Q. Right.

Now, plus or minus -- 1400 feet plus or minus -- how much -- how much do you think -- that plus or minus, what do you -- when you see that, what do you think of that when you say plus or minus?

A minute ago you said 1400 feet, 1500 feet. So, it was a hundred feet plus or minus, within the ballpark?

A. If we -- if we look at what Mr. Lanoue did -- if we think about the original proposed plat, which was what Mr. Lanoue had, 330 feet off of the east line, this one shows 740.

What this has done, it means that it's moved it off of this very solid survey line some 410 feet back over to the west. If you then add 410 to that 1080 that they had initially, you're at 1490.

I -- I don't know that that's what Mr. Lanoue did; but I -- as I say, I've tried to back in his numbers many ways to find some basis for it and...

Q. Okay. That really wasn't my question. Listen carefully to my question.

When you see 1400 feet plus or minus, what does the plus or minus mean to you? How much is plus, how much is minus, 50 feet, 75 feet?

A. I don't know.

Q. As a surveyor you have no opinion on that?

A. No.

Q. Okay.

A. It -- it introduces an element of it could be a little more, it could be a little less. The day before

10:21:49

10:22:24

A. I -- I don't know.

Q. All right. So, your testimony, then, is Mr. Hooks, given what we know about Mr. Hooks, should have been able to -- when he received this plat, concerned about 1,320 feet, he should have been able to ignore whatever inconsistencies there are, not even noticed them, just relied on that and gone on down the road?

A. I think it's entirely reasonable --

Q. Okay.

A. -- for Mr. Hooks to receive this plat and rely upon it.

Q. That -- that is what a reasonable and prudent mineral interest owner would have done?

A. As -- as a landowner in response to his request, having been told it was 1500, this shows plus or minus 1400, certainly he should be able to rely on what Samson is telling him.

Q. All right. So, it's 1500 and 1400. That's close enough that that shouldn't raise a red flag; is that true?

A. They're both outside of the 1320.

Q. Okay. But --

A. And he has every reason to rely upon Samson.

Q. So, a hundred feet difference like that, 1500

feet, 1400 feet, that shouldn't make any difference, the inconsistency -- that's -- that's consistent in your mind?

A. Both of those are outside of the 1320.

Q. Okay.

A. So, I -- I think he should have been able to rely on it.

Q. Is it your testimony that 1500 and 1400 are essentially the same?

A. Well, there's a hundred between them and then plus or minus on the 1400.          10:51:37

Q. Okay.

A. It is outside of the 1320.

Q. Okay. Now -- and to make sure I'm perfectly sure I understand, too, that we're in agreement, the directional survey that would allow you or any other surveyor to locate the bottom hole location was on file with the Railroad Commission in July of 2000, right?

A. That's correct.

MR. CARRINGTON: We'll pass the witness, your Honor.          10:52:33

REDIRECT EXAMINATION

BY MR. SIMPSON:

Q. Ms. Foster, let me ask you about some of the supposed inconsistencies that Mr. Carrington's brought

you met before this deposition with Samson personnel?

A. A portion of a lease.

Q. Who read this?

A. Rob Human.

Q. Portion of which lease?

A. It was one -- it might have been the Hooks'.

Q. And what portion of the lease was read?

A. It was referring to the different spacing units, I believe. I'm trying to recall. It's missing me right now, but I'm sure it will come to me.

Q. Did it relate to pooling?

A. Yes, and protecting their -- it's coming to me. Maybe it's the water. I don't know.

Q. Go ahead.

A. In regard to pro -- protecting their correlative rights.

Q. Did it relate to something called offset obligations?

A. Yes.

Q. Do you have any idea why Mr. Human read you that paragraph -- or that section?

A. I guess he felt it was necessary.

Q. Well, did you have -- then discuss that offset obligations section?

A. Yes.

11:22:48

11:23:22

Q. What was -- what did you discuss about it?

A. He had asked if it was ever a topic of conversation when we were forming the units and whenever I'd sent a plat to the Hooks.

Q. And what was your answer?

A. No. The plat I'd sent to the Hooks wasn't intended to be a plat showing where the -- how far away the well was located. It was purely an informational plat to show where their tract was to be located within the unit.

Q. But the plat did show the well location, didn't it?

A. Yes, sir.

Q. And --

A. It showed a well location.

Q. For the Black Stone Minerals No. 1?

A. I believe that's right. I didn't read -- look at the plat.

Q. Is Samson compensating you in any way for being here today?

A. No, sir. It would be nice, but it's not happening.

Q. Has -- has anyone at Samson or on Samson's behalf talked to you about attending trial in this case?

A. No, sir.

11:24:29

11:24:54

in some small handwriting it says 740 feet from the east line and 290 feet from the south line?

A. Yes, sir.

Q. All right. Do you recall where you got those locations, information that you gave Mr. Fansler?

A. Where I got them?

Q. Yes, sir.

A. I got them from myself.

Q. I'm sorry?

A. I got them from myself.                    13:40:55

Q. Well, then, there had been a plat for the unit prepared back at least in March of 2000, hadn't there?

A. Well, probably.

Q. Well, take a look at an exhibit we've already seen, right? Exhibit 44?

A. Well, evidently that one wasn't going to work.

Q. Why do you say that?

A. I don't know. Because I'm doing a new one.

Q. So, the numbers you gave Mr. Fansler, 740 from the east line and 290 from the south line, they were     13:41:27 measurements from a map?

A. Yes, sir.

Q. In your view were they supposed to be accurate?

A. As accurate as a land guy is using a ruler on a scaled piece of paper that might not even be to scale,

sure.

Q. So, did you think that should be the actual location of the bottom hole?

A. I was probably assuming that or hoping that.

Q. In fact, that's what you told the -- y'all told the surveyor?

A. Yes.

Q. And, now, in Exhibit 52 Mr. Fansler has done as instructed and just indicated the bottom hole location, right?

A. Yes, sir.

Q. And, again, 740 feet from the east line and 290 feet from the south line?

A. Yes, sir.

Q. And a total distance from the surface of the bottom hole of a little under 920 feet?

A. Yes, sir.

Q. Do you note -- see the note there on Exhibit 52 says -- it's been added -- position of the bottom hole location was provided by Samson Lone Star, LP, right?

A. Yes, sir.

Q. And that was accurate, an accurate statement?

A. Well, it appears to be that way, yes, sir.

Q. So, the bottom hole location was not Mr. Fansler's but what Samson had told him it was?

13:42:15

some of the lessors?

A.  Yes, sir.

Q.  Mr. Lanoue?

A.  Yes, sir.

Q.  Is Exhibit 63 a copy of a letter you sent some of the lessors in that Jefferson County Tract 4?

A.  It appears to be.

Q.  And you sent this letter on February 15th, 2001?

A.  Yes, sir.

Q.  And is this -- you sent the same letter or a similar letter to a number of lessors?

A.  Yes, sir, all the ones that required it.

Q.  And you asked them in the letter to amend their lease to allow Samson to pool their lease with other tracts and to grant 640-acre pooling plus a 10 percent tolerance for the Black Stone Minerals No. 1 well, right?

A.  Yes, sir.

Q.  And in your understanding that's 640 plus 10 percent, allows you to have a 704 acre unit?

A.  Yes, sir.

Q.  And then you noted that -- in the second sentence of Exhibit 63 or the second paragraph:  Please be advised that Jimmy Broussard has already given

approval for the 640-acre pooling plus a 10 percent tolerance, and we would like to have your approval as well.

Did I read that right?

A. Where -- I'm -- yes -- yes, sir.

Q. So, you had talked to Mr. Broussard of the Broussard lessors?

A. Jimmy Broussard was the -- there's -- there's a lot of owners that are in that family, and he was the spokesman for them.

Q. So, your position -- did you understand that Mr. Broussard was speaking for the Heisigs in California?

A. I just knew he was speaking for some of them. I'm not absolutely sure of the exact list today. I knew it was quite a long list whenever I visited with them and I was surprised but I knew he represented a number of people.

Q. And there were other lessors that he did not represent in that who were -- also had interest in that tract, right?

A. I'm sure there would be because they didn't have a hundred percent of that tract.

Q. The Broussards did not have a hundred percent of the Jefferson County Tract 4, right?

13:57:01

13:57:39

A.   No, sir.

Q.   So, you had to -- your understanding was that you had to get consent to pool from the other lessors that he did not represent?

A.   Yes.

Q.   Were the Hooks' interests one of those lessors you had to go contact?

A.   They were one of the owners, yes.

Q.   Have you ever met Mr. Hooks?

A.   No, sir.                                               13:58:13

Q.   Okay.

A.   I just talked to him on the phone; Charles, that is.

Q.   And you sent Mr. Hooks a letter similar to the one you sent the -- to the Heisigs and the Carlisis in Exhibit 63?

A.   Yes, sir, I sure did.

Q.   And, then, did you then send Mr. Hooks some additional information about the Black Stone Minerals well and unit?                                          13:58:44

A.   He had called and was not sure -- was not sure where their land was laying.  He wanted to know where their tract was going to be located within the unit and requested a plat.  So, I sent him one.  I faxed him one.

          And then, again, I talked to him in May

sorts of things associated with that, you know, oil and gas business.

Q. Okay. Now, we've heard -- and you've sat here through the testimony here for a couple of days -- about the pooling of your tract in 2001 and the faulty information that was given to you at that time.

I want to move past that time for just a minute, and I want to move up until the time you met my partner Paul Simpson in 2006. At that point in time did you have any reason to suspect that you'd been supplied false information in order to get you to join that unit?

A. No, I didn't.

Q. How did you run into Paul?

A. I'm a member of the Oil Gas and Mineral Law Section of the Houston Bar Association and every month they have a monthly luncheon meeting at the Houston Club and -- with a speaker and, so, I normally attend those and I -- this one particular month, day, I attended the meeting and that's when I -- that's when I met him.

Q. Okay. And you had lunch with him there and listening to the exciting speech, I'm sure, that was given about oil and gas law?

A. Yes, we had lunch. I don't know how exciting it was. I think it was on ethics, as I recall, but...

Q. Okay. The -- I remember Mr. Burmeister saying

that you had celebrated your 60th birthday going to a legal seminar.

A. That was just coincidental, but that's true actually.

Q. Now, at that point -- in that conversation did you -- when you just met him casually did you suddenly discover that you'd been defrauded?

A. No, that's -- no, not at all.

Q. How did the conversation go that you became interested in looking into seeing whether or not Samson    15:09:08 had done something wrong to your family?

A. Well, when I sat down next to Paul at this table, he was sitting there by himself initially and I went over to join him and I thought I'd be friendly, it'd be a nice thing to sit down next to him. So, I did that. We introduced each other and he recognized my name from some litigation that he had been involved in already and started asking me some questions and said, "Yes, I'm that Charles Hooks," et cetera, and, so, we got into a little bit of discussion about some of the    15:09:44 things that are involved here.

Q. And I don't want to get into all that, but did you eventually go down to his office and see some of the materials that he had accumulated in this existing lawsuit against Samson for some other people?

A. Yes, yes, I did.

Q. Okay. And, again, at that point in time was the nature of the claim failure to pay royalties, something like that?

A. Things of that nature, right.

Q. It wasn't -- you hadn't discovered the fraud yet?

A. No, that wasn't involved at that time.

Q. Well, at what point in time just generally did you-all, through the discovery process, uncover what had happened to you?                    15:10:23

A. Oh, I think it was in the spring, the following spring that information came out.

Q. And it was at that point in time that you actually amended your lawsuit that -- you were already part of another lawsuit against Samson. You amended that and brought the fraud allegation as part of this case here today?

A. Yes, once we became aware of the situation.

Q. Now, now I want to rewind back -- okay? -- to    15:10:52
how you got into any kind of business arrangement with Samson.

Let me show you Exhibit 501 (tendering). Can you identify Exhibit 501?

A. This -- yes, I can identify it.

beginning of all that, it says that that's to be done within 90 days from the date production is first sold.

A. Right.

Q. Okay. Now, you've seen leases -- provisions like this in other leases, I assume?

A. I've seen variations of that, yes.

Q. Okay. Now, this was in '99 when you entered into this lease. Do you recall getting a letter from a Mr. Glenn Lanoue in February of 2001?

A. Yes. Yes, I did.                                    15:22:24

Q. Okay.

MR. LOCHRIDGE: Can we throw Exhibit 65 up on the screen, please.

THE TECHNICIAN: (Complying).

Q. (BY MR. LOCHRIDGE) Okay. And is this similar to the letter that he sent to you? And I say "similar," because you've added some things here, right?

A. Yes. That's my -- my annotated version of the letter, right.

Q. So, this actually is the letter as you sent it       15:22:49
back to him a couple of days later, correct?

A. Yes.

Q. Okay. So, let's -- let's go to Exhibit 63, which just shows the letter as it was sent to most of the other royalty owners. And it just is basically

saying --

MR. CARRINGTON: Judge, can we get Mr. Lochridge to quit leading the witness? He's just testifying for Mr. Hooks.

MR. LOCHRIDGE: I realize I'm leading, your Honor; but we've heard a lot of this. I'm trying to move quicker.

MR. CARRINGTON: Well, then, if we've heard it, we don't need to repeat it.

THE COURT: All right. Try not to lead.

MR. LOCHRIDGE: All right. Yes, sir.

Q. (BY MR. LOCHRIDGE) Did you get a letter with the similar language from Mr. Lanoue?

A. Yes.

Q. In February, 2001?

A. Yes, I did.

Q. Now, in that letter they were -- he was requesting you to give permission to agree to a unit, right?

A. Yes, to pool at least a portion of the 640-acre tract.

Q. Okay. And what did you do when you got this request from the people at Samson?

A. I called Mr. Lanoue on the telephone.

Q. You just took the -- got the number here from

the letter?

A.  Yeah.

Q.  You just gave him a call; is that right?

A.  Yes.  I had some questions for him.

Q.  While you were -- when you were making this telephone call, did it so happen that you took some notes of the telephone conversation while you were talking to him or just after?

A.  Yes, I did.

Q.  And is Plaintiff's Exhibit 160 the notes that you took at the time of the telephone conversation (tendering)?

15:24:31

A.  Yes, those are my notes.

MR. LOCHRIDGE:  Your Honor, we offer Plaintiff's Exhibit 160.

MR. CARRINGTON:  No objection.

THE COURT:  Admitted.

(Plaintiff's Exhibit No. 160 received)

Q.  (BY MR. LOCHRIDGE)  Now, let's -- let's just make sure we're reading your handwriting here.  We've got the date of 2-20-01, correct?

15:25:01

A.  Yes.

Q.  All right.  And you've got your first note. Would you just read that out loud to the jury to make sure that there's no mistake about what you've written.

A.   (Reading) 13,700-foot deep gas well with good deal of condensate located about 1500 feet west of Pine Island Bayou on Black Stone lease.  Well drilled by Samson.  Want to include 50 acres out of our 640 acres in 704-acre gas unit.  Haven't decided about remaining 590 acres.

Q.   Now, what you've written here, is this what you're telling him or what he's telling you?

A.   That's what he was telling me.

Q.   All right.  And generally what were you asking him about?                                          15:25:50

A.   I was asking him about the location of our property in relation to the rest of the unit; and, also, I was concerned about the location of the well because I knew about the offset obligation that could be involved here.

Q.   Okay.  And in response to your inquiry he indicated that it was located about 1500 feet west of Pine Island Bayou?

A.   Yes.                                                15:26:23

Q.   And what did you understand that to mean?

A.   I understood that to mean that the well was located or completed outside of that 1320-foot zone that we've talked about.

Q.   Is that what you were trying to find out?

been admitted.

THE TECHNICIAN: (Complying).

Q. (BY MR. LOCHRIDGE) Is this the -- the fax he sent to you that -- I think the same day or the next day?

A. It looks like it's the next day, and it looks like the transmittal sheet.

Q. All right.

MR. LOCHRIDGE: And let's flip to the -- I believe it's the last page of this exhibit.

THE TECHNICIAN: (Complying).

Q. (BY MR. LOCHRIDGE) The jury's seen this before.

First of all, is that the plat he sent to you, the last page of this Exhibit 64?

A. Yes, as far as I can tell.

Q. And what did you do to verify that the -- what he told you was true about the well being located 1500 feet away from Pine Bayou -- Pine Bayou?

A. Well, I looked at the -- what was indicated on the plat; and it shows me that it was approximately -- the bottom hole location was approximately 1400 feet west of Pine Island Bayou.

Q. Now, that's a little bit different than the 1500 feet that he told you over the telephone, right?

15:29:36

15:30:06

A. A little bit. I assumed that he was talking in generalities in that case and that once he got the plat it was more specific on the plat.

Q. Well, did that spark any concern that he might be lying to you if he told you 1500 on the telephone and then gave you a plat that was 1400?

A. No. I -- the plat speaks for itself.

Q. Okay.

A. And I had no reason to be concerned that it wasn't accurate.

15:31:02

Q. Well, did you go and hire a surveyor or anyone to check it out?

A. No. I didn't see any reason to do that. It seems -- I mean, I assumed that he was going to send me accurate information; and that's what I got.

Q. Now, earlier there was some argument made about this arrow going -- the leader, I think they call it, from this box that says B.H.L. going over in the direction.

From looking at this plat where did you believe the bottom hole to be?

15:31:43

A. Well, it looks like the bottom hole is there at that sort of black dot area where the -- right about --

Q. (Indicating)?

A. -- right there about where the red is, right.

That would be about where it would be, that intersection.

Q. Now, I want to -- well, first of all, after you got this plat and checked it out and confirmed what Mr. Lanoue had told you over the telephone, what did you then do? Did you agree to -- to accept the pooling?

A. Well, once I had satisfied myself that everything was in order, was appropriate, then I decided I would send back the letter that he had requested me to sign agreeing to this but with some changes on it.                    15:32:49

Q. Okay. Let's turn back to Exhibit 65. Now, is that the -- did you just take his letter dated February 15th and edit it with your changes?

A. Yes, that's what I did.

Q. And does your change begin here: ...as per a photocopy of a plat?

A. Yes, the -- after the comma.

Q. Okay. And you just typed that in yourself?

A. I personally typed that on there.

Q. And, then, is that yours and your wife's                    15:33:26
initials to the left?

A. Yes, they are.

Q. Now, why did you want to tie them down to the plat that he had sent to you?

A. Well, that's the basis on which I made the

decision that everything was okay; and I wanted to be sure there was no confusion later as to what was what. I mean, that's the basis on which it was all done.

Q. Let's turn to the third page of this. The jury's seen this plat.

Now, is this the same plat that he sent to you, only now it has your and your wife's signatures?

A. Yes. Right. We initialed it.

Q. Or I'm sorry. Initialed it.

And what was the purpose of initialling the plat?                                             15:34:16

A. To be sure that that was, in fact, the plat and that if it ever came up later, that this was the plat we were using to establish this information.

Q. And what are the two things that were of importance to you on this plat?

A. Well, first and foremost, the location of the well and then, of course, how our 50 acres would fit into this proposed unit that they were -- would do.

Q. And the plat shows both the area here is your                 15:34:50
50 acres?

A. Yes. I think it's Tract 4, that they have it designated as Tract 4.

Q. And, then, the 1400 plus or minus scale line?

A. The 1400 feet, yes.

Mr. Carrington).

Q. (BY MR. LOCHRIDGE) Is Exhibit 5 -- what is Exhibit 552?

A. Exhibit 552 appears to be a copy of all of the various royalty checks we've received from Samson over a period of time.

Q. Okay. And does Samson send -- how does Samson send the checks, a different check for each well; or how do they do this?

A. No. They send one check each month which covers all of the royalty from each of the -- the wells or units --

Q. Okay.

A. -- involved.

Q. And then you re -- what, do you generally just routinely put those in the bank, you or Norma?

A. Well, yes, we deposit those each time.

Q. Okay. Now, you've heard the counsel for Samson talk about you just accepting this money all along and -- despite the fact that you feel like you were not shot straight with regard to this unit. You've heard that argument, right?

A. Yes, I have.

Q. Well, when you've cashed these checks, has it been your intent to ratify or acquiesce in any way with

16:24:27

16:24:54

what they have done here with regard to this unit?

A. Not at all.

Q. Well, why have you cashed the checks, then?

A. I've cashed the checks because I see that as just being a part of what they actually owe me. I saw no reason not to go ahead and accept them.

Q. Now, you have not calculated yourself what you think you're owed, have you?

A. No.

Q. Again, is that -- have you left that up to Mr. Graham?

A. Yes. That's his job.

Q. Now, do you know if Mr. Graham has been instructed one way or the other about giving Samson credit for the -- the funds that they have paid you?

A. Well, yes. If -- whatever that may be that I'm owed -- I mean, anything I've already received, I would certainly give him credit for that.

MR. LOCHRIDGE: Your Honor, we offer Plaintiff's 552.

MR. CARRINGTON: No objection.

THE COURT: Admitted.

(Plaintiff's Exhibit No. 552 received)

MR. LOCHRIDGE: Could you put Exhibit 71 up on the board, please.

16:25:44

16:26:21

oil and gas law.

A.   I wouldn't classify myself as an expert.  I'd say I was somewhat knowledgeable but not an expert.

Q.   Well, you -- you've described yourself as having expertise in oil and gas law and real estate law on previous occasions, have you not?

A.   Yes, in that I had -- that's the areas I do most of my work in.

Q.   Right.  Most of your knowledge is in real estate law and oil and gas law.

A.   Yes, that's fair to say.

Q.   And you're active, as you mentioned yesterday, in the oil and gas section of the Houston Bar Association?

A.   I'm a member, and I attend the meetings.  I'm not otherwise active as such.

Q.   You keep up with -- try to keep up with current events and keep your legal education in that field updated, correct?

A.   I do.  I do that, yes.

Q.   You're certainly not a novice in this area?

A.   No, I wouldn't say I'm a novice, no.

Q.   And you've been involved in this for 30-some-odd years, right, ever since you got out of school?

A.   Yes, a little over 33 years now.

Q.   And since you got out of school -- and I'm not --

I'm not demeaning what you do 'cause I wish I could do the same thing; but this is all you've done, is manage your family's investments since you got out of law school, right?

A. That's been my primary job, yes, although it's -- it's pretty challenging and certainly very time-consuming, yes.

Q. But you've never had a job where you worked for someone else or anything like that, right?

A. Well, I have.

Q. Since you got out of law school.

A. Since law school?

Q. Right.

A. No, not since I've been involved in this.

Q. I understand back in high school and so forth, between there and the Navy, that you had a job.

All right. So, for the last 30-plus years you have been involved in negotiating oil and gas leases?

A. Yes.

Q. Talking to landmen?

A. Yes.

Q. Dealing with landmen, correct?

A. Right, right.

Q. And that's who you normally deal with when you're negotiating leases, isn't it?

A. Yes, usually.

Q. All right. And you've been involved in numerous gas

units, I assume, over the years?

A. Yes, we've had properties and various gas units.

Q. How many states did you say you had properties in, 30-some-odd?

A. No. We have -- our property's basically in Texas and Louisiana.

Q. I'm sorry. Maybe I misstated. I said "states." I meant counties. How many counties?

A. There are 36 counties that we have some interests in of some description or another.

Q. How many leases do you think you negotiate a year?

A. Well, that varies. It's hard to say. In a year's time -- I don't know -- maybe a half a dozen --

Q. Okay.

A. -- over the course of a year.

Q. And I think you told us in your deposition you've negotiated over a hundred oil and gas leases in your -- in your life.

A. I don't recall saying that but I -- over 33 years, that's probably true.

Q. Well, you said it would be purely a guess; but you said it would be right around a hundred -- over or a hundred, you said.

A. Well, that's probably right, yeah.

Q. All right. The point is you have a lot of

Q. Yes, sir.

A. Yes.

Q. All right. Now, your position is you told Mr. Lanoue that you wanted to get a plat to see where this -- where this well was going to be?

A. To see the location of the well and the property and that sort of thing.

Q. Did you mention to Mr. Lanoue anything about offset obligations in that phone call?

A. I don't know if we specifically talked about offset obligations. We talked about the location of the well; and I believe that was clear, that that was a potential issue.

Q. Well, you did not tell Mr. Lanoue that you were concerned about whether the well was going to be within 1,320 feet. You never said that specifically, did you?

A. I may not have. I was concerned with the location of the well; and once I could determine that, then I'd see if there was a concern.

Q. All right. You asked him for a plat?

A. Yes.

Q. And he sent you one by fax the next day?

A. Yes.

Q. And we've all seen the plat; and we're going to look at it again here in a minute, as well.

You wanted that plat for -- am I hearing you

say two reasons? No. 1, just to see what the unit was going to look like and, then, No. 2, to see where itself well was going to be in proximity to your tract?

A. Yes. Those were the two things I was basically interested in.

Q. Okay. You know Jimmy Broussard, don't you?

A. I've talked with Jimmy on the phone a few times. I've never met him personally face to face.

Q. You guys are cotenants, joint tenants, whatever, on a number of pieces of property or mineral interests; is that -- is that correct?

A. Yes. Our families have interests in various properties.

Q. Right. I think you said in your deposition there was some relationship back up the food chain with your grandfather and one of the Broussards. They did business together, something like that, right?

A. Right. They all knew each other.

Q. And that's how you and the Broussards have come to own property together?

A. As I understand it, yes.

Q. And you understand that Jimmy Broussard is -- is, I guess, kind of like you. He's the person that runs the Broussard oil and gas interests and things of that nature.

A. That's my impression.

ANITA L. BECKER, CSR, RPR, CRR

doesn't go to that intersection.

A.    Well, frankly I'm not so sure that you can't -- that it doesn't go to that intersection because the way those lines were drawn and what I had to look at, it looked very much like it could have.

Q.    Mr. Hooks, look at this.  This arrow for the surface location goes to right there (indicating).  Okay?  You with me there?

A.    Uh-huh, yes.

Q.    This box for the bottom hole location, the arrow goes right here (indicating), right underneath that "4".  You see that?

A.    Well, now I can see that.

Q.    All right.  How did you know where the bottom hole was when you got this?

A.    I knew it was approximately in that location based on that information and --

Q.    Well, Mr. Hooks "approximately" doesn't cut it when you're talking 180 feet.  If that bottom hole location's right there (indicating), you've got a problem.  If it's over here (indicating), you don't have a problem.

Didn't you want to know exactly where it was if you were really concerned about 1320?

A.    Well, as far as I could tell on what he had faxed me, that was -- that area was where the -- was the bottom hole

location; and that 1400 feet was the distance to it.

Q.    But this is what he faxed you, Mr. Hooks; and from looking at this, you can't tell where the bottom hole is.

But, yet, you didn't call him, did you, and ask him for some clarification?

A.    Well, I didn't think I needed any clarification.  It seemed clear to me that it was -- it was 1400 feet away from the bayou.

Q.    Well, there's a line over here that's 1400 feet away; but you can't tell where the well is, Mr. Hooks.  That's what's important, isn't it?

A.    To me, where that line went to and where that arrow appeared to go to were very close and it -- it -- I didn't have -- there was no confusion as far as I was concerned.

Q.    All right.  So, your testimony is that where this arrow is going, which is right here (indicating) underneath this "4", and where the bottom hole location actually was, at least for purposes of this map, are all in the same area and it was okay, it was ballpark, and it was close enough for government work, huh?

A.    From the fax that I got, which was not the size of this -- it was a small piece of paper -- it looked very much like that arrow was at that intersection where the bottom hole location supposedly is.

Q.    All right, Mr. Hooks.  Here's one just the same size

you got (tendering). You see the arrow going right under the "4" just like it is on the big one? It's even harder to see on that one, isn't it, Mr. Hooks?

A. Actually this is clearer to me because that line appears to continue across there and there's a little circle where that intersection is and that looks like that's where the bottom hole location would be and that's exactly what -- the way I interpret it.

Q. So, you don't think that arrow goes to the bottom of the "4"? You think it kicks over here (indicating)?

A. I think it's entirely -- that's the case.

Q. All right. I'm going to mark this --

A. That's the way I interpreted it.

Q. Is this (indicating) the map that you received?

A. What's the date on it? February 21.

I assume that it is, based on the dates.

Q. It sure looks like it, doesn't it? And the dates are the same.

A. February 21, 2001, that would be appear to be.

Q. All right. Thank you.

MR. CARRINGTON: I'm going to mark this Defendant's Exhibit 1. Judge, we offer this into evidence, Defendant's Exhibit 1.

MR. LOCHRIDGE: May I see it, please?

MR. CARRINGTON: Oh, I'm sorry (tendering).

MR. LOCHRIDGE: Might I ask the witness a question about this, your Honor?

THE COURT: Yes.

MR. CARRINGTON: And it did not have the red dot on it when you got it.

MR. LOCHRIDGE: That was my question.

MR. CARRINGTON: The red dot's me.

THE WITNESS: No, there was no red dot on it.

MR. LOCHRIDGE: Okay. So, this has got a red dot that wasn't on there when you got this map?

THE WITNESS: Correct.

MR. LOCHRIDGE: Well, your Honor, we don't -- we object to the red dot and any representation that that might be part of the map; but with that explanation we have no objection to this exhibit.

THE COURT: The jury will disregard the red dot. It's admitted.

MR. CARRINGTON: Disregard the red dot.

(Defendant's Exhibit No. 1 received)

Q. (BY MR. CARRINGTON) All right, Mr. Hooks. So, anyway, you concluded that wherever in there the bottom hole was that it was in a satisfactory location, right?

A. Yes. I -- I concluded that it was fourteen -- approximately 1400 feet west of Pine Island Bayou.

Q. Now, did it give you any concern that, even by this

map, it was a hundred feet different than what Mr. Lanoue had supposedly told you the day before?

A. Not really.

Q. So, now that we're within 80 feet, given that he's already missed it by a hundred feet, it didn't send off a -- a red light in your head, thinking, "Wow, this guy told me 1500 feet yesterday, which was close enough, and now he's missed it by a hundred feet. Now we're within 80 feet. What if he's missed it any more"?

That didn't trigger a question like that in your mind?

A. No. His comment was that he was approximately 1500 feet; and when I saw a surveyor's plat that shows 1400 feet, I assume that's more accurate than what his -- his verbal estimation was.

Q. What about the fact that it was 1400 feet plus or minus? What if 80 feet is the minus?

A. To me plus or minus means just a few feet, not a huge substantial amount.

Q. Well, you heard Ms. -- Ms. Foster's testimony and I -- and she was a little ambivalent but she seemed to think, ah, 1500 feet, 1400 feet, you know, it's not much difference, kind of like the plus or minus might go as far as a hundred feet.

A. That's not my -- that's not my assumption.

Q.   So, you weren't worried about that, huh?

A.   It didn't bother me particularly, no.  I assumed it was fairly close --

Q.   Okay.

A.   -- to 1400 feet.

Q.   All right.  Now, the final thing, I guess, that's curious on this map -- or this plat --

MR. CARRINGTON:  And if you guys would, do the same thing you did last time with the twin screens and blowing up the bottom.

THE TECHNICIAN:  (Complying).

MR. CARRINGTON:  There you go.

Q.   (BY MR. CARRINGTON)  Now, Mr. Hooks, on -- on this plat down at the bottom where it's in writing, whereas it's 1400 feet from your lease line up here, 1400 feet from the bayou, down here it says the bottom hole location is 14 heat [sic] -- 1400 feet from the east line of the unit, which is over there (indicating).

You understand that?

A.   I understand what it says.

Q.   Okay.

A.   Yes.

Q.   That would be a problem for that 1320 issue, wouldn't it?

A.   Not if it's -- not if it's the east line of the unit

before this acreage is added in. It's clear that it's 1400 feet from Pine Island Bayou.

Q. Did you have any other plats to look at from -- that would indicate previous unit designations?

A. I hadn't seen anything --

Q. No.

A. -- no.

Q. So, when you get this (indicating), this is all you're operating from, right?

A. Yes.

Q. And you've got -- aside from the ambiguities about where the -- where the well actually is, you've got something that's saying it's 1400 feet from your lease line, your property over here (indicating); and, then, you've got it written down here that it's 1400 feet from over here (indicating).

Doesn't that inconsistency give you at least enough pause, if you're really concerned about the 1320, to pick up the phone and call Mr. Lanoue and say, "I don't understand this. Why is it -- why is it different?"

A. Well, I didn't have any confusion about it. To me, it would indicate -- I knew our tract was not in any other unit and the east line of whatever unit there was couldn't have been any further east than Pine Island Bayou and, since the line ran from Pine Island Bayou west, it seemed to me that that was not

ANITA L. BECKER, CSR, RPR, CRR

a problem.

Q. Mr. Hooks, you've got a map that says two different things, one going over here (indicating), one going over there (indicating). You're concerned about 1320 and, so, you're just going -- you just assume that somehow it's all right with the world and that this is from some previous map that they just didn't change? Is that what you're telling us?

A. I'm telling you that there was no confusion in my mind. I assumed this was a proposed unit and that the reference, if I even saw that down there, was from the other unit, not from what they were proposing, because it was consistent with the arrow -- with the 1400 feet.

Q. Well, there's no way -- just to be absolutely sure, Mr. -- Mr. Hooks, there is no way that 1400 feet to this line (indicating) and 1400 feet to this line (indicating) are consistent. You'll give me that, won't you?

A. No.

Q. You think they're the same?

A. I didn't have any confusion about it. It's clear to me.

Q. Crystal clear?

A. Yes, or I would have inquired.

Q. And you never did, did you?

A. I had no reason to.

Q. You were very, very concerned about the 1320,

for you to get in on the unit?

A. Well, the way it was presented to me, it was the only way we'd have any economic benefit out of the situation.

Q. Right. And that's because the well was not drilled on -- on your property, correct?

A. Correct.

Q. And you were told that if you didn't join the unit that you wouldn't participate in the production, right?

A. Right.

Q. Now, your position is that -- that that was the case because it was outside of 1320 and no well on your property. So, if I don't join the unit, I don't get anything, right?

A. That's -- that's correct, yes.

Q. In reality -- in reality, Mr. Hooks, the reason you would have gotten nothing is because Samson would have released your property, isn't it?

A. I don't know that. They never talked about releasing it.

Q. Why in the world would they ever pay you compensatory royalties, Mr. Hooks, instead of just releasing your lease?

A. I don't know. That would be for Samson to decide.

Q. Exactly. Exactly. They had 60 percent already of the property, aside from yours, under lease in the unit, correct?

A. If they had all the rest of it leased, yes, approximately 60 percent.

Q. And if you did not join the unit and your property was released, your interest in the property was released, the portion that would have gone to you would have just stayed with Samson, wouldn't it?

A. I believe that's correct.

Q. And that's perfectly legal, isn't it?

A. Yes.

Q. They would not have been doing anything improper, illegal, or wrong by doing that, would they?

A. I suppose not.

Q. So, they had zero incentive, didn't they, Mr. Hooks, to feel compelled to do whatever it took to get you into the unit?

A. I don't know what their incentive is.

Q. Given that they had more money in their pocket without you going into the unit, would you agree with me that certainly is a counterincentive?

A. I -- if that were the case, it would appear to be.

Q. Now, since you have -- and setting aside the question of whether you're really even in the unit or not due to lack of complying with your own specific terms, you have been receiving the checks as you have been all along, right?

A. Yes.

Q.   And you said that you've been cashing them because you think, well, Samson owes me money anyway.  So, this will just be kind of a down payment or something like that.  Do you recall that?

A.   Well, yes, that would be -- I'd consider that part of what I was owed.

Q.   How long have you been cashing the checks under that pretense?  What did -- how long have you been cashing the checks thinking, well, Samson owes me money anyway so I'm going to keep cashing them?

A.   Well, once I became aware that there were some issues here associated with this situation that I didn't know about.

Q.   Once you realized that you shouldn't have been so happy with that $2 1/2 million you'd been paid, then you decided that in the future it was going to be payments against what they really owed you?

A.   I just saw no reason not to continue to take the checks, that whatever they may owe me in the future, that would certainly apply to that.

Q.   Now, Mr. Hooks, there are two other wells in this unit, aren't there?

A.   I believe so.

Q.   I'll just hold this up briefly (complying).  Here's the BSM-1 that we've been talking about; and here's 2 and 3,

it, you know.  I wasn't even -- I was just addressing why I hadn't done it, you know, in a timely fashion.  That's what that was about.

Q.  It was a condition you put into the letter agreement, and then you were going to be able to be the one that decided whether you really had to do it or not?

A.  No.  I intended to do it.

Q.  But then you decided you just weren't going to do it, right?

A.  Only after the conversation with Ms. McGhee that that wasn't necessary to do it.  So, we agreed that we'd just not do it.

Q.  Which, of course, we both know -- although you say it's only possible -- really has no effect on a written agreement involving oil and gas.

A.  I did agree in writing to join the unit, but it was subject to further documentation.

Q.  And that documentation, of course, never occurred, right?

A.  Yes, that's correct.

Q.  All right.  You...

Now, once -- I guess it was in the fall of 2006 when you and Mr. Simpson ran into each other up at the Houston Club, right?

A.  Yes.

Q.    And that's the first time that you -- or sometime thereafter -- and I don't know if it was that day or when -- but at some point then you became, you know, unhappy and felt like you had been defrauded, right?

A.    After some further information came to light that that was apparently the situation.

Q.    After that happened, did you pick up the phone and call your acquaintance, if not a friend, Jimmy Broussard and say, "Jimmy, man, look what I found out.  I got snookered on this thing.  What about you?  Did you get tricked?  You're in the same situation"?

Did you do that to see whether the other folks on the property had gotten hoodwinked?

A.    I don't recall that.

Q.    Why do you think that Samson picked on you?  Why do you think you're the only one that got tricked?

A.    I don't know.  I may not be the only one.

Q.    Well, has anyone else ever told you they got tricked?

A.    No.

Q.    Now, there was a little bit of testimony -- there's been some talk about this DuJay 1 well.  You know where that is, don't you, Mr. Hooks?

A.    I think I do.

Q.    Let's just put this up here just long enough for

Q. All right. Because there is another unit up there -- and here it is on this board (indicating).

There is a DuJay unit of which you are a participant, correct?

A. Yes.

Q. Now, we don't -- here's the DuJay 1 (indicating).

And you're in this unit up here (indicating), right? You're receiving money on the DuJay 1, aren't you?

A. Yes.

Q. All right. Now, nobody tricked you into -- or nobody did anything to deceive you or defraud you with respect to the DuJay 1 well, did they?

A. Not that I'm aware of.

Q. Well, you never talked to Mr. Lanoue about it. Nobody ever sent you anything that you say is fraudulent. With respect to the DuJay 1 nobody did anything -- or from Samson, anyway, nobody did anything to trick you or hoodwink you or defraud you or something with respect to the DuJay 1, right?

A. Not that I'm aware of, no.

Q. Okay.

MR. CARRINGTON: Your Honor, we'll pass the witness.

THE COURT: Let's take about a ten-minute break.

(Recess)

Q.    It'd be a well just of your own on your property?

A.    It would be a well on our property.

Q.    You said several times that you weren't the least bit confused about this map when it was sent to you by Mr. Lanoue. Now, tell us again why that map didn't confuse you in light of the conversation you had with Mr. Lanoue.

A.    He commented that the well was located about 1500 feet west of Pine Island Bayou, that being west of our property. The plat indicates that the -- that the bottom hole location, which is what we were talking about, is about 1400 feet west, which was, I considered, consistent with what he was saying. I assumed that he was just estimating and -- verbally, but the plat would be more accurate.

Q.    Fair enough.

Did you have any reason whatsoever to suspect that Mr. Lanoue, calling you on behalf of Samson, was attempting to mislead you?

A.    No, not at all.

Q.    And --

MR. LOCHRIDGE:  I just have one thing further, your Honor, as a matter of clean-up.

Q.    (BY MR. LOCHRIDGE)  We had talked yesterday about the provision in the lease where they are to pay your ad valorem taxes.

A.    Yes.

enable us to know that that's what Mr. Lanoue was trying to do, to deceive you, as opposed to give you a map that had some mistakes?

A. I -- no, I have no knowledge of -- of that, no.

Q. Okay. Now, Mr. Lochridge brings up an excellent point. If this number down here (indicating) is correct, 1400 feet from the east line of the unit, that well -- I think Ms. Foster said it wouldn't be on your property. It would be close; but, as he said, if you're just eyeballing it, it could be -- it could be on your property.

Isn't that -- doesn't that make it even more important that you'd want to get that clarified just in case Samson had made a mistake and it's actually on your property? Wouldn't you want that clarified?

A. Well, it was clear to me from what Mr. Lanoue said that the well was not on the property, it was 1500 feet west of our property, and that this was not inconsistent with what he said.

Q. But when you get a plat that potentially says something completely different, that didn't bother you?

A. I don't find that problem in it.

Q. Do you know the difference between a scaled map and a surveyed map?

A. I'm not sure I could give you a technical definition.

Q. But you know that when a distance indicates that it's scaled, that that means it's not surveyed. It's been done with a scale. It's been mapped off on a plot -- on a plat with a scale and a ruler, correct?

A. That would make sense.

Q. Which, of course, leaves room for inaccuracies anytime you're using a ruler and trying to do something by scale based on the scale of the map, correct?

A. There would probably be some room for some error.

Q. And those numbers, as they indicate on that plat, are scaled, aren't they?

A. Yes.

Q. Now, I never implied -- or never said that you never talked to Ms. McGhee or told you talked to Ms. McGhee; but is there anywhere in your deposition, Mr. Hooks, where you said that, when you talked to Ms. McGhee, "I told her that we didn't need that lease agreement after all"?

A. I don't recall that.

Q. But you were asked on multiple occasions, at least two or three occasions in your deposition, "Why didn't you ever complete the amended lease agreement?" You were asked those questions, weren't you?

A. Yes.

Q. And never once in response to that question did you say, "Well, when I talked to Ms. McGhee, we agreed we didn't

Q. Did Mr. Lanoue report to the team periodically about his progress with getting the unit formed and getting consents and things of that nature?

A. I imagine he did. That was eight years ago. That would have been standard operating procedure. I can't remember exactly from eight years ago.

Q. Would you remember if during the discussion of those team meetings that Mr. Lanoue mentioned to you that, "Hey, we need to trick this guy because we need to get him into the unit"? Would you remember that?                    10:40:47

A. That would have been one of those "fall out of the seat" moments that, yeah, you wouldn't forget that 'cause you've got to know Glenn. Glenn's as honest as the day is long. That wouldn't have happened; and I would have remembered it, yeah.

Q. What -- if Mr. Hooks had declined to participate in the unit, what would Samson have done --

A. Well --

Q. -- with his tract, with his lease?

A. Sure. Obviously we would have released that 50                    10:41:15 acres.

Q. But why is that? Why would you have done that?

A. Well, that's kind of why it's so flabbergasting to hear Mr. Hooks claim that, you know, he would have opted out of the unit. If we'd have released it or he'd

have opted out of the unit, then all that money that we paid him, we would have got.  It makes no sense.

Q.  Was there any motive whatsoever to trick Mr. Hooks or defraud Mr. Hooks into staying in the unit or joining the unit?

A.  No.  As Mr. Hooks himself said, there was kind of a counter motive, you know.  It makes the opposite sense.  If anything, if he'd have claimed that we tried to trick him out of joining unit so we could have kept his money.  Now, that makes sense because we would have gotten more money.  To claim that we tried to trick him into the unit makes zero sense.

Q.  Did you need to keep his lease in order to recover the gas that was underneath his tract?

A.  No.  We had the Broussard interest lease.  The Broussards had agreed to the unit.  That's all we needed.

Q.  Well, frankly, Mr. Beale, did you even need the Broussard's lease to drain or to extract the minerals that might have been captured from coming under their land?

A.  No.  I mean we could have just excluded that acreage entirely and just drilled the well and formed the unit differently.  Then he didn't have to be in the unit at all.

and so forth.  My question to you is:  Was there ever a big secret that this well was intended to be within 1,320 feet of Mr. Hooks' tract?

A.  I don't see how it could be a big secret when you're turning in a plat that says that to the Railroad Commission.

Q.  Now, you have seen introduced into evidence a lease renewal and extension for 590 acres.  You recall that?

A.  Sure.                                                    10:44:38

Q.  Mr. Hooks' tract is 640 and then the 50 had been participated in the unit?

A.  Right.

Q.  Samson took out a lease extension and renewal on the remaining 590 acres?

A.  Sure.

Q.  Why did you do that?

A.  Well, we had a active exploration program going in the area.  It's just standard policy to keep your lease position intact while you're still active in the      10:45:03 area.  There's no reason not to.  It's small dollars. That's what we're in the business for.

Q.  Did that -- does that other 590-acre tract and the renewal and extension you got on it have anything to do with the BSM-1 well or the DuJay 1 well?

A.   Absolutely nothing.

Q.   Why is that?

A.   Well, it's across a fault.  We included in the unit the acreage that we felt was part of the -- you know, what we were producing out of and then there's a fault and then there's the other 590 acres which was just completely different, had nothing to do with it.

Q.   So, could -- had you released Mr. Hooks' 50 acres, if he didn't want to join the unit, could you have kept the 590 acres, extended that and renewed that?          10:45:54

A.   Yeah, could have, would have -- we did -- whether he joined the unit or not.

Q.   Did Simpson -- excuse me -- Samson have any incentive to agree to pay compensatory royalties to Mr. Hooks?  Would there have been any -- any scenario that under the conditions that we know existed that would have caused Samson to pay him compensatory royalties rather than release?

A.   Well, let me think.  If we release it, we get a bunch of money.  If we pay compensatory royalties, we've          10:46:26 got to pay out a bunch of money.  No, there's no reason to do that, absolutely none.  We'd have just released it.  We'd have made more money.  End of story.

Q.   Now, Mr. Beale, at the outset of this -- this examination, we talked about how you felt about being

A. Yes.

Q. Now, we also know from what we've seen that in November of 2001 -- which we'll go to Exhibit 71 -- the lawyer -- this is November of 2001 -- the lawyer sends to Mr. Lanoue another amended plat. And this one -- or amended designation.

And this one has an accurate plat on it. Do you recall that?

A. I recall that I think the final amendment had the right plat.

Q. Right. And that Mr. Lanoue had that in November of 2001, correct?

A. Makes sense.

Q. And we also know --

MR. LOCHRIDGE: -- if you would put Plaintiffs' 19 up there --

Q. (By Mr. Lochridge) -- that it doesn't get filed until some 14 months later in early 2003, correct?

A. Right.

Q. So, it's not until then that if Mr. Hooks had any reason to suspect he had been misled that he could actually find some accurate information, correct?

A. No, I don't think that is correct. I think there was a correct plat out there at the Railroad Commission, wasn't there?

here. Yet, I heard testimony today that the bottom hole location is supposed to be 1400 feet, which is over here (indicating). So, those two things don't go around. I mean, just by looking at the plat those two things don't match. And then if you go to the Railroad Commission records that were available at this time, the actual bottom hole location is way over here.

Then, in addition, the plat says the bottom hole location is 1400 feet from the east unit line. Well, the east unit line is this point right here, which would be 1400 feet this way. So, if you just simply look at this plat in any detail you just see that it has severe problems.

Q. Let's talk about -- you can sit back down -- well, keep standing because you're probably gonna point at the map.

What is the significance of the distance being marked as 1400 feet plus or minus scale? And could you point to that over there?

A. Right here (indicating).

Q. Yes, sir. What does 1400 plus or minus scale mean?

A. Well, scale means that somebody used a ruler to do it, as opposed to surveying it.

Q. Okay. So, a surveyor didn't go survey 1400 feet.

Somebody took out a ruler on a map with a scale and measured 1400 feet?

A.    That's my interpretation.

Q.    Okay.  How would that possibly affect the accuracy of this plat?

A.    Well, it's -- the 1400 feet doesn't go to any known point that I'm aware of that's relevant or material here, because it doesn't go to the bottom hole location even shown on this map.  It doesn't go to the bottom hole location that's in the commission records at this time, been in the records about six months at this time.  So, it just sort of goes to an irrelevant point.

Q..    Okay.  Well, how much faith would you put in on a -- you've got a copy of it in your hand, don't you?

A.    Yes, sir.

Q.    How -- is it difficult to accurately scale on a map like that?

A.    Well, I mean, it's -- if you look at this scale, sure, it's subject to some error.

Q.    What is the scale on that map, the one in your hand?

A.    The one in my hand says an inch to 2000 feet.

Q.    Okay.  So, on that plat 1 inch is supposed to equal 2000 feet, correct?

A.    Right.  So, every single nick on this is about